**From:** Molly A. Burrows Schumacher (staff)
**Sent:** Wednesday, February 10, 2021 10:42 AM
**To:** Rachael N. Swift <Rachael.Swift@loras.edu>
**Subject:** RE: Following Up on 9/6/20 Report

Hi Rachael,

Thank you so much for your reply and willingness to participate in the hearing. The next communication you will receive related to the hearing will come from Kelsey Callahan, Assistant Director of Student Life, via email to discuss the hearing process with you and answer any questions you might have about the process prior to the hearing. Please don't hesitate to let me know if you have any questions in the interim.

Thank you,

Molly

Molly Burrows Schumacher
*Assistant Dean of Students*
LORAS COLLEGE
1450 Alta Vista St
Dubuque, IA 52001
molly.burrowsschumacher@loras.edu
BE MORE. BE LORAS.

**From:** Rachael N. Swift <Rachael.Swift@loras.edu>
**Sent:** Wednesday, February 10, 2021 8:06 AM
**To:** Molly A. Burrows Schumacher (staff) <Molly.BurrowsSchumacher@loras.edu>
**Subject:** Re: Following Up on 9/6/20 Report

I would like to be apart of the hearing.

Rachael Swift
Sent from my iPhone

On Feb 2, 2021, at 2:43 PM, Molly A. Burrows Schumacher (staff) <Molly.BurrowsSchumacher@loras.edu> wrote:

Dear Rachael,

I hope this message finds you well. I'm following up on an email sent to your Loras email on January 26, 2021, inviting you to share any additional or new information you might have regarding the report filed on 9/6/20, and to invite your participation in the college hearing board process. If you would like to provide additional information or participate in the college hearing board process, please reply by Wednesday, February 10. A copy of the original email is included below for your convenience.

Thank you,

Molly

Molly Burrows Schumacher
*Assistant Dean of Students*
LORAS COLLEGE
1450 Alta Vista St
Dubuque, IA 52001
molly.burrowsschumacher@loras.edu

LORAS 0750

## Troy M. Wright

**From:** Troy M. Wright
**Sent:** Tuesday, March 16, 2021 10:51 PM
**To:** Rachael N. Swift; Nancy Z. Fett
**Subject:** RE: Meeting

Hello Rachael,

Given the very short notice, Nancy and I were unable to meet with you due to prior commitments.

Regards,

Troy

Troy M. Wright SHRM-SCP, MBA '15
Director of Human Resources
LORAS COLLEGE

-----Original Message-----
From: Rachael N. Swift
Sent: Monday, March 15, 2021 12:33 PM
To: Troy M. Wright <Troy.Wright@loras.edu>; Nancy Z. Fett <Nancy.Fett@loras.edu>
Subject: Meeting

Hello Troy and Nancy,

I will be coming on campus later today for the hearing against Kyle Hall. I think it would be best if we could set up a meeting between us later today. The hearing is at 3:30. So, anytime around then.

Rachael Swift

Sent from my iPhone

- sent email to Rachael
on 2/9/21

- left voicemail on Rachael's
cell phone on 2/17/21

1

LORAS 0746

**Troy M. Wright**

| | |
|---|---|
| **From:** | Rachael N. Swift |
| **Sent:** | Thursday, February 25, 2021 7:30 PM |
| **To:** | Troy M. Wright |
| **Subject:** | RE: Investigation Regarding the Discrimination Claim Filed on September 14, 2020 |

Hello Troy,

Thank you for reaching out to me. I appreciate someone at the College finally addressing some of my issues, concerns and complaint.
My complaint was originally filed in September 2020 and it is now almost March 2021. What has the school done over the last approximate six months? As my mom and I told President Collins, if the College had taken my complaint seriously when it was filed then the break in of at least three female apartments could have possibly been avoided. Please let me know what the College has done since September 2020 and why the College is now reaching out to me.

I want to make sure that the College understands my complaint. I originally filed a Title IX complaint in September 2020 because I believe that the College was treating me differently based on my gender. Specifically, I felt that the College treated me as "hysterical woman" that was overreacting. I believe that if I was a man, the College would have taken me more seriously and would have responded differently. I also believe that my apartment was broken into because I am a woman and that the perpetrator (Kyle Hall) was motivated by sexual or gender based desires.

As we proceed with this process, I will be happy to answer any questions you may have. I noticed that you are the College's Human Resources Director. As the HR Director, what is your role in this process?

With respect to your inquiries:

- The school security officer never said nor did what was listed in your email. The security officer only said that I could contact security for an escort if it was dark and I felt worried about going to my car or going a friend's apartment. I was on the phone with my mother during the time he was in my apartment and she heard the exact same thing.
- My position is that the College's response was discriminatory based upon the fact that the College did not believe my claim because I am woman. The College never took my complaint or my requests seriously. The College attempted to claim the sexual assault by this person did not occur and otherwise downplayed my concerns and fears. The College also tried to downplay the intrusion and assault as just someone in the wrong apartment. The College treated me as a "hysterical female" that was too dumb or too emotional to know what was going on. The break in was not an attempt to steal; the break in was sexually motivated. This has been a devasting and damaging assault for me and the College did not take it seriously. The College's attempt to ignore the break in and assault and there attempt to make me believe this assault did not happen is unacceptable, shameful and disgusting.

Thank you,
Rachael Swift

1

LORAS 0555

## Statement of Limitations

No student shall be subject to disciplinary procedures due to alleged violation(s) of College policies unless procedures are initiated within one year from the time the alleged misconduct occurred or was made known to the Dean of Students Office, whichever occurs later. This limitation will apply only when the student is enrolled at Loras College.

## Hearing Officers

Area Coordinators may serve as the initial hearing officers authorized to deal with incidents contrary to College or residence hall policy. Area Coordinators may dispense sanctions, impose disciplinary measures and recommend suspension/expulsion from the College.

The Assistant Dean of Students and her/his designee may initially hear cases pertaining to violations of policy in Residence Life. Review of Area Coordinator sanctions will be heard by a representative from Student Life or Residence Life. Typically, policy infractions and incidents contrary to College policy are handled initially within the context in which they occur. Incidents that occur off campus may initially be heard by the Student Life Office.

## College Hearing Board

In the event of an incident involving possible sanction of suspension or expulsion, the incident will be considered by the College Hearing Board. This board is chaired by the Associate Dean of Students or his/her designee and includes appointed representatives from the Loras College community: two students, two faculty members and two staff members. These appointed individuals, approved by the Dean of Students, are the voting members of the Hearing Board. The chairperson may vote in the event of a tie. A secretary will be appointed to take minutes of the proceedings; however, recording devices are not permitted during the hearing or any preparation meeting. In some instances, at the discretion of the Dean of Students or his/her designee, a formal administrative hearing may be held due to the nature of the complaint or infraction of College policy. In instances of Title IX hearings, as indicated in Questions and Answers on Title IX Regulations on Sexual Harassment July 2021, rules of decorum may be established for hearing boards, and will be shared with participants at the time of the hearing.

Due to the extensive documentation required to prepare a case for the college hearing board, respondents who are referred to the college hearing board will be charged a $50.00 administrative fee. This fee will be refunded in the event the respondent is found not responsible for any allegations.

### Procedures

The respondent will be advised of the specific charges being brought against him/her in advance of the hearing. If the board proceedings involve a complainant other than the college, the complainant also has the right to a prehearing notification meeting. If the student does not appear at the established hearing time, the case shall be heard without the student being present.

During the course of the hearing, the respondent will be allowed to respond to any alleged violations presented, ask questions of the complainant and/or witnesses and present a summary of the case. Please note that per the United States Office of Civil Rights in hearings related to any type of sex discrimination, the complainant and the respondent are not to personally question or directly cross-examine each other during the hearing, as allowing so may be traumatic or intimidating for the complainant, thereby possibly escalating or perpetuating a hostile environment.

LORAS 0054

After the hearing has been completed, the board (or administrator) will retire to closed session to determine if the respondent is responsible or not for the policy infraction. If the student is found responsible, the board (or administrator) will determine an appropriate sanction and the date of its implementation. The decision of the board will be presented in writing to the respondent as soon as possible. Under applicable Clery Law and Title IX Law, in instances involving violent crime or any type of sexual misconduct, the complainant will also be notified in writing, and simultaneously, of the outcome of the hearing in the manner described as appropriate under these laws. If the student is suspended or expelled, the date of implementation is the date of the board or administrator decision, and such date is non-negotiable. The decision of the College Hearing Board (or administrator) will be effective immediately unless a timely petition to review has been filed. Please note, in the event of a hearing for any type of sexual misconduct, Title IX Law requires the incident related to the sex discrimination be heard independent from any other code of conduct violation allegations.

Per Title IX regulations on sexual harassment, cases of this nature are required to provide for a live hearing with the opportunity for cross-examination to be conducted by each party's advisor of choice. In the event a party does not have an advisor to assist with cross-examination, the College will provide an advisor to assist. A live hearing may occur virtually, with parties to simultaneously see and hear the party or witness answering questions. Any party may request the entire hearing including cross-examination be held virtually, and the College must grant that request. The party does not need to provide a reason for this request.

If a party or witness does not submit to cross examination, the individual's statements cannot be relied on by the hearing board in determining whether the respondent engaged in the alleged harassing event (even if the individual is unable to participate in the hearing due to death or disability). Police reports, medical reports, and other documents and records may not be relied on to the extent that they contain the statements of a party or witness who has not submitted to cross examination. The hearing board may consider certain types of statements where the statement itself is the alleged harassment, even if the party does not submit to cross-examination. For example, a text, email, or recording sent by a party is permissible even if there is no cross examination. In these situations, the hearing board is evaluating whether the statement was made or sent. If a party or witness submits to cross examination but does not answer a question posed by the hearing board, the hearing board may still rely on that party's statement.

**Hearing Board Advocates**

Both the respondent and complainants may have an advocate (faculty, staff or peer) present at the hearing or appear without the assistance of an advocate. In the event that the hearing board is held to address a Title IX violation that involves sexual misconduct, respondents and complainants may choose any individual, including legal counsel to serve in the advocate role; however, the advocate must act within the described role of the advocate as listed below. The identity of attending advocate must be submitted to the Associate Dean of Students or his/her designee 48 hours prior to the hearing.

**The advocate may:**

- Advise the student on the preparation and presentation of the case and/or;
- Accompany the student to the hearing(s)

**The advocate may not:**

- Present the case or summary of the case for the student;
- Directly address the college hearing board

LORAS 0055

APP. 268

**Review of College Hearing Board Decisions**

Review of a decision of the College Hearing Board may be petitioned by a respondent who has been suspended or expelled. Under Title IX law, in the instance of any type of sexual misconduct, a petition for review may also be filed by a complainant. The written petition for review must be written and prepared by the student, and filed in the Dean of Students' Office within three business days of notification of suspension or expulsion, and must also include reasons for the request and the factual information to substantiate those reasons. The request for review must be based on one of the following:

- The student believes the College Hearing Board decision was flawed procedurally.
- Loras College Student Handbook policy was not applied correctly.
- New information not available at the time of the College Hearing Board meeting is now available, which could alter the outcome of the case.

The request for review will be considered by a Review Board, appointed by the Dean of Students and consist of one faculty member, one staff member and one student. If the Review Board determines there is valid basis for review, a review hearing will be scheduled. Following the review hearing, the Dean of Students or his/her designee shall recommend a course of action to be taken. The recommendation may include:

- Affirm the decision of the College Hearing Board.
- Remand the case to the College Hearing Board with instructions for a rehearing.
- Modify the sanction(s) imposed by the College Hearing Board.
- Reject the decision of the College Hearing Board and dismiss the complaint.
- The decision of the Dean of Students or his/her designee is final.

**Hearing Board Witness**

Both the complainant and respondents may also have witnesses available to be brought in during the hearing. The Associate Dean of Students or his/her designee needs to be notified 48 hours in advance of the identity of any witnesses asked to attend the hearing. Both complainant and respondent may bring incident witnesses. An incident witnesses is someone who is present with the questioned behavior occurred. Neither the complainant or respondent may bring character witnesses to the hearing; however, both the complainant and the respondent may provide two letters of character to be submitted to the college hearing board as a part of the hearing process. Letters of character should be submitted in advance to the Associate Dean of Students and/or her designee.

**Evidentiary Standards for Non-Academic Misconduct**

The standard of evidence used by the College is preponderance of evidence, or a determination that it is "more likely than not" a violation has occurred. Hearsay evidence and personal testimony may be considered.

**Requests for Accommodations**

In all cases of alleged non-academic misconduct, requests for accommodations should be made to the Associate Dean of Students or his/her designee.

LORAS 0056

# Kelsey D. Callahan

| | |
|---|---|
| **From:** | Kelsey D. Callahan |
| **Sent:** | Thursday, February 18, 2021 1:16 PM |
| **To:** | Rachael N. Swift |
| **Subject:** | Incident Witness |

Hi Rachael,

Campus Safety indicated that you had requested to participate in the Hearing Board regarding the event that took place in your apartment on September 6th, 2020. The Hearing Board Date has been set for **Tuesday, March 2nd at 3:30 PM**. If you are still interested in participating, please send me some meeting times that would work best for you tomorrow and next week so I can walk you through your role in the process. I am happy to meet in person or via Zoom, whichever you are more comfortable with.

I look forward to hearing from you!

Best,
Kelsey

**Kelsey Callahan '16**
*Assistant Director of Student Life*
*Pronouns: she/her*
LORAS COLLEGE
1450 Alta Vista St
Dubuque, IA 52001
O:563.588.7731
Kelsey.Callahan@loras.edu

1

LORAS 0752

LORAS 0753

APP. 263

**Kelsey D. Callahan**

| From: | Kelsey D. Callahan |
|---|---|
| Sent: | Friday, February 26, 2021 2:01 PM |
| To: | Rachael N. Swift |
| Subject: | RE: Incident Witness |

Hello Rachael,

Thank you so much for your reply. The hearing is scheduled to take place on March 2 at 3:30 pm, as indicated in my email to you on February 18th. In your email last evening, you indicated that you thought that it was to take place on March 3.

In your message, you reference being listed as an interested party in the upcoming hearing process. Please know that in the non-academic disciplinary proceeding against Kyle Hall, you are listed as a complainant. Please keep in mind also that the upcoming hearing will focus on the accusations against Kyle Hall and not on your accusations against Loras College.

Kim Walsh is the person who will be presenting the evidence and questioning witnesses on behalf of the college. Thus, she could be regarded as the "point person" for purposes of the upcoming hearing. Should you wish to speak to her, she can be reached at Kimberly.Walsh@loras.edu or 563.588.7417.

Please send me some meeting times that would work best for you between now and March 2 so I can answer whatever remaining questions you might have regarding the hearing against Kyle Hall. I am happy to meet in person or via Zoom, whichever you are more comfortable with.

Thank you,

Kelsey

**Kelsey Callahan '16**
*Assistant Director of Student Life*
*Pronouns: she/her*
O:563.588.7731
Kelsey.Callahan@loras.edu

From: Rachael N. Swift
Sent: Thursday, February 25, 2021 7:32 PM
To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
Subject: RE: Incident Witness

Hello Kelsey,

- Please explain the purpose of the March 3rd meeting. The email references the Public Safety department, yet I have had no interaction with Public Safety since the break in and assault. I am referenced as an interested party, yet I am the complainant and would like it to be noted as such.

1

LORAS 0754

Since the break in and assault in September I requested basic safety measures that I wanted the school to perform to both identify who broke in and assaulted me and to stop him form doing it again. Those safety measures were not done and the result was at least four additional break in and assaults. One of the items requested was to send an email to the student population and at least the apartment building occupants to inform them of the break in and assault and request any information from the residents or to be cautious moving forward. The College's response was "we did not want to alarm anyone". The College put their "image" before the safety of the students. Adequate locks were not installed, cameras were not installed at all entrances, doors are not adequate to minimize or alert security of door "propping", added security was not in place, panic buttons were deemed too expensive for the benefit. Safety was not made a priority.

How did he get in the building on numerous occasions? I requested a physical inventory of all master keys. Did he ever have employment within the College where he may have access to private information? Was Kyle Hall the individual that was on the key fob report?

With admission and evidence that Kyle Hall committed these crimes and he was added to the Title IV complaint how did the College proceed to provide him with a diploma? What actions are the College going to take against Kyle Hall moving forward. You have allowed an individual that committed sexual assault to receive his degree and teach young children.

Who is the point person on my complaint moving forward?

Thank you,
Rachael Swift

From: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
Sent: Thursday, February 18, 2021 1:16 PM
To: Rachael N. Swift <Rachael.Swift@loras.edu>
Subject: Incident Witness

Hi Rachael,
Campus Safety indicated that you had requested to participate in the Hearing Board regarding the event that took place in your apartment on September 6th, 2020. The Hearing Board Date has been set for **Tuesday, March 2nd at 3:30 PM**. If you are still interested in participating, please send me some meeting times that would work best for you tomorrow and next week so I can walk you through your role in the process. I am happy to meet in person or via Zoom, whichever you are more comfortable with.

I look forward to hearing from you!

Best,
Kelsey

**Kelsey Callahan '16**
*Assistant Director of Student Life*
*Pronouns: she/her*
LORAS COLLEGE
1450 Alta Vista St
Dubuque, IA 52001
O:563.588.7731
Kelsey.Callahan@loras.edu

2

LORAS 0755

# Kelsey D. Callahan

| | |
|---|---|
| **From:** | Kelsey D. Callahan |
| **Sent:** | Thursday, March 11, 2021 9:30 PM |
| **To:** | Rachael N. Swift |
| **Subject:** | Re: Meeting |

Hi Rachael,
I would be able to meet <u>4:30-5 tomorrow</u>. As mentioned in my email on March 1st, the rescheduled Hearing Board will take place <u>on March 15th.</u>

During our meeting, I would be discussing your opportunity to participate in the Hearing Board <u>on March 15th</u> as a complainant in the case. You would be able to make a statement regarding the incident that took place at your apartment. You would have three different options: attend in person to make your statement, submit your statement to me that I will read to the Hearing Board if you can't or don't feel comfortable attending in person, or not participate.

If this is something you are still interested in, I am happy to meet with you tomorrow.

Kelsey Callahan

> On Mar 11, 2021, at 7:20 PM, Rachael N. Swift <Rachael.Swift@loras.edu> wrote:
>
> Hello Kelsey,
>
> I can meet tomorrow after 4:30 or next week Monday after 5:30 or Tuesday after 4:30. Let me know if any of these times work. Also can you give me a brief summary on what we will be talking about?
>
>
> Thank you,
> Rachael Swift
>
> -----Original Message-----
> From: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
> Sent: Thursday, March 11, 2021 12:59 PM
> To: Rachael N. Swift <Rachael.Swift@loras.edu>
> Subject: RE: Meeting
>
> Hi Rachael,
> Checking in again to see if you wanted to get something scheduled. I am happy to meet with you!
>
> All my best,
> Kelsey
>
> Kelsey Callahan '16
> Assistant Director of Student Life
> Pronouns: she/her
> O:563.588.7731

1

LORAS 0756

Kelsey.Callahan@loras.edu

-----Original Message-----
From: Kelsey D. Callahan
Sent: Monday, March 1, 2021 10:27 AM
To: Rachael N. Swift <Rachael.Swift@loras.edu>
Subject: RE: Meeting

Hi Rachael,
Thank you for getting back to me. For reasons beyond our control, we have rescheduled the Hearing Board for Monday, March 15th. If you could send me times that work for you the remainder of this week or next week, I would be happy to set up a Zoom meeting for us.

I hope you are enjoying your Student Teaching experience! I look forward to hearing back from you. Have a great Monday!

All my best,
Kelsey

Kelsey Callahan '16
Assistant Director of Student Life
Pronouns: she/her
O:563.588.7731
Kelsey.Callahan@loras.edu

-----Original Message-----
From: Rachael N. Swift
Sent: Monday, March 1, 2021 9:49 AM
To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
Subject: Meeting

Hello Kelsey,


I can meet today from 12:00-1:00 or after 5:30. I'm student teaching during the day and have a night class, so those are my only times. It will also have to be over zoom since I haven't returned to campus. My mom will also be joining the meeting.

Thank you,
Rachael

Sent from my iPhone

**Kelsey D. Callahan**

| | |
|---|---|
| **From:** | Kelsey D. Callahan |
| **Sent:** | Saturday, March 13, 2021 1:02 PM |
| **To:** | Rachael N. Swift |
| **Subject:** | RE: Meeting |

Hi Rachael,

I have answers for you below following our meeting yesterday.

You may submit your statement in writing and/or recorded. Keep in mind that the hearing will take place on Monday, commencing at 3:30 PM. You can send your statement or recording to me. If you believe that there is something inaccurate in the materials that you have reviewed, please identify the inaccuracy and offer your correction in your statement.

The Title IX investigation is being handled by Troy Wright, the Director of Human Resources. His contact information is below:

Troy M. Wright SHRM-SCP, MBA '15
Director of Human Resources
LORAS COLLEGE
1450 Alta Vista St
Dubuque, IA 52001
563.588.7816 - P
563.588.7101 - F
troy.wright@loras.edu

All my best,
Kelsey

**Kelsey Callahan '16**
*Assistant Director of Student Life*
*Pronouns: she/her*
O:563.588.7731
Kelsey.Callahan@loras.edu

**From:** Kelsey D. Callahan
**Sent:** Friday, March 12, 2021 4:30 PM
**To:** Rachael N. Swift <Rachael.Swift@loras.edu>
**Subject:** RE: Meeting

Great, thank you. See you soon!

**Kelsey Callahan '16**
*Assistant Director of Student Life*
*Pronouns: she/her*
O:563.588.7731
Kelsey.Callahan@loras.edu

1

LORAS 0758

**From:** Rachael N. Swift
**Sent:** Friday, March 12, 2021 4:29 PM
**To:** Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
**Subject:** Re: Meeting

Then I will be my mom and I. I will fill out the form.

Sent from my iPhone

> On Mar 12, 2021, at 4:20 PM, Kelsey D. Callahan <Kelsey.Callahan@loras.edu> wrote:
>
> Hi Rachael,
> Additionally, if you plan to have your mom attend with you please fill out the FERPA Release Form. Here is the LINK to do so.
>
> All my best,
> Kelsey
>
> **Kelsey Callahan '16**
> *Assistant Director of Student Life*
> *Pronouns: she/her*
> 0:563.588.7731
> Kelsey.Callahan@loras.edu
>
> **From:** Kelsey D. Callahan
> **Sent:** Friday, March 12, 2021 4:16 PM
> **To:** Rachael N. Swift <Rachael.Swift@loras.edu>
> **Subject:** RE: Meeting
>
> Hi Rachael,
> Thank you for your response. The upcoming Hearing Board on Monday, hearing for Kyle Hall, is not a Title IX Hearing Board. Therefore, lawyers are not part of the process for the complainant nor the respondent. Therefore, your lawyer, Brad, should not be a part of our meeting at 4:30. If your lawyer has a concern about this, he can contact Loras' attorney. It is my understanding that he has that information.
>
> Below is the link for the Zoom meeting at 4:30. Please let me know ASAP if you will not be attending.
>
> Join Zoom Meeting
> https://zoom.us/j/92506814748
>
> Best,
> Kelsey
>
> **Kelsey Callahan '16**
> *Assistant Director of Student Life*
> *Pronouns: she/her*
> 0:563.588.7731
> Kelsey.Callahan@loras.edu

2

LORAS 0759

**From:** Rachael N. Swift
**Sent:** Friday, March 12, 2021 3:59 PM
**To:** Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
**Subject:** RE: Meeting

Kelsey,

My mom, Elaine and my lawyer, Brad will be joining me as my advocate for the meeting and the case.

Rachael


**From:** Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
**Sent:** Friday, March 12, 2021 3:48 PM
**To:** Rachael N. Swift <Rachael.Swift@loras.edu>
**Subject:** RE: Meeting

Hi Rachael,
Can you let me know who will be joining you on the call today as well as their relationship to you and the case?

**Kelsey Callahan '16**
*Assistant Director of Student Life*
*Pronouns: she/her*
0:563.588.7731
Kelsey.Callahan@loras.edu

**From:** Rachael N. Swift
**Sent:** Friday, March 12, 2021 3:40 PM
**To:** Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
**Subject:** RE: Meeting

Hello Kelsey,

I'm happy to meet today at 4:30 over zoom. I will also have a few people to join me for the meeting today. Do you want to send the zoom link or should I?

Rachael

**From:** Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
**Sent:** Thursday, March 11, 2021 9:30 PM
**To:** Rachael N. Swift <Rachael.Swift@loras.edu>
**Subject:** Re: Meeting

> Hi Rachael,
> I would be able to meet 4:30-5 tomorrow. As mentioned in my email on March
> 1st, the rescheduled Hearing Board will take place on March 15th.

3

LORAS 0760

During our meeting, I would be discussing your opportunity to participate in the Hearing Board on March 15th as a complainant in the case. You would be able to make a statement regarding the incident that took place at your apartment. You would have three different options: attend in person to make your statement, submit your statement to me that I will read to the Hearing Board if you can't or don't feel comfortable attending in person, or not participate.

If this is something you are still interested in, I am happy to meet with you tomorrow.

Kelsey Callahan

> On Mar 11, 2021, at 7:20 PM, Rachael N. Swift <Rachael.Swift@loras.edu> wrote:
>
> Hello Kelsey,
>
> I can meet tomorrow after 4:30 or next week Monday after 5:30 or Tuesday after 4:30. Let me know if any of these times work. Also can you give me a brief summary on what we will be talking about?
>
>
> Thank you,
> Rachael Swift
>
> -----Original Message-----
> From: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
> Sent: Thursday, March 11, 2021 12:59 PM
> To: Rachael N. Swift <Rachael.Swift@loras.edu>
> Subject: RE: Meeting
>
> Hi Rachael,
> Checking in again to see if you wanted to get something scheduled. I am happy to meet with you!
>
> All my best,
> Kelsey
>
> Kelsey Callahan '16
> Assistant Director of Student Life
> Pronouns: she/her
> O:563.588.7731
> Kelsey.Callahan@loras.edu
>
> -----Original Message-----
> From: Kelsey D. Callahan
> Sent: Monday, March 1, 2021 10:27 AM
> To: Rachael N. Swift <Rachael.Swift@loras.edu>
> Subject: RE: Meeting

LORAS 0761

Hi Rachael,

Thank you for getting back to me. For reasons beyond our control, we have rescheduled the Hearing Board for Monday, March 15th. If you could send me times that work for you the remainder of this week or next week, I would be happy to set up a Zoom meeting for us.

I hope you are enjoying your Student Teaching experience! I look forward to hearing back from you. Have a great Monday!

All my best,
Kelsey

Kelsey Callahan '16
Assistant Director of Student Life
Pronouns: she/her
O:563.588.7731
Kelsey.Callahan@loras.edu

-----Original Message-----
From: Rachael N. Swift
Sent: Monday, March 1, 2021 9:49 AM
To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
Subject: Meeting

Hello Kelsey,


I can meet today from 12:00-1:00 or after 5:30. I'm student teaching during the day and have a night class, so those are my only times. It will also have to be over zoom since I haven't returned to campus. My mom will also be joining the meeting.

Thank you,
Rachael

Sent from my iPhone

LORAS 0762

LORAS 0763

APP 278

**Kelsey D. Callahan**

| | |
|---|---|
| **From:** | Kelsey D. Callahan |
| **Sent:** | Monday, March 15, 2021 12:44 PM |
| **To:** | Rachael N. Swift |
| **Subject:** | RE: Meeting |

Hi Rachael,
Thank you for letting me know. I have the Arizona Room in the ACC reserved beginning at 3 PM. Other women who are participating in person will be meeting in there as well. Below is a step-by-step process of what you can expect:

At 3:30 and when the Hearing Board Members are ready to begin, I will bring Kyle into the ballrooms and walk down to the Arizona Room to bring you all in.
We will go around the room and everyone will introduce themselves After introductions, Complainants will leave and wait outside the ballrooms We will call complainants in one at a time to make statements Once you are done with your statement, you are free to go.

Please let me know if you have any questions. Safe travels on the roads!

Kelsey Callahan '16
Assistant Director of Student Life
Pronouns: she/her
O:563.588.7731
Kelsey.Callahan@loras.edu

-----Original Message-----
From: Rachael N. Swift
Sent: Monday, March 15, 2021 12:30 PM
To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
Subject: Re: Meeting

Hi kelsey,
I was able to move things around to come in person. I think to be able to get my message across it will be best in person. See you at 3:30.

Rachael

Sent from my iPhone

> On Mar 15, 2021, at 8:31 AM, Kelsey D. Callahan <Kelsey.Callahan@loras.edu> wrote:
>
> Hi Rachael,
> Yes, Olivia can be in the room while I play your recorded statement to
> the Hearing Board. Please send that to me as soon as possible. The
> Hearing Board begins at 3:30, so I would need it before then. Thank
> you
>
> Best,
> Kelsey
>

LORAS 0764

> Kelsey Callahan '16
> Assistant Director of Student Life
> Pronouns: she/her
> O:563.588.7731
> Kelsey.Callahan@loras.edu
>
> -----Original Message-----
> From: Rachael N. Swift
> Sent: Monday, March 15, 2021 7:19 AM
> To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
> Subject: Re: Meeting
>
> Hello Kelsey,
>
> I want to sent in a recorded video of my statement, but before doing so I need to know if I can have an advocate in the room. I want this person to make the video is played fully and watch by the board. If there are problems with the video, then she would read it out loud. One of my roommates is giving her statement in person today. I would ask she be my advocate in the room. Olivia DeVriese.
>
> Rachael
>
> Sent from my iPhone
>
>> On Mar 13, 2021, at 1:02 PM, Kelsey D. Callahan <Kelsey.Callahan@loras.edu> wrote:
>>

LORAS 0765

## Kelsey D. Callahan

| | |
|---|---|
| **From:** | Kelsey D. Callahan |
| **Sent:** | Monday, March 15, 2021 3:17 PM |
| **To:** | Rachael N. Swift |
| **Subject:** | RE: Meeting |

Hi Rachael,

Not a problem. Driving in the snow is not fun!

The cell phone I have on file for you is: (224) 548-2807. Is that correct? You can just go right to the couches outside the ballrooms when you get here. We will be in ballroom AB and I will come get you when we are ready.

Kelsey Callahan '16
Assistant Director of Student Life
Pronouns: she/her
O:563.588.7731
Kelsey.Callahan@loras.edu

-----Original Message-----
From: Rachael N. Swift
Sent: Monday, March 15, 2021 3:14 PM
To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
Subject: Re: Meeting

Ya that works. We will be a little over 30 minutes. Sorry about being late. The a 2 hour and 45 minute drive has become 4 hours.

Rachael

Sent from my iPhone

> On Mar 15, 2021, at 2:46 PM, Kelsey D. Callahan <Kelsey.Callahan@loras.edu> wrote:
>
> I will have my email on me after 3:30. If you could just email me once you get here, that would be great.
> If we are ready for you and you are not here yet, can I give you a call to see your ETA?
>
> Kelsey Callahan '16
> Assistant Director of Student Life
> Pronouns: she/her
> O:563.588.7731
> Kelsey.Callahan@loras.edu
>
> -----Original Message-----
> From: Rachael N. Swift
> Sent: Monday, March 15, 2021 2:44 PM
> To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
> Subject: Re: Meeting
>
> They shut down part of the highway because of the snow and trucks getting stuck. I might be late.
>

1

**LORAS 0766**

> Rachael
>
> Sent from my iPhone
>
>> On Mar 15, 2021, at 1:25 PM, Kelsey D. Callahan <Kelsey.Callahan@loras.edu> wrote:
>> That is fine - no need to be here before 3:30. Safe travels!
>>
>> Kelsey Callahan '16
>> Assistant Director of Student Life
>> Pronouns: she/her
>> O:563.588.7731
>> Kelsey.Callahan@loras.edu
>>
>> -----Original Message-----
>> From: Rachael N. Swift
>> Sent: Monday, March 15, 2021 1:25 PM
>> To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
>> Subject: Re: Meeting
>>
>> Okay. I'm driving in the snow, so I'm going to try and get there at 3 but with the snow my time might be closer to 3:30.
>>
>> Rachael
>>
>> Sent from my iPhone
>>
>>> On Mar 15, 2021, at 12:43 PM, Kelsey D. Callahan <Kelsey.Callahan@loras.edu> wrote:

LORAS 0767

## Kelsey D. Callahan

**From:** Kelsey D. Callahan
**Sent:** Monday, March 15, 2021 3:55 PM
**To:** Rachael N. Swift
**Subject:** RE: Meeting

Great! Glad you made it safely.
I will be out to bring you in once we are ready for complainant statements.

Kelsey Callahan '16
Assistant Director of Student Life
Pronouns: she/her
O:563.588.7731
Kelsey.Callahan@loras.edu

-----Original Message-----
From: Rachael N. Swift
Sent: Monday, March 15, 2021 3:53 PM
To: Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
Subject: Re: Meeting

Hi,

I'm here and outside the ballrooms.

Rachael

Sent from my iPhone

> On Mar 15, 2021, at 3:25 PM, Rachael N. Swift <Rachael.Swift@loras.edu> wrote:
>

1

LORAS 0768

LORAS 0769

APP 288

## Kelsey D. Callahan

| | |
|---|---|
| **From:** | Kelsey D. Callahan |
| **Sent:** | Friday, March 26, 2021 3:18 PM |
| **To:** | Rachael N. Swift |
| **Subject:** | RE: Hearing |

Hi Rachael,

I am also glad you were able to attend a few weeks ago. Thank you for taking the time to share your experience with members of the Hearing Board. The outcome of non-academic hearings are confidential unless a determination has been made that the conduct alleged constitutes sexual harassment under Title IX. In this case, the allegations against Mr. Hall did not constitute such. Thus, the outcome of this hearing is not something that we are at liberty to disclose to you.

I hope you had a great week student teaching and are looking forward to the weekend.

All my best,
Kelsey

**Kelsey Callahan '16**
*Assistant Director of Student Life*
*Pronouns: she/her*
O:563.588.7731
Kelsey.Callahan@loras.edu

**From:** Rachael N. Swift
**Sent:** Thursday, March 25, 2021 5:20 PM
**To:** Kelsey D. Callahan <Kelsey.Callahan@loras.edu>
**Subject:** Hearing

Hello Kelsey,

I'm glad I was able to be at the hearing a few weeks ago. But know that some time has past, I would like to know the outcome and result of the hearing. Please keep me updated.

Thank you,
Rachael Swift

**Troy M. Wright**

| | |
|---|---|
| **From:** | Troy M. Wright |
| **Sent:** | Thursday, March 4, 2021 4:19 PM |
| **To:** | Rachael N. Swift |
| **Subject:** | RE: Investigation Regarding the Discrimination Claim Filed on September 14, 2020 |
| | |
| **Importance:** | High |

Dear Rachael:

Thank you for getting back to me. I can assure you that the College has addressed and is continuing to address your issues, concerns and complaint. Please note that after you called our Security Office in September 2020, the College has taken your complaint very seriously. Listed below are some, not all, of the action taken to address your concerns.

- Increased awareness of concerns and increased campus patrols;
- Timely replies to all e-mails from you and your family/representatives wherein concerns were raised over the incident and over campus safety;
- In-person meetings with you and your family/representatives to discuss your concerns;
- Increased RA assessment;
- Changing the locks;
- Reviewing fob access logs;
- Advising of suspect identification possibly linked to the incident;
- Greater awareness of personal safety;
- Window bars and other physical barriers;
- Working to determine if deadbolts could be added;
- Working to determine if additional security such as cameras was appropriate;
- Seeking additional dialogue and opinions from you on the appropriateness and acceptability of these and other steps implemented by the College.

One of my roles at Loras College is to investigate claims regarding employees. Once you named multiple employees of the College, I was brought in to investigate your discrimination claim.

Thank you for responding to the initial questions I sent you. I will be in touch should I need additional information.

Sincerely,

Troy

Troy M. Wright SHRM-SCP, MBA '15
Director of Human Resources
LORAS COLLEGE

**From:** Rachael N. Swift
**Sent:** Thursday, February 25, 2021 7:30 PM
**To:** Troy M. Wright <Troy.Wright@loras.edu>
**Subject:** RE: Investigation Regarding the Discrimination Claim Filed on September 14, 2020

LORAS 0743

*KH opening statement*

room on December 5th and am taking responsibility for it, I have not done any of the other things the school alleges. I would ask this hearing board to consider all of these factors as the evidence is presented. I would further ask that this matter be dismissed based upon the information presented herein and I appreciate your attention and consideration in allowing to me to address these issues before you.

LORAS 0777

KW: Questions for Kyle?

CLH: In relation to the December 5th entry that was recorded, one of the residents reported she had a friend see you peeking into the room a few weeks prior. Did you go up to room 301 a few weeks before?

KH: I did not, no.

CLH: Why did you go up to your old room the time when students were not present?

KH: It was just to see my old room, no one was there at the time so I wanted to see it.

KW: What prompted you to go to your old room? All of the rooms in BO have the same layout, so why would you go up to look?

KH: I was just curious.

KW: It had almost been a year so it seems unlikely that after a long period of time to have spanned to have muscle memory occur. You lived in 303 but went in to 301?

KH: Yes, it was the time the camera caught me. I went to the bathroom, then I was on my phone, and wasn't paying attention and made the mistake and entered the wrong room.

CLH: The video shows you entering and the only thing we see you do is walk in notice the camera, then you left, and then came back. Are you alleging that you came back to see a poster?

KH: I went in to double check it wasn't my room and I left. I was intoxicated and confused.

CLH: Was the bathroom you went to on the first floor?

KH: Yes.

CLH: And you walked up three flights of stairs without knowing what you were doing?

KH: Yes.

KW: After the reports came in we noticed a pattern emerge, there seems to be some commonalities among the break-ins. Because of the preponderance of evidence there were enough similarities for us to believe it was the same person breaking in.

KH: My only response to that would be that there are other students around that may look similar to me.

KW: You were the only student to fob in the building at those times.

KH: I have no response to that.

MKH: Did you ever apologize to the students for the mistake?

KH: No, I did not see them. Had I seen them in person I would have.

KW: Any more questions?

KW: Kelsey, please bring in ████████. She is one of the complainants who is here to read her statement.

KW: ████████ please read your statement to the board.

LORAS 0778

Paralyzed. Unable to move. Terrified. That's how I felt the night of December 5th, lying awake in my bed, praying to God that whoever came into my apartment at 2 in the morning wasn't going to murder me.

I had been unable to sleep that night and was already awake when I heard the front door open. Time stopped. My heart was pounding out of my chest. I held my breath for what felt like five minutes. I tried to move to get up to lock my bedroom door, but I was paralyzed. Paralyzed by fear.

Although the incident lasted only about a minute, for me it lasted that whole night. I could not move, breathe, call for help, anything. I was too horrified, trying to convince myself that no one was in my apartment, that it was my roommates coming home from a late night, that it was nothing. I was simply hearing things.

I left my room the next morning after not being able to sleep and checked our security camera footage. We had installed one because things were going missing in our apartment, and a few weeks prior, one of our friends saw a man sticking his head through our door. As women, we were scared for our safety thinking about who could possibly coming in. As a former cross country teammate of the man who we saw in that footage breaking in, I am now more horrified at who couldn't be breaking in. If someone you knew, someone you ran on a team with has the capability and the drive to break into your apartment, you can never feel safe. It feels as if everyone you knew is coming for you. Every time I hear a door open, even if not ours, I feel paralyzed all over again.

I got asked by the cops the day after why I did not call the police when I heard someone break in. My answer? I couldn't. I was too busy trying to convince myself nothing had happened. Paralyzed by fear.

The cops told us not to press charges. They said they would document the incident, but if we pressed charges we ran the risk of bringing the man that broke into our apartment coming and retaliating against us. Fearing our own safety, we accepted this explanation from the police.

January 13th I regretted not pressing charges. January 13th was the day I was told that the man who had broken into my apartment had gotten a job and not just any job, but one working with children. I was paralyzed again, thinking about who else was now in danger and how I had enabled a CREEP, who not only broke into my apartment but has multiple accusations of watching women sleep, to get a job working with SPECIAL NEEDS CHILDREN. Paralyzed by fear.

I am kept awake at night still, thinking about what could have happened that night and how many people this has happened to. I never got to find out just what the man was doing in my apartment, but looking at that footage, I feel sick every time. He knew where he was going. He had been there before. The only thing that stopped him was the realization that he had been caught.

LORAS 0779

KW: Are there any questions for ███████?

CLH: Do you have a sense of how many times someone broke in before that night?

███████: At least four.

CLH: On the basis of missing items?

███████: Yes.

KW: Are there any more questions?

KW: Thank you, ███████, you may now leave. Kelsey, please bring in Rachel. She is another complainant who is here to read her statement.

KW: Rachel please read your statement to the board.

RS: Hello, my name is Rachel Swift and I am a senior here at Loras and came here to play soccer, one of the major things I came here for. On the weekend of September 6th, I was alone in my apartment because my roommates were all gone for the weekend. I remember it was a crazy rainy night and I went to bed at 11pm. Before that, I went around the room to check the doors, windows, and rooms. I am from Chicago so I make it a habit to check that before bed. It was at 4:05am that I rolled over on my bed and faced the door. It was the the off chance that I woke up and I see a man standing at my door. I screamed "oh fuck" and when I screamed that he left, I wasn't sure if he left the apartment right away because I got up and shut my door. I didn't know what was going on for like 15 minutes. I didn't know if he was still in the apartment or not but I couldn't hear anyone outside of the door. Then I walked out of my room to check the apartment to see if anything was moved, stolen, or rearranged in any other way. We have multiple TVs, Apple products laying around, and a ps4 console. Nothing was stolen so clearly something else was the motive. I don't know how long he had been in the apartment prior to that. I called my mom immediately and I was crying hysterically. I was on the phone with her for the 4 hours my dad drove to campus. My mom stayed on the phone while I talked to campus police. We checked every room again so make sure no one was there. Security offered to walk to my car to see if I could stay with a friend so I won't be alone but it I didn't think any of my friends would be up at 4 in the morning, I wouldn't have been if this hadn't happened. I called Coach Pucci because I could not think about what else to do. He was in St. Louis at the time so he couldn't do much, but he stayed on the phone with me for an hour trying to talk me down.

I believe that the only other reason he entered the apartment was for something called voyeurism where people get sexual gratification by watching someone sleep. It wasn't him at the wrong place at the wrong time, it wasn't a one-time drunken occasion. If it were, this would be different, but it wasn't. He had the opportunity to steal something, I was asleep, but he didn't. One of the other apartments that was broken in to set up a camera and that's why we can be here today. I do not feel this is a hearing whether he is guilty or not rather than for his punishment. I received an email from Loras College saying he admitted to two other incidents. This was supposed to be a big year for me and now I do not feel safe on campus. Sometimes, even though my roommates weren't there that night, we all squeeze into one room because that is the only way we felt comfortable sleeping and you know BO rooms are not big so trying to fit 6 mattresses into one room was difficult. My senior year is in Illinois, my student teaching is in Illinois, and my soccer season got moved to spring so I can't even play. Even the idea of driving up here gave me so much anxiety I freak out every time I come back. Later, I was forced in a zoom call

LORAS 0780

meeting with Kyle and had to be in a breakout room with him to talk about student teaching. The thought of talking to him disgusts me. Knowing he works with children sickens me. I am an education major and I don't understand it. Its been a difficult time for me. All of the females in the apartment building knew what was going on after the second time. I asked for extra security measures, but none were taken. Its been months since it happened and I'm still petrified. Loras has allowed him to graduate and move on, but this is something I will have for the rest of my life. The charged should be changed and there should be a sexual assault component added. He didn't go in there to disturb, it was a lot more than just watching someone sleep.

CLH: When did the zoom happen in relation to the incident?

RS: It happened in December I don't remember the date. It was horrible for me to have to sit in the meeting. I didn't know about it at the time, but to later learn I had to have conversations with him disgusts me.

KW: Any more questions?

KW: Thank you, Rachel, you may now leave.

KW: Kelsey will read the other complainant statements who could not be here.

KC: This statement is by ▓▓▓▓▓▓

The morning after the incident I woke up to hearing two of my roommates freaking out about something. I walked out of my room and the first thing they said to me was to check the group chat. Once opening it, I saw one of my roommates panicked message from 2am and my other roommates message containing the footage of a man walking into our apartment and leaving. I watched it over and over in horror wondering who they were, why they were there, and what their intentions would have been if they didn't notice the camera. My roommate, ▓▓▓▓▓▓ knew who he was and we proceeded in figuring out what to do next. Our day was spent talking to campus security and the police while ultimately trying to freak out about a man coming into our apartment at 2am. During the days following, we learned from other apartments in our building that they had experienced the same thing we had. This made me wonder if this was the first time he had been in our apartment, or just the first time one of us was awake to hear him come in. For myself, I struggled to sleep in my room alone because the thought of Kyle standing in my doorway watching me sleep haunted my brain. I am very thankful my roommate, ▓▓▓▓▓▓, was awake to hear Kyle come into our apartment otherwise we wouldn't have known to check the camera. Just because our door was unlocked, does not make it an invitation for someone to enter our apartment in the middle of the night. Kyle lived in a first-floor apartment and we live on the third floor. He had no business being on the third floor at that time and especially not in our apartment. Something like this shouldn't be happening to anyone and whoever does this should be faced with consequences.

The following statement is by ▓▓▓▓▓▓

To whom it may concern, my name is ▓▓▓▓▓▓ and I live in Byrne Oaks apartment 101. I am writing about the incident of the break in on September 5th. Our apartment was the first, that is known of, to be broken into by Kyle Hall. I was in Dubuque that night and I was in the apartment most of the day but I happened to spend the night at a friend's house that night. Following that day, I have experienced a

LORAS 0781

roller coaster of emotions. I have felt confused, violated, scared, guilty, and exhausted.
Why us? What made him walk into our apartment? Has he done this before? How did he get in? What was his motive? How long was he in the apartment and what was he looking for? These are questions that keep me up every night and these are questions a 19-year-old girl should never have to ask. Since that day, I have found myself constantly awake until 3 or 4am double and triple checking the doors to make sure they are locked. I sit up at night and listen to every noise that is made and I get out of bed every time to check if someone is in the apartment. I have spent money on alarms and door stoppers to feel some sort of security but I continue to feel anxious. I feel violated that a stranger, that I have always said hello to, came into our apartment uninvited. I do not know if he had done this before or how many times he had tried to but did not succeed. I do not know if he was looking through my room or even if he took anything. I am scared that he could come back or someone else could break in. I feel guilty that I was not there for my roommate, my teammate, and my friend on a night that will affect her forever. I am lucky to not have been there that night but the thought of what could've happened will forever continue to be on my mind.

Loras College is a safe place and this apartment was a place where I could go and relax to take my mind off of things. This apartment was my home and now it feels like a jail cell. I am constantly anxious about someone breaking in and how the outcome could be worse. My roommate will never be that same after that night and neither will anyone else who is involved. It is a lesson learned by us to always make sure our doors are locked but it is not us that should've had to learn the lesson, it is Kyle. I hope the board can take into consideration the mental, physical, and emotional effects of the break in that we have experienced and implement a consequence that not only gives us a moment of relief but proves to Kyle that what he did is not okay. I wish upon no one the stress and anxiety we have gone through and I hope that nothing like this will ever happen again.

Thank you, ▮▮▮▮

The following statement is by ▮▮▮▮▮▮▮▮▮

On Sunday morning, November 22, 2020, around 4 AM I was awoken to a sound at the foot of my bed. I jolted up to see a dark figure standing at the end of my bed. I had just awoken and didn't have my contacts in so I couldn't make out much except that he was a male and lanky in stature. As soon as he realized that I saw him, he dropped down to all fours and crawled out of my room as quickly as he could. I was paralyzed with shock and couldn't even cry out or move. I held my breath and silently prayed "Hail Marys" as I heard him sulk into the kitchen. I heard the main door to the apartment shut, however I still couldn't move or react. I just sat up in my bed for minutes trying to figure out what just happened. It was such a bizarre thing, in that moment I thought to myself this must be a dream. For oh, how I wish it was only a dream, or more appropriately, a nightmare. I gained my composure and turned my phone flashlight on. As I scanned the room, I didn't notice anything missing or out of place. However, as my light made its way over to the door of my room, I saw that it was partially open. I *always* sleep with my door shut, always. None of my other roommates were home. It was just supposed to be me in the apartment that weekend, or so I thought. This is the moment I knew what happened was real. The terrifying idea that a man was watching me while I slept started to sink into my bones.

What's more, I fear this could have happened on more occasions than just this night. No doubt there were likely other nights I forgot to lock the main door and can't shake the thought that he may have watched me nights previously without my even knowing. I shudder to think about the "what ifs". A college girl all alone in her room, sleeping peacefully, unknowingly at the mercy of a predator. While I

LORAS 0782

wasn't physically injured in this encounter, my emotional state was, and continues to be, shaken. I notified campus safety later that morning.

I thought I was the only one, but a few weeks later a friend reached out to me explaining how a man had been sneaking into their BO apartment, stealing food and possibly watching them as well. They caught him on camera. As I watched this video, I was horrified to discover that the predator was a man I knew. He had been on the cross-country team with me. Other girls began to come forward as well saying they had spied a man, fitting the same description, in their apartments at night as well.

With multiple accounts and evidence of this predator watching innocent girls at night, it would be appalling if the college took no actions against him. What this man did has terrorized me as well as other girls on campus, and was even enough to make one of the girls in the BO leave Loras altogether. Please take a moment to realize the effect this experience has had on all females on the Loras campus. As if being a victim myself was not enough, my roommates, the roommates of the other girls who were victimized, and many other girls now question their safety on campus. If the students don't feel safe in their own apartments, what does that say about Loras? How are we to get an education if we don't feel comfortable or secure in our own beds?

My parents as well as the parents of my roommates were horrified by this as well. From a parents' perspective, they immediately thought the worst. I could have been raped, beaten, or killed in my sleep. They encouraged me to sleep with pepper spray or a bat next to my bed from now on. Coming to Loras, I thought safety in the comfort of my own bed was something I would never need to worry about. I figured that was something concerning only on the big campuses, not a smaller, close-knit community like Loras. This cannot be swept under the rug. I desire for no other individual to ever go through this terrorizing experience.

To keep this man from doing anything like this again, I propose banning him from campus permanently. Additionally, I am aware this predator wants to work with the vulnerable population of the special needs community. We must do everything in our power to prevent this from happening. If we can strip him of his diploma and his teaching license so be it. I tremble to think about what this man could do to a population that would not be able to defend themselves against such a predator. He should never be able to be with a young woman or girl, especially a young woman or girl with special needs who rely on adults to take care of them and not physically or emotionally hurt them. If this is swept under the rug, he will be alone with special needs individuals without their parents even knowing the scandalous track record this predator possesses; a record that Loras is very well aware of. Don't we all have a duty to assure that is never the case?

Although my mental health, my feeling of safety at Loras, and my sense of comfort have been drastically altered due to this experience, I consider myself lucky to come out of this situation physically unscathed. However, the next victim might not be so lucky. There must be action taken against this man so that there will be *no next victim.*

The following statement is by ▮▮▮▮▮▮▮▮:

To whom this may concern, my name is ▮▮▮▮▮▮▮ and I live in Byrne Oaks apartment 101. I am writing in regards to the incident of the break in our apartment on the night of September 5th. When this incident occurred, I was currently at home for the weekend, visiting my family. Saturday morning, my roommates and I received a message from Rachel Swift, who was here alone the night of September 5th, saying that a man had broken into our apartment and was standing in her doorway watching her sleep in the middle of the night. Upon my arrival back to campus the following Sunday, I was scared, and

LORAS 0783

nervous to come back to my on-campus apartment. The feeling I had that first night was something I had never experienced before. I generally do not get frightened easily, but I was pretty shaken up that I didn't feel safe in my own apartment. Since this incident has occurred, I have not been the same. Going to bed has been hard, and I have spent many nights starring at the door making sure that no one walks in. The feeling of discomfort that I have experienced since the break-in has been high, and there are still nights where I will not get up in the middle of the night to go to the bathroom because I am afraid of someone breaking in. Since this incident has happened, I have not felt safe in my apartment. It is heartbreaking that I can no longer go to bed, and not worry about someone coming into my room. Prior to coming to Loras, I was comforted by the fact that it was a small campus. I never had to worry about anything like this happening. With all due respect, I am 20-year-old women, and it is frightening knowing a man was capable of breaking into several girls' apartments. Thank you for your time, █████████

The following statement is by █████████ :

To whom this may concern, my name is █████████ and I live in the Byrne Oaks apartment building 101. Due to the incident that occurred early in the morning on September 5th, 2020, the environment that was created after that has become an uncomfortable and rather scary environment. Although I was not physically there the night Kyle Hall came into my apartment unannounced and uninvited, the repercussions of that night still remain very present and relevant. I have not been able to wrap my head around someone wanting to come into an apartment in the middle of the night to watch young women sleep, and don't think there is any excuse or explanation that would ever be able to rationalize how violating, uncomfortable, and scary that truly is. Since that night, I have had a very hard time falling asleep at night or even being alone in my apartment. I constantly have the thought or fear that somebody has eyes on me. I can't even go so far as walking down the hallway to switch my laundry for two minutes without having to make sure all of the doors in the apartment are locked and secured. Like I previously said, I don't think there is an excuse or explanation to explain this unusual, uncomfortable, and violating behavior. His actions have caused me many sleepless nights, and I wasn't even the main victim of his chosen actions of that night. I have no idea what his true intentions were that night, and I guess no one will ever know, which might be a good thing. However, if there was a hidden agenda during the early morning of September 5th, I don't think it would be crazy to say that he does not impose a threat to future young women or children in general. I very strongly believe that if a school or workplace is ever going to hire Kyle Hall, they should be very aware of the actions he chose to take this night and the potential danger he may be to people or children he may be working with in the future. I think it's only fair to help protect men, women, and children that could potentially be around him. I hope the hearing board truly understands the long-lasting effects of Kyle's actions. This is inexcusable and off-putting behavior, and I very much hope that he faces the appropriate consequences that will hopefully be coming his way. Thank you.

The following statement is by █████████

Hello, my name is █████████. I am a student here at Loras College and I live in the Byrne Oaks apartments where the break-in occurred. In November, my roommates and I started to notice that food from our kitchen was going missing. We thought it was just each other, so we did not think much of it. In late November, a man tried walking into the apartment until he realized that a friend of ours was awake in the apartment. He quickly closed the door and left. Shortly after this incident, we put a camera up right next to the front door to see if we could figure out what was going on. On December 5th at around

LORAS 0784

2:00AM, my roommate, ███████████████, started texting me in a panic about hearing someone walk into the apartment. I checked the camera footage right away when I woke up later that morning. The footage showed Kyle Hall sneaking into our apartment until he stopped in his tracks when he noticed the camera. After noticing the camera, he stands in our kitchen for a couple of seconds before sneaking back out. We reported this incident to campus security, and then later the police. I was relieved when he was asked to leave campus. I already felt more comfortable knowing that he was not allowed back on campus. Him breaking into my apartment has traumatized me ever since. I can't fall asleep at night unless I double check to make sure the front door is locked. I lock the door when I am home alone in fear of something like this happening again. I have even started locking my bedroom door at night in case someone could get passed the locked front door. I was terrified when I heard that Kyle got a job working with special needs children. It makes me so uncomfortable thinking about a man working with children who has broken into multiple all-girl apartments. Personally, I do not think he should be allowed to have this type of career. I worry for the children he would be working with.

Thank you.

KW: Kelsey, will you also read Joey's statement?

KC: This s statement from Kyle's witness, Joey:

To Whom it may concern, I would like to take the time to write up a brief witness statement on behalf of Kyle Hall. Kyle is a great friend to everyone and is helpful to people he knows well, and to people who he may not know too well! He would not even think about doing something wrong to anybody whether it is to hurt them, or to make them feel uncomfortable. Kyle is a very caring person and would go out of his way for anybody and you can tell that just by his leadership roles and willingness to take charge in any situation. Kyle has been a leader on numerous occasions while he was in High School. He was the team captain for the Track and Cross Country teams our senior year, he led multiple retreats in high school that had to do with drug/alcohol prevention. Such retreats were Operation Snowball for high school aged students, and then the same thing called Snowflake for Middle School aged students. These school organizations helped to empower youth to lead successful lives and make healthy life decisions. As far as being a witness for Kyle, I did come to Dubuque, Iowa in the fall for a weekend to come visit some friends. While I was in Dubuque, I had asked Kyle if he was available one of the nights to come hangout knowing that he was taking an extra semester of school. Kyle had replied that he would like to come visit. So, with, I can confirm that Kyle was with me on the night in question. He was at my hotel room with one of his friends from college, and we hung out and watched tv, talked, and drank. As far as the drinking part, Kyle was perfectly fine. He had 3 cans of Coors Light beer in a matter of a few hours, then went back home. He was not drunk by any means, but he did have alcohol in his system, but he was fully capable of doing normal activities like anybody else would knowing he had to drive home. Hope this hearing plays out in the fairest way possible for a person who would never think of doing such things to invade another person's property or wellbeing. Sincerely, Joey.

LORAS 0785

VB: Can I get a clarification? What night was he referring to?

KC: There was not a date listed, it just says he came for a weekend in the fall.

KW: Will you also read the email from David?

KC: Here is an email I received from David Salyer in regards to licensure steps:

Hi Kelsey, here are the procedures/criteria we have in place to *recommend* a student for licensure (criteria per Chapter 79 of the Iowa Administrative Code, and written into the program standards). The program's role is to *recommend only*; the Board of Educational Examiners actually issues the initial license. Note: The college does not recommend, it is the Teacher Education Program. The licensure official (Rebecca Fabricius) is the only person authorized at the college to recommend a student for initial licensure.

1. Receive passing grades for all major and endorsement courses (grade of C or better)
2. Have a GPA of 2.75 or above
3. Receive a passing grade for student teaching (this includes the capstone course and portfolio: EDU 490)
4. Pass both the content and pedagogy tests of the Praxis II (ETS). This is considered a *program completion* requirement and not a licensure requirement (per the Department of Education)

The program does have the discretion *not* to recommend a candidate (even if all other criteria are met) if the candidate does not demonstrate the appropriate professional dispositions. Other situations, such as those involving a conviction, are addressed on a case by case basis in consultation with the Board of Educational Examiners and the BOEE attorney.

KH has met criteria 1-3. KH has a *folder number* at the BOEE, but that is the standard process for all candidates when they begin student teaching. No steps have been take toward recommendation.

I hope this helpful.
David

KW: We also received 9 reference letters, I believe everyone on the board has had a chance to read them. Any more questions?

CLH: On the Dec 5th night, am I correct in recalling that your testimony said you immediately went inside, went to the bathroom, then walked up?

KH: I came back from drinking, went inside, went in the bathroom, then I was using my phone and out of mistake, I walked up to the third floor.

CLH: So, did you go to your room first, then to your car, then back inside?

KH: No.

CLH: Can you describe the shoes you were wearing that night?

KH: I don't remember.

CLH: In the video you're just wearing socks and that would suggest to me that you came back from drinking without shoes or that your stories don't align.

LORAS 0786

KW: When the women met with safety they stated that you would stand in the crossing of the T-shaped hallway where they had to get uncomfortably close to you to pass. They even mentioned you followed them to their room and made them feel uncomfortable once.

KH: I don't recall forcing anyone to go around me. When you first walk in the hallway it's narrow so there would've been times where we met by the door and I moved over, I guess not far enough. I also don't recall following them to their room. I don't know who would say this because the names are redacted in the document.

CLH: Complainants described the perpetrator as a predator, do you believe the person that entered the apartment was there for voyeurism or sexual gratification?

KH: No, because I am a person who does not believe in those types of predatory ways. I am a full Christian so I don't believe in doing those things.

CLH: Do you believe the complainants emotions are reasonable?

KH: I can see where their coming from, anyone would be frustrated with this. Some of them went to extremes on how I talk and treat people and I try to treat everyone the same, but the perception of me could be different.

CLH: So, Rachel argued that whoever entered their room was there for voyeurism and sexual desire. Do you believe that's what they went in to do?

KH: No because like I said I don't believe in those behaviors.

CLH: Roman could you help explain, maybe he is not understanding my question.

RC: Could you ask again?

CLH: I just want to know your general thoughts. Let's assume for the questions sake you are not the perpetrator. Do you believe it is reasonable for her to believe it was for sexual desire?

KH: I don't really know it depends on the person and how they perceive others. It could be, but I don't know for sure.

CLH: What do you think would be the appropriate punishment or sanctions for this person?

KH: Banning them from campus for some time, probably not forever, but maybe for a few months or a couple of years.

CLH: Do you think the fact that the perpetrator entered unlocked apartments makes this a less serious offense than if they would've jimmied the locks open?

KH: Could be, but since it was unwelcomed, it's not breaking so it could just be ummm...

VB: Trespassing

KH: Yes, trespassing, thank you.

KC: Many brought up your ability to work with kids. Can you tell us why you chose to be a teacher and what other teachers would say about you?

LORAS 0787

KH: Because of my parents working with children with and without disabilities. I went to many events with them and I love seeing how kids grow with their learning and everything. Kids also make me want to try and do better as well. Sometimes it depends on how I am working with students it helps me grow on how they learn that I haven't seen before. They would say I am a hard-working person and I care about others and the individuals I teach. I put lots of effort and work into all of my learning.

MKH: You mentioned one time you entered BO then you went to go back to your car and came back. When was that?

KH: When did I, I am trying to remember. It was on the November 22nd incident, if I remember right. Or you're thinking the December 5th.

MKH: The typical weather in December is about 9 to 21 degrees. Looking at the video, you aren't wearing shoes or a jacket. So, on that date you came in, went to the bathroom, then what?

KH: Then I got on my phone and went up the stairs. I was distracted on my phone and confused with the drinking.

MKH: Why weren't you wearing a coat or shoes?

KH: I may not have been wearing a coat that night. I don't recall not wearing shoes.

CLH: Did you pull out your keys?

KH: Yes, to enter the building and then put them in my pocket.

CLH: Shouldn't you have needed them to get into your apartment?

KH: No, sometimes we leave the door unlocked.

CLH: In the submitted testimony by Joey he stated that you spent time in his hotel room, but then you left to go back to your apartment?

KH: Correct.

CLH: I don't want to speak for everyone else, but for me it seems that more likely than not that it was you who entered these apartments. You heard the complainants, they want to revoke your degree and prevent your licensure. If found guilty what should the sanctions be?

KH: Since I graduated already and I'm not really part of the school anymore. I think banning me from the campus for however long you choose to. I think that would be fair. I am not associated with Loras as a student anymore, I am an alum.

MKH: You are associated with Loras College as an alumni status. What you do now reflects Loras College. With you being in special needs and teaching, what you do reflect on the college's reputation. The outcome of this hearing is not to be taken lightly. What do you think about that?

KH: I don't know.

KW: Anymore questions? Kelsey would you read the colleges closing statement?

LORAS 0788

KC: On behalf of the college, I hope members of the hearing board come to a decision that is in the best interest of the student and college.

KW: Kyle now you have the chance to give a closing statement to the board.

KH:

LORAS 0789

*Kyle Hall*

Closing Statement:

I would like to thank everyone on the hearing board for taking the time to conduct this hearing and listening to everything I have had to say. Without a doubt, this has been one of the most difficult situations I have dealt with in my life. I have worked extremely hard to fulfill my dream of becoming a special education teacher and the thought that all my hard work could be taken away from me because of this unfortunate misunderstanding is devastating to me.

At the same time, I am extremely grateful for spending the last 4 and a half years here at Loras College. The level of education, the friendships and experiences I have gained during my time here will stick with me for the rest of my life. I would not trade these last 4 and a half years away for anything. Prior to this incident, I never faced any type of disciplinary actions or reprimands, either from the school, other students, security, my student-teaching job, or my other full-time job at Hy-Vee. My experience has been and remains a positive one and I am and will continue to be thankful for my time at Loras College.

If there is one thing I could change, it would be my thoughtless action of entering my old room accidentally on the night of December 5th. This incident occurred because of a combination of alcohol, exhaustion, distraction and clumsiness on my behalf. I had left my second job, had a few drinks, came back to the dorm, went to the bathroom, and was not paying attention to where I was going or what I was doing. I have come to realize that while I did not have any malicious intent or even conscious regard to enter the wrong room, my actions have had a negative affect on my fellow students. For this, I am deeply sorry and apologize to the students in room 301.

Outside of the night of December 5th, I was not involved in those incidents. As I previously stated, I did not enter anyone else's rooms on any of these nights and did not have any involvement in the events that occurred. Any attempts to link me to these other events are based on misapprehensions of my character by people who do not really know the real me.

LORAS 0790

*KH closing statement*

The hardest part for me in this whole process has been the attacks and assumptions of my character by people who have admitted they do not know the real me. I am aware and admit that I can be socially awkward. This is something I have dealt with my whole life and is an obstacle I am still trying to overcome. I believe I am a good, kind-hearted person. I try to be friendly to everyone I come into contact with to overcome quick judgements I may face because of my eyes or lack of self-confidence. If my actions have led others to have different thoughts and feelings about me or my character, I will continue to do what I have always done: strive to be the best person I can be and to treat others with kindness and respect. This is a lesson I learned at a young age in life and have continued to put into practice during my time here at Loras.

I have worked extremely hard to graduate from Loras and am excited about the prospect of beginning my teaching career. I ask this committee to recognize and understand my position, that my unintentional actions on December 5th do not rise to the level of a violation of the policies and certainly do not justify expulsion after I have already graduated. Unfortunately, Loras has had several issues with other individuals breaking into rooms, burglaries and pulled alarms over the course of the semester that have nothing to do with me. I can only speak to my own actions and, while I am more than willing to accept responsibility for my actions, it is not fair to pile on a lot of unrelated and unverifiable events against me. Suspicion is not proof, misperceptions are not proof and assumptions are not proof. It is the school's job to provide proof and they have not done that outside of the December 5, 2020 incident. Based upon that actual evidence, I would urge this board to dismiss these complaints and appreciate your time and consideration.

LORAS 0791

**LORAS COLLEGE**

Catholic | Liberal Arts | 1450 Alta Vista Street | Dubuque, IA 52001 | 563.588.7100

March 22, 2021

Kyle Hall
7241 Kelly Pl
Downers Grove, IL 60516-3706

Dear Kyle:

The Review Board met and examined your appeal. In their meeting, they reviewed the *Loras College 2020-21 Student Handbook* in regards to your appeal as well as the information provided by you. The Review Board determined your appeal met the criteria of the process was flawed procedurally and policy was not applied correctly. Therefore, the decision of the College Hearing Board was reviewed.

After reviewing your file and the Review Board's recommendation, I concurred with the Review Board's findings and modified your sanctions. Consequently, the original sanctions of the College Hearing Board are no longer in place. The following sanctions are:

1. Ban from the Loras College campus indefinitely. After seven years of this date, you may appeal this ban through the Dean of Students Office.

2. The Education Program is aware of the appeal as the Program has an educational right to know. It is the Program's responsibly and authority to determine recommendation for licensure. Please be in contact with Dr. David Salyer if you have questions.

Kyle, while it was determined the process was flawed and applied incorrectly, the fact of unauthorized entry to an apartment other than your own, was concerning. I hope that the overall process and outcome provide you the opportunity to evaluate your decision-making. This concludes the appeal process.

Sincerely,

Dr. Arthur Sunleaf
Vice President for Student Development
and Dean of Students

Cc: file

**Troy M. Wright**

| | |
|---|---|
| **From:** | Troy M. Wright |
| **Sent:** | Friday, March 26, 2021 11:23 AM |
| **To:** | Rachael N. Swift; Nancy Z. Fett |
| **Subject:** | RE: Title IX |

Hello Rachael,

The investigation has been completed and a certified letter is being sent to you today.

Regards,
Troy

Troy M. Wright SHRM-SCP, MBA '15
Director of Human Resources
LORAS COLLEGE

**From:** Rachael N. Swift
**Sent:** Thursday, March 25, 2021 5:17 PM
**To:** Troy M. Wright <Troy.Wright@loras.edu>; Nancy Z. Fett <Nancy.Fett@loras.edu>
**Subject:** Title IX

Hello Troy and Nancy,

Seeing as it has been a few months since I filed my title IX claim I would like a full update on the investigation that you have completed so far. I would also like to know when I can expect a hearing to be held.

Thank you,
Rachael Swift

1

LORAS 0749

# LORAS COLLEGE

*1450 ALTA VISTA, DUBUQUE, IA 52001*

Ms. Rachael Swift
1338 N. Chicago Ave
Arlington Heights, IL 60004

*Sent via certified mail on 3/26/21*

**STRICTLY CONFIDENTIAL**

Dear Rachael,

I have gathered and reviewed all documentation pertinent to your Incident Report #00145-2020 regarding an intruder in your apartment on September 6, 2020, with focus upon the actions taken by the Loras College employees you named on September 14, 2020 in your Incident Report #00154-2020. These individuals were Jim Collins, President; Dr. Art Sunleaf, Dean of Students; Katie Keleher-Garfoot, Assistant Director of Residential Life; and Bob Rosenow, Security Officer. Based on a thorough review, the College has determined your complaint, which focuses on responsiveness, to be unfounded. Furthermore, I find no discriminatory actions by these individuals or any other employee at the College because you are a female student alleged to have been subjected to a sexual assault.

Your September 14, 2020 Incident Report stated that you requested the College provide additional safety measures after the initial incident, yet you allege that the College took no action to protect your safety. This is simply incorrect, as supported by multiple statements. Per my email correspondence to you on February 9, 2021, below is a list of the actions the College has already taken or continues to implement:

- Increased awareness of concerns and increased campus patrols;
- Timely replies to all e-mails from you and your family/representatives wherein concerns were raised over the incident and over campus safety;
- In-person meetings with you and your family/representatives to discuss your concerns;
- Increased RA assessment;
- Changing the locks;
- Reviewing fob access logs;
- Advising of suspect identification possibly linked to the incident;
- Greater awareness of personal safety;
- Window bars and other physical barriers;
- Working to determine if deadbolts could be added;
- Working to determine if additional security such as cameras was appropriate;
- Seeking additional dialogue and opinions from you on the appropriateness and acceptability of these and other steps implemented by the College.

Your September 14, 2020 Incident Report, indicating that you asked for information about the investigation into who entered your apartment but only received limited updates is inaccurate. Below is a list of the updates the College provided to you:

- On September 7, 2020, Dean Sunleaf met with you and your mother, Elaine Kostopoulos, to discuss your concerns regarding the entry into your apartment the night before;
- On September 7, 2020, Molly Burrows-Schumacher advised you that Campus Security was reviewing fob access to your building and there would be additional rounds in your area by Campus Security and RA's;

LORAS 0747



- On September 7, 2020, Katie Keleher-Garfoot advised you of additional safety measures the College could take on your behalf, including bars on window and alarm devices for your apartment;
- On September 11, 2020, Tricia Borelli, Director of the Student Counseling Center, emailed you offering you counseling support through the Counseling Center and a specific program online called Doxy;
- On September 11, 2020, President Collins spoke with you and your mother, offering the College's support services including but not limited to: Spiritual Life, Counseling, and Academic Services.
- On September 15, 2020, Burrows-Schumacher advised you that increased surveillance had not provided any additional information and the College would contact the Dubuque Police to assist in any additional avenues it may explore;
- On September 15, 2020, Nancy Zachar-Fett, Title IX Coordinator, contacted you stating that an investigation into your newly filed September 14, 2020 Title IX complaint would be conducted;
- On September 16, 2020, Burrows-Schumacher corresponded with you again, offering to set up a meeting between you and a Title IX investigator to discuss your claim;
- On October 8, 2020, President Collins spoke with you and your mother, advising you that College was continuing to investigate and address the situation;
- On December 8, 2020, Burrows-Schumacher notified you that a suspect was identified in your case and the Dubuque Police were notified;
- On December 17, 2020 Burrows-Schumacher notified you that she had spoken to Officer Brianna Marzette with the Dubuque Police and that Officer Marzette wanted to speak with you;
- On January 5, 2021, Burrows-Schumacher contacted you regarding your housing assignment and meal plan assignment that was still on file for Spring 2021 on campus, advising that she would be willing to remove these items, that these items could be re-added at any time and also indicating that because you had spent most of the fall semester away from campus, housing charges had been removed from your account; and
- On January 26, 2021, Burrows-Schumacher contacted you regarding the hearing for the September 6, 2020 incident investigation, to which you replied on February 10, 2021 that you would like to participate in the hearing process.

While the College understands the entry into your apartment on September 6, 2020 was a deeply concerning event, College personnel's investigation into this incident was comprehensive. The result of this investigation has determined that the entry does not meet the definition of sexual harassment as contemplated by Title IX and as described by the College's Sexual Misconduct Policy and Grievance Procedures. As such, please accept this letter as the official dismissal of your Title IX allegations.

Respectfully Yours,

Troy Wright
Director of Human Resources
Loras College
563-588-7816
Troy.wright@loras.edu

LORAS 0748 LORAS.EDU

**RECEIVED**

SEP 0 6 2022

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA**

RACHAEL SWIFT,                          )
                                        )     No. 22 cv 1019
        Plaintiff,                      )
                                        )     Jury Trial Demanded
v.                                      )
                                        )
LORAS COLLEGE                           )
                                        )
        Defendant.                      )
                                        )
                                        )

## COMPLAINT

Plaintiff Rachael Swift, pro se, bring this Complaint against Defendant Loras College as follows:

### Nature of the Case

1.      Rachael Swift ("Ms. Swift") was enrolled at Loras College in order to obtain a quality education and a bachelor's degree. Her education was severely disrupted the outset of her senior year when John Doe ("the Assailant") broke into her student housing and entered her bedroom to watch Ms. Swift sleep on September 6, 2020. Ms. Swift reported the break-in that same day to Loras College's campus security, who then contacted the Dubuque Police Department and later informed the Director of Residential Life. Throughout its response to Ms. Swift's report of voyeurism, Loras College's staff displayed a gross lack of comprehension of the Loras College's own written policies for addressing sexual misconduct, and a callous disregard for how the aftermath of the break-in and the badly managed process was profoundly affecting Ms. Swift's ability to complete her education.

### The Parties

2.      Plaintiff is a citizen of the State of Illinois who resides in Cook County, Illinois.

3.     Defendant Loras College is a Catholic, liberal arts educational institution with its primary campus is located in Dubuque, Iowa, in the United States District Court for Northern District of Iowa.

4.     Defendant Loras College receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX.

**Jurisdiction and Venue**

5.     Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 1343.

6.     Venue is proper in the United States District Court for Northern District of Iowa pursuant to 28 U.S.C. § 1391.

**Facts Giving Rise to Relief**

7.     In September 2020, Ms. Swift was a varsity soccer player and a senior enrolled at Loras College in the Elementary Education Program.

8.     As a varsity soccer player, Ms. Swift lived on Loras College's campus in student housing provided by Loras College.

9.     On September 6, 2020 in the early morning hours, John Doe ("Assailant") broke into Ms. Swift's student housing. Ms. Swift was alone in her apartment and woke to find the Assailant watching her sleep. She screamed and the Assailant fled her apartment.

10.     Ms. Swift did not know the Assailant before the break in, but later learned that the Assailant was enrolled in the same Elementary Education Program as her and that the Assailant had been a presenter at classes taught in the Elementary Education Program.

11.     On September 6, 2020, immediately after he the fled her apartment, Ms. Swift called her mother who told her to call Loras College's security. Ms. Swift then called campus security and reported what occurred.

2

APP. 308

12.     On September 6, 2020, Loras College security as well as the Dubuque Police Department arrived at Ms. Swift's apartment in response to her reporting the break-in.

13.     On September 6, 2020, Loras College Security Officer, Bob Rosenow, quickly dismissed Ms. Swift's concerns that she had been victim of sexual misconduct telling her that it was likely just an intoxicated student that entered her apartment by accident. Likewise, a police officer from the Dubuque Police Department dismissed Ms. Swift's concerns that she had been victim of sexual misconduct. During the time that Loras College Security Officer and Dubuque Police Department at her apartment, Ms. Swift was on the phone with her mother allowing her mother to hear all the conversations with between Ms. Swift and Loras College Security Officer as well as the Dubuque Police Department.

14.     Upon information and belief, on September 6, 2020, Molly Burrows-Schumacher, the Director of Residential Life, was contacted about the break-in.

15.     On September 7, 2020, Ms. Swift reached out to Ms. Brown-Schumacher and Loras College's Dean of Students Art Sunleaf about the break-in and a meeting was arranged for the following day.

16.     On September 8, 2020, Ms. Swift met with Dean of Students Art Sunleaf about the break-in and her safety concerns.

17.     Ms. Swift also met with Katie Keleher-Garfoot, Assistant Director of Residential Life, on September 8, 2020 and told Ms. Keleher-Garfoot that she did not feel safe the student housing provided by Loras College and asked that Loras College take action to increase security including, among other things, install cameras at all entranceways to the student housing and post flyers to inform other students about the break-in. As to Ms. Swift's request to inform other students about the break-in, Ms. Keleher-Garfoot responded that "we don't want to alarm the

3

APP. 008

students in the building." Ms. Keleher-Garfoot said that Loras College would look into increasing security, but Loras College never increased security.

18.     As a result of the break-in and Loras College's failure to adequately increase security within the individual apartment and student housing as well as Loras Colllege's campus generally, Ms. Swift no longer felt safe living in student housing and returned home. Ms. Swift attempted to go back to Loras College due to soccer, but could not stay in her apartment because Loras College took no action to secure her student housing so she was forced to rent a hotel room.

19.     Pursuant to the Loras College's Title IX Administrative Policy and Procedures, voyeurism is nonverbal sexual misconduct.

20.     Because Loras College ignored her requests to increase security, Ms. Swift submitted an incident report as provided for in Loras College's Title IX Administrative Policy and Procedures via Loras College's online portal. In her report, Ms. Swift complained that Loras College ignored her requests to increase security and was discriminating against her because she was a female student that had been subjected to sexual misconduct. Ms. Swift's reported listed, among others, Loras College's Dean of Students Art Sunleaf, Loras College's President Jim Collins, and Ms. Burrows-Schumacher.

21.     Loras College stated it would investigate the incident report submitted by Ms. Swift but never did so.

22.     On or about September 11, 2020, Ms. Swift and her mother, Elaine Kostopoulos, had conversation with Loras College's President Jim Collins about the break-in, the ongoing investigation to identify the Assailant, Ms. Swift's concerns about her safety and Loras College's failure to increase security.

4

23.     During the September 11 conversation, Ms. Swift told Loras College's President Jim Collins that as a result of the break-in she no longer felt safe living in student housing and consequently had returned home rather than remain at Loras College.

24.     Following the September 6, 2020 break-in to Ms. Swift's student housing, numerous other female students living in the same student housing as Ms. Swift suffered similar break-ins.

25.     Upon information and belief, there were four (4) other break-ins of apartments occupied by female students in the same student housing as Ms. Swift from September 2020 to December 2020.

26.     Despite there being numerous other break-ins of apartments occupied by female students in the same student housing as Ms. Swift from September 2020 to December 2020, Loras College took no action to increase security or otherwise safeguard women living on campus.

27.     Ultimately, the Assailant was caught on video by a camera set up female students living in an apartment in the same student housing as Ms. Swift. These female students set up cameras in their apartment because Loras College refused to place cameras in all of the entranceways to the building or otherwise to safeguard women living on campus.

28.     But for the actions of these female students, the Assailant would have continued breaking into apartments occupied by female students.

29.     Shortly after the Assailant was caught, Ms. Swift attempted to amend her incident report and bring a Title IX complaint against the Assailant, but Loras College refused to conduct a Title IX investigation or hearing.

5

30.     Pursuant to the policies in place at the time, Loras College's Title IX Coordinator was required to hold pre-hearing meetings with both Ms. Swift and the Assailant to review the investigative file, discuss the hearing process, receive their input regarding sanctions, and attempt to resolve the matter without conducting a formal hearing. Despite Loras College knowing that Ms. Swift sought a formal hearing, it took no action against the Assailant under its Title IX policy.

31.     Loras College refused to conduct a Title IX investigation or hearing of the Assailant because Loras College did not believe that Ms. Swift had been the victim of sexual misconduct.

32.     Rather than conducting a Title IX hearing, Loras College brought lesser charges against the Assailant under the student code of conduct.

33.     Upon information and belief, the lesser charges brought against the Assailant under the student code of conduct did not include the September 6, 2020 break-in of Ms. Swift's apartment.

34.     As a result of Loras College's decision to neither conduct a Title IX hearing nor believe that Ms. Swift had been the victim of sexual misconduct, Ms. Swift was denied the rights outlined in Loras College's Title IX Administrative Policy and Procedures for victims of sexual misconduct including, but not limited to, to be treated with respect by college officials, to not be prejudged or blamed for what occurred; to take advantage of campus support resources; to experience living in a safe and educational environment; to be made aware of options regarding support resources, remedial actions, timeframe to file a complaint and resolution options; to have an advocate present during disciplinary hearings; to have College officials answer questions and explain the systems and processes involved; and, to be informed on the progress of the

6

investigation of the case, including the right to prompt, fair, and impartial discipline proceedings, the right to learn the outcome of the case, and the right to appeal that outcome.

35.    As a result of Loras College's decision to neither conduct a Title IX hearing nor believe that Ms. Swift had been the victim of sexual misconduct, Ms. Swift was denied the right to know the outcome of the charges against Assailant.

36.    As a result of Loras College's decision to not believe that Ms. Swift had been the victim of sexual misconduct, Ms. Swift was unable to continue living on campus and lost certain financial benefits connected to her living in student housing.

37.    As a result of Loras College's decision to neither conduct a Title IX hearing nor believe that Ms. Swift had been the victim of sexual misconduct, Ms. Swift was denied the right to seek an academic, housing or reasonable accommodation to eliminate the hostile environment as provided for under Loras College's Title IX Administrative Policy and Procedures.

38.    Ms. Swift filed a complaint with the United States Department of Education's Office of Civil Rights ("OCR") and OCR is currently investigating Loras College for sexual harassment in violation of Title IX.

### Count I
### (Discrimination in violation of Title IX of the Education Amendments of 1972)

39.    Plaintiff incorporates by reference and re-alleges paragraphs 1-38 above.

40.    Plaintiff was subjected to sexual harassment that was so severe, pervasive, and objectively offensive that it deprived her of access to educational opportunities and benefits provided by the University.

41.    Loras College had knowledge of Plaintiff's report of sexual misconduct.

7

42.    Loras College acted with deliberate indifference to Plaintiff's report of sexual misconduct because its response to her report was clearly unreasonable in light of the known circumstances.

43.    Loras College's response to Ms. Swift's report of sexual misconduct was clearly unreasonable because, contrary to its own policies, it failed to assign a Loras College official to independently investigate the report of sexual misconduct and for purposes of the disciplinary hearing, collect evidence and witness statements.

44.    Loras College's response to Ms. Swift's report of sexual misconduct was clearly unreasonable because it failed to offer her appropriate academic support and accommodations that would enable her to continue her education on Loras College's campus.

45.    Loras College's response to Ms. Swift's report of sexual misconduct was clearly unreasonable because it failed to sufficiently train its staff to enable proper execution of its sexual and domestic violence policies and procedures. Loras College's inability to bring the disciplinary process regarding Ms. Swift's report of sexual misconduct to a prompt and final conclusion created a prolonged sexually hostile environment that barred her access to educational opportunities.

**WHEREFORE**, Plaintiff respectfully demands judgment be entered in her favor and against Defendant as follows:

    i.    Damages in amounts to be established at trial, including, without limitation, reimbursement and repayment for all of Plaintiff's tuition and related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual misconduct; damages for deprivation of equal access to the educational benefits and opportunities provided by Loras College; and damages for past, present and

8

future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present and future enjoyment of life, and past and present lost earnings and earning capacity;

ii.     Injunctive relief to be determined at trial requiring Loras College to comply with federal law under Title IX;

iii.    Pre- and post-judgment interest;

iv.     Costs;

v.      Attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

Such other and further relief as the Court may deem just and proper.

## Jury Demand

Plaintiff demands a trial by jury.

## Certification

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case

Date of Signing: _9/6/22_____

Signature of Plaintiff: _Rachael Swift_____
Rachael Swift

10

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF IOWA
2

3         RACHAEL SWIFT,              )
                                      )
4                    Plaintiff,       )
                                      ) Civil No. 2:22:CV-
5                    -vs-             ) 01019-LTS-KEM
                                      )
6         LORAS COLLEGE,              )
                                      )
7                    Defendant.       )
          ------------------------)
8
              DEPOSITION OF RACHAEL SWIFT, taken at
9         666 Grand Avenue, Suite 2000 Ruan Center,
          Des Moines, Iowa, commencing at 9:04 a.m.,
10        August 21, 2023, before Michele L. Proesch,
          Certified Shorthand Reporter of the State of
11        Iowa.

12                          APPEARANCES

13        Benjamin R. Merrill, of the BrownWinick Law
          Firm, 666 Grand Avenue, Des Moines, Iowa
14        50309, appeared on behalf of the Plaintiff.

15

16        CHRISTOPHER P. JANNES and KATHERINE E. GRAL,
          of the firm of Dentons Davis Brown,
17        215 Tenth Street, Suite 1300, Des Moines,
          Iowa 50309, appeared on behalf of the
18        Defendant.

19

20

21

22

23

24              Michele L. Proesch, CSR, RPR, CRR
                   Veritext Legal Solutions
25                     800-567-8658
```

1                           <u>INDEX</u>

2          <u>Witness</u>              <u>Attorney</u>              <u>Page</u>

3          Rachael Swift      Mr. Jannes              3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          <u>Requests</u>

19          #1 - E-mail communications with Loras
            College from the second female who had a
20          break-in at the school, page 179, line 8

21          #2 - Article from the <u>Dubuque Daily Herald</u>
            regarding Rachael Swift's Title IX claim,
22          page 237, line 5

23

24

25

```
 1                    PROCEEDINGS

 2                    RACHAEL SWIFT,

 3           witness herein, called as a witness by the

 4           Defendant, after having been first duly

 5           sworn, was examined and testified as

 6           follows:

 7                    EXAMINATION

 8           BY MR. JANNES:

 9      Q.   Ms. Swift, would you state your full name

10           for the record, please?

11      A.   Rachael Nadine Swift.

12      Q.   Ms. Swift, my name is Chris Jannes.  This is

13           my colleague, Katie Gral.  We represent

14           Loras College.  We're here to ask you some

15           questions about the lawsuit that you've

16           filed.  I'll start with if you've ever had

17           your deposition taken before.

18      A.   I have never.

19      Q.   I'll just go over a few ground rules, and

20           see if you can agree with me that this is

21           how we'll conduct it today.

22                First of all, you understand you're under

23           oath today --

24      A.   Uh-huh.

25      Q.   -- to tell the truth just as if you were in
```

1          a courtroom?

2     A.   Yes.

3     Q.   And you understand our court reporter here is taking

4          down everything you and I say.  So it's important

5          that we don't talk over one another.

6     A.   Yes.

7     Q.   So I will do my best not to talk over you if you

8          will let me get my question out, and if you would do

9          your best to wait until the question's out to give

10         an answer, it will be a lot easier for her.

11             Does that sound like a good way to proceed?

12    A.   Yes.

13    Q.   Also, it's normal in conversations for us to say

14         uh-huh, huh-uh, meaning yes and no.  That doesn't

15         work for our court reporter.  So I need yes or no

16         answers from you if I ask you a yes or no question,

17         all right?

18    A.   Sounds good.

19    Q.   And finally -- and perhaps most importantly -- if I

20         ask an unclear question, ask me to clarify.  It's my

21         job to ask clear questions to you so you understand

22         what I'm asking you, so if you don't understand,

23         please ask me to clarify.

24    A.   Sounds good.

25    Q.   And finally, if I've asked you a question and I've

1       received an answer, I'm going to assume that you

2       understood the question and, of course, answered

3       truthfully.

4   A.   Sounds good.

5   Q.   Fair enough as a way to proceed?

6   A.   Yes, sir.

7   Q.   All right.  I don't have a right to know any

8       conversations you had among your attorneys, but

9       other than that did you do anything to get ready

10      today to come talk to me in the sense of reviewing

11      documents, talking to people who are not attorneys,

12      et cetera.

13  A.   I reviewed the documents that Loras submitted to my

14      attorney, and that is all that I did --

15  Q.   Okay.  There were --

16  A.   -- and communications with my lawyer.

17  Q.   Right, and, again, during this deposition I am not

18      asking for any attorney-client communication.  So

19      you can assume any question I ask does not ask for

20      that information, and, of course, Mr. Merrill

21      will -- will object if I do, but understand that is

22      not my goal here today, to seek attorney-client

23      communication.

24         So you reviewed -- there were roughly

25      1,000 documents give or take.  You reviewed those

1          documents to get ready for today?

2     A.   I reviewed the 463-page document.  I skimmed through

3          the second half, but I read the first half in your

4          position, in Loras' position.

5     Q.   Okay; and when you say "position," there was a

6          proceeding before the office of civil rights.

7            Is that the position you're referring to, what

8          was submitted to the office of civil rights?

9     A.   I cannot answer that.  I do not recall exactly.  I

10         just reviewed what my attorney sent me.

11    Q.   Okay; and also, that's -- you bring up an important

12         point for a deposition.  If you don't know the

13         answer to a question, I'm not asking you to

14         speculate.  You can tell me you don't know.  I might

15         ask you why you don't know and then you can explain

16         further, but that's an important ground rule also

17         when we give a deposition --

18    A.   Okay.

19    Q.   -- is that fair?

20    A.   Fair.

21    Q.   Okay.  How old of a lady are you?

22    A.   I am 24.  I'm turning 25 in October.

23    Q.   Congratulations, I guess.  What's your date of

24         birth?

25    A.   10/16/98.

```
 1    Q.   Are you taking any medications today that would
 2         affect in any way your ability to listen to my
 3         question or to give a truthful answer?
 4    A.   None that would affect that, no.
 5    Q.   Do you have any mental or physical impairments,
 6         again, that would restrict you from hearing and
 7         understanding my question or giving a truthful
 8         answer?
 9    A.   No.
10    Q.   Are you married?
11    A.   I am not.
12    Q.   Do you have any children?
13    A.   I do not.
14    Q.   Where have you resided since birth?  You can just
15         tell me the towns.
16    A.   Since birth I have lived in Crystal Lake; Long
17         Grove; Arlington Heights; San Clemente, California;
18         and back in Arlington Heights.
19    Q.   Okay.
20    A.   And Loras, or Dubuque, Iowa, for school.
21    Q.   And other than the California location and Loras all
22         the other places I believe are in Illinois --
23    A.   Correct.
24    Q.   -- are they not?  And where do you currently live?
25    A.   Arlington Heights, Illinois.
```

```
1    Q.   And do you live with anyone there?

2    A.   I live with my mom and my sister.

3    Q.   And have you lived with your mom and your younger

4         sister since leaving Loras College?

5    A.   No, I was in California and then I moved back home

6         with my mom.

7    Q.   Were you in California for employment or for some

8         other reason?

9    A.   Some other reason.

10   Q.   Where were you born?

11   A.   Barrington, Illinois.

12   Q.   Where did you attend high school?

13   A.   John Hershey High School in Arlington Heights.

14   Q.   And I assume you graduated because you went on to

15        Loras College; is that correct?

16   A.   Correct.

17   Q.   And what year did you graduate?

18   A.   2017.

19   Q.   Other than Loras College have you ever attended any

20        other colleges, junior colleges or full four-year

21        colleges?

22   A.   I took classes, summer school classes at Harper

23        College in Illinois.

24   Q.   What was your start date at Loras, approximately?

25   A.   That would have been August of 2017.
```

```
 1   Q.   And why did you decide to attend Loras College?

 2   A.   I played soccer and the coach wanted me to come play

 3        soccer at Loras.

 4   Q.   Did you have a scholarship to play there?

 5   A.   I -- Not to play.  I had academic scholarships.

 6   Q.   And you did earn your degree from Loras; correct?

 7   A.   Correct.

 8   Q.   You have a four-year degree from there?

 9   A.   Correct.

10   Q.   What year did you graduate?

11   A.   2021.

12   Q.   And what was your major or area of concentration

13        that you got the degree in?

14   A.   Elementary education with an endorsement in math.

15   Q.   Besides soccer were you involved in any other

16        activities at Loras?

17   A.   Not that I can recall, no.

18   Q.   Are you currently employed?

19   A.   Self-employed.

20   Q.   Tell me what you do.

21   A.   I create home decor.

22   Q.   Can you be a little bit more specific as to what the

23        home decor is so I understand.

24   A.   I create wreaths, centerpieces, garlands, swags.

25   Q.   Is that a year-round business for you or is that
```

```
 1          more of a seasonal position?

 2    A.    Year-round.

 3    Q.    Have you ever used your education degree up to this

 4          point?

 5    A.    Up to this point, no.

 6    Q.    Do you work out of an office or do you work out of

 7          your home?

 8    A.    I work from home.

 9    Q.    And for at least the immediate future do you intend

10          that to be your employment and your means of

11          obtaining income or is there some other plan in the

12          future to use your degree or do something else?

13    A.    I cannot answer that.  I am going to follow the path

14          that I'm taking and see what goes from there.

15    Q.    Fair enough.  Now, you understand that we're here

16          today because you've filed a lawsuit against Loras;

17          correct?

18    A.    Correct.

19    Q.    Who drafted the lawsuit?

20          MR. MERRILL:  Objection.

21          MR. JANNES:  Because at the time I believe you

22          were pro se.

23          MR. MERRILL:  I'm going to object to the extent

24          it asks for attorney-client privileged

25          information --
```

```
1              MR. JANNES:  Yeah, and I can clarify.

2              MR. MERRILL:  -- but you can answer.

3              MR. JANNES:  And I'll clarify.

4      Q.    Your attorney's again stating that to the degree

5              you're going to relate anything that was said

6              between an attorney and you, he's objecting, and I

7              agree with that.  I'm not asking for anything said.

8              I'm just asking for a name, the identity of who

9              drafted the lawsuit because at the time I believe

10             the record would show you were pro se.

11     A.    Myself and Brad Levison.

12     Q.    Mr. Levison is an Illinois attorney; right?

13     A.    Correct.

14     Q.    And I see that he's appeared in this lawsuit along

15             with Mr. Merrill; correct?

16     A.    Correct.

17     Q.    Now, you're alleging a Title IX claim against Loras

18             College.

19                  Is that your understanding?

20     A.    Yes.

21     Q.    What's your understanding, if any, of the

22             obligations of Loras College under Title IX --

23             MR. MERRILL:  I'm going to object to the extent

24             it calls for a legal conclusion.  To the extent you

25             have an understanding, you can answer.
```

1    A.    My understanding was that Nancy Fett was going to be

2           conducting the process of investigating my claims

3           against the people in my Title IX.

4    Q.    Okay.  Do you have an understanding again from a

5           layperson's perspective of what obligations Title IX

6           places upon a college?

7           MR. MERRILL:  Same objection.

8    A.    Title IX -- Can you clarify --

9           BY MR. JANNES:

10    Q.    Yeah.

11    A.    -- the question?

12    Q.    What I'm asking is from your layperson's perspective

13           what obligations does a college or educational

14           institution have to do to comply with Title IX.

15    A.    I believe it has to do with discrimination based on

16           race, gender; and that's what my understanding is of

17           Title IX.

18    Q.    Okay.  The incident that's the subject of this

19           lawsuit, as I understand it, began on September 6th

20           of 2020; is that correct?

21    A.    Correct.

22    Q.    And at that time where were you living?

23    A.    Byrne Oaks apartment 101.

24    Q.    And how long had you been living in Byrne Oaks?

25    A.    I lived in there from -- in that apartment from the

1          start of the school year until the incident.

2     Q.   And were you living alone or did you have roommates?

3     A.   I had five other roommates.

4     Q.   Can you tell me their names?

5     A.   Olivia, Kaitlyn, Caitlin, Abbey, Jaelynn, and

6          myself.

7     Q.   Do you know their last names?

8     A.   Some of them.  It's Abbey Erikson, Olivia DeVries,

9          Caitlin Scopa.  That's the best.  I don't recall the

10         other two last names.

11    Q.   Okay.  Also, I'll just tell you as we go through the

12         deposition  if you need a minute to pause to collect

13         your thoughts, it's completely appropriate.  Don't

14         feel like I'm rushing you to answer, because that's

15         not my intention.  So if you need to sit for a

16         minute and think, that's completely appropriate.

17    A.   Okay.  Thank you.

18    Q.   Do you still keep in contact with those five

19         roommates?

20    A.   I have contacted them since I graduated, yes.  It is

21         not constant contact, no.

22    Q.   Okay.  Which of those five, if any, do you consider

23         yourself to be closest with in the sense that still

24         in contact with most often?

25    A.   I don't have constant contact with any of them, but

1            I know that if I reached out, we would still be in

2            cordial contact.

3      Q.   Okay.  Are you friends with them on social media?

4      A.   Yes.

5      Q.   All of them?

6      A.   To my knowledge, yes.

7      Q.   Have you ever discussed this lawsuit with them?

8      A.   They know of the lawsuit.  I don't recall if I

9            directly told them of the lawsuit.

10     Q.   Byrne Oaks is I understand a residence hall or

11           dormitory that was made available by the college to

12           students; correct?

13     A.   Correct.

14     Q.   And how many bedrooms did you have in Byrne Oaks in

15           your apartment?

16     A.   Bedrooms?  There are four.

17     Q.   Did you share a bedroom or did you have a bedroom to

18           yourself?

19     A.   I had a single.

20     Q.   Did it have a kitchen?

21     A.   Yes.

22     Q.   And open living space in it also?

23     A.   Yes.

24     Q.   All right.  I'm going to show you what's been marked

25           in this record as Loras 705.  And, again, as I show

1          you exhibits today -- I'm going to show you quite a

2          few -- it is absolutely fine and appropriate for you

3          to take your time to look at that, and I'll give you

4          the opportunity to look at it and ask you each time

5          hopefully, if I remember, are you ready for the

6          question.

7              So why don't you look at 705 and after you feel

8          like you have had an adequate opportunity, let me

9          know if you're ready for the question.

10    A.    (Witness complied.)  Okay.

11    Q.    Okay.  Do you recognize Loras 705?

12    A.    Yes.

13    Q.    What's that depicting?

14    A.    The layout of Byrne Oaks first floor apartments.

15    Q.    Okay, and this is accurate -- an accurate layout as

16          of the time that you were a student there when the

17          September 6th, 2020, incident occurred; correct?

18    A.    Correct.

19    Q.    All right.  It looks to me like from this layout

20          your apartment is on the right-hand side of this

21          diagram at the bottom; right?

22    A.    Correct.

23    Q.    And it looks like we also have a kitchen that's on

24          the right-hand side, again, of the diagram depicted

25          and then there is also an X there with your name

```
 1          next to it, Rachael Swift, in a single room

 2          designated 101-D.

 3              Do you see that?

 4     A.   I do see it.

 5     Q.   Okay.  Is that accurate as to how it was on that

 6          date?

 7     A.   No.

 8     Q.   All right.  Where was your room on that date?  Oh --

 9     A.   I was --

10     Q.   Go ahead.

11     A.   I was in 101-C.

12     Q.   All right, so you were one back --

13     A.   Correct.

14     Q.   -- from -- So we had 101-D, a bathroom, 101-C.

15              Is the general layout correct as to the

16          configurations as to the four bedrooms, the living

17          room, the kitchen, and the entry to the apartment?

18     A.   The entry was more on the left side and the kitchen

19          was more on the right.

20     Q.   Okay.  Other than that generally it's correct?

21     A.   Generally the living room was just that whole space,

22          not only on the left side and then the dining room

23          was that whole length of space, not just on that

24          side, but, yes.

25     Q.   Okay, and there were two means of ingress and egress
```

1              from the apartment depicted at least in this

2              diagram, the entry, which you said might have been

3              on the other side, and then it looks like also there

4              was a deck; is that correct?

5    A.    Correct.

6    Q.    And this was a first floor apartment, right.  So

7              it's on the ground level?

8    A.    Correct.

9    Q.    All right.  Was there a balcony on the deck that you

10             would walk up or was it just the ground level, the

11             deck was?

12   A.    It was a slab of concrete and then a door entering

13             the apartment.

14   Q.    Back on September 6, 2020, were you alone in the

15             apartment in the late evening, early morning hours

16             or were roommates there with you?

17   A.    I was alone.

18   Q.    And were the roommates gone for any particular

19             reason?

20   A.    It was Labor Day weekend, so students either -- or

21             my roommates either returned home or was staying

22             with boyfriends or other friends.

23   Q.    Had classes started at Loras at that time?

24   A.    Yes.

25   Q.    What had you been doing earlier in the day?  I think

```
 1          it was a Sunday; correct?
 2    A.    So the incident occurred in the early morning, so I
 3          was sleeping --
 4    Q.    Okay.
 5    A.    -- Sunday morning.
 6    Q.    Okay.  How about on the 5th, what had you done?
 7    A.    I hung out in the apartment.  I believe I ran some
 8          errands and then I worked on a project.
 9    Q.    What time did you go to sleep that evening?
10    A.    To my knowledge anywhere from nine o'clock to
11          midnight.
12    Q.    Can you attest under oath that you locked the front
13          door to your apartment that evening before you went
14          to sleep?
15    A.    Yes.
16    Q.    Is that answer based on what you normally do or do
17          you have an actual memory of locking the front door?
18    A.    Both.
19    Q.    How about the exterior or entrance by the deck, was
20          that locked --
21    A.    Yes.
22    Q.    -- before you went to sleep?
23    A.    To my knowledge it was locked.
24    Q.    Did you check it before you went to sleep?
25    A.    I believe I checked it before going to bed.
```

1    Q.    Okay.  Is that typical for what you would do; in

2          other words, before you'd go to sleep would you go

3          around and check and make sure your doors are locked

4          to the apartment?

5    A.    Yes.

6    Q.    Okay, so after locking the doors your testimony is

7          you went to sleep.

8          When did that occur approximately?

9    A.    I would say I probably returned to my room and

10         watched TV for an unknown amount of time and then

11         went to bed.

12   Q.    And, again, do you have any recollection of about

13         when you fell asleep?

14   A.    I do not have an exact number --

15   Q.    Okay.

16   A.    -- or time.

17   Q.    What do you remember happening next after you fell

18         asleep?

19   A.    It was storming that night.  I was lying in bed.  I

20         had a window in my room.  So where my bed was was

21         where one of the windows was.  I was sleeping.  I

22         was facing the window, and as I rolled over in bed,

23         there was someone opening my door to my bedroom.

24   Q.    And do you know about what time this occurred?

25   A.    Just after 4:00 in the morning.

1    Q.    Let me show you what's been marked as Loras 135,

2          136, and, again, the same representation I gave you

3          as before applies.

4                What I'd like you to do is just take your time

5          to look at that and when you're ready to answer my

6          questions, let me know.

7    A.    (Witness complied.)

8                MR. JANNES:  We'll go off the record.

9                (An off-the-record discussion was held.)

10               MR. JANNES:  We can go back on.

11   A.    I have read through and I'm ready for your

12         questions.

13   Q.    All right.  This looks to me as if this is an

14         incident report information that was completed by

15         Officer Robert Rosenow of the campus safety police

16         on or about September 6th, 2020.

17               Is that your understanding of what this document

18         is?

19   A.    Yes, that's my understanding.

20   Q.    All right.  I'm going to refer you to the incident

21         description at the bottom.  It's right below

22         Descriptive Information.  It looks like about the

23         middle of that first paragraph it states, she heard

24         a noise, woke up and saw a person in her bedroom

25         door.  She screamed and the person took off out the

1          front door.

2              Do you see that?

3     A.    Uh-huh.

4     Q.    Is that accurate as to what occurred?

5     A.    No, I don't recall hearing a noise.  My -- What I

6          did was I rolled over in bed, and as I was rolling

7          over in bed, I ended up just opening my eyes and

8          screamed.  Once I screamed he left my doorway.  I

9          had no knowledge if he left the apartment officially

10         or if he just left my doorway.

11    Q.    Okay, so if we take out the "heard a noise" part and

12         we -- and we take out the "took off out the front

13         door" part, is the part that says saw a person in

14         her bedroom, she screamed, and the person took

15         off -- is that accurate as to what occurred?

16    A.    Yes.

17    Q.    Did you sleep with your bedroom door open or closed

18         typically when you were residing in that apartment?

19    A.    Closed all the time.

20    Q.    And that evening was it open?

21    A.    No, it was closed.

22    Q.    And when you saw the person in your bedroom door,

23         are you assuming that the person must have opened

24         the door since you indicate it's typically closed?

25    A.    Yes.

```
 1    Q.    Were you able to describe the person with any other

 2          specifics other than knowing it was a person?

 3    A.    I could tell that it was a male figure, that he had

 4          one hand on my door handle (indicating) as he was

 5          opening the door.  He was average male height, and

 6          he looked like he had messy hair (indicating) from

 7          the outline I saw.

 8    Q.    Did you relay that information to Officer Rosenow

 9          that night?

10    A.    Yes, I did.

11    Q.    When you look at the report, do you see anywhere

12          where he indicated that this person was a male who

13          had messy hair in any way?

14    A.    No, I do not see that --

15    Q.    Do you know of any person --

16    A.    -- in this report.

17    Q.    Okay.  I'm sorry.  I did not mean to interrupt you.

18          Do you know of any reason why he wouldn't note

19          that if you told him that?

20    A.    That is not something I can say yes or no -- or give

21          any information on to why it wouldn't be in here.

22    Q.    Was this person actually in the room or just in the

23          doorway; in other words, had they -- had they

24          entered into the room or were they squarely in the

25          doorway with the hand I think you indicated on the
```

```
 1        doorknob; is that correct?
 2   A.   Correct.  They had the hand on the doorknob
 3        (indicating) and it looked as though they had taken
 4        at least one step into the room.
 5   Q.   How long did they remain in the doorway after you
 6        screamed -- saw them and screamed?
 7   A.   I cannot give an accurate amount of time.  I would
 8        say anywhere from 1 to 10 seconds.
 9   Q.   Okay.  When they left, were they running?  In other
10        words, other than normal walk.  Were they running
11        away from the doorway and going someplace else?
12   A.   My focus was not watching them leave the apartment.
13        My focus was trying to shut my bedroom door because
14        I didn't know if he left the apartment when he left
15        my doorway.
16   Q.   Okay, so is it your testimony you got up out of bed
17        after the person left the doorway and shut your
18        door?
19   A.   Yes.
20   Q.   What was the lighting like in the apartment and the
21        bedroom at night?  Were there night lights, other
22        lights on or was it completely dark in the
23        apartment?
24   A.   I have the light post right outside my window, so I
25        had light from outside coming in.  I have -- coming
```

1        in from my windows in my room, but beyond that the

2        lights were not on.

3  Q.  Okay.  Did that light reach the doorway or was it

4        you were just able to see this figure or this person

5        because your eyes had adjusted to the darkness?

6  A.  I was really only able to see the outline of the

7        person.

8  Q.  But your testimony here today is that it was a male

9        person?

10  A.  Yes --

11  Q.  Okay.

12  A.  -- from the outline.

13  Q.  And your testimony here today was you told

14        Officer Rosenow that it was a male person?

15  A.  Correct.

16  Q.  Had you ever had any encounters with Officer Rosenow

17        before this time?

18  A.  Not that I can recall, no.

19  Q.  Had you ever had any encounters with campus security

20        before this time?

21  A.  Beyond maybe -- or I might have had an issue with

22        parking on campus or getting a parking pass, but I

23        cannot recall an incident where I had communications

24        with security officers.

25  Q.  Okay.  Does your bedroom have a lock on the door?

```
 1    A.    On the door it does, yes.

 2    Q.    Did you use it that evening?

 3    A.    I did not.  It's not typical that I lock it.

 4    Q.    When is, if you recall -- I assume that you've seen

 5          this exhibit, Loras 135, 136 before today; correct?

 6    A.    This (indicating) might have been one of the

 7          documents that I skimmed over, but I did not have a

 8          chance to fully read this document.

 9    Q.    All right, and that's -- that's what I'm asking you,

10          had you seen it before today, and you just testified

11          that you believe maybe it was part of the package of

12          documents that we gave to your attorney.

13             Is that what you're saying?  And you think you

14          might have skimmed over it?

15    A.    I might have.  I believe I skimmed over I believe

16          this (indicating) section, the Descriptive -- or the

17          Descriptive Information was in a different part of

18          the information that I read, and that's the part

19          that I was able to read previously, but I believe I

20          skimmed over the entire thing.

21    Q.    Other than seeing it as part of the documents that

22          we produced to your attorney in this lawsuit, had

23          you ever seen it before then?

24    A.    Not that I can recall, no.

25    Q.    Do you know what the person did after they exited
```

```
 1          your doorway?

 2     A.   No.

 3     Q.   What happened after you got up and shut the

 4          apartment door?  What did you do?

 5     A.   I locked the bedroom door, I shoved my side table in

 6          front of the door, and was hysterically crying while

 7          I was on the phone with my mom.

 8     Q.   Was your mom the first person that you called or was

 9          there somebody else that you called first after this

10          incident?

11     A.   My mom was the first person I called.

12     Q.   Did you call anyone else after that?

13     A.   My mom informed me that I needed to call campus

14          security.  So I called campus security after I

15          called my mom.

16     Q.   And what -- what was the time differential between

17          getting off the phone with your mother and calling

18          campus security in relation to when the incident

19          occurred?

20     A.   So I just put my mom on hold, and by the time --

21          There was -- I was probably on the phone with my mom

22          for about five minutes by the time I was able to

23          tell her what occurred to her informing me that I

24          should call campus security.

25     Q.   And what was the time differential, if you recall,
```

1          between calling campus security and when

2          Officer Rosenow came to your apartment?

3   A.   I cannot give an official time.  I do not recall the

4          exact timing of when the officers arrived or when I

5          called.

6   Q.   If we look at that first paragraph under Incident

7          Description, it says that Officer Rosenow was

8          checking three other bedrooms and also checked the

9          hallways and the stairs, and he notes he didn't see

10         anyone else.

11            Did he do that?

12  A.   He checked the other bedrooms while I remained in my

13         bedroom.  I cannot say whether or not he checked the

14         hallways.  I did not see.

15  Q.   Okay.  Did he come back and report to you that he

16         had checked the hallways also?

17  A.   I am unsure.

18  Q.   Did he find anyone or see anything as far as you

19         know?

20  A.   As far as I know, no.

21  Q.   Would you agree that there wasn't any sign of forced

22         entry into your apartment on either entrance?

23  A.   It did not look like there was forced entry.

24  Q.   I want to refer you to the second paragraph under

25         the Incident Description.  Officer Rosenow notes

```
 1            that you told him that you noticed you must not have
 2            locked the front door to the apartment.
 3               Do you see that there?
 4    A.      I do.
 5    Q.      Do you disagree with that?
 6    A.      I do.
 7    Q.      Do you know of any reason why Officer Rosenow would
 8            state something to the contrary to what you contend
 9            you did?
10    A.      I cannot say how or why he might have misheard or
11            written this incorrectly.  It also talks about me
12            only having three roommates, when I know I told him
13            I had five other roommates.
14    Q.      So there were a total of six of you in the
15            apartment, is that accurate; you and five others?
16    A.      We all lived there, but at the time of the incident
17            it was just myself.
18    Q.      Right.  I'm just getting -- I'm just asking if
19            everyone was present in the apartment as opposed to
20            some -- or the majority of the people gone away,
21            there would have been six people living there;
22            correct?
23    A.      If -- If we were all there at one time --
24    Q.      Yes.
25    A.      -- there would be six females living within the one
```

```
 1          apartment.

 2     Q.   Is there anything else in this document that you

 3          disagree with in the sense of how Officer Rosenow

 4          described the incident, described what he did, and

 5          described his conversations with you?  And I'll say

 6          that you don't have to, Ms. Swift, go over what you

 7          told me that you disagree with.  I'm just --

 8     A.   Okay.

 9     Q.   -- wanting to know if there is anything else.

10     A.   The description part, I wasn't able to give a

11          detailed description, but I was able to give a

12          description.

13     Q.   All right.  Anything else that we haven't already

14          talked about?

15     A.   I didn't say I was going to be staying alone.  I

16          said my roommates would be returning and that my dad

17          would be coming to campus.

18     Q.   Okay.  Anything else?

19     A.   Not that I can see.

20     Q.   There is a date and time of incident noted on the

21          first page, Loras 135, right in the middle.  It says

22          date and time of incident, September 6, 2020, at

23          4:25 a.m.

24               Is that accurate as to the approximate time that

25          this occurred?
```

```
 1    A.    I would say it happened closer to around 4:15 to

 2          4:20 by the time he made it to my apartment and got

 3          there --

 4          THE REPORTER:  "By the time" what, ma'am?

 5    A.    By the time the officer got to my apartment.

 6    Q.    Would you agree that Officer Rosenow showed concern

 7          for you and your safety?

 8    A.    I think he attempted to.  I don't necessarily feel

 9          that he was understanding.

10    Q.    When you say he wasn't understanding, what do you

11          mean by that?

12    A.    I don't believe he was understanding in terms of how

13          frightened I was and how scared I was and just

14          worried for my own safety.

15    Q.    Did he ask you if you wanted to stay with a friend?

16    A.    I believe he asked if there was anywhere else I

17          could stay on campus.

18    Q.    Wouldn't you interpret that as being concerned for

19          your safety and wanting to make sure that you were

20          okay?

21    A.    That's how it could be depicted from someone else.

22          I felt that the way he was conversing with me he

23          didn't necessarily understand what I was feeling and

24          going through.

25    Q.    Would you agree that he did understand, based upon
```

1          his actions and based upon his conversation with

2          you, that this was a scary incident to you?

3   A.   He might have believed it was a scary incident.  I

4          didn't necessarily feel very comforted or supported

5          throughout my interaction with him.

6   Q.   Okay, so -- and you can disagree or correct me.  Are

7          you saying essentially that he perceived that this

8          was a scary incident, but he wasn't understanding

9          how scary it was to you?  Is that what you're

10         telling me?

11  A.   I believe that he realized an incident occurred and

12         that someone entered my apartment, but I don't

13         think -- I don't feel that he was understanding how

14         scared I was and fearful for me.

15  Q.   Okay.  Would you agree that in checking all the

16         other bedrooms of the apartment is showing concern

17         for your safety?

18  A.   I think that is him doing his job.

19  Q.   And he is part of campus safety; right?  That's your

20         understanding of what he was doing?

21  A.   That's my understanding, yes.

22  Q.   Okay; so when he checked all those doors and he

23         checked the apartments -- individual apartments in

24         your campus apartment, do you think that he was

25         doing his job to make sure that you were safe?

1   That's what I'm asking you.

2 A. Yes.

3 Q. All right, and if we assume -- Okay.  I understand

4   you didn't leave your bedroom, but if we assume he

5   went and checked the hallways and checked outside

6   the apartment, would you also agree that he was

7   doing his job as part of campus safety to make sure

8   you were safe?

9 A. Yes, if that is what he did.

10 Q. When was the first time you came out of your

11   apartment?  It sounds like -- and you correct me if

12   I'm wrong, 'cause I want to understand the facts in

13   the right context.

14   Was all your interaction with Officer Rosenow

15   with you still in your apartment and him going and

16   checking the other apartments and then assuming he

17   checked outside, performing that duty while you were

18   still in your apartment?

19 A. I did not leave my apartment until my dad arrived on

20   campus.

21 Q. Okay.  When was that?

22 A. I would say between nine and ten o'clock.

23 Q. If we go back a moment again to when Officer Rosenow

24   came to your apartment, I don't believe I asked you

25   how long he stayed, how long his total time there

1       was.

2       Do you have an understanding of how long he was

3       there in the sense of minutes or hours, if that's

4       the case?

5  A.   It wasn't hours.  I would say it ranged anywhere

6       from 15 to 30 minutes.

7  Q.   All right.  Did anyone else from Loras College that

8       morning at approximately 4:15, 4:25 a.m. come to

9       your apartment in response to your call besides

10      Officer Rosenow?

11  A.   Not that I recall.

12  Q.   So your dad arrived approximately 10:00 a.m. on

13      September 6th; correct?

14  A.   Correct.

15  Q.   And what -- what happened after that just basically?

16  A.   We left the apartment.

17  Q.   Okay.  By the way, are you aware of any other

18      security measures that Officer Rosenow or anybody

19      with campus safety put in place after he left your

20      apartment?

21  A.   I was informed of things that they were doing.  I

22      did not see or can say if it was done or not.

23  Q.   All right.  Let's talk just a minute about what you

24      were informed of.

25       First of all, tell me what you were informed of

```
 1          was done in the sense of additional security

 2          measures after Officer Rosenow left your apartment

 3          that morning.

 4    A.    When he left my apartment, he said that campus

 5          security would do extra rounds around the building

 6          and in the building.

 7    Q.    Okay.  Did he tell you anything else?

 8    A.    Not that I can recall.

 9    Q.    Okay.  Are you aware of anything else in the sense

10          of additional security measures that was done after

11          the incident, whether the information derived from

12          Officer Rosenow or from anyone else?

13    A.    On September 6th I do not have knowledge besides

14          just extra patrols.

15    Q.    And that would be around basically the Byrne Oaks

16          apartment; correct?

17    A.    Correct.

18    Q.    So you said your dad came at 10:00 a.m.; correct?

19    A.    Approximately.

20    Q.    What's your dad's name?

21    A.    Kenneth Swift.

22    Q.    Was anyone else with your dad or was it just your

23          dad that arrived?

24    A.    My younger sister.

25    Q.    And what's her name?
```

```
 1    A.    London Swift.

 2    Q.    I'm going to show you what is marked as Loras 0594,

 3          and that purports to be a September 6, 2020, e-mail

 4          from Molly Burrows Schumacher to Arthur Sunleaf, and

 5          before I ask you some questions, again, I want to

 6          give you the full opportunity to read that and you

 7          let me know when you're ready, okay?

 8    A.    Okay.  Thank you.  (Witness complied.)  Okay.

 9    Q.    All right.  Ms. Swift, have you seen this document

10          before, Loras 0594?

11    A.    Yes.

12    Q.    Can you tell me when you first saw it?

13    A.    When I was reviewing documents my lawyer sent me.

14    Q.    Okay, so just recently; right?

15    A.    Correct.

16    Q.    Who do you understand Molly Burrows Schumacher to

17          be?

18    A.    She is the head of resident life on campus.

19    Q.    Okay; and how about Arthur Sunleaf, who do you

20          understand him to be?

21    A.    The Dean of Students.

22    Q.    And you would agree this e-mail is authored the same

23          day as you reported the incident, September 6th,

24          2020?

25    A.    Correct.
```

```
 1   Q.   Would you agree that Molly is expressing concern

 2        over what occurred and noting to Dean Sunleaf the

 3        availability to help you in this situation?

 4   A.   Can you repeat that?  Sorry.

 5   Q.   Sure.  What I'm asking you is would you agree that

 6        Molly is expressing concern over what occurred to

 7        you and noting the college's availability to help

 8        you with the situation?

 9   A.   I don't necessarily read concern for me within this

10        e-mail, yeah.

11   Q.   Let me ask how do you interpret this sentence then,

12        I told him to send it to Katie and they could

13        discuss safety strategies and how we can help.

14            What do you understand her to be saying if it's

15        not to help you?

16   A.   That she's going to have Katie talk with me and have

17        a meeting and do her job on keeping the students

18        safe on campus.

19   Q.   Would Katie talking with you and keeping the

20        students safe on campus -- wouldn't you agree that

21        that's helping you with this situation that occurred

22        to you?

23   A.   I think if we have a conversation about what can be

24        done to help me is great, but the steps that follow

25        are also important.
```

1    Q.   Also, the e-mail states Pucci -- Am I saying that
2         right?
3    A.   Yes.
4    Q.   Pucci called.  She went home.  Mom bringing her back
5         tomorrow.  Wants to talk with someone in person
6         about it.
7             Do you see that portion of the dialogue in the
8         middle of the e-mail (indicating)?
9    A.   I do.
10   Q.   All right.  Who is Pucci?
11   A.   He is the head women's soccer coach.
12   Q.   What's his first name?
13   A.   Matt.
14   Q.   Matt?
15   A.   Matt.
16   Q.   Okay.  How did Mr. Pucci know about this incident in
17        the approximate 4 hours that occurred between when
18        you first reported it to campus security and when
19        Ms. Burrows Schumacher sent this e-mail to
20        Mr. Sunleaf -- or Dean Sunleaf?  Excuse me.
21   A.   It's actually more like 12 hours.
22   Q.   Yes, you are absolutely right.  I misread it.  It's
23        8:38 p.m., so 12 hours.
24            Go ahead.  How did -- How did Matt Pucci,
25        Mr. Pucci know that something had occurred?

```
 1   A.   Once the incident occurred and I was on the phone
 2        with my mom, she didn't want me alone in the
 3        apartment waiting for my dad to come.  So she was
 4        going to see if Matt Pucci could come and either sit
 5        with me or if we could leave the apartment.
 6   Q.   Mr. Pucci calling Ms. Schumacher, which is what this
 7        e-mail implies, would you agree that that's
 8        reflective of Mr. Pucci being concerned about you
 9        and what occurred with regard to the incident?
10        MR. MERRILL:  I'm going to object to the
11        question in that it speculates on something that's
12        in Mr. Pucci's mind, and I don't think Rachael can
13        testify to it, but you can testify to your
14        understanding.
15   A.   To my understanding Matt -- Sorry, 'cause we were
16        calling him Matt -- that Pucci cared and tried his
17        best to be there to support me.
18   Q.   Okay.  It says, Pucci called.  She went home.
19        Do you see that portion?
20   A.   I do.
21   Q.   Did you go home that particular day, September 6th,
22        2020?
23   A.   I did.
24   Q.   And was home at that time Arlington Heights?
25   A.   It was.
```

1    Q.   Do you know what time Mr. Pucci called

2         Ms. Schumacher?

3    A.   I do not.

4    Q.   Did you ever speak with Mr. Pucci about what had

5         occurred other than perhaps the day of -- or, I'm

6         sorry, was it your -- Strike that.

7           Was it your mother who spoke with Mr. Pucci or

8         your father or was it you?

9    A.   I believe my mother did and that I also did --

10    Q.   Okay.

11    A.   -- at some point throughout the day.

12    Q.   All right.  Thank you.  Tell me about your

13         conversations with Mr. Pucci about what occurred in

14         the sense of when did they occur and what did you

15         tell him.

16    A.   I cannot give a specific time that it occurred.  I

17         was on the phone with my mom and then my dad came to

18         town -- or came to Dubuque.  I believe throughout my

19         phone call with my mom we were trying to get in

20         touch with him.  We were unable to get in touch with

21         him until later, and I just informed him on what was

22         happening and what was going on.

23    Q.   And I think you told me earlier that you felt he was

24         concerned about you and what had happened; correct?

25    A.   I hope so.

```
 1   Q.   That was your perception, though; correct?

 2   A.   That was my perception of -- yes.

 3   Q.   All right; and, again, I can -- I'm asking for your

 4        perceptions based on the conversations you had with

 5        him and what was said.

 6             You understand that; right?

 7   A.   Yes.

 8   Q.   All right.  Did you have more than one talk with

 9        Matt Pucci about this incident or was it just this

10        one close in time to when the incident occurred?

11   A.   I cannot give an exact number of times I talked to

12        him about this incident.  I know I just know that I

13        did it at least once on September 6th.

14   Q.   All right.  I'm going to show you what's been marked

15        as Loras 0633, and where I'm going to refer you is

16        to the middle of that page with an e-mail that

17        begins, "Good evening".  This purports to be a

18        September 6, 2020, e-mail from Elaine Kostopoulos to

19        Molly Burrows Schumacher.

20             Do you see that e-mail?

21   A.   I do.

22   Q.   Okay.  Would you tell me when you're ready to

23        receive a question?

24   A.   Okay.  Okay.  I'm ready.

25   Q.   All right.  Have you seen Loras 633 before?
```

```
1    A.    Yes, in documents that my lawyer sent me.

2    Q.    And never before then; correct?

3    A.    Not that I can recall.

4    Q.    And Elaine Kostopoulos is your mother; is that

5          correct?

6    A.    Elaine Kostopoulos is my mother.

7          MR. JANNES:  Boy, I didn't do very good with

8          that name, did I?  Off the record.

9          (An off-the-record discussion was held.)

10         MR. JANNES:  Back on the record.

11   Q.    Did you discuss with your mother the sending of this

12         e-mail to Molly Burrows Schumacher?

13   A.    My mother and I discussed trying to set up a meeting

14         with both Dean and Molly.  I cannot -- I do not

15         believe that I saw her write this e-mail at this

16         point because I was not with her.

17   Q.    Okay; and was that the purpose of the e-mail going

18         out, as you understood it, to set up a meeting?

19   A.    From my understanding it was to set up a meeting

20         with both Dean and Molly.

21   Q.    Okay.  About halfway into the body of that e-mail we

22         have a sentence that says, What happened to Rachael

23         is unacceptable.

24         Do you see that?

25   A.    I do.
```

```
 1    Q.    Okay.  Did your mother ever discuss with you what

 2          she meant by the word "unacceptable"?

 3    A.    She did not.

 4    Q.    And there is a Katie mentioned in there.  Is that

 5          your understanding to be Katie Keleher-Garfoot of

 6          the college?

 7    A.    Correct, that is my understanding.

 8    Q.    And what is -- what is Katie Keleher-Garfoot's role

 9          at the college, if you know?

10    A.    To my understanding she is the assistant in res

11          life.

12    Q.    "res" like in residence; right?

13    A.    Yes.  I apologize.

14    Q.    No, that's all right.  Just as long as we're all

15          understanding one another.

16              All right.  I'm going to show you what's been

17          marked as Loras 632 to 633, and, again, this -- and

18          specifically I'm going to refer you to the bottom of

19          the page that looks like this is an e-mail from

20          Molly Burrows Schumacher to your mother, and it runs

21          over into the second page on 633, and if you can

22          just read that section for me and let me know when

23          you've done that.

24    A.    (Witness complied.)  Okay.

25    Q.    All right.  It looks like -- If we look back at the
```

```
1            prior exhibit that I just showed you, it looks like

2            your mom's e-mail went out at 8:46 p.m. on

3            September 6th, and if we look at this e-mail, it

4            looks like it went out at 10:56 p.m. on

5            September 6th.

6                 Do you see that?

7      A.    I do.

8      Q.    So there is about a two-hour difference to where we

9            have Molly responding to your mom's e-mail; correct?

10     A.    Correct.

11     Q.    And it looks like, due to unavailability due to some

12           hospitalization in July, Molly was suggesting to you

13           that you meet with Katie Keleher-Garfoot on 9/7,

14           which would have been the day after the incident.

15                Do you see that there at the bottom of the page?

16     A.    I do see that, yes.

17     Q.    And it looks like Molly's also telling you that even

18           though she's unavailable, if you want to have a call

19           with her, that she would also be available for that,

20           too, and that's on the next page in the middle

21           paragraph?

22     A.    I do see that, yes.

23     Q.    And she was also telling you that -- in the bottom

24           paragraph if you'd prefer to meet with Dean Sunleaf,

25           that he would be available also.
```

1          Do you see that?

2     A.   I do.

3     Q.   And also it looks to me like that Molly is telling

4          you that -- excuse me, Molly is telling your mother

5          that Katie will address additional safety resources

6          for your apartment.

7          Do you see that at the last paragraph of the

8          e-mail?

9     A.   I do.

10    Q.   Would you agree that from this dialogue between

11         Molly and your mother that it's logical to conclude

12         that the college was treating this incident as a

13         serious matter?

14    A.   I would agree that after my mother and I requested

15         meetings to discuss all of this, they were more than

16         willing to have meetings.

17    Q.   They certainly weren't ignoring you and your mother,

18         you'd agree based on the e-mails and the dialogue

19         back and forth here.

20         That's a fair statement, isn't it?

21    A.   Yes, I would say that's a fair statement.

22    Q.   All right.  Let's take a look at what's been marked

23         as Loras 146, and, again, you take your time to read

24         that, Ms. Swift.  This purports to be a

25         September 7th, 2020, e-mail from Dean Sunleaf to

1          your mother, and, again, I'm up at the top of the

2          page on Loras 146.

3             Before -- Before I ask you some questions and

4          before you tell me you're ready, the To line at that

5          e-mail at the top, I assume that's your mother's

6          e-mail, at least that's what I've perceived to be

7          her e-mail at the time; is that correct?

8     A.   The ukchelsea?

9     Q.   Yes.

10    A.   That was her e-mail at the time, yes.

11    Q.   All right.  Please let me know when you're ready for

12         a question.

13    A.   Okay.  Okay.  I am ready.

14    Q.   All right.  It looks like in the last sentence of

15         that two-paragraph e-mail Dean Sunleaf is telling

16         you he also will be available in his office for a

17         meeting if that's desired of your mother and

18         yourself.

19            Do you see that?

20    A.   I do see that.

21    Q.   And he is reaching out it looks like roughly within

22         about 26 hours of the incident.  His e-mail goes out

23         September 7th, 2020, at 6:35 a.m.; is that accurate?

24    A.   That is.

25    Q.   So at that point in time you had had approximately

1          four folks from the college reaching out to you

2          telling you that they were available and at your

3          disposal and at your mother's disposal concerning

4          the incident.

5          Would you agree that's accurate?

6     A.   Approximately at that time I contacted the officer

7          to check the apartment and we contacted the

8          officials at Loras for a meeting.

9     Q.   Right, and they had -- they had -- approximately

10         four of them had responded by that time directly to

11         you or your mother telling you that they were

12         available for consultation or meeting.  That's

13         accurate, isn't it, based on what we saw in the

14         e-mails?

15    A.   After we had already requested, correct.

16    Q.   And would you agree based upon Dean Sunleaf's

17         response making himself available for a meeting

18         that -- that he was treating your situation as a

19         serious matter that the college was willing to

20         devote attention to?

21    A.   I can't speak to what his goal was in this.  What I

22         take away from it was he was doing his job and

23         following through with what he's supposed to do.

24    Q.   It's fair at least to say that he was saying to you

25         and your mother "If you want to meet with me to

```
1              discuss your concerns, I'm available."
2                  That's a fair way to interpret the last line of
3              that e-mail, wouldn't you agree?
4    A.    I would say that he was making himself available for
5              the meeting that we requested, yes.
6    Q.    All right.  Let's take a look at Loras 145, and on
7              this one we're referring to the middle of the page.
8              This purports to be a September 7th, 2020, e-mail
9              from Katie Keleher-Garfoot to you at 8:48 a.m.
10                 Do you see that, the body of that e-mail there
11             in the middle of the page?
12   A.    I do.
13   Q.    All right.  Would you take the time to review that
14             and let me know when you've done that.
15   A.    Okay.  (Witness complied.)  Okay.
16   Q.    Okay.  This e-mail was going out from Katie to you
17             approximately one day and, say, four hours after you
18             reported the incident.
19                 That's correct in approximate terms, isn't it?
20   A.    Approximately, yes.
21   Q.    And it looks like in essence Katie is saying in that
22             first and second line of the e-mail that she's
23             making herself available to meet with you that day
24             either in person or if you'd prefer to meet
25             virtually; correct?
```

```
 1    A.    Correct, from those first two lines; yes.

 2    Q.    And would you agree by the fact that she's making

 3          herself available to meet with you that the college

 4          was treating your concerns seriously in responding

 5          to your concerns over the incident?

 6    A.    Once again, I can't speak on the college's

 7          viewpoint.  From -- My understanding was that she

 8          heard of the incident and was doing her job in

 9          making students feel safe on campus.

10    Q.    Okay.  She certainly wasn't ignoring you, right?

11          She was making herself available to you.

12              That -- That's -- That's a fair interpretation

13          of what the e-mail is telling you, wouldn't you

14          agree?

15    A.    Correct, I would say that is a correct assumption of

16          the e-mail.

17    Q.    And it looks like, if we refer up to the top of the

18          page, that's your response, Ms. Swift, to Katie that

19          went out at 10:07 p.m.

20              Do you see that?

21    A.    I do.

22    Q.    All right.  Why don't you take a minute to read

23          that, your response, and then tell me when you're

24          ready.

25    A.    Okay.
```

```
 1    Q.    In the response you state, My mom and I would like

 2          to talk about what happened and what else can be

 3          done to the apartment to make me and my roommates

 4          feel safer.

 5              Do you see that?

 6    A.    I do.

 7    Q.    Is it your recollection that you and your mom met

 8          with Katie the next day on September 8th of 2020?

 9    A.    It is my understanding, yes.

10    Q.    And let's step back a moment.  After the incident

11          occurred at what point did you share with your

12          roommates what had occurred?

13    A.    To my recollection I believe it was a mix of texts

14          and then one of them returning home and then she

15          contacted everyone else.

16    Q.    For any of the e-mail conversations that we're now

17          discussing and may discuss later on in this

18          deposition in which you were a party, have you

19          preserved those e-mails?

20    A.    I attempted to.  When I lost -- When Loras took back

21          their computer and my e-mail, I do not believe I

22          have every e-mail.  I have some of my e-mails.

23    Q.    And how about texts, did you attempt to preserve any

24          texts that were exchanged with anyone, whether it be

25          roommates, folks at Loras College, or otherwise in
```

1       which the subject was this incident that occurred to

2       you on September 6th, 2020?

3  A.  I can say that even though I am 24 years old, I'm

4       not great with technology and the cloud, so I can't

5       say whether or not it's -- the text or phone call

6       logs have been officially fully saved or not.  I

7       think that's the best answer I can give.

8  Q.  Okay.  When you spoke to your roommates, what was

9       their reaction, if any, when you told them about

10      what occurred?

11  A.  They were upset, uncomfortable, worried about me.

12  Q.  Did each one of the five roommates -- I understand

13      they were gone on Labor Day, as you told me.

14        Did each one of the five roommates return to

15      campus at some point in time to finish their

16      education?

17  A.  Yes.

18  Q.  Did each one of the five continue to reside in the

19      apartment?

20  A.  I cannot speak to that.  I don't know.

21  Q.  Do you know whether any of the five continued to

22      reside in the apartment throughout the school year?

23  A.  I believe they might have stayed in the apartment,

24      but I can't say whether that's a full yes or a full

25      no.

```
 1    Q.    You state in that e-mail again at the top of

 2          Loras 145, My mom and I would like to talk about

 3          what happened and what else can be done to the

 4          apartment to make me and my roommates feel safer.

 5              Do you see that?

 6    A.    I do.

 7    Q.    Besides locking your apartment door what other

 8          safety measures would you believe would combat

 9          someone from improperly entering your apartment?

10    A.    A better lock on the door; an alarm so I would be --

11          I would have heard -- or been notified that someone

12          opened the door, entered without my knowledge or

13          consent.

14    Q.    Anything else that comes to mind that -- at that

15          time that you were thinking of, again, that could be

16          done to make you and your roommates feel safer in

17          the apartment?

18    A.    I think also just cameras, learning that there were

19          none in the apartment building.  We wanted one to be

20          added at all entry points and within the hallways.

21    Q.    Anything else at that point in time that comes to

22          mind other than those three things?

23    A.    Not that comes to mind as of this moment.

24    Q.    Did you and your mom meet with Dean Sunleaf on

25          September 7th of 2020, do you recall?
```

```
1    A.    I believe we did, yes.

2    Q.    Could you tell me about that meeting in the sense of

3          let's start with who was present at the meeting.

4    A.    From my recollection it was Art, myself, my mom, and

5          my little sister was also in the room off to the

6          side.

7    Q.    All right, and did this occur in Dean Sunleaf's

8          office at Loras College?

9    A.    It did.

10   Q.    And what was discussed?

11   A.    To my recollection it was the incident that

12         occurred, how I was feeling about it and feeling

13         about being on campus, changes that could have been

14         made on campus to make it safer, different measures

15         that the school looked in to.

16   Q.    Okay, so was Dean Sunleaf telling you different

17         measures that the school was looking in to to

18         address your concerns?  Is that what you're saying?

19   A.    We were told that cameras were within the five-year

20         plan of being added on campus --

21   Q.    Okay.

22   A.    -- and then that the blue light emergency safety

23         buttons were tested and seen as not needed.

24   Q.    Okay.  Did Dean Sunleaf tell you that the college

25         didn't feel that blue light cameras were needed due
```

```
1              to the advanced technology the students now had with
2              cell phones and the ability to text or call, where
3              those things might not have been available years ago
4              on behalf of a student?
5     A.       From my recollection of the conversation it was that
6              they did a test-run, and it was ultimately figured
7              out that the people that they tested would have
8              rather called versus hitting a button.
9     Q.       I see.  When you were in this meeting with Dean
10             Sunleaf, did he listen to what you and your mom had
11             to say?
12    A.       I would -- I would assume so.  He was sitting within
13             the meeting with us, so I hope he did.
14    Q.       He was -- Yeah.  He was looking at you, I assume,
15             you and your mom when you were talking; correct?
16    A.       Correct.
17    Q.       And he was conversing back?
18    A.       Correct.
19    Q.       So you assumed he was hearing what you were saying;
20             correct?
21    A.       Correct.
22    Q.       And did he appear to you concerned in the sense of
23             listening to what you had to say and trying to
24             respond to what you had to say to show that the
25             college was interested in your opinions and making
```

1          you feel safe?

2     A.   In terms of listening to what I was saying and

3          attempting to show compassion, yes, I would say

4          those -- that was done.

5     Q.   Okay.  What, if anything, did he offer to help

6          address your concerns?  Did he tell you that the

7          college was going to do something in the sense of

8          take an action or have another person reach out to

9          you or anything else like that?

10    A.   I don't recall an exact list of what he said would

11         be given or to help me on campus.  I believe we went

12         over campus security doing rounds around the

13         apartment building.

14    Q.   Okay.  That would have been the -- the Byrne Oaks

15         apartment building you lived in; correct?

16    A.   Correct.

17    Q.   That was my next question, and you might have

18         already answered it, but my next question was was

19         there a plan of action going forward after that

20         meeting that you had discussed with Dean Sunleaf?

21             So you just told me a moment ago additional

22         rounds.  Was there any other plan of action in the

23         sense of things that you and your mother thought

24         should take place and he told you the college would

25         look in to or implement in some way?

```
 1    A.    I think part of it was that he wanted us to talk

 2          with Katie because she would know more about what

 3          can be done within my apartment and then besides --

 4          it was -- We talked about cameras on campus and

 5          cameras in at least the resident halls and the blue

 6          lights around campus for safety measures.

 7    Q.    All right.  I'm going to show you what's been marked

 8          as Loras 645.

 9    A.    Okay.

10    Q.    And these are two e-mails, Ms. Swift, and what

11          I'd -- As a starting point I'm going to refer you to

12          the bottom one and give you a chance to read that.

13          That purports to be an e-mail from Molly Burrows

14          Schumacher to you dated September 7th, 2020, at

15          3:08 p.m.

16              So if you would take a moment and read that and

17          let me know when you've done that.

18    A.    Okay.  (Witness complied.)  Okay.

19    Q.    All right.  If we look at that particular e-mail

20          that starts in the middle of the page and runs to

21          the bottom, it looks like Molly is following up with

22          you after your meeting earlier that afternoon with

23          Dean Sunleaf; is that fair?

24    A.    Yes, that would be the assumption I'd gather.

25    Q.    And, in fact, she says in the very first sentence
```

1          "Dean Sunleaf asked me to follow up".

2               Do you see that where the e-mail begins?

3   A.   I do.

4   Q.   She said maintenance would be changing the locks on

5          your door and issuing new keys first thing on

6          September 8th.

7               Do you see that?

8   A.   I do.

9   Q.   Were you concerned that the person who entered your

10         apartment had gotten ahold of a key or was that

11         something that Molly or the college just decided to

12         do on its own to attempt to make you safe?

13   A.   I had no way of knowing how my apartment was

14         entered, so I didn't know if it was with a key that

15         might have been lost from my roommate or I or a

16         master key of the campus or just entering the

17         apartment, so I cannot recall if that was something

18         I asked for or something they offered.

19   Q.   Okay, and the -- and the doors were rekeyed; right?

20   A.   Correct.

21   Q.   Okay.  Was it just the entrance doors to the

22         apartment or were the individual doors to the

23         bedrooms also rekeyed, if you recall?

24   A.   It was the main door and then the bedroom door, but

25         the wrong bedroom door.

1    Q.    Did they later correct that if it was the wrong

2           bedroom door and get your door keyed -- rekeyed

3           again?

4    A.    They did.

5    Q.    It looks like in this e-mail she also states, Campus

6           security and RAs -- Which I assume is residents

7           advisors.

8           Is that your understanding?

9    A.    Yes.

10   Q.    All right; so she states campus security and RAs,

11         increased interior and exterior rounds of the

12         facility and surrounding grounds.

13         Do you see that?

14   A.    I do.

15   Q.    All right.  Do you have any reason to believe that

16         this was not being done as represented by her?

17   A.    I personally never saw the extra security or the

18         extra walk-around while I was on campus, and after

19         discussions with my roommates they also did not see

20         the extra rounds that campus security was doing.

21   Q.    Okay, so are you saying you don't think it was done

22         or you're saying you just never saw it?

23   A.    I have no knowledge whether it was done or not.

24   Q.    Okay.

25   A.    From my point of view I didn't see it, so I can't

1          attest to whether it was done or not, but I did not

2          see the increase of safety rounds.

3     Q.   There is also a statement in that e-mail that says

4          campus security was also reviewing the key fob logs

5          to see who had come in and out of the building.

6               Do you see that in the e-mail?

7     A.   I do.

8     Q.   Do you have any reason to believe that this was not

9          being done by the college?

10    A.   I can't -- I -- That was something that I believe I

11         asked Art about in our meeting, if they have yet to

12         look at the log, and it was that -- from my

13         recollection it was -- I was told that they were

14         talking to someone.

15    Q.   Okay, and let's just step back a minute 'cause I

16         probably should have asked you this when I was

17         talking with you generally about your apartment.

18              You just can't walk into the Byrne Oaks

19         apartment front door; correct?  You have to fob in;

20         is that accurate?

21    A.   You have to fob in to the front door and the side

22         door, but there are also entrances where you do not

23         have to fob in to.

24    Q.   Okay.  What were the entrances to the apartments

25         that you did not have to fob in to?

```
 1    A.    Any apartment on the first floor had a back door, so
 2          someone could go in through the back door if it was
 3          left unlocked and enter through the building.
 4    Q.    So if the intruder who came into your apartment that
 5          evening entered through the front door, then that
 6          person would have had to have fobbed in; correct?
 7    A.    He could have entered through a different
 8          apartment's back door or fobbed in.
 9    Q.    All right, and I think you told me -- and this
10          obviously makes sense -- you have no idea how the
11          person got into the building that evening; correct?
12    A.    I have no knowledge.
13    Q.    Was it later explained to you -- or I should say
14          confirmed to you that the college did indeed look at
15          those fob logs to see who was entering the Byrne
16          Oaks apartment building other than the time the
17          incident happened to you on September 6th, 2020?
18    A.    From my recollection of the conversation it was told
19          that there was someone that fobbed in earlier that
20          morning and that they talked to him, and that was my
21          knowledge of it.
22    Q.    Okay, so it was your understanding based upon that
23          bit of information that the college had taken the
24          time to look at the fob logs and, in fact,
25          identified somebody who had fobbed in on or about
```

```
 1            the time of your incident; correct?

 2      A.    Correct.

 3      Q.    Molly -- Again, back to this e-mail, Ms. Swift,

 4            Molly says that Katie Keleher-Garfoot would reach

 5            out regarding additional alarms and devices for

 6            safety purposes.

 7                  Do you see that?

 8      A.    I do.

 9      Q.    And this was done by Katie, was it not?

10      A.    Yes -- Well, the e-mail is from Molly, but Katie did

11            reach out, yes.

12      Q.    Yes, that's what I was asking.  If I asked an unfair

13            question.  I'm sorry.

14                  Katie reached out to you per the representation

15            of Molly regarding additional alarms and devices for

16            safety purposes in your apartment; correct?

17      A.    Correct.

18      Q.    And would you agree again that this is -- Molly's

19            e-mail was again reflective of her attempting to

20            address your concerns regarding safety with regard

21            to your apartment?

22      A.    Correct, I would assume that she is doing her job

23            and making sure the students feel safe within their

24            apartments.

25                  MR. JANNES:  All right.  Off the record.
```

```
 1              (An off-the-record discussion was held.)

 2              (A recess was taken.)

 3    Q.   All right, Ms. Swift, we're still looking at

 4         Loras 645, and I want to refer you up to the top

 5         portion of that e-mail.  We've looked at the bottom

 6         portion, which appears to be your response to Molly

 7         Burrows Schumacher on September 7th.

 8              If you'd take a moment to review that and let me

 9         know when you're ready.

10    A.   Okay.  (Witness complied.)  Okay.

11    Q.   All right.  The first part of that e-mail to you

12         from Ms. Schumacher begins, Yes, my roommates and I

13         are interested in the additional safety devices.

14              What roommates of yours were interested in the

15         additional safety devices?

16    A.   To my recollection and knowledge all of us were.

17    Q.   How did you make your roommates aware that these

18         additional safety devices were an option being

19         offered for your room by the college?

20    A.   I was back in Dubuque on September 7th.  So I

21         believe one of my e-mails from Katie said that there

22         were additional devices that could be given to my

23         apartment.

24    Q.   Okay, and how did you -- My question was -- and

25         maybe you misunderstood it -- how did you tell your
```

```
 1          roommates?  If this information was conveyed by
 2          Katie to you, how did you tell your roommates that,
 3          "Hey, there are additional safety devices we can
 4          have for our apartment"?
 5     A.   To my recollection we talked in person.
 6     Q.   So on September 7th when you were back you saw your
 7          roommates.
 8     A.   Correct.
 9     Q.   You asked in that same e-mail if an e-mail would be
10          going out to Byrne Oaks informing them -- which I
11          assume is the Byrne Oaks residential community -- of
12          what had happened.
13             Do you see that?
14     A.   I see where I asked if an e-mail would be going out
15          to just students in general; not only in Byrne Oaks,
16          just the students.
17     Q.   All right.  With that qualification, why did you
18          think that was important to mention to Molly?
19     A.   That was a question I also asked Art during the day,
20          during our meeting, if something happened in the
21          apartment building, I would want to know, so I felt
22          that the rest of the students had that same right.
23     Q.   It also -- You also say in the very last sentence
24          before you close, It has been mentioned that the
25          intruder attempted to enter another unit before he
```

```
1              entered mine.

2                   Do you see that?

3      A.     I do.

4      Q.     Where did you learn this information?

5      A.     During a conversation I had with one of my

6              roommates.

7      Q.     Which roommate was that?

8      A.     I do not recall which roommate exactly.

9      Q.     Okay.  What other details did your roommate provide

10             to you concerning when this had occurred, what

11             apartment, what person, so forth?

12     A.     I don't recall in exact detail.  It was my

13             understanding that my roommates talked with other

14             apartments within the building, and that's how that

15             knowledge came to mind.

16     Q.     Do you have any information to indicate that this

17             information about another intruder was conveyed to

18             the college in any way?

19     A.     I don't have any knowledge that another intruder.  I

20             have just my intruder.

21     Q.     Okay, so what you're telling me -- you correct me if

22             I'm wrong -- you don't know -- assuming that your

23             roommate had information that an incident like this

24             had happened to someone else before your incident,

25             you don't have any information whether it was
```

```
 1              conveyed to the college or not.  You just knew that

 2              you had been told that by your roommate.

 3       A.     I just knew that within the conversation it was

 4              mentioned, and that was one of the -- something that

 5              stuck.

 6       Q.     Okay.  When you say, "another unit," do you know

 7              when you spoke to your roommate, was it conveyed

 8              that -- if that other unit was in Byrne Oaks or was

 9              it somewhere else on the college campus?

10       A.     Within Byrne Oaks.

11       Q.     All right.  I'm going to refer you to a series of

12              e-mails here marked Loras 642 through 644, and

13              specifically I'm going to direct you to the 644

14              page, so if you would turn to that page, please.

15       A.     (Witness complied.)

16       Q.     There is a September 7th e-mail on Loras 644 from

17              Academic Dean Donna Heald to you.

18                 Do you see that e-mail?  It looks like it's in

19              the middle of the page.

20       A.     I do.

21       Q.     And that was sent at -- according to the header, on

22              September 7th at 4:00 p.m.

23                 Do you see that?

24       A.     I do.

25       Q.     It looks like -- Well, let's step back a minute.
```

1          Who did you understand Donna Heald to be?  I've

2          called her the Academic Dean.

3             Is that your understanding who she was?

4    A.   That was my understanding, yes.

5    Q.   Had you ever had any interaction with Donna Heald

6          prior to this e-mail of September 7th?

7    A.   I don't know if it was necessarily with Donna, but I

8          had -- No, not with Donna to my knowledge.  It might

9          have been Donna, though.

10   Q.   All right.  You're just really not sure?

11   A.   Not sure.

12   Q.   Not sure.

13   A.   I just wasn't sure who I spoke with.

14   Q.   Fair enough.  Okay.  It looks like that Donna is

15         reaching out to you on September 7th, 2020, at

16         4:00 p.m., like we established.

17            So this is a day-and-a-half, maybe a tiny bit

18         longer after the incident that occurred to you;

19         correct?

20   A.   Correct.

21   Q.   And it looks like she states that Dean Sunleaf

22         notified her that you had concerns with some of your

23         classes and she was inquiring if you would share

24         those concerns.

25            Do you see that?

1    A.    I do.

2    Q.    What concerns did you have?

3    A.    Can you clarify that?

4    Q.    Yeah.

5    A.    Is -- Sorry.

6    Q.    I'll just refer you to the e-mail again,

7          Dean Sunleaf notified me you have a concern with

8          some of your classes.

9              And what I'm asking you is what concerns did you

10         have, assuming that statement is true; in other

11         words, that you did have concerns.

12   A.    My concerns were about the times -- the time -- the

13         amount of time that my classes were being held and

14         that I was having face to face with teachers.

15   Q.    Okay, so the concerns is it fair to say didn't have

16         anything to do with the incident of the intruder

17         being in the apartment.  It more had to do with

18         concerns about face-to-face times in a classroom

19         setting at Loras?

20   A.    Correct, other face to face or Zoom, just --

21   Q.    Did you end up meeting with Donna Heald, as -- as it

22         says it looks like in the second sentence, "Would

23         you be willing to share those concerns with me?"

24   A.    We did have a meeting.

25   Q.    And it looks like the e-mails that I've given to you

```
 1              on 642 and 643 reflect that a meeting took place.

 2              Specifically on 643 it looks like you and Donna

 3              Heald are trying to find a time, and it looks like

 4              you're locating 8:15 a.m. per the middle of that

 5              page.

 6                   Do you see that?

 7      A.      On page 643?

 8      Q.      Yes.

 9      A.      Yes.

10      Q.      And then on 642 she's giving you -- in the middle of

11              the page she's giving you the location of her office

12              and so forth.

13                   Do you see that?

14      A.      I do.

15      Q.      All right.  Did -- Was there any discussion in your

16              meeting with Donna Heald about the incident that

17              occurred at Byrne Oaks or was the discussion solely

18              confined to your concerns about classroom time,

19              classroom interaction, and so forth?

20      A.      From my recollection of the meeting the incident was

21              broughtly -- briefly brought up.

22      Q.      Okay.  Did you bring it up or did Donna Heald bring

23              it up to your recollection?

24      A.      I can't say which one of us brought it up.  It could

25              have been either.
```

```
 1    Q.    All right; and I believe, if we look at these

 2          e-mails from 642 to 644, it looks like your mom was

 3          present also, at least it's hinted to that your mom

 4          would attend.

 5                Do you see that?

 6    A.    Yes.

 7    Q.    Yeah.  In fact, at the top of 643 you say, "Donna,

 8          That works for me.  My mom and I will be there."

 9                Do you see that?

10    A.    Correct, I do see that.

11    Q.    When you discussed this with Donna Heald, what in

12          particular about the incident on September 6 of 2020

13          was discussed?

14    A.    To my recollection that my mom is on campus for

15          meetings with Art and that we met with Art, and we

16          have a meeting I believe later that day with Katie,

17          and then I -- I would -- I don't recall exactly, but

18          I'm assuming that I told her what occurred.

19    Q.    Okay.  Did you ask her to do anything for you, help

20          you, address concerns or otherwise regarding the

21          September 6, 2020, incident or was it just more

22          informational purposes for her that you were meeting

23          with other Loras officials?

24    A.    To my recollection it was just informing her that we

25          are meeting with others.  I don't believe she --
```

```
1              I -- or I don't believe I asked anything of her

2              regarding the case.

3    Q.   Okay.  Did you ask anything of her concerning your

4              issues or concerns regarding classroom time?

5    A.   Yes, that was the main focus.

6    Q.   Okay, and did she address those?

7    A.   I can't necessarily say if she addressed them.  She

8              heard my point of view, and we had a discussion

9              about them.  I can't say whether or not it was taken

10             past our meeting.

11   Q.   Okay.  Did you ever attend any live classroom

12             sessions after the incident or was all of your

13             learning and interaction to get your degree remote

14             at that point in time?

15   A.   After the incident I believe I attended a few

16             in-person and then I also had classes that were

17             strictly Zoom.

18   Q.   So when you say "a few," are you able to quantify

19             for me a number?  I know perhaps you can't give me

20             the exact number, but can you give me a range of how

21             many in-person classes you attended at Loras versus

22             attending remotely until such time you were

23             conferred your degree.

24   A.   So prior to the incident any class that was offered

25             in person I attempted to go there in person and then
```

1          any class that was on Zoom I attended via Zoom.

2          After the incident I would say anywhere from one to

3          ten classes I attended in person and then I also

4          attended in Zoom.

5     Q.   Okay.

6     A.   I don't have an exact number, though.

7     Q.   Do you know the last time starting with the

8          September 6th, 2020, incident, which occurred on a

9          weekend or early -- early Monday morning, a Labor

10         Day holiday -- do you know the last time you would

11         have attended a class in person at Loras College in

12         the sense of a date?

13    A.   I do not have a specific date on the last time I

14         attended an in-person class, no.

15    Q.   Okay.  I'm going to show you what's been marked as

16         Loras 144 and 145, and I'm going to refer you to --

17         You can take your time to look at those two e-mails,

18         but I'm going to refer you specifically to the

19         e-mail that starts from Katie Keleher-Garfoot to you

20         at 10:01 a.m. at the bottom of Loras 144 and it runs

21         into Loras 145.

22            So if you want to review that one

23         specifically --

24    A.   Okay.

25    Q.   -- and let me know when you're ready, that's where

```
 1          we'll start.
 2    A.    (Witness complied.)  To clarify you just wanted me
 3          to review that one e-mail?
 4    Q.    Yeah, I don't want to restrict you from reviewing
 5          everything, but what I'm letting you know is my
 6          question is going to be directed to that one e-mail
 7          that starts at the bottom of 144 and runs to the
 8          second page on 145.
 9    A.    Okay, then I am ready whenever you have a question.
10    Q.    Okay.  It looks like to be an e-mail that's setting
11          up a meeting between you and Katie, apparently at
12          1:00 p.m. that particular day on September 8th; is
13          that correct?
14    A.    Correct.
15    Q.    And did that meeting indeed take place at 1:00 p.m.
16          between you and Katie?
17    A.    To my recollection, yes.
18    Q.    Can you tell me about who was present?  Was there
19          anybody else other than you and Katie?
20    A.    I believe it was Katie, my mom -- I'm unsure if my
21          younger sister was in the room or in the hallway --
22          and then myself.  I don't have any recollection of
23          anyone else --
24    Q.    And this was --
25    A.    -- joining.
```

1    Q.    I'm sorry.

2    A.    No.

3    Q.    Nobody else, all right.  And this was an in-person

4          meeting, right --

5    A.    Correct.

6    Q.    -- at the college?  Did Katie listen to what you had

7          to say during the meeting?

8    A.    She was in the room and she looked as though she was

9          paying attention.  So I would assume, yes.

10   Q.    And -- And you were having dialogue with her?  You'd

11         say something and she would be responding to what

12         you were saying; correct?

13   A.    Correct.

14   Q.    And did she appear to you to be concerned over what

15         had happened to you on September 6th?

16   A.    I can't say whether or not she was concerned or not.

17         That would be something that she would know.  From

18         my point of view she was having a meeting and --

19         with me.

20   Q.    Do you recall that she offered to provide you some

21         assistance in responding to your concerns about what

22         occurred?

23   A.    Can you clarify that question?

24   Q.    Yeah.  Did she -- Did you express concerns about

25         what happened and ask for the college to do certain

1        things and did she tell you that she would address

2        those concerns and act appropriately on behalf of

3        the college?

4   A.    From my recollection of our conversation we asked

5        for certain -- we had a conversation about certain

6        measures that could be -- could take place and there

7        was a mix of answers from that.

8   Q.    Were you honest with her about what occurred on

9        September 6th in your apartment; in other words, did

10       you tell her honestly what had occurred that early

11       morning hour when the intruder entered your

12       apartment?

13  A.    From my recollection I was honest, yes.

14  Q.    Did the issue of whether your door was locked or

15       unlocked come up during that conversation with her?

16  A.    Not that I can recall specifically, no.

17  Q.    Do you recall -- So you don't recall ever making any

18       representations to her one way or the other about

19       whether the door was locked or unlocked to your

20       apartment?

21  A.    I can't say if that conversation took place.  No, I

22       don't have recollection of that exact conversation.

23  Q.    During that meeting did she give you some additional

24       safety options that were available to you, in

25       particular bars on windows, door alarms, deadbolt on

1          the door, so forth?  Do you recall that coming up

2          and her offering those options to you?

3   A.   I recall it coming up.  I recall that we asked for

4          those, not necessarily that they were offered up.  I

5          recall that none was on hand, so it wasn't -- I

6          wouldn't say readily available to me.

7   Q.   Okay.  Do you have any reason to believe that door

8          alarms and window bars were not ordered for your

9          room by the college for installation?

10   A.   I have no knowledge whether or not they were ordered

11          or not.  We did have the door alarm, but I'm unsure

12          on when it was ordered or when the window locks were

13          ordered -- or the window bars were ordered.

14   Q.   Okay.  Let me show you what's been marked as Loras

15          737, and just take a moment to review that,

16          Ms. Swift, and when you have had a chance to look at

17          that, let me know.

18   A.   (Witness complied.)  Okay.

19   Q.   As I look at this exhibit, Loras 737, this purports

20          to be an order for door and window alarm for home

21          wireless security system, and also the second item

22          there, telescoping window security guard bars to

23          prevent forced entry, an order placed on

24          September 8th of 2020 with Amazon by Loras College.

25            Do you interpret this document, Loras 737, the

1          same way I do?

2   A.    I would interpret that these items were ordered,

3          correct.

4   Q.    And were these items indeed, after being ordered by

5          the college, installed in the apartment that you and

6          your five other roommates occupied?

7   A.    I can for certain say that the door alarm was,

8          but -- The security bars were ordered, but I believe

9          the problem was they were the wrong ones, so they

10         were not the correct size.

11  Q.    Okay.  Do you know if the college reordered those

12         and got the correct size?

13  A.    I have no knowledge of whether they reordered or

14         not.

15  Q.    Okay; and based upon the e-mail we were looking at a

16         moment ago, Loras 144 to 145, that was reflective

17         of, again, that approximately ten o'clock meeting on

18         September 8th that you and your mother and perhaps

19         little sister had with Katie, and this order took

20         place the same day for these items.

21         Would you agree?

22  A.    Yes, I would agree that we had the meeting then.

23  Q.    In the meeting did you tell Katie about what had

24         been told to you by one of your roommates, that

25         there had been a prior incident where somebody had

1        entered an apartment uninvited or inappropriately?

2        Did that come up?

3    A.  I might have mentioned it.  I don't recall my exact

4        wording.  I didn't have any other information.

5    Q.  Okay, so are you thinking you didn't bring it up at

6        that point because you didn't know?  I just need you

7        to clarify your answer for me.

8    A.  I -- I can't say whether I said it or not.  I -- I

9        might have brought it up, but, once again, I didn't

10        have any other information regarding anything else

11        that happened.  That was just something my roommates

12        talked about and that told me.

13    Q.  Okay.  Do you remember Katie telling you, regardless

14        of whether you brought it up, whether the college

15        had any knowledge of any other incidents where

16        someone had inappropriately entered an apartment?

17    A.  I don't remember if she informed me of anything

18        involving any other cases.

19    Q.  What comments, if any, do you recall your mother

20        making to Katie during your September 8th, 2020,

21        meeting?

22    A.  I believe an issue that we -- that my mom and I both

23        brought up was whether an e-mail would be sent out

24        to anyone, and we were told that we didn't -- they

25        didn't want to alarm the students; and that was

```
 1          upsetting to both my mom and myself, and I believe

 2          my mom said something.  I don't recall exactly what,

 3          but my mom was involved in that meeting, so I can't

 4          say what she did or didn't say exactly.

 5     Q.   Okay; and, again, all I'm asking you, Ms. Swift, is

 6          what you recall your mother saying during the

 7          meeting.

 8               So you recall your mother saying something about

 9          the topic of whether an e-mail would be sent out to

10          the campus as a whole, to the students to let them

11          know this incident had occurred; correct?

12     A.   Correct.

13     Q.   Do you recall anything else that your mother said

14          during the meeting?

15     A.   Not word for word.

16     Q.   How about generally then -- I'm not asking you to

17          quote verbatim, of course, but do you recall her

18          bringing up any other topics -- that's what I'm

19          asking you -- during the meeting?

20     A.   I think -- She -- She was involved in the meeting,

21          so she had said something with every topic.  I think

22          that's the best I can --

23     Q.   Was there anything else that you recall your mother

24          saying to the college that would be a criticism of

25          how the college was operating, either security-wise,
```

1        safety-wise, so forth in relation to what had

2        occurred to you on September 6, 2020?

3  A.  I know my mom saw her daughter extremely upset, and

4        that my mother was extremely upset over what

5        occurred and our viewpoint on what the college was

6        doing, and she -- You would have to get more

7        information out of her, but I'm assuming she was

8        emotional during this meeting, as -- as I was.

9  Q.  I understand.  I guess what I'm asking you -- and

10       what I interpret you to be telling me, but you, of

11       course, tell me if I'm interpreting it wrong -- is

12       that other than the specific remark about sending

13       out a campus-wide e-mail, you can't recall any

14       specific dialogue, concerns that your mother

15       addressed or brought up with Katie, is that

16       accurate, other than that one thing?

17  A.  She was involved in the meeting.  So any topic that

18       Katie and I discussed, my mother was also a part of

19       every topic that we discussed.

20  Q.  Right, but nothing -- nothing -- --

21  A.  I don't --

22  Q.  -- comes to mind in particular beyond that one item?

23  A.  Not beyond her being upset about what occurred and

24       the safety measures.

25  Q.  If the college would attest that it was

```
 1            investigating the incident in the days after you

 2            reported it and it was attempting to identify the

 3            individual that entered your apartment, do you have

 4            any reason to believe that this wasn't true?

 5      A.    Can you clarify your question?

 6      Q.    Yeah.  All I'm asking you is this:  If someone from

 7            the college, one or more people would say after

 8            Ms. Swift reported the September 6, 2020, incident

 9            to us, we attempted through an investigation to

10            identify who that individual was that entered --

11            improperly entered her apartment on the morning of

12            September 6th, 2020.

13      A.    I would say that I -- I don't know the steps that

14            Loras was taking at this point to investigate or not

15            investigate.  From what I was trying to do and how I

16            was the one reaching out and asking for these

17            meetings and taking those first steps, it felt like

18            the college was -- this wasn't a main focus for the

19            college.

20      Q.    Let me phrase the question to you differently, all

21            right?  If someone from the college was to attest in

22            a document, let's say, filed with the Court or give

23            a deposition like you're giving today and say,

24            "After the incident with Ms. Swift on September 6,

25            2020, we were investigating to find out who that
```

1          person was that improperly entered her apartment,"

2          what I'm asking you is do you have any reason to

3          believe that that wasn't true.

4               I understand you may not have all the details of

5          what they were doing, but do you believe that's just

6          false, they were not investigating what occurred?

7     A.   We felt like they weren't -- or I felt like they

8          weren't, because we weren't getting answers, and I

9          didn't feel safe on campus still.

10    Q.   So even though given we've went through a couple of

11         days' worth of e-mails that had been exchanged

12         between you and the college representatives and

13         discussed a few meetings that have gone on between

14         you, your mom, and the college representatives a few

15         days after the incident, you didn't feel like they

16         were addressing what happened to you?  Is that what

17         you're telling me?

18    A.   Yes.  I was the one that wanted the meetings, I was

19         the one that was reaching out and setting up the

20         meetings.

21    Q.   Okay.  Would you agree that after those initial

22         meetings had taken place, that some representatives

23         of the college were independently reaching out to

24         you after that without any further prompting from

25         you to find out if you were okay and your needs were

1        being addressed?

2    A.   From my recollection I struggle to remember if the

3         college -- if the college was really following

4         through on things, and I have no knowledge of the

5         investigation they did, and I felt as though I

6         wasn't kept up to date on things.  We only got

7         answers after we asked for them.

8    Q.   Okay, so are you telling me it's your belief that

9         every action the college took was only in response

10        to a prompt by you and your mother requesting

11        information or requesting a meeting?  Is that what

12        you're saying?

13   A.   A large majority of the communication was started

14        from our end.

15   Q.   Okay.  Do you agree that the college did initiate

16        some communication with you or your mother

17        regarding --

18   A.   Um.

19   Q.   I'm sorry, let me just finish.

20   A.   I'm sorry.

21   Q.   You're just fine.  -- regarding their investigation

22        of what had occurred and addressing your concerns?

23        Was there some that was initiated independently by

24        them and without a prompt from you?  That's what I'm

25        asking you.

```
 1    A.    Out of all the people we spoke to regarding just the

 2          break-in, only one other person -- only one person

 3          reached out first.

 4    Q.    Okay.  Who was that?

 5    A.    Katie was the only one that was not prompted, but

 6          she was prompted from her boss to reach out.

 7    Q.    How about in the days that followed after you left

 8          campus and returned home -- I think you said you

 9          attended between one and ten classes and I think you

10          said you returned home earlier to me -- were there

11          instances there afterward, after you had left campus

12          where the college was independently reaching out to

13          you and contacting you even without a prompt from

14          you to them?

15    A.    Not that I recall.

16    Q.    If there is e-mail traffic that we're going to

17          discuss, would that be the best record of what was

18          going on -- in other words, e-mails from you to them

19          and e-mails from you -- from them to you back and

20          forth -- would you agree that that's going to be the

21          best record of at least what occurred in writing

22          concerning that communication?

23    A.    There is also a recording of a phone call that would

24          be -- would explain some e-mails I think is the best

25          way to put it.
```

```
 1    Q.    Okay; so you would agree that the e-mails are a good

 2          indication, but there is a recording also.

 3             Is that what you're telling me?

 4    A.    To my understanding there is a recording, yes.

 5    Q.    Who has the recording?

 6    A.    Loras President Collins.

 7    Q.    All right.  Let's take a look at Loras 623, and,

 8          again, I'm going to show that to you and give you

 9          the opportunity to take a look at that.

10    A.    Uh-huh.

11    Q.    And this is an e-mail that runs -- Specifically what

12          we're referring you to is the body of the e-mail

13          that starts at the top and goes about two-thirds of

14          the way down.  It looks like it's from Molly

15          Schumacher on September 8th to many individuals.

16             If you'd read through that and let me know when

17          you've done that.

18    A.    Okay.  (Witness complied.)  Okay.

19    Q.    All right.  It looks like this -- the first bullet

20          point in this e-mail is dealing with Byrne Oaks;

21          correct?

22    A.    Correct.

23    Q.    All right; and it looks like that Molly is

24          indicating a female student, which I assume to be

25          you, reported an intruder in her apartment on 9/6
```

```
 1            and she goes on to state, I'm currently

 2            investigating - fob access reports show the

 3            next-door neighbor entered the building just a few

 4            moments earlier, and then a little further down in

 5            that e-mail before she changes topics to another

 6            location she says, Until that's determined for sure

 7            please do extra rounds on the first floor of Byrne

 8            Oaks and around the perimeter of the building.

 9              Do you see all of that in that e-mail?

10     A.    I do, yes.

11     Q.    Do you have any reason to believe after Molly sent

12            the e-mail that campus security was not performing

13            those rounds?

14     A.    I did not see anyone making those additional rounds,

15            and after discussing with my roommates they also did

16            not see additional rounds being made.

17     Q.    Okay, and just because you or your roommates didn't

18            see them doesn't mean they weren't made.

19              You're just telling me "I never witnessed this";

20            right?

21     A.    Correct.

22     Q.    All right; and then we have also in the e-mail the

23            fob access reports that they're looking at, and,

24            again, we discussed that earlier.

25              Do you recall that testimony?  I asked you about
```

```
 1              fob access and so forth, and -- and I believe your

 2              testimony was "I don't know whether they reviewed

 3              the fob access reports or not"; is that correct?

 4       A.     Correct.

 5       Q.     Do you know anything else about what they did with

 6              regard to fob access other than them representing

 7              they reviewed it and your testimony being "I don't

 8              know whether they reviewed it or not"?

 9       A.     At the time that this is occurring I did not know

10              any other information on -- if they reviewed it, if

11              they didn't review it or not.

12       Q.     Okay.  Did you learn later that they had reviewed

13              it?

14       A.     I was informed that they were looking in to it and

15              they spoke to someone.

16       Q.     Okay; and is what you're hinting to in that second

17              line, "fob access reports show the next door

18              neighbor entering the building just a few moments

19              earlier"?

20       A.     I have no knowledge.  They just said that they spoke

21              to someone who entered the apartment building around

22              that time, and that's all I know.

23       Q.     And this is them letting you know that they had

24              spoken to someone -- they looked at the fob access

25              reports and they had spoken to someone; is that
```

```
1            correct?

2      A.    Correct.

3      Q.    They were keeping you informed in that regard.

4      A.    They didn't inform me that it was my neighbor.  They

5            just said that someone did.

6      Q.    Okay, so they told you they looked at logs, they

7            told you that someone had entered but did not

8            specify it was a neighbor of yours; correct?

9      A.    Correct.

10     Q.    Assuming the college was doing all of these things

11           we have in this first paragraph next to the Byrne

12           Oaks reference, would you agree that they were

13           following up on your concerns, taking the concerns

14           seriously, and attempting to find out who entered

15           your apartment?

16     A.    I believe they did things that were asked of them

17           from myself and my mom and that they -- and that I

18           was told they spoke to someone, and that's my

19           understanding of the situation at this time.

20     Q.    Okay, so if I understand what you're telling me,

21           you're agreeing that they did all of these things,

22           but you're saying they're doing it in response to

23           concerns expressed by you and your mother; is that

24           correct?

25     A.    That would -- Yes, and that just that we weren't
```

1          100-percent informed that the person lived next to

2          me, just that we were told it was someone.

3     Q.   Okay.  We're going to go back to Loras 642 through

4          644, and for the record that was about two or three

5          exhibits ago.  If you could find that for me.  If

6          you find the Loras exhibit that begins at 642,

7          Ms. Swift, hopefully 643 and 644 follow there.

8               Do you have that in front of you?

9     A.   Yes.

10    Q.   We may have already covered this, so I just want to

11         be thorough.  I'm going to refer you to the e-mail

12         at the top of the page.

13    A.   Okay.

14    Q.   This is an e-mail from Donna Heald to you on

15         September 10th at 8:00 a.m.

16              Do you see that e-mail?

17    A.   I do.

18    Q.   Is this, again, following up with you about your

19         concerns regarding what's going on in the classroom,

20         and none of this e-mail has anything to do with the

21         incident on September 6th of 2020; is that correct?

22    A.   That is correct.  This e-mail has to do with

23         academics and not with the -- with the incident.

24    Q.   Did you and your mother have a telephone call with

25         President Collins on September 11th, 2020, in the

1    morning of that day?

2  A.  I believe that was the day, yes.

3  Q.  Yeah, and I think you talked about a recording that

4    Loras College might have.

5     Is that the conversation you were referring to

6    or are you referring to something else other than

7    that?

8  A.  Yes.

9  Q.  Yes, that's the conversation --

10  A.  That's the conver- --

11  Q.  -- or, yes, something else?

12  A.  Sorry.

13  Q.  That's all right.

14  A.  Yes, that is the conversation that I was talking

15    about.

16  Q.  So it was you and your mom and President Collins on

17    that day speaking.

18     Was there anyone else on the call with you?

19  A.  Not that I can recall, no.

20  Q.  What was discussed during that call?

21  A.  The incident that occurred on the 6th, the -- kind

22    of an overview of the meetings that -- the overview

23    of meetings we have had.  We also talked to him

24    about the academic portion of what was going on at

25    this time.

```
 1    Q.    If I can just stop you for a second.  When you say
 2          "academic portion," is that what we looked at just a
 3          moment ago with regard to Donna Heald or is that
 4          something different academically?
 5    A.    Correct, it has regard to what we spoke about with
 6          Donna.
 7    Q.    That's at the top of Loras 0642, that topic
 8          (indicating); correct?
 9    A.    That topic --
10    Q.    That e-mail.
11    A.    -- correct.
12    Q.    All right.  Anything else that you spoke with
13          President Collins about -- you or your mother spoke
14          with President Collins about?
15    A.    I believe we spoke about safety measures that the
16          school doesn't have and when they believe they might
17          have them.
18    Q.    Can you be more specific, Ms. Swift, what -- in
19          particular what safety measures?
20    A.    Adding cameras on campus, and that it's within the
21          five-year plan.
22    Q.    All right.  Anything else on safety measures you
23          spoke about?
24    A.    Not that I can recall anything else that we
25          discussed.
```

1    Q.   Did President Collins offer you any assistance from

2          anyone at the college to deal with what had happened

3          to you on September 6, 2020?

4    A.   I believe either myself or my mom brought up the

5          fact that no one from the counseling service had

6          reached out, and that he was surprised by that

7          answer.

8    Q.   Did he offer you counseling services?

9    A.   He said that someone -- To my recollection he said

10         that someone would be in contact with me.

11    Q.   All right.  Anything else that he offered to you in

12         the sense of support that the college could make

13         available to you as a result of the September 6,

14         2020, incident?

15    A.   During that meeting I think it was -- I don't have a

16         full recollection of exactly what was said.  From

17         what I do recall it was more along the lines of

18         "Reach out if you need help with anything else."

19    Q.   All right.

20    A.   That's all I recall from that meeting.

21    Q.   Okay, and September 11th, 2020, would have been

22         five days after the incident; right?

23    A.   Yeah, yes.

24    Q.   Okay, and did the -- did an individual named Tricia

25         Borelli from the college ever contact you?

1    A.    About ten minutes post the phone meeting.

2    Q.    Okay.  I'm going to show you what's been marked as

3          Loras 577 and 578.  Okay; and specifically,

4          Ms. Swift, I'm going to refer you to the e-mail

5          that's at the bottom that begins September 11th,

6          2020, at 11:01 a.m. and runs to the second page

7          where Tricia just signs off with her name and so

8          forth.

9              If you'd review that section of the e-mail and

10         let me know after you have done that.

11   A.    (Witness complied.)  Okay.

12   Q.    It looks like, if we look at the first full

13         paragraph that begins at the bottom of Loras 577,

14         she's offering to set up an appointment with you.

15             Do you see that?

16   A.    I do, yes.

17   Q.    Did you ever meet with Tricia Borelli?

18   A.    I did not.

19   Q.    Why didn't you?

20   A.    At that point throughout my time discussing things

21         with Loras I did not feel comfortable talking to a

22         staff member at Loras.

23   Q.    About what had happened to you on September 6th;

24         right?

25   A.    Correct.

```
 1    Q.    Not about academic concerns, but --

 2    A.    Concerns about the incident on September 6th.

 3    Q.    If we look one e-mail above that, it looks like this

 4          is your reply that comes approximately four days

 5          later to her on September 15th at 9:45 p.m.

 6             Do you see that?

 7    A.    I do.

 8    Q.    Okay.  Would you read that to yourself and just let

 9          me know when you're ready for a question.

10    A.    (Witness complied.)  Okay.

11    Q.    It looks like you're saying there "I am (sic)

12          already have someone who I am talking to about what

13          happened.  If I need any more help I will contact

14          you."

15             Do you see that?

16    A.    I do.

17    Q.    Who were you visiting with about what happened at

18          that particular time?

19    A.    At that particular time I had an appointment

20          scheduled -- I don't have an exact date -- with a

21          therapist to discuss everything that was going on.

22    Q.    Was this a therapist in your hometown area --

23    A.    Correct.

24    Q.    -- in Illinois?

25    A.    Yes.
```

1    Q.   Can you tell me the name of the person?

2    A.   That was something my mom set up for me.  I do not

3          have a name, and -- Yeah, I don't have a name.

4    Q.   Okay.  Did you ever meet with that person to discuss

5          the incident?

6    A.   At that time I did not meet with a therapist about

7          the incident, no.

8    Q.   Have you ever met with any therapist or counselor to

9          discuss the incident of September 6, 2020?

10   A.   I have, yes.

11   Q.   All right.  Can you tell me who you met with?  I'm

12         just looking for their name.

13   A.   Her name is Courtney Harrick (phonetic), Harrick,

14         Harrick.

15   Q.   Can you try to spell that for the court reporter the

16         best you can.

17   A.   A- -- or, sorry, H-a-r-k-i-n-s.

18   Q.   It looks like Harkins to me.  Is that the right way

19         to say it, H-a-r-k-i-n-s?

20   A.   I called her Dr. Courtney --

21   Q.   All right.

22   A.   -- so that's -- I --

23   Q.   Well, I'll call her that, too.

24         Where is Dr. Courtney located?  Where does she

25         practice out of in the sense of a city, a place?

```
 1    A.    She practices out of Long Beach in California.

 2    Q.    And I think you told me at the beginning of the

 3          deposition that at some point you went out to

 4          California, but you returned to Illinois; is that

 5          correct?

 6    A.    Correct.

 7    Q.    Was the California visit after the incident at Loras

 8          College, that you were out there for a while and

 9          then you returned back to Illinois?

10    A.    The time I spent out in California was

11          post-graduation.

12    Q.    How long were you out there?  I probably should have

13          asked you that when we were starting up.

14    A.    Approximately nine to ten months.

15    Q.    What were you doing out there?

16    A.    Living life, I think is --

17    Q.    Okay.  Yeah; I mean, what I'm asking you is was it

18          for work?  Was it for pleasure, an extended

19          vacation?  I just want you to kind of tell me in

20          your own words why you went and what you were doing.

21          That's all.

22    A.    I learned that Kyle Hall lived in the surrounding

23          area from where I was staying -- or where I am

24          staying.  I didn't feel comfortable being at home.

25          So I have family that lives in California that
```

```
 1              allowed me to come and spend time, however much I
 2              needed, with them.
 3     Q.       Did you -- Did you work during that time or were --
 4     A.       I did.
 5     Q.       All right.  What were you doing during that nine to
 6              ten months?
 7     A.       I was DoorDashing and Uber Eats and Instacarting.
 8     Q.       I think you told me that Dr. Courtney is located in
 9              Long Beach, and you may have told me where in
10              California you were staying, but can you tell me
11              again where -- what city in California you were
12              living in during those nine to ten months?
13     A.       San Clemente.  I believe her office is in Long
14              Beach.  It might be somewhere closer, but I believe
15              it's in Long Beach.
16     Q.       To the best of your recollection when did you first
17              see Dr. Courtney in relation to the September 6,
18              2020, incident?
19     A.       In relation to then it was about -- I believe I
20              started in December of '21.
21     Q.       Okay.  'Cause if I understand correctly -- and you
22              tell me if I'm wrong -- you completed your fall
23              semester at Loras basically remotely, right, from
24              your home doing student teaching; right?
25     A.       No -- Well, so I -- the fall semester had classes.
```

```
 1            Student teaching was spring semester.

 2     Q.    Okay; so the spring semester of 2020 you would have

 3            been student teaching, and then after you got done

 4            with the student teaching did you go immediately out

 5            to California?

 6     A.    So I was teaching spring of '21 and then -- So I

 7            finished classes -- I finished the fall semester of

 8            2020 and then the spring semester of '21 I went and

 9            stayed home and did my student teaching and then I

10            graduated, and then about July of '21 I was in --

11            July or -- between July and August I was in

12            California.

13     Q.    How many times did you meet with Dr. Courtney to the

14            best of your recollection?

15     A.    Approximately anywhere from 20 to 50 times.  I don't

16            have an exact...

17     Q.    After you concluded meeting with her have you met

18            with anybody else at any other location concerning

19            the incident that occurred on September 6, 2020?

20     A.    Just my doctor.

21     Q.    Your general practitioner?

22     A.    My general practitioner, yes.

23     Q.    Have you ever been prescribed any medication as a

24            result of what happened on September 6, 2020?

25     A.    Yes.
```

```
 1    Q.   What is that medication, if you recall?

 2    A.   One is 100 milligrams of sertraline, which I believe

 3         is the off-brand of Zoloft, and then I have one

 4         other medication that I do not know the name of.

 5         It's a very large name.

 6    Q.   All right.  Have you ever been treated by a mental

 7         health provider for any other claims other than the

 8         September 6, 2020, incident?

 9    A.   Not -- Not officially diagnosed, no.

10    Q.   Okay.  Have you ever been on any prescription

11         medication for either depression or anxiety prior to

12         the September 6, 2020, incident?

13    A.   No.

14    Q.   Have there been any other incidents or occurrences

15         in your life since September 6, 2020, that have

16         prompted you to seek an opinion from a medical

17         provider and to obtain medication for either anxiety

18         or depression?

19    A.   Not -- Nothing that would have me seek medication

20         for anxiety -- or anxiety or depression.

21    Q.   Okay; so is your testimony that the two medications

22         you mentioned, the generic equivalent of Zoloft and

23         the other big name you couldn't think of, are

24         for --

25    A.   It's for -- Yes, yes.
```

1   Q.   -- are they all in your opinion -- You're fine,

2        you're fine.  -- are they all related to the

3        September 6, 2020 incident; in other words, to deal

4        with what occurred in that incident?

5   A.   Yes.

6            MR. MERRILL:  Off the record.

7            (An off-the-record discussion was held.)

8            (A recess was taken.)

9   BY MR. JANNES:

10  Q.   I'm going to show you -- Where did we leave off?

11       What exhibit do you have?

12  A.   I have 577.

13  Q.   All right.  We're going to go to another exhibit

14       then.

15  A.   Okay.

16  Q.   I'm going to show you what's been marked as

17       Loras 137 and 138, and this purports to be a

18       September 14, 2020, Incident Report Information on

19       Loras College stationary.

20           If you just want to take a moment to read

21       through that and let me know when you've done that.

22  A.   Clarify, read through the whole thing?

23  Q.   Yes.  Specifically I'm going to direct your

24       attention to the bottom paragraph, so that will

25       shorten it up.  Under Descriptive Information, see

```
1              Incident Description and then there is a paragraph?

2    A.    Uh-huh.

3    Q.    Why don't you start with that --

4    A.    Perfect.

5    Q.    -- because I think my question will be confined to

6          that.

7    A.    (Witness complied.)  Okay.

8    Q.    All right.  You start off in that first paragraph at

9          the bottom that begins under Incident Description by

10         saying, "On September 6, 2020 an unknown male broke

11         into my campus apartment."

12             Do you see that?

13   A.    I do.

14   Q.    And at this point in time you're classifying the

15         individual as a male.

16             What tells you that the individual was a male?

17             How do you know that who broke into your apartment?

18   A.    From what I saw of him -- or the person standing in

19         my doorway, I saw a figure of a male.

20   Q.    Okay; and you would agree that there is a difference

21         between this (indicating) report that occurred on

22         September 14, 2020, and Officer Rosenow's report

23         that -- wherein he tells the reader that it was an

24         unknown person and you didn't identify them as male

25         or female.
```

```
 1              Would you agree with that?
 2      A.    I would agree that the documents say different
 3            things.
 4      Q.    Okay.  That's all I was asking you.  The documents
 5            say different things, his report versus this report.
 6              And for clarification, this September 14th,
 7            2020, report marked as Loras 137 and 138, that was
 8            something you filled out online on Loras' website;
 9            correct?
10      A.    Correct.
11      Q.    This is -- I take it this is a website with a report
12            or report template that allows a student like you to
13            fill out an Incident Description or some other
14            information that's of concern to you; correct?
15      A.    Correct.
16      Q.    And this is what you filled out on that date,
17            September 14th.
18      A.    Correct.
19      Q.    It looks like you also then go on to say -- and,
20            again, I'm focusing on that paragraph at the bottom.
21      A.    Uh-huh.
22      Q.    -- that you reported the incident to campus place,
23            Dubuque police, residence advisors, the Dean of
24            Student (sic), the Assistant Dean of residence life,
25            and Loras' president.
```

```
 1                    Do you see that?

 2      A.    I do.

 3      Q.    And have we -- Other than the Dubuque Police

 4            Department have we discussed through e-mails and

 5            questions already all of those people in that

 6            grouping that you're talking about there?

 7      A.    Yes.

 8      Q.    All right.  I want to talk a little bit about

 9            Dubuque Police Department, because I don't think

10            we've touched on that during your deposition.

11                Did you make a report to the Dubuque Police

12            Department?

13      A.    I did.

14      Q.    When did you make that report in relation to the

15            September 6, 2020, incident?

16      A.    That morning.

17      Q.    Do you recall the name of the officer that you spoke

18            to or detective?

19      A.    Two officers came.  I do not remember their names.

20      Q.    Did you keep any paperwork that they gave to you

21            concerning the incident?

22      A.    I do not recall getting anything from them at that

23            exact moment.  I believe I have paperwork with my

24            report on it --

25      Q.    Okay.
```

```
 1    A.    -- from a later date.  Sorry.

 2    Q.    That was my next question.  Did you ever get any

 3          paperwork from them, if you didn't get it

 4          contemporaneously with them visiting you that day?

 5    A.    I believe we reached out to them fixing something

 6          that was on there and asking for a copy.

 7    Q.    After reporting it to the Dubuque Police Department

 8          what were you told by them concerning what they were

 9          going to do to investigate this incident?

10    A.    I was told that since there were no cameras on -- or

11          in or on the building they can't look at footage, so

12          identifying the person would be difficult.  I was

13          asked about what happened and then I was asked -- or

14          I was told just to -- that there would be a record

15          of it and just to keep vigilant.

16    Q.    We saw from one of the earlier exhibits that

17          Officer Rosenow came to your apartment somewhere

18          between 4:15 and 4:25 a.m.

19              When in that timeline did Dubuque police come to

20          your apartment?

21    A.    From my recollection of the events they came after

22          the officer from the campus came.

23    Q.    Was it an hour, half hour?  Do you have any

24          recollection of approximately how much time had

25          occurred from when he had come and left to when
```

1          Dubuque police showed up?

2     A.   I don't.

3     Q.   Was it the same morning?

4     A.   Yes.

5     Q.   Was it -- Do you think it was early or late, or if

6          you know, in the morning?

7     A.   I know that I left campus to be with my dad at

8          around ten o'clock and that campus security came and

9          left at about 4:00, so somewhere between that

10         timeframe the police came.

11    Q.   Did Dubuque police ever tell you that they had

12         identified a person who was the perpetrator in the

13         sense of entering your apartment without

14         authorization?

15    A.   They did not.

16    Q.   Did you ever follow up with them to see whether they

17         had closed their investigation and what their

18         findings were when they closed the investigation?

19    A.   I did.

20    Q.   Okay.  What were you told?

21    A.   That there was no other evidence that they could get

22         because there was no cameras, so it was pretty much

23         at a standstill at that time when I checked back in

24         with them.

25    Q.   Was it your understanding that the administrators

```
1              and other individuals at Loras College were also
2              communicating with the Dubuque Police Department
3              concerning this incident?
4      A.      I had no knowledge --
5      Q.      If the --
6      A.      -- that I can recall of them -- Sorry.
7      Q.      You're fine.  You're still finishing, okay?
8              If the administrators and officials at Loras
9              College were to attest that they were also working
10             and in communication with the Dubuque Police
11             Department concerning this incident, would you have
12             any reason to believe that wasn't the case, even
13             though you don't have any details?
14     A.      If I was told that they were doing something, I
15             would have assumed they were doing that.
16     Q.      Okay.
17     A.      I believe that answers your question.
18     Q.      Yeah.  What I'm asking you is just assume -- It
19             probably wasn't the greatest question.
20             Just assume for purposes of my question that
21             someone, one or more people from Loras College, are
22             going to say, either in a document or in testimony
23             or otherwise, "Yes, we were also communicating with
24             the Dubuque Police Department, working with them on
25             this investigation to identify an intruder."
```

1          All I'm asking you is do you have any

2          information or documents to indicate that that

3          absolutely was not occurring, that they weren't

4          doing that.

5     A.   I don't have any documents saying they did not -- or

6          that they did not work with the police.

7     Q.   Or information?

8     A.   Or information.

9     Q.   You also -- I don't know that we -- When we went

10         over that list at the beginning of my questions a

11         few minutes ago, we also mentioned residents'

12         advisors, and I'm not sure I asked you who your

13         residence advisor was and whether you spoke to the

14         residence advisor about the incident.

15    A.   My resident advisor was Kiki Cabrera.  I believe we

16         had a very brief conversation about it when she

17         stopped in the -- into the apartment.

18    Q.   And you say also -- Again, I'm referring you back to

19         this paragraph at the bottom of Loras 137.  You say,

20         "I have requested that Loras provide additional

21         safety measures including, but not limited to, a

22         deadbolt lock, yet Loras has done nothing to protect

23         my safety."

24         Do you see that?

25    A.   I do.

1    Q.   Now, having reviewed the e-mails that we looked at

2         and the purchase of the safety equipment and alarms

3         and so forth, do you still feel that Loras had done

4         nothing at that point in time to protect your

5         safety?

6    A.   I believe that all the safety measures that were

7         taken or not taken were asked and wanted by myself.

8         It was not them openly saying that they were

9         available, and some of them weren't readily

10        available to when I was still on campus and felt

11        safe on campus.

12   Q.   Well, regardless -- I understand your answer.

13        Regardless of who made the request to initiate

14        certain safety measures, Loras College did respond

15        and do some things in response to those requests,

16        did they not?

17   A.   They did.

18   Q.   All right.  For example, they changed -- and I know

19        we have been over some of this, but let's just be

20        clear given your statement.

21        They did change the locks on your exterior door

22        and on the interior doors of the apartment; correct?

23   A.   Correct.

24   Q.   And they had done that by September 14th; correct?

25   A.   I don't have the exact date, but if that's what -- I

1    don't have an exact date, but they did it, yes.

2    Q.   All right, and you had met with Katie

3         Keleher-Garfoot on September 8th to discuss the

4         other safety measures that we went over, I think

5         specifically the window bars and the door alarms;

6         correct?

7    A.   Correct, and the deadbolt.

8    Q.   And the deadbolt.  And you had seen the order from

9         Amazon whereby they had ordered those things on

10        September 8th.

11            They had done that; correct?

12   A.   I saw that it was ordered, correct.

13   Q.   And, again, we discussed the additional rounds that

14        at least Loras says they were making, but you have

15        no knowledge whether they made 'em or not; correct?

16   A.   Correct.

17   Q.   And you acknowledge that Loras College had told you

18        they were reviewing the key fob information at that

19        point in time, although you don't know exactly what

20        they reviewed or when; correct?

21   A.   Correct.

22   Q.   So it's really not fair, is it, to say that the

23        college was doing nothing at that point in time?

24   A.   I think that at this point in time when I submitted

25        this, I felt very alone and that I was no longer

```
 1            safe on campus.

 2    Q.      Okay; but, again, I guess what I'm asking you -- and

 3            understand I'm not trying to argue with you.  I'm

 4            just trying to understand if you believe this

 5            statement is still true given what we've reviewed.

 6                 Given what we just talked about and what the

 7            college did, do you still think that your statement

 8            that they were doing nothing at that point is an

 9            accurate one?  Do you stand by or do you agree they

10            were doing something?

11    A.      I would adjust it to say that they were doing the

12            bare minimum of what was asked.

13    Q.      I want to, again, go back to your -- your statement

14            here at the bottom of Loras 137.

15                 You say you have asked for information about the

16            investigation into who broke into your apartment but

17            have only received limited updates.

18                 Do you see that?

19    A.      I do.

20    Q.      What additional information were you seeking,

21            Ms. Swift, at that point in time on September 14th

22            of 2020?

23    A.      To my recollection information involving the person

24            they talked to, just not -- not necessarily just who

25            he -- who they talked to, but if it seemed suspect
```

1            or anything, just any information on anything at

2            that point.

3    Q.   All right.  In the last sentence you say, "I believe

4            Loras is discriminating against me because I am a

5            female student that has been" the subject -- "that

6            has been subjected to a sexual assault."

7          Do you see that statement in the -- in the

8            paragraph at the bottom of Loras --

9    A.   I do.

10   Q.   -- 137?  And I want to start with the last part of

11           that sentence where you say you have been subjected

12           to sexual assault.

13         You previously reported to campus security that

14           someone came into your apartment while you were

15           sleeping.

16         We both agree that that's accurate; correct?

17   A.   Correct.

18   Q.   And that you weren't able to identify the person,

19           although you're telling me during your deposition

20           you believed it was a male, he had a certain type of

21           hair, but you couldn't tell who it was; correct?

22   A.   Correct.

23   Q.   And as frightening as I'm sure that was for you --

24           and I certainly concede that it was a frightening

25           situation -- what about someone being in your

```
 1          apartment and running out when you awoke equates to
 2          a sexual assault?
 3     A.   In Loras' handbook it says that when someone enters
 4          an intimate space, it's called voyeurism, and that's
 5          under the -- under the umbrella of sexual harassment
 6          and sexual assault.
 7     Q.   If I understand correctly, the intruder who was in
 8          your apartment, they never made any physical contact
 9          with you; correct?  You just saw them in the
10          doorway.
11     A.   They were entering my bedroom, correct.
12     Q.   And you couldn't tell in their mind what their
13          intent was, whether they were there to observe you,
14          to steal, to do whatever?  You don't know what was
15          in the thoughts of that person; correct?
16     A.   I did not know what was in the thoughts.  I also
17          know that nothing was missing from my apartment.
18     Q.   And there was no dialogue between you and the
19          intruder.  As I understood the report and what you
20          told me earlier, there was a scream by you and the
21          person fled; correct?
22     A.   I screamed vivid words at him.
23     Q.   What did you scream?
24     A.   "Oh, fuck."
25     Q.   And -- And the person fled after that; correct?
```

```
1    A.   The person was no longer standing in my doorway;

2         correct.

3    Q.   Right.  And there was -- Assuming this was a male,

4         according to your testimony today, there was no

5         response from him back in response to what you

6         yelled; correct?

7    A.   Not that I heard a response.

8    Q.   And that person made no gestures of any type that

9         you would determine -- or conclude would be sexual;

10        is that correct?

11   A.   I woke up before anything could happen.

12   Q.   Okay.  Let me give you an example -- and I'm not

13        trying to disgust you -- the person didn't have

14        their pants down, they weren't touching themselves

15        in a -- in a -- their genitals or making any other

16        type of sexual act to indicate they were getting

17        some type of gratification.

18             That's accurate; right?

19   A.   I did not see him do any of those motions.

20   Q.   The most that you saw there was a person standing

21        there, you were naturally alarmed, you said what you

22        said, and the person fled.

23   A.   Yes, the person was entering my room, I screamed,

24        and he left.

25   Q.   And by virtue of the fact that you were sleeping and
```

```
 1              the person saw you and your interpretation of Loras'
 2              policies, you deemed that to be a sexual assault.
 3                  Is that what you're telling me?
 4      A.      When reviewing Loras' handbook and looking at the
 5              incident, I was led to believe that from my
 6              understanding it would be considered voyeurism and
 7              within the sexual harassment or sexual assault in
 8              Loras' handbook.
 9      Q.      Do you have an understanding of whether voyeurism,
10              as you interpret it, always has to have a sexual
11              motivation or implication?
12      A.      Can you clarify your question?
13      Q.      Yeah, I'll do the best I can so you and I are
14              communicating.
15                  What I'm asking you is the fact -- First of all,
16              voyeurism is someone watching someone else; right?
17              A voyeur observes another person; correct?
18      A.      Correct.
19      Q.      What I'm asking you -- and, again, I'm asking for
20              your belief and understanding of the term, all
21              right -- is voyeurism always sexually motivated or
22              can someone be a voyeur and observe someone else but
23              there be no sexual motivation?
24      A.      I think there can be no -- there can be no -- there
25              doesn't have to be a sexual component to voyeurism.
```

1    Q.   Okay, but by virtue of the fact that you were

2         sleeping at that time and just the way this incident

3         occurred as you explained to me, you believe it was

4         sexually motivated.

5    A.   Yes.

6    Q.   And, again, my -- my purpose is just to understand

7         what your interpretation was.

8    A.   (Nods head.)

9    Q.   I want to focus on the last sentence, again, and

10       specifically just the last few words of that

11       statement where you say, "I am a female student that

12       has been subjected to a sexual assault."

13        What actions do you believe the college would

14       have taken for a male student that they did not take

15       for you because you were a female student?

16    A.   Throughout my experience with the college I felt

17       that as a female student, certain things were said

18       that indicated and made me feel as though it was my

19       fault.

20    Q.   Okay.  Can you be more -- And, again, before I ask

21       you another follow-up question, again, we're

22       confining this to the September 6, 2020, incident;

23       not any other interactions you had with the college

24       during your four years there; correct?

25    A.   Correct.

 1    Q.    All right.  What in particular are you talking

 2          about?  If you're talking about certain interactions

 3          that made you feel that way, I'd like you to tell me

 4          what those were.

 5    A.    Uh-huh.  Within meetings with I believe it was

 6          Katie, but I'm not 100 percent certain, it was

 7          brought up that it could have been someone just

 8          going into the wrong apartment or going into the

 9          wrong room.  It was very heavily indicated that I

10          didn't lock my door and that it was my fault because

11          I didn't lock my door.  It just made me feel that

12          because I was a female, I was getting blamed for

13          what was -- what occurred, which is why I indicated

14          that.

15    Q.    Did the -- Did the college, Ms. Swift, in any way

16          ever use the terms "Because you're a female you

17          should have done this" or "Because you're a female,

18          you know, you're at fault for that"?

19              Were those terms ever used by anyone at the

20          college in the conversation?

21    A.    Those terms were not used to my recollection.

22    Q.    So what I understand you're telling me is this was

23          your feeling, these things were implied to you

24          because you were a female based on the actions of

25          the college, but nobody said, "Hey, we're treating

1          you differently as a female versus a male student";

2          is that accurate?

3     A.   Based on the actions that the employees of the

4          college took and said made me feel that it was my

5          fault.

6     Q.   Okay.  Now, this report that we're looking at,

7          Loras 137, that took place -- or I should say was

8          made by you on September 14th, 2020; correct?

9     A.   Correct.

10    Q.   All right.  Is it fair to say that this is the first

11         time you had communicated to the college your belief

12         it was discriminating against you because you were a

13         female?

14    A.   From my recollection I believe that was the first

15         time I mentioned it, yes.

16    Q.   All right.  Let's take a look at Loras 625.

17         THE WITNESS:  Can we take a break?

18         MR. JANNES:  Absolutely, whenever you want.

19         (A recess was taken.)

20    Q.   I'm going to show you what's been marked as

21         Loras 625.

22    A.   Is that what we have in front of us?

23    Q.   No, Katie is going to show us another exhibit.

24    A.   I was like --

25    Q.   All right.  I -- I lost track of where we were

```
1              before you asked for a break.

2       A.     You looked a little panicky, so I was like, "Oh."

3       Q.     Sorry.  Would you take a look at that e-mail that

4              purports to be from Molly Burrows Schumacher on

5              September 15th, 2020, again, to a variety of people,

6              and let me know after you've read through that.

7       A.     (Witness complied.)  Okay.

8       Q.     The subject line of that e-mail was "increased

9              rounds requested at Byrne Oaks".

10                 Do you see that?

11      A.     I do.

12      Q.     And I'm paraphrasing here, but basically Molly asked

13             individuals receiving that e-mail to -- she used the

14             word maintain an increased presence in the area of

15             Byrne Oaks, with additional rounds through and

16             around the building.

17                 Do you see that?

18      A.     I do.

19      Q.     And she also goes on to say, "the rounds have been

20             requested by the student and their family to help

21             the student feel comfortable in the building."

22                 Do you see that?

23      A.     I do.

24      Q.     Now, at this point in time on September 15th, 2020,

25             were you still on campus or not?
```

```
 1    A.    I'm not officially -- I'm not -- I can't recall the

 2          exact date I moved out.  I'm not certain.

 3    Q.    So it's possible you were, possible you weren't.

 4          You just cannot tell us at this point.

 5    A.    At this exact moment I cannot say if I was or was

 6          not.

 7    Q.    Is there anything that you would -- would or could

 8          consult, like a diary or a calendar or something,

 9          that would give you that answer or is that all

10          lost --

11    A.    Yes.

12    Q.    -- in time?

13    A.    No, I -- I can look to see if -- if I can find

14          anything that says a date.

15    Q.    Assuming that the college was taking these

16          additional security measures that we already

17          discussed, the door alarms and the changing of the

18          locks and the increased rounds, all assuming that

19          they would testify to that effect that these things

20          were occurring, did you have any intention of

21          staying on campus at that point in time?

22    A.    If I felt safe and comfortable and protected on

23          campus, I would have stayed.  I planned on coming

24          back for the spring semester.

25    Q.    Let's assume for purposes of my question,
```

1          Ms. Swift -- 'cause I understand that you don't

2          personally know whether they were doing some of

3          these things, but let's assume that they were doing

4          all of those things, doing the additional rounds;

5          they had changed the locks on your doors, interior

6          and exterior; they had gotten the safety bars and

7          the alarms and so forth, what else would have made

8          you feel more safe, assuming they did all of those

9          things?

10          MR. MERRILL:  Object to form and foundation.

11          You can answer.

12          BY MR. JANNES:

13     Q.   You can answer subject to his objection.

14          THE WITNESS:  Okay.

15     A.   Having an additional lock put on the door, whether

16          it be a deadbolt or any other kind of lock put on

17          the door; having cameras at every entrance and

18          throughout the hallways within the building.

19     Q.   Anything else that comes to mind?

20     A.   In terms of feeling safe I think as of right -- as

21          of right now those are the two that I recall.

22     Q.   It looks like Molly also says, "We are still

23          investigating the issue I mentioned in my e-mail on

24          9/8".

25          The issue mentioned in that e-mail was your

```
1              report of the intruder, at least that's how you

2              would interpret this; correct?

3     A.      That's how I would interpret it, correct.

4     Q.      All right.  Let's take a look at Loras 536.  I'll

5              represent to you this is a September 15th, 2020,

6              e-mail from Katie Keleher-Garfoot to you sent at

7              12:08 p.m., and take your time to review that and

8              then when you're done let me know.

9     A.      (Witness complied.)  Okay.

10    Q.      All right.  Let's -- It looks like this e-mail was

11             addressing several things.

12                  So, first, you're being advised by the

13             college -- or you're being advised the college

14             received the window bars and the door alarms for

15             your apartment; correct?

16    A.      I am being told that they received window and door

17             alarms.  I don't know if those were the correct

18             window ones 'cause that was an issue.

19    Q.      All right, and at that point in time I take it your

20             testimony is the same as you gave a moment ago,

21             'cause we looked at another September 15th, 2020,

22             e-mail, that you don't know whether you were still

23             on campus at this point or off campus for good;

24             correct?

25    A.      Looking at this e-mail, at that point I'm assuming I
```

1        was back and forth between being at home and being

2        on campus.  So I don't have an exact date of when I

3        officially moved home, but I know between the

4        incident and officially moving home I was back and

5        forth pretty often.

6   Q.   And she's asking you in that same first paragraph of

7        that e-mail if you'd like assistance putting up the

8        window and door alarms, how many you want, and so

9        forth.

10        Do you see that?

11  A.   I do.

12  Q.   Did you ever respond to her concerning that

13        question?

14  A.   I believe there was a response.  I'm not sure if it

15        was from me or one of my other roommates also.

16  Q.   Okay; and it looks like if we move to the second

17        paragraph of that e-mail, she's also answering your

18        question that I think the record would show you

19        asked when you first met with her on 9/8/20 about

20        the possibility of a deadbolt.

21        Do you see that in the second paragraph?

22  A.   I do.

23  Q.   And she told you it would not be possible, and she

24        had cc'd the physical plant in this e-mail,

25        specifically John McDermott, who was with the

```
 1          physical plant.

 2              Do you see that?

 3     A.   I do.

 4     Q.   Did you ever communicate with the college's physical

 5          plant about why a deadbolt was not a possibility for

 6          your door in Byrne Oaks?

 7     A.   I did not.

 8     Q.   If the physical plant were to say -- or someone from

 9          the physical plant were to attest that there were

10          fire codes in place for that apartment and a

11          deadbolt would take it out of compliance with fire

12          codes, would you have any reason to think that's not

13          accurate?

14     A.   I don't have a reason to think that that's not

15          active -- or that that's not correct.  I would have

16          hoped that if it wasn't allowed per fire safety,

17          then we would be able to find an additional lock

18          that does coincide with fire safety.

19     Q.   Let's look at the third paragraph of that e-mail.

20          It says -- or it references requesting a report.

21              Do you see that?

22     A.   I do.

23     Q.   What report are you -- is Katie referring to, if you

24          know?

25     A.   I'm not certain, but I'm assuming it has to do with
```

1    the officer in that report because at that time that

2    was the only report I filed.

3  Q.  Okay.  "the officer," just for clarification --

4  A.  Uh-huh.

5  Q.  -- Officer Rosenow's September 6, 2020, report, is

6    that what you're referring to, or your September 14,

7    2020, report?

8  A.  The report from September 6th.  I'm not certain, but

9    I'm assuming that is what is being talked about.

10  Q.  And also she in the final -- well, not final,

11    second-to-final paragraph, which is the largest

12    paragraph on that page, she is responding to your

13    questions about blue lights.

14    Do you see that?

15  A.  I do.

16  Q.  And we already had a discussion on the record about

17    that; correct?

18  A.  Correct.

19  Q.  All right, and did her reasoning in that paragraph

20    make sense to you?  In other words, she was giving

21    you an explanation as to why blue lights might not

22    be the most effective way to notify someone that

23    there was an incident of concern to a student.

24    Did that explanation make sense to you?

25  A.  That explanation made sense.  I disagree with parts

1          of it.

2     Q.   And what parts do you disagree with?

3     A.   Just in terms of lots of colleges have -- I don't

4          have an exact number, but during this time we did

5          look it up on colleges that have it versus not

6          having it and whether or not there is false

7          reporting involved.  I feel -- we felt -- I felt

8          that there is false reporting even if you call the

9          police.  So having the buttons and saying that one

10         of your reasons is because -- one of the reasons for

11         not having the blue lights is for false reporting,

12         at that point I felt that that was -- that that was

13         kind of bogus because you can false report lots of

14         ways, and I just know on campus as a student there

15         are areas that are dark and don't have lights and

16         are secluded, and that just in campus safety as a

17         general whole there are places that could be

18         improved.

19              MR. JANNES:  Off the record a minute.

20              (An off-the-record discussion was held.)

21     Q.   I'm going to hand to you, Ms. Swift, what's been

22         marked as Loras 634, and I'm going to refer you to

23         the e-mail that is about a third of the way down

24         that looks like a response from you to Katie dated

25         Thursday, September 17th, 2020.

1              Do you see that?

2     A.    I do.

3     Q.    And then if we look down one more e-mail, we see the

4           original e-mail that we were talking about just a

5           moment ago where she told you about the -- the

6           window and door alarms, requesting the copy of the

7           report, et cetera; correct?

8     A.    Correct.

9     Q.    So what we're seeing right above that here on

10          Loras 634 is your reply to her that occurred

11          approximately two days later; correct?

12    A.    Correct.

13    Q.    All right.  I'll give you a moment to read that, and

14          let me know when you're ready.

15    A.    (Witness complied.)  Okay.

16    Q.    Okay.  In your response you state that you had been

17          staying at a hotel because you didn't feel

18          comfortable at your campus apartment.

19              Do you see that?

20    A.    I do.

21    Q.    What hotel were you staying at?

22    A.    I believe some -- one of the Marriott franchises in

23          Dubuque.

24    Q.    Was anyone staying there with you?

25    A.    No, I was staying there alone.

1    Q.    Why did you think a hotel where anyone could access

2          the guest rooms was safer than a fobbed-entry campus

3          apartment that could be equipped with window bars

4          and door alarms?

5    A.    They had -- They have cameras within the hotel and

6          they also have two types of locks on the door, not

7          just one.

8    Q.    Did they have fob entry at the hotel?

9    A.    To get into the doors that were not the main door,

10         from what I can recall, yes, they did.

11   Q.    Did they have window bars and window alarms in their

12         rooms?

13   A.    No.

14   Q.    Could anyone from the public just enter the hotel

15         through the main entrance and come up to a room?

16   A.    They could, but they would have been caught on

17         camera and have had multiple people see them on the

18         way, I would assume.

19   Q.    You think there is a difference between having

20         cameras and having fobbed entries, whereby the

21         person who fobs in's name and time for the fob-in is

22         recorded?

23   A.    I think there is a -- there is a difference in level

24         of safety, yeah.

25   Q.    You would agree that both methods are going to

```
 1              record the person coming into the building; correct?

 2              They're just different ways.

 3      A.      A fobbing would only catch the person entering,

 4              whereas a camera would catch the person entering,

 5              what they do when they enter, and when they leave.

 6      Q.      Are you saying this Marriott had a camera on every

 7              floor of every room that was in the hotel?

 8      A.      To my knowledge they had one in the lobby and by the

 9              elevators.

10      Q.      Okay.

11      A.      And that's to my -- the extent of my knowledge.

12      Q.      Okay; so if there weren't ones in the individual

13              hallways, how would Marriott or anyone else know who

14              was entering a particular room?

15      A.      When someone -- Can you clarify your question?

16      Q.      Sure.  You told me that there was -- to your

17              recollection there was a camera in the entryway --

18      A.      (Nods head.)

19      Q.      -- and also I believe in the elevators?  What did

20              you --

21      A.      I believe there was one with -- watching the

22              elevators.

23      Q.      Okay.  I just want to make sure I have your

24              testimony correctly --

25      A.      Yes.
```

1    Q.    -- so I can clarify for you.  So there is a camera

2          at the entryway to your recollection and watching

3          the elevators.

4          My question was if there is not individual

5          cameras on every floor of the hotel, how is the

6          hotel supposed to tell what person might have, for

7          example, entered their room without permission?

8    A.    Seeing as how I'm not the hotel, my best assumption

9          would be that the person is caught entering the

10         camera in the main lobby, and then if the person

11         enters through a side door, they had to fob in and

12         then they were also caught on the camera going up

13         into the elevator and what floor they went to, so --

14   Q.    Well, let's say, for example, 25 people went up an

15         elevator within a ten-minute period.

16         There would be -- You would agree there would be

17         difficulty telling if there is no camera in the

18         hallways which particular person entered a room.

19   A.    The rooms require a fob to get into, so you would --

20         My assumption would be that the hotel would then

21         look at the history of the fobs entering into the

22         hotel, physically the rooms, not just the hotel.

23   Q.    Well, but that's similar to people fobbing into the

24         particular Byrne entranceway; correct?  Your

25         understanding is --

1   A.   I --

2   Q.   -- there is a record, right?  A record is made when

3         someone fobs in.

4   A.   The record is made when someone fobs into the

5         specific room versus the entire building, so there

6         is a difference.

7   Q.   All right.  Was your understanding of the -- First

8         of all, let's talk about fobs a minute 'cause I

9         don't think I've asked you these questions, and

10        they're important for our discussion.

11        Everybody who lived in Byrne Oaks apartment got

12        a fob to get in the front door; right?

13  A.   Anyone that lived in an on-campus apartment had a

14        fob.

15  Q.   Including, but not limited to, your --

16  A.   Correct.

17  Q.   -- to your apartment?  Okay, and that -- was it your

18        understanding that that fob contained some

19        identification of who the person was; in other

20        words, the fob was assigned to them.

21  A.   Correct.

22  Q.   All right; and it was your understanding that by

23        fobbing in, if the college wanted to, they could

24        track the identity of who is entering at any given

25        time.

1    A.    Correct.

2    Q.    Did you ever ask to see any fob reports for anybody

3          that ever entered in the apartment at any time that

4          you lived there?

5    A.    We -- Can you clarify your question?

6    Q.    Yeah.  Did you ever -- We -- We have been talking

7          about fob reports this morning off and on, and I'm

8          just -- I'm not sure I asked you this, so I want to

9          know what your knowledge is in this regard.

10             Did you or anyone else affiliated with you ever

11         request from the college to see the fob reports for

12         who entered at any given time?

13   A.    To my best recollection during the meeting with Art

14         and then also during the meeting with Katie it was

15         brought up and requested, but they said that they

16         looked in to it and they spoke to the person who

17         fobbed in, and that was the information we received.

18   Q.    Okay.  Did you ever receive any information that

19         anyone other than Kyle Hall had fobbed in close in

20         time to when someone entered your apartment in that

21         early morning hour on September 6th of 2020?

22   A.    I had no knowledge that Kyle Hall fobbed into the

23         building minutes before the incident until I

24         reviewed the information given to me by my lawyer.

25             Prior to that I was just told they spoke to someone

1            and it was cleared.

2     Q.    All right, and are you -- are you sure about that?

3            And the reason I want to -- the reason I ask I want

4            to focus you on a particular event we're going to

5            talk about a little later.

6                There was a disciplinary hearing for Kyle Hall;

7            correct?

8     A.    Correct.

9     Q.    And you and several others attended that

10           disciplinary hearing and were allowed to make

11           statements, either in writing or verbally; correct?

12    A.    Correct.

13    Q.    Are you saying at that point in time you did not

14           know that Kyle Hall was the person that fobbed in in

15           the early morning hours to Byrne Oak (sic) and

16           immediately prior to someone unauthorized entering

17           your apartment?

18    A.    At that point I knew that when Kyle was caught

19           entering an apartment in December, he admitted to

20           two previous break-ins during the semester, which

21           led us to conclude that I was one of them.

22    Q.    Okay.  That's -- I understand your testimony and

23           appreciate it, but that's a little bit different

24           than my question.

25                My question was at that point in time when you

1       were participating in that disciplinary hearing for

2       Mr. Hall, is it your testimony that you didn't know

3       that someone had fobbed into the building close in

4       time to when an unauthorized person had entered your

5       apartment.

6   A.  I think we're talking in circles.  I was told and my

7       knowledge was that someone fobbed in minutes before

8       the incident -- that's what I was told -- early

9       September -- or mid, early September; then in

10      December when I received an e-mail that he was then

11      caught entering an apartment, that he admitted to

12      two others.  From what I can recall I was not told

13      that Kyle Hall was the one that fobbed in during my

14      incident --

15  Q.  Okay.

16  A.  -- from my recollection.

17  Q.  But if we move -- I understand what you're telling

18      me.  If we move forward a little bit in time to go

19      to his disciplinary hearing, which was after

20      September, had you learned at that point in time, on

21      or about that disciplinary hearing, that he was the

22      one who had fobbed in prior to the incident?  That's

23      what I'm asking you.

24  A.  From my best recollection, no, I did not know he was

25      the -- specifically the one.  It was more that he

1        admitted to other break-ins.

2   Q.   Did you spend the entire or remainder of the fall

3        2020 semester at home?

4   A.   From when I went home officially, which I'm assuming

5        is sometime between September -- or late September

6        and October, I stayed at home and did school through

7        there.  I planned to come back to school for soccer

8        once, but the game was cancelled.

9   Q.   How many days did you stay at the Marriott?

10  A.   I believe two nights from my best recollection.

11       It -- between two to three nights.

12  Q.   All right, and after that you took your classes

13       remotely and eventually you went on to your student

14       teaching; correct?

15  A.   Correct.  I planned -- Well, my plan was to come

16       back for student teaching and do it, excuse me, in

17       Dubuque, but plans changed.

18  Q.   Okay.  We're going to discuss that, but since you

19       brought the topic up -- it would have been one of my

20       later questions, but why did you not return to

21       Dubuque to do your student teaching?

22  A.   I was very fearful that if anything happened on

23       campus, that I wouldn't feel supported and I

24       wouldn't feel safe and I wouldn't feel that it was

25       made to be my fault.

1    Q.   Did anyone from the college ever tell you that what

2         happened concerning the September 6th, 2020,

3         incident was your fault, using those words?

4    A.   Not using those words exactly, no.

5    Q.   Did they ever imply it to you in any way?

6    A.   From my perspective of the events, yes, I felt that

7         in certain incidents with -- when working with the

8         college, that it was implied that I didn't do

9         enough.

10   Q.   What was implied to you that you should have done

11        that you didn't do?

12   A.   Mostly to do with the door locking and then locking

13        my bedroom door also, and that those were measures

14        that the school believed I didn't take, but I do

15        believe I did.

16   Q.   Okay, and I assume you do agree, just in theory,

17        it's a good idea to lock your door if you don't want

18        anybody entering inappropriately; correct?

19   A.   Correct.

20   Q.   That's why there is door locks; correct?

21   A.   Correct, to keep people that aren't welcomed out,

22        but also that's what a door is for, too.

23   Q.   Right.  And did you see in the Loras College student

24        handbook where there is a recommendation to

25        students -- all students, female, male, et cetera

1         keep your doors locked?

2    A.   Yeah.

3    Q.   And you think that's good advice, don't you?

4    A.   Yes.

5    Q.   All right.  Let's take a look at Loras 633.

6         MS. GRAL:  663.

7         MR. JANNES:  663.  Thank you.

8    Q.   This looks like an e-mail that occurred -- and

9         obviously we're ignoring the top, Ms. Swift, and

10        we're starting from the part -- or the middle part

11        of the page -- or the -- not the middle, but near

12        the top down.

13         This looks like an e-mail from Nancy Fett of

14        September 15th, 2020, at 7:09 to you.

15         Do you see that?

16    A.   I do.

17    Q.   All right.  Would you review that for me and let me

18        know when you're done?

19    A.   Uh-huh.  (Witness complied.)  Okay.

20    Q.   All right.  She starts off by saying thank you for

21        the phone call.

22         And my question is when did you call her.

23    A.   I don't have a specific date.  I'm assuming it was

24        the 14th and then I didn't hear anything from her.

25    Q.   All right; and it says -- Also, it looks like that

1    there must have been a message left by you to her

2    because she's responding to you.

3     What was, if you recall, your message to her in

4    that phone call?

5  A. From my best recollection it would have been me

6    asking how to file a Title IX and where do I go

7    about doing that step and then just that I had

8    concerns.

9  Q. Okay, so you had -- you had called her and left a

10    message, by your testimony, on September 14th, and

11    she's e-mailing you back on September 15th; is that

12    accurate?

13  A. I'm not positive if it was September 14th.  I'm --

14    That's my assumption, is that it might have been,

15    but -- yes.

16  Q. Okay.  Your best -- Can we term it this way, your

17    best recollection is September 14th, the day before;

18    Is that fair?

19  A. From my best recollection, yes.

20  Q. All right; and then she says, "Thank you for having

21    the courage to advocate for yourself".

22     Do you see that?

23  A. I do.

24  Q. Do you agree that's a pretty supportive statement

25    that she's making to you, that she thinks you're,

1         you know, doing a good job in -- in advocating your

2         position concerning what happened to you?

3   A.   Can you clarify your question?

4   Q.   Yeah.  Do you deem that statement to be supportive?

5         In other words, she's telling you, look, I'm proud

6         of you, you have the courage to do this.

7          Would you call that a supportive statement or do

8         you think of it as something else?

9   A.   I would say that it's a supportive statement.

10   Q.   All right, and then she goes on to tell you that

11         Matt Saylor or Molly Burrows Schumacher will contact

12         you and conduct an investigation.

13          Do you see that?

14   A.   I do.

15   Q.   Okay.  Now, did you understand that Nancy Fett had

16         to do with the Title IX claims and the handling of

17         Title IX claims on behalf of Loras?

18   A.   Can you clarify your question?

19   Q.   Yeah.  Who was Nancy Fett?  Why were you contacting

20         her is really what I'm asking you.

21   A.   My understanding of who Nancy Fett was was that she

22         was the lead person to deal with Title IX and

23         Title IX inquiries.

24   Q.   Okay; and is it your best recollection that when you

25         contacted her September 14th, if we assume that's

1        the case per your testimony, that it was

2        specifically about pursuing your Title IX claim?

3   A.   Yes.

4   Q.   Okay; and Nancy is telling you there in that e-mail

5        that you'll likely be contacted by one of two

6        people, Matt Saylor in security or Molly Burrows

7        Schumacher in student life.

8            Do you see that?

9   A.   I do.

10  Q.   And you had been -- you were contacted by both of

11       those people at some point in time after this

12       e-mail; is that correct?

13  A.   I might have been contacted by both of those people

14       after this e-mail, but I can't say if it was in

15       regards to investigating the Title IX or not.

16  Q.   Okay.

17  A.   To my --

18  Q.   We know from the e-mails we looked at before that

19       Molly was in touch with you as early as 9/7/20,

20       which would have been one day after; correct?

21  A.   We were in contact with Molly, not Molly with us.

22       We were the first to initiate the contact and the

23       first to start the process.

24  Q.   And Molly responded.

25  A.   Yes.

1    Q.   She didn't ignore you.  In fact -- Is that a yes?

2    A.   Yes.  Sorry.

3    Q.   In fact, would you agree that none of the college

4         administrators ever ignored any of the inquiries

5         that you or your family made for some type of

6         contact or feedback?  That's a fair statement, isn't

7         it?

8    A.   I don't think we were necessarily ignored.  I think

9         there were some delays throughout some of the

10        process, but -- yes.

11   Q.   Okay; so they never ignored you, but you thought

12        maybe the -- there might have been a few timeliness

13        issues here and there.

14            Is that what you're telling me?

15   A.   Yes.

16   Q.   All right.  Now, Nancy says -- also, in the very

17        last paragraph she says, "If you feel like you are

18        not being heard, please contact me."

19            Do you see that?

20   A.   I do.

21   Q.   Did you ever contact her and tell her, "Look, no

22        one's responding to me.  I'm not being heard

23        regarding my issues with the college and the way the

24        September 6th, 2020, incident was handled"?

25   A.   That's why we filed -- filed the Title IX, 'cause we

1          filed the Title IX, if I remember correctly, the

2          14th; so the reason why we filed the Title IX.

3     Q.   Okay; and we have been through all of the e-mails

4          that preceded the Title IX, and I'm not going to

5          waste your time or my time to go back through those

6          again, but even though we went through all of those

7          e-mails, you felt like given what dialogue had

8          occurred prior to September 14th, that you were not

9          being heard?  Is that what I understand your

10         testimony to be?

11    A.   Yes, that I was not being heard, that I felt like

12         there was blame, that I felt like there could have

13         been more done, and that I wasn't necessarily kept

14         up to date on certain things that I wish I would

15         have been.

16    Q.   All right.  We're going to look now at Loras 538,

17         and this is a rather long e-mail, so I'm going to

18         give you an opportunity to read that all the way

19         through, and let me know when you've done that, and

20         I'll represent to you that this appears to be an

21         e-mail from Molly Burrows Schumacher to you on

22         September 15th, 2020, at 9:32 p.m.

23              So after you have had a chance, Ms. Swift, to

24         read through that, let me know, okay?

25    A.   Okay.  (Witness complied.)  Okay.

1    Q.    All right.  It looks like within three hours of when

2          Nancy Fett said that either Matt Saylor or Molly

3          Burrows was going to contact you, Molly Burrows sent

4          you this e-mail; is that accurate?

5    A.    Looking at the timestamps, yes.

6    Q.    Molly says she got your incident report from the

7          prior night.

8              And, again, without going over that again,

9          that's that 9/14/20 incident report that you

10         completed online where you claim that you were the

11         victim of discrimination, sexual assault; correct?

12   A.    I'm not sure if it was talking -- if this -- Can you

13         point out where it is again?

14   Q.    Yes.  "Your recent report was routed to me today for

15         review."  Let me see if I can find the context.  I

16         thought she --

17   A.    I'm not sure if that is talking about the incident

18         report that was filed on the 6th with -- through

19         campus security or if that is talking about my

20         Title IX claim or not.

21   Q.    Right, but you -- and, again, I -- I don't mean to

22         argue with you, and I'm not.

23   A.    No.

24   Q.    You only filed one report.  The September 6th report

25         wasn't filed by you.

1          That was filed by Officer Rosenow; correct?

2     A.   I mean, I asked for a report to be made.

3     Q.   Yes, and we're in agreement on that --

4     A.   Okay.

5     Q.   -- he made a report.

6     A.   And he made the report and submitted it and then I

7          did the Title IX claim on the 14th.

8     Q.   Right.  So the only report you had ever filled out

9          yourself, completed was the 9/14/20 report; correct?

10    A.   Correct.

11    Q.   So did you understand, if you had an understanding,

12         that that's what she was referring to in the opening

13         paragraph there, where she says, "Your recent report

14         was routed to me today for review."

15    A.   I'm assuming that I understood it meant the

16         Title IX.

17    Q.   Right.  And if we look in the third full paragraph

18         from the bottom -- or third full paragraph from the

19         top, excuse me, in the middle she's, in fact,

20         referencing some information in there.  She said, "I

21         noticed in your report you contacted the Dubuque

22         police about what occurred".

23         That's some things that you put in the

24         September 14th report; correct?

25    A.   I believe so, yes.

1    Q.    So that tells you that's the report she's referring

2          to, is that fair, when you look at those things in

3          this e-mail?

4    A.    Yes.

5    Q.    All right, and she tells you she apologizes that you

6          felt you didn't receive a response.

7              Do you see that in the first paragraph of the

8          e-mail?

9    A.    I do.

10   Q.    And then she goes on to provide you with some

11         updates in the -- in the body of the e-mail; is that

12         correct?

13   A.    Yes.

14   Q.    The first thing she tells you in the second

15         paragraph from the top is that campus security has

16         increased its rounds on the interior and exterior of

17         the building?

18   A.    That is what we are being told, correct.

19   Q.    And she also tells you that they contacted those

20         that fobbed in -- that's the first part of the third

21         full paragraph from the top -- shortly before the

22         incident occurred.  They contacted those

23         individuals -- or individual?

24   A.    Yes, it does say that they contacted him.

25   Q.    Yeah.  It actual uses the word "those" fobbed into

```
 1              the building, but we're in agreement the report is

 2              telling you, Hey, we've contacted -- she used the

 3              word "those" who fobbed into the building shortly

 4              before the incident; right?

 5     A.       And then it switches to "he," so, yeah.

 6     Q.       All right, and then she asks you for a Dubuque

 7              Police Department case number also in that middle

 8              portion of that third full paragraph.

 9                 Did you provide that to her?

10     A.       I cannot recall whether I did or not.  I know when I

11              was looking for the case number, we were having

12              problems finding it, so I'm not sure.

13     Q.       Okay, so your recollection is you don't remember one

14              way or the other whether you provided any

15              information to her about the Dubuque police case.

16     A.       Correct.

17     Q.       And it looks like also that in that fourth paragraph

18              from the bottom she addresses the deadbolt on your

19              Byrne Oaks apartment again and states that the

20              school has resubmitted the request.

21                 Do you see that?

22     A.       I do.

23     Q.       Okay; and you don't have any reason to dispute

24              that -- that that happened, do you?

25     A.       Only that it happened -- or I'm being informed of it
```

1          after I already filed the Title IX.

2    Q.    Right.  So -- So you're telling me "I have nothing

3          to indicate it didn't happen.  I just don't know."

4          Is that what you're telling me?

5    A.    That I received -- I have nothing that says if -- if

6          it was submitted or not, but from my best

7          recollection when I received this letter, I was not

8          told that they were resubmitting it to my best

9          recollection.

10    Q.    Okay; and, again, I might have asked a poor

11          question.

12          The paragraph certainly says, "I am aware you

13          requested a deadbolt be added to your door at Byrne

14          Oaks, and I saw today that the Physical Plant

15          indicated they would not be able to honor that

16          request," and then she goes on to say they're going

17          to resubmit the request in the next sentence;

18          correct?

19    A.    Correct, that is what the e-mail says.

20    Q.    Right, and she's notifying you -- You acknowledge

21          she's notifying you of this fact; correct?

22    A.    After I already filed Title IX, correct.

23    Q.    And what I'm asking you is this:  You have no reason

24          to believe -- no information in the sense of

25          testimony or documents to indicate that there wasn't

```
 1          a resubmission of the request.  That was my

 2          question.

 3     A.   I have nothing that would prove that, correct.

 4     Q.   And also she's going on in the -- in that same

 5          paragraph as the deadbolt to tell you that they were

 6          gathering prices for blue light poles?

 7     A.   That is what the e-mail says.

 8     Q.   Yeah.  And you have no reason to believe that they

 9          weren't doing that, do you?

10     A.   The only thing is per our previous discussions we

11          were told that was not -- that blue lights on campus

12          were not an option.

13     Q.   Right, but that's different than gathering

14          information.

15             Do you have any reason to believe that they

16          weren't gathering information, even though we might

17          know that blue lights never became an option?

18     A.   Correct.

19     Q.   And she's also addressing in that fifth paragraph

20          from the top the request from you or members of your

21          family for the installation of a camera outside

22          Byrne Oaks.

23             Do you see that?

24     A.   In which paragraph?

25     Q.   It is the fifth one from the top or it can be the
```

```
 1            second full one from the bottom.  It begins --

 2     A.     Okay, yes.

 3     Q.     -- "Additionally".

 4            Do you see that?

 5     A.     I do.

 6     Q.     So she's giving you a report there saying, "I have

 7            submitted a request to have a surveillance camera

 8            installed at the access point at Byrne Oaks."

 9            Do you see that?

10     A.     I do.

11     Q.     And you have no information to indicate that she was

12            not doing that, do you?

13     A.     Just along the lines of there are more than one

14            access point into the building, so I'm not sure

15            which she was talking about.

16     Q.     Okay, but you have no reason to believe that at

17            least the college was looking at submitting -- or

18            excuse me, installing a camera at some access point.

19            You don't have any reason to believe that wasn't

20            a true statement from her, do you?

21     A.     I do not.

22     Q.     And finally, I'm down at the bottom now, Ms. Swift,

23            the last full paragraph from the bottom that begins,

24            "In your report".

25            Do you see that?
```

1    A.    I do.

2    Q.    Regarding the report of sexual assault she offers to

3            assist by directing you to on- and off-campus

4            resources and to discuss the matter with you.

5        Do you see her doing that in that paragraph?

6    A.    I do.

7    Q.    And did you ever take advantage of any of those

8            opportunities by contacting her back and saying, "I

9            would like these campus resources made available to

10          me in connection with what occurred to me"?

11    A.    I did not.

12    Q.    And then she mentions finally at the very -- It

13          looks like the very bottom she mentions your right

14          to file a report of sexual assault.

15        And my question to you is did you ever file a

16          report of sexual assault with the Dubuque Police

17          Department as opposed to filing an improper entry

18          into the apartment report with Dubuque police?

19    A.    I did not adjust the -- the initial report.

20    Q.    Okay, so the only report that Dubuque police had on

21          file from you was someone entered improperly into my

22          apartment but not any allegations of sexual abuse

23          with them; correct?

24    A.    Correct.

25    Q.    Did you -- By the way, do you recall responding to

1            this e-mail, the one marked Loras 538?

2     A.    I believe I responded to it.  To my best

3            recollection I responded to it at some point.

4     Q.    All right.  I didn't see a response, but I'm not in

5            any position to question your word.  I'm just -- I

6            have -- I have the documents that I have here.

7            That's what I'm telling you.

8     A.    I'm assuming at some point I responded to her.

9     Q.    By the way -- Again, I don't want to go over ground

10           we have been over and you've given me your testimony

11           on, but I think you said you had a Loras computer.

12           At some point in time that Loras computer was taken

13           back and so forth.

14            Did you -- Have you collected any of your

15           correspondence, e-mails, letters, anything that you

16           exchanged with the college or is everything that

17           you're relying upon and looking at in this case what

18           we recently gave to you through your attorneys?

19    A.    So when I filed the Title IX, I still had access to

20           everything, and when we were going through the

21           school year, I still had access to everything.  At

22           the end of the school year I attempted to download

23           all my e-mails from my -- Loras and all my stuff on

24           my computer to the cloud; some of it worked, some of

25           it didn't.  So I have correspondence -- some

1      correspondence from my Loras e-mail and some from my

2      regular e-mail and then e-mails between my mom and

3      the school also.

4   Q.   Okay.  Let me ask you this:  You have had the

5      benefit of reviewing at least it sounds like around

6      the first 400 documents that we gave you, and what I

7      mean by "documents" is documents marked Loras 1

8      through 400.

9         It sounded like from your testimony you reviewed

10      those in-depth, and it sounds like the rest of the

11      stuff you skimmed at some point; correct?

12   A.   I would say that in-depth it was more of your

13      position statement, and a skim of -- skimmed through

14      some of these (indicating) e-mails.

15   Q.   Okay.  The reason I ask you this -- that question is

16      whether you believe -- and maybe you don't know at

17      this point 'cause you haven't reviewed enough

18      documents, but whether you believe you possess any

19      documents, e-mails, letters, notes, anything like

20      that that's different than what Loras has already

21      produced to you from your attorneys -- or to your

22      attorneys.  Excuse me.

23   A.   I believe there is some different e-mails, whether

24      that was with my Gmail or my mom's e-mail.

25   Q.   All right.  Well, we may ask your attorney to

```
1              produce those at some point in time, but I'm just
2              trying to get on the same page with you --
3        A.    Yeah.
4        Q.    -- are we looking at the same -- lawyers call it
5              record --
6        A.    Okay.
7        Q.    -- or evidence, okay?  So that was the reason for
8              the question.
9                  Let's look at Loras 147.  That purports to be a
10             September 16th, 2020, e-mail from Molly Burrows
11             Schumacher to you, and, again, what I'm referring to
12             is the middle one that's -- that went out at
13             6:40 p.m.
14                 If you would review that for me and just let me
15             know when you've done that.
16       A.    (Witness complied.)  Okay.
17       Q.    All right.  This looks like, again, a day after your
18             e-mail exchange with Nancy Zachar Fett, you're
19             corresponding again with Molly Burrows-Schumacher;
20             is that correct?
21       A.    Correct.
22       Q.    Molly says that Loras has three Title IX
23             investigators -- trained Title IX investigators and
24             asked if you would like to set up a meeting.
25                 Do you see that in the first part of that
```

1          e-mail?

2      A.   I do.

3      Q.   Did you ever meet with any of those investigators

4           who looks like identified in the e-mail were Matt

5           Saylor, Katie Keleher-Garfoot, or Molly

6           Burrows-Schumacher?

7      A.   From my best recollection I did not meet with them.

8           I had hesitations about meeting with them because

9           I -- If I remember my Title IX claim, I had Molly

10          and Katie both on there as part of my Title IX, so I

11          wasn't sure how they were going to investigate

12          themselves.

13     Q.   Okay.  Why didn't you meet with Matt Saylor then?

14          He wasn't part of your Title IX claim.

15     A.   I can't give a definitive answer except that this

16          was a very hard time for me, and I was struggling a

17          lot with the uncertainty of the whole thing, and --

18          yeah.

19     Q.   All right.  Let's take a look at Loras 660.  That's

20          a September 17th, 2020, e-mail from Molly Burrows

21          Schumacher to you, and, again, I'm referring to the

22          top part of Loras 660.  It looks like an e-mail sent

23          on Thursday, September 17th, 2020, at 3:16 p.m.

24              If you'd just take a moment, Ms. Swift, and

25          review that and let me know when you've done that.

1    A.    (Witness complied.)  Okay.

2    Q.    All right.  In the third paragraph from the top --

3          the first two paragraphs are pretty short -- she

4          says -- well, she provides you with updates on

5          matters that you had previously expressed concern

6          about, specifically cameras outside your campus

7          residence building, college maintenance contacting a

8          locksmith about a deadbolt on your residence door

9          and awaiting estimates on blue lights.

10              Do you see that?

11   A.    I do.

12   Q.    And, again, my question is similar to -- similar to

13         you as other questions I've asked, which is you

14         don't have any evidence to dispute that the college

15         was doing those things, do you?

16   A.    I don't have any evidence that they weren't doing

17         them or doing them.

18   Q.    Okay, but you have nothing to dispute that they

19         weren't.

20              I think you're telling me you don't know; right?

21         Is that fair?

22   A.    Yes.  I got -- received this update after I

23         already -- after my Title IX was already started and

24         submitted, and I'm not sure if I was on campus or

25         not at this exact point.

1    Q.    Okay.  Let me put it another way to you -- and I

2          absolutely am not trying to confuse you -- if folks

3          from the college were to come in and testify, either

4          through an affidavit or through live testimony or

5          something and say, "Yes, we did those three things

6          that we represented to Ms. Swift we were saying we

7          were doing," all I'm asking you is you don't have

8          any evidence through a witness or a document to say,

9          "No, they absolutely were not and here's the proof

10         that they weren't."  That's what I'm asking you.

11   A.    At this time I do not.

12   Q.    All right; and also, if the college -- We went over

13         this a little bit, but I'm not sure that -- that I

14         asked you whether you agreed or knew, for that

15         matter, whether this was the case, but let's assume

16         that the college were to say, "Look, the possibility

17         of installing deadbolts on the residence at

18         101 Byrne Oak was governed by outside factors such

19         as fire codes and so forth," any reason to think

20         that's not true if that's what they will testify to?

21   A.    When we first brought up the idea of getting a

22         deadbolt, we were told no, it wouldn't be possible,

23         and then we received the other e-mail saying that it

24         was rejected, and then now saying that there is a

25         possibility, so I can't say if -- or I can't say if

```
 1          the college was -- I had no proof at that point what
 2          the college was doing.
 3     Q.   All right; so if they were saying they -- they were
 4          doing this, you don't have any proof indicating
 5          they -- they weren't.
 6               That's what you're saying at this point in time?
 7     A.   Yes.
 8     Q.   And they did revisit the lock issue in response to
 9          the concerns of you and your mother, right; in other
10          words, they first told you, as you indicated, look,
11          a deadbolt's not possible and then you asked them to
12          revisit that and they did revisit that issue again.
13               That's a fair statement, isn't it?
14     A.   Yes.
15     Q.   And, in fact, in that e-mail they're talking about a
16          fire rating in the -- in the second paragraph from
17          the bottom.
18               Do you see that mentioned there?
19     A.   In -- On --
20     Q.   Yep.  The paragraph -- I'm sorry, Ms. Swift.  Let me
21          do a better job of directing you.
22               The paragraph begins "Technology has indicated".
23          Do you see that, that big paragraph right there
24          (indicating) at the top, and if we move into the
25          second-to-last sentence from the bottom and move
```

1          over to the right-hand side, you see the college

2          through Molly mentioning to you that there is a fire

3          rating concern.

4                Do you see that?

5     A.   Yes.

6     Q.   So not only were they revisiting that, they were

7          giving you some information as to why it may or may

8          not be a possibility through this e-mail; correct?

9     A.   After I filed the Title IX, correct.

10    Q.   Yeah, but -- but in all fairness to the college and

11         to yourself also, the -- the deadbolt issue was not

12         something that had not been raised and responded to

13         prior to the Title IX claim.

14               That had been something that had been out there

15         prior to that; correct?

16    A.   Correct, but I didn't know that it was denied for

17         fire ratings reasons, and I would have liked to

18         discuss other possible locks that did fall within

19         the fire rating.

20    Q.   Let me ask you this:  Did you ever -- If that was a

21         concern of yours or your family, did you ever visit

22         with anybody at the college to say, "Look, if there

23         is a fire rating concern about installing another

24         lock, what else can be done?  I want to understand

25         if there is another possibility of a different

1        lock"?

2    A.   When we received this e-mail, we did not have a

3         meeting involving that, but during the meetings

4         after it happened when we were talking about

5         additional safety measures and we brought up the

6         deadlock -- or the deadbolt, I apologize, I would

7         have hoped that they might have said, "Here's

8         another option for us instead since that is not

9         available."

10   Q.   Okay.  I understand that is your testimony, but my

11        question was just a little bit different than that.

12             Did you or your family bring up to them, bring

13        to their attention other possibilities for an

14        additional lock to the door?

15   A.   I have no recollection if we did or didn't.

16   Q.   Fair enough.  Let's take a look at Loras 148 through

17        150, which is a series of e-mails that span

18        three pages, and I'll represent to you that these

19        three pages, Loras 148 through 150, are e-mail

20        exchanges between you and Nancy Fett from

21        September 17th, 2020, through September 29, 2020,

22        and I'm going to start you off with referring you to

23        Loras 149 near the top where Nancy is e-mailing you

24        at approximately 3:00 p.m.  So we have a portion of

25        an e-mail that runs at the top and then you can see

1      Nancy e-mailing you on September 17th at 3:00 p.m.

2          Do you see that?

3   A.  I do.

4   Q.  All right.  If you'd just read through that short

5       e-mail and let me know when you've done that.

6   A.  (Witness complied.)  Okay.

7   Q.  All right.  Nancy is telling you that she can be

8       available on Monday, which would have been I believe

9       9/21/20, to discuss your Title IX claim.

10         Do you see that?

11  A.  I do.

12  Q.  And then we're going to refer to your e-mail to her.

13      If you'd turn to 148, you have an e-mail to her that

14      begins at the bottom of Loras 148 and concludes at

15      the top of Loras 149, and that was sent out by you

16      it looks like on September 24th at 11:25 a.m.

17         Do you see that?

18  A.  I do.

19  Q.  It starts -- I think you meant to say, Hello, Nancy.

20      It starts there.  Would you read that and please let

21      me know when you've done that.

22  A.  Yes.  (Witness complied.)  Okay.

23  Q.  All right.  Nancy's e-mail that we looked at just a

24      moment ago was -- said she could meet on 9/21/20.

25      That's the e-mail she sent on September 17th.

1         Was there a reason that you took three days to

2         respond back to her when she was -- when you were

3         requesting a meeting from her?

4    A.   As indicated in the e-mail, I was moving home.  I

5         had -- yeah.

6    Q.   You said, "I have moved home indefinitely," but that

7         really doesn't give us any idea of when you moved

8         home.

9         Does that e-mail help you tell me when exactly

10        you had left Loras and moved home?  Because it's in

11        the past tense at the top of page 149.

12   A.   I don't have an exact date on when I moved home.  By

13        putting this in this e-mail it was some time before

14        this that I moved home.  So that had to go along

15        with packing up my room, getting home, and then, as

16        I said, too, I still had school, so trying to

17        rebalance everything back at home.

18   Q.   Okay.  Yeah.  And you say right in that portion

19        you're referring to that you had moved home

20        indefinitely.  You were trying to adjust to being

21        home and balancing schoolwork.  Correct --

22   A.   Correct.

23   Q.   -- those are your words?  Were the adjustments

24        anything other than what you just talked about?  In

25        other words, you had to move your stuff, you had to

```
 1              adjust to being back home, you had to set your
 2              schedule I assume at some point in time.
 3                   Were there any other adjustments going on in
 4              your life other than that?
 5      A.      Getting acquit (phonetic) -- Oh, my gosh, sorry.
 6      Q.      Acclimated?
 7      A.      Getting reacclimated at home and then just sleep at
 8              nights was difficult, so that was another challenge
 9              that I faced.
10      Q.      Were you working at that time or just still a
11              student full time at that point in time?
12      A.      At that time I was a full-time student.
13      Q.      And was the fall of 2020, that semester, the last,
14              for lack of a better word, schoolwork class semester
15              you had to complete to get your degree followed up
16              by the student teaching?
17      A.      Student teaching we still had.  From my best
18              recollection is it was technically two courses for
19              student teaching.  So one was just the student
20              teaching and then we had work that we had to do and
21              submit to teachers while student teaching, and that
22              was I believe considered still a class, but we
23              didn't -- I don't recall meeting at a set time every
24              week in the spring.
25      Q.      Would you agree with me that the college throughout
```

```
 1            your journey from leaving the campus, going back

 2            home, that they were trying to accommodate your

 3            concerns and display flexibility so you could

 4            complete your degree and resume a career -- or start

 5            a career, I should say, as a teacher, if that's what

 6            you wanted to do with your degree?

 7    A.      Classes were already on Zoom, so it was -- or we had

 8            the option to be on Zoom or in person, and I didn't

 9            feel safe being on campus, and by the time I got the

10            updates from Molly I have -- I had already I'm

11            assuming made the decision to go home.

12    Q.      Well, let's put the classes aside.  I understand

13            your point and your testimony on that.

14                If we move to the student teaching aspect, your

15            student teaching got done in I believe Arlington

16            Heights, if I read the records --

17    A.      Uh-huh.

18    Q.      -- correctly.  Is that true?

19    A.      Correct, yeah.

20    Q.      All right.  Would you agree that the college

21            displayed flexibility, willing to work with you and

22            accommodate you given your concerns about what

23            happened to you, to facilitate that student teaching

24            not back in Dubuque and in Iowa but to have it take

25            place back home where you're located?
```

```
 1     A.    Rebecca Fabricius -- I believe that is her -- how
 2           you pronounce her last name -- helped me secure the
 3           spot in Arlington Heights, and that was an option
 4           given to me, that you could choose to do it in
 5           Dubuque or in Arling- -- or anywhere else
 6           throughout when anyone student teaches.  I believe
 7           that because I didn't feel safe on campus, my
 8           student teaching wasn't as -- I didn't have the same
 9           connections as other students because I wasn't -- I
10           didn't feel safe on campus.
11     Q.    Okay, but -- I understand and appreciate your
12           testimony, but -- and just one small clarification
13           in that regard.
14           So Ms. Fabricius, which I assume was someone in
15           the education department at Loras, was assisting you
16           for whatever reasons and concerns you had to make a
17           student teaching position happen for you back home
18           in Arlington Heights versus in Dubuque.
19     A.    I believe that was her -- that's her job, is to
20           facilitate student teaching.
21     Q.    Had you quit the soccer team at this point in time,
22           which was, you know, September -- on or about
23           September 21, give or take?  There were several
24           e-mails in this chain.
25           Had you quit the soccer team?
```

```
 1   A.   Not officially.  I told Pucci that at some point if
 2        I felt comfortable returning to campus, that I would
 3        love to return to whatever soccer season we would
 4        have had.
 5   Q.   Okay.  Were you a starter on the team?
 6   A.   Depending on the year, yes and no.
 7   Q.   Okay.  I want to -- Let's go forward from
 8        September 6 forward.  At that time I assume soccer
 9        practice was going on.
10        You were part of the team; right?
11   A.   It was very limited 'cause of COVID.
12   Q.   All right.
13   A.   So it was -- it was not a regular season.
14   Q.   From September 6th, 2020, forward would you have
15        been a starter on the soccer team whenever and
16        however that season would have played out?
17   A.   From my knowledge I would have been a starter.
18   Q.   Had you started the soccer season before?  Were you
19        a starter?
20   A.   Correct.
21   Q.   What position did you play?
22   A.   Sweeper.
23   Q.   What in the world is that?
24   A.   So it's like the last defender.
25   Q.   Okay.  Sorry.
```

1    A.    No.

2    Q.    I had to ask, so -- I had never heard that before.

3          Let's refer to Loras 148 at the bottom.  That's

4          that first e-mail in that -- in that chain.  It

5          looks like Nancy is e-mailing you -- Nancy Zachar

6          Fett -- that's the bottom portion of this page on

7          148 -- she's e-mailing you on September 29th at

8          7:08 a.m.

9          Do you see that?

10   A.    I do.

11   Q.    And she's telling you -- there she's proposing

12         several times to meet with you.

13         Do you see that?

14   A.    I do.

15   Q.    Did you ever respond to her to set up a meeting?

16   A.    I have no recollection of seeing this e-mail

17         offering times to meet.

18   Q.    Okay.  Well, let's look right above it.  You send

19         her a response that's on the same page as the Nancy

20         Zachar Fett e-mail of September 29th that's dated

21         12/9/2020, so it's a couple months later -- several

22         months later, saying, Hello, Nancy Fett.  This is

23         Rachael Swift.  I want to amend my Title IX claim.

24         I want to add Kyle Hall as part of the claim.

25         The fact that both of these e-mails appear on

1          the same page, does that make you reconsider your

2          testimony of a moment ago that you had never saw

3          Nancy's e-mail?

4     A.   In the -- In the time prior to looking for my

5          e-mails with Nancy I didn't see this e-mail, but

6          once I went back into my e-mail and wanted to

7          re-e-mail her, then I saw that e-mail.

8     Q.   Okay, and you had the same e-mail address at that

9          time; right?  If we look at the December 9th e-mail

10         and the September 29th, it's

11         Rachael.Swift@loras.edu.

12              The same e-mail appears there for you; right?

13    A.   Correct.

14              THE REPORTER:  Can we take a small break?

15              MR. JANNES:  Yes, absolutely.

16              (A recess was taken.)

17    Q.   Ms. Swift, before we took our break we were talking

18         about Loras 148, which was an exchange of e-mails

19         you had with Nancy Fett about your Title IX claim.

20              You recall those questions; right?

21    A.   Yes.

22    Q.   And I think we established that three people were

23         offered to you as Title IX investigators you could

24         correspond with, Matt Saylor, Molly

25         Burrows-Schumacher, and Katie Garfoot.

1              And if I recall your testimony, you told me you

2              weren't comfortable with Ms. Burrows Schumacher or

3              Ms. Garfoot because, I think your words were, they

4              were part of your Title IX claim; correct?

5  A.   Correct.

6  Q.   And Mr. Saylor, you never followed up to -- to meet

7              with him, even though he was offered to you as a

8              Title IX investigator; correct?

9  A.   Correct, and then he didn't contact me in regards to

10             the Title IX to my best recollection.

11  Q.   Okay; but Ms. Zachar Fett's e-mail we looked at

12             earlier, she told you you should reach out to one of

13             these three people if you want to discuss.

14             Do you remember that?

15  A.   Saying that there -- that -- Could you tell me

16             where?

17          MR. JANNES:  Sure.  Let's go off the record a

18             second and see if we can locate that so we can put

19             it in context for you.  Just give me a moment.

20            (An off-the-record discussion was held.)

21  Q.   If you'll look at Loras 147, Ms. Swift, and the

22             first three or four lines of that e-mail in the

23             middle, do you see where Ms. Zachar Fett is telling

24             you, see if you'd like to talk or meet with the

25             Title IX investigator on campus to discuss in

```
1              telling you who the Title IX investigators were,
2              being herself, Matt Saylor, Katie Garfoot, and I
3              don't think that Molly Burrows Schumacher was
4              mentioned, but she gave you the list there.
5                  Do you see that?
6      A.      Could you repeat the number on that --
7      Q.      Yes, it's Loras 147 (indicating).
8      A.      Okay.  You said -- Sorry, that's why I was confused.
9              You said Nancy, but this is from Molly.
10     Q.      I'm sorry, you're correct, it is from Molly, and
11             Molly is telling you that the investigators are
12             Nancy and Matt Saylor and Katie Garfoot.
13                 I think if you read the first four lines, do you
14             see that there --
15     A.      I do --
16     Q.      -- where she's saying that?
17     A.      -- yes.
18     Q.      Okay, and would you agree that she's telling you
19             that if you would like to meet or discuss with a
20             Title IX investigator, they're available and she
21             tells you the names in the e-mail?
22     A.      Yes, I agree that that's in the e-mail.
23     Q.      Okay, and you never reached out to them -- any of
24             those three to say, "I want to specifically discuss
25             my Title IX claim with you."
```

1    A.    I did not.

2    Q.    Is it fair to say that throughout this entire

3          process that was going on concerning the

4          September 6, 2020, incident you felt that the school

5          wasn't doing enough for you.

6    A.    Yes, and I felt that there was also victim shaming

7          within communications as well.

8    Q.    So if the school was offering you three people to

9          discuss your Title IX claim with, why didn't you

10         take 'em up on that process?  And I -- I understand

11         that you felt uncomfortable with some people --

12   A.    Uh-huh.

13   Q.    -- in that group, but there certainly was at least

14         one person --

15   A.    Yeah.

16   Q.    -- Matt Saylor; if not two, Nancy Fett who weren't

17         part of the Title IX claim that you could have

18         visited with.

19             Why didn't you take them up on their offer?

20   A.    After the September 6th incident I suffered from

21         anxiety and depression from the school's responses

22         to me in conversations I had with them where victim

23         shaming was perceived from my perspective.  I was in

24         a very difficult spot mentally, and I would have --

25         I -- I didn't feel comfortable with Katie or Molly,

```
 1          and I'm assuming -- I can't fully recollect at this
 2          point, but -- that I honestly didn't even see --
 3          or -- such that I didn't process the information
 4          that Matt was also available.  I just know I was in
 5          a tough spot, and if -- maybe if Matt reached out
 6          separately, it would have been a different route or
 7          a different outcome.
 8     Q.   Okay; and in fairness to what's stated in Loras 147,
 9          there were really two people that were available to
10          you, Nancy Fett was available and Matt was
11          available, along with Katie.
12               And you said Katie made you uncomfortable;
13          right?  You weren't going to meet with her; correct?
14     A.   Katie and Molly were both involved in the
15          Title IX -- like, in my Title IX accusation, so I
16          didn't feel comfortable talking to them and having
17          them lead the investigation against themselves.
18     Q.   And when you say "victim shaming" -- I heard you say
19          earlier that you believe that they were critical --
20          and those are my words -- of you because they felt
21          you should have locked your door, right, and you
22          didn't.
23               Is that the victim shaming that you're --
24     A.   Well --
25     Q.   -- talking about?
```

1    A.    Well, I repeatedly said that I locked the door, and

2           they repeatedly would bring up that the door should

3           have been locked, and it made me feel that it was my

4           fault somehow that he was able to enter my

5           apartment.

6    Q.    And that's really what I was asking you, and you may

7           have already answered.  You tell me if you have.  I

8           just want to understand what you meant by victim

9           shaming, and I was just going back to your past

10          testimony and recalling that you told me that you

11          felt they were, for lack of a better word,

12          unnecessarily shifting things to you for not locking

13          your door.

14             And all I was asking is there anything else

15          other than that.  Was that the shaming you're --

16          you're referring to?

17    A.    There was that and then it was also comments along

18          the lines of, "Oh, it was probably just a student

19          going into the wrong apartment" or, "Oh, it was a

20          drunken college student making a mistake."  Those

21          comments made me feel that it -- it wasn't -- that

22          the incident -- it's fine, like it wasn't that big

23          of an incident, and that's not correct.

24    Q.    Can you point me to any correspondence that we've

25          produced through your attorney that indicates where

1       the college was saying, "Oh, it just must have just

2       been a drunken student" or "It just must have been a

3       student in the wrong apartment by mistake"?

4  A.   That I can't find it as of this moment, and I also

5       know that was something that was just mentioned in

6       the conversations and not via e-mail.

7  Q.   You'd agree that it's difficult for the college to

8       perform a full investigation, perform a full

9       evaluation if you won't meet with their appointed

10      Title IX investigator and discuss it with them?

11  A.   It's not necessarily that I wouldn't meet with them.

12      It was that I was struggling, and I never -- If I

13      missed Nancy Fett's e-mail and I never responded, a

14      follow-up phone call or a check-in would have gotten

15      that ball rolling again or just an e-mail from Matt

16      saying -- introducing himself, because at that point

17      I -- the only contact I believe I had with him was

18      he was copied on an e-mail.

19  Q.   Do you recall a follow-up telephone call between you

20      and your mom and President Collins that occurred in

21      the first part of October of 2020?

22  A.   I do.  That was a phone call that my mother and I

23      requested to have with President Collins.

24  Q.   Do you recall what was discussed on the call?

25  A.   Everything -- I would -- or information about the

1          incident, what has occurred, how my mom and I felt

2          that the school wasn't supporting me, we talked

3          about the victim blaming, and that's to my best

4          recollection of that phone call.

5     Q.   Was the request made by either you or your mother to

6          have your tuition that had been paid to Loras

7          College reimbursed?

8     A.   From my point of view the initial suggestion was

9          made by President Collins and that President Collins

10         asked myself and my mom to write him a letter

11         explaining where the college failed and then -- and

12         that after that we would discuss tuition, but from

13         my understanding from that phone call with

14         President Collins is he was the one that first

15         initiated --

16    Q.   So are you saying that based on your recollection,

17         neither you or your mother ever requested or implied

18         to President Collins that you were seeking some type

19         of financial concessions from the college, that that

20         idea was solely his?

21    A.   The whole purpose of this at that time wasn't about

22         the money.  It was about making me feel safe at that

23         time.

24    Q.   And at that point in time on October 8 -- I think

25         the record will show October 8th the conversation

| 1 | | took place.  Go ahead and just assume that for my -- |
|---|---|---|
| 2 | | for the purposes of my question. |
| 3 | | If it did occur on October 8th of 2020, you had |
| 4 | | been home for some length of time at that point in |
| 5 | | time; correct? |
| 6 | A. | I believe at that time about anywhere from 10 days. |
| 7 | Q. | So why was it of issue to make you feel safe at that |
| 8 | | point in time if you had returned to home and never |
| 9 | | intended to come back to the campus? |
| 10 | A. | I did intend to come back. |
| 11 | Q. | Okay. |
| 12 | A. | I was going to come back -- |
| 13 | Q. | Did -- |
| 14 | A. | -- in the spring. |
| 15 | Q. | Did you ever -- Is there ever -- Strike that. |
| 16 | | Is there a writing somewhere that you're aware |
| 17 | | of where you expressed to anyone at the college that |
| 18 | | it was your intent to return in the spring? |
| 19 | A. | I kept my student teaching enrollment in Dubuque |
| 20 | | because I wanted to return to do student teaching in |
| 21 | | Dubuque and be with my professors and be able to get |
| 22 | | a full-rounded understanding of student teaching. |
| 23 | Q. | Okay, and I'm not disputing that's the case.  What I |
| 24 | | really was asking you is did you memorialize it |
| 25 | | anywhere in writing, because I can tell you when I |

```
 1          reviewed all the records, I see nothing like that in

 2          writing, and it's possible I'm mistaken.

 3              I'm asking you did you put it in writing to

 4          someone.

 5     A.   I can't say whether or not it was officially in

 6          writing.  I can -- Really more along the lines of my

 7          intentions of keeping my Dubuque placement was

 8          because I wanted to return and I wanted to have

 9          student teaching experience in Dubuque where I could

10          have the support.

11     Q.   Let's take a look at Loras 151.  I'll represent to

12          you this is a December 8th, 2020, e-mail from Molly

13          Burrows Schumacher to you sent at 11:13 a.m.

14              Go ahead and take a moment to read that and tell

15          me after you've done that.

16     A.   (Witness complied.)  Okay.

17     Q.   All right.  Molly in that e-mail, referring to the

18          first paragraph, tells you that a suspect was caught

19          on camera entering the Byrne Oaks apartments and the

20          person admitted to entering at least two other

21          apartments over the semester.

22              Do you see that?

23     A.   I do.

24     Q.   And she's telling you there also was a Loras

25          student.
```

```
 1              Do you see that?

 2      A.    I do.

 3      Q.    And it looks like she's further informing you that

 4            the person has been removed from campus.

 5              Do you see that?

 6      A.    I do.

 7      Q.    And do you have any reason to believe that anything

 8            that Ms. Schumacher was telling you, as I've recited

 9            in the past few questions, was untrue?

10      A.    I have nothing to prove that any of it was untrue.

11      Q.    All right, and she also tells you that college is

12            working with law enforcement to continue to

13            investigate the incident.

14              That's also noted in that first paragraph, isn't

15            it?

16      A.    Yes.

17      Q.    And can I assume that you have no reason to believe

18            that that wasn't taking place, that they weren't

19            working with law enforcement to investigate?

20      A.    Once again, I have no proof on whether they were or

21            were not.

22      Q.    But you know of nothing to indicate they weren't;

23            correct?  That's my question.

24      A.    Correct.

25      Q.    And then she tells you you can contact Matt Saylor
```

APP. 436

```
 1              or her to report any additional information for the
 2              on-campus information -- or investigation, and
 3              that's in that second paragraph of the e-mail.
 4                 Do you see that?
 5     A.    I do.
 6     Q.    Did you ever contact either Molly or Matt to report
 7              any additional information concerning what occurred
 8              in your apartment on September 6th?
 9     A.    I -- To my best recollection it was not Molly or
10              Matt, but I believed -- I believe I had a
11              communication with Katie.
12     Q.    Okay.  What do you recall that communication being?
13     A.    Just that I found out prior to receiving this e-mail
14              about what occurred on campus already.
15     Q.    Okay, and as a result of that -- we looked at an
16              e-mail earlier -- was that when you notified the
17              college you wanted to amend your Title IX complaint
18              to include Kyle Hall?
19     A.    Correct.
20     Q.    And you had made the assumption that the individual
21              who entered your apartment was Kyle Hall because he
22              was the person who had been positively identified as
23              entering the other apartments?
24     A.    That, along with the -- the timeline of not only my
25              break-in, but this (indicating) break-in and the
```

```
 1            other one (indicating) that is mentioned.
 2    Q.    She also tells you in this e-mail that they will
 3           continue to provide updates for you.  That's right
 4           at the bottom of that second paragraph.
 5              Do you see that?
 6    A.    Yes.
 7    Q.    And you would agree that the college did this;
 8           correct?  They continued to communicate with you
 9           about the status of the investigation of your claim
10           and these claims.
11    A.    There was certain information that I would have
12           liked to know that I didn't find out -- or that I
13           would have liked to have been updated on that I
14           wasn't updated on, and that there was -- I'm not
15           100 percent certain that I got any other updates
16           from Molly, and I might be wrong on that, but I
17           remember the rest of my updates coming from someone
18           else.
19    Q.    Okay.  Let's break that down just a little bit so
20           you and I are communicating.
21              You would agree that the college continued to
22           update you with information concerning this incident
23           and the investigation involving this incident with
24           another student with another break-in and your
25           incident.
```

1           But you're not exactly sure it was from Molly?

2           You're saying it was from someone else?  Is that

3           what you're telling me?

4    A.     So Loras updated me on certain things but not things

5           that would have made me feel safe on campus or made

6           campus as a whole safer.  I was not updated in

7           regards to that there was even any other break-ins

8           on campus that were reported.  I was not informed

9           that Kyle Hall ended up being the person that they

10          talked to that morning after it happened to me.  So

11          their updates were limited and not with information

12          that had -- that I -- that helped me moving forward.

13   Q.     Let's break that down a second.  Wouldn't you agree

14          that that's really not true based on this e-mail

15          that you received on September 8th?  And here's what

16          I mean by that, they're telling you right there

17          there had been other break-ins; correct?  And

18          they're also telling you it involved at least two

19          other apartments.  So they're letting you know there

20          had been other break-ins and involved two other

21          apartments.

22   A.     But they're only letting me know that after someone

23          was caught.  I wasn't notified when it was

24          officially reported, and I believe it was either in

25          October or November that the -- that another

1        break-in following the same parameters that mine

2        had, I was not informed that that occurred on campus

3        in the same apartment building with the same

4        parameters as my break-in.

5   Q.   Well, if the record in this case were to show that

6        the college didn't know who broke in until

7        approximately a week give or take before this

8        e-mail, how could they inform you that there were

9        other break-ins involving the same suspect?

10  A.   It --

11       MR. MERRILL:  Objection, speculation, it

12       misstates the record, too, but you can answer as --

13       to the extent that you have an understanding.

14  A.   So my understanding was that I was -- my apartment

15        was broken into; it was, and I was the first

16        apartment.  Later in the semester there was another

17        break-in that occurred at the same time as mine with

18        the same idea of entering a bedroom and standing at

19        the doorway and doing something, and then this third

20        break-in was caught on camera, and I know that the

21        break-in that happened in the semester was reported.

22  Q.   What evidence do you have that the college knew

23        about any other break-in besides yours until such

24        time as they caught the individual on camera as

25        identified in this December 8th, 2020, e-mail?

```
 1    A.    One of the females from the second break-in

 2          contacted me and sent me her e-mails that she had in

 3          communications with the school and that she did

 4          report it.

 5    Q.    Okay.  Do you have those e-mails still?  Because

 6          I'll represent to you I've never seen them.

 7    A.    I do.

 8    Q.    All right.  Will you give them to your lawyer so he

 9          will produce those to me?

10    A.    (Nods head.)

11    Q.    Is that a yes?

12    A.    Yes.

13    Q.    All right.  Thank you.  Did you respond at all to

14          this December 8th, 2020, e-mail?

15    A.    I cannot recall if I responded or not to this

16          e-mail.  I believe I did informing her that I

17          already knew.

18    Q.    Okay.  We're going to go back again to Loras 148.

19          We looked at that already.  That's the one -- If you

20          could find that for me, Ms. Swift, that's the one in

21          the middle of the page where you were informing

22          Nancy Fett you want to amend your Title IX claim.

23             Do you have that in front of you?

24    A.    I do.

25    Q.    And you state in the middle of the page, "This is
```

```
 1          Rachael Swift.  I wanted to amend my Title IX claim.

 2          I want to add Kyle Hall as part of the claim."

 3            Do you see that?

 4     A.    I do.

 5     Q.    Okay.  We have been over this a little bit, but I

 6          want to make sure I have a very clear understanding

 7          from you on this point.

 8            Why did you want to add Kyle Hall as part of

 9          your claim?

10     A.    I wanted to add him to my claim because he admitted

11          to two prior incidents throughout the semester, and

12          with my knowledge of knowing that there was my

13          break-in and one other break-in that was reported, I

14          made the assumption that he was the person that did

15          it and that I wanted to add it to my Title IX claim

16          so it could be investigated, whether or not he was.

17     Q.    Okay, and would you agree that based on the

18          information you have and the documents that have

19          been provided to your attorneys, that the college

20          did indeed investigate whether Kyle Hall was the

21          individual that entered your apartment?

22     A.    From the documents that -- Are you -- Can you

23          clarify your question?

24            MR. JANNES:  Yeah.  Repeat it, please.  Thank

25          you.
```

```
 1              (The requested portion of the record was read by
 2              the reporter.)
 3    A.   I don't believe that they investigated to their full
 4              ability or capacity.
 5    Q.   Let me represent this to you.  You can assume this
 6              to be true for purposes of my question.  If there is
 7              documentation we've produced to your attorneys
 8              indicating that after the break-in occurred and
 9              after the college looked at the fob-in logs, they
10              interviewed Kyle Hall and asked him directly, "Did
11              you enter the apartment of Ms. Swift?" -- if you
12              assume that to be true --
13    A.   They didn't interview him, though.  Oh, sorry, I
14              thought you were finished.
15    Q.   That's all right.  I understand you want to
16              answer.  -- if you assume that to be true, okay,
17              would you not agree that they investigated whether
18              he was the individual who invest- -- who entered
19              your apartment?  That's what I'm asking you.
20         MR. MERRILL:  Objection to form, foundation.
21         You can answer.
22    A.   At this point in the process of all of this when I
23              added Kyle to my Title IX, I didn't know that he was
24              the one they talked to that -- the following days,
25              so I had no knowledge of whether or not they
```

1        investigated or not --

2        BY MR. JANNES:

3    Q.   And that's really not my --

4    A.   -- at that point.

5    Q.   -- my question, but I understand and appreciate your

6        answer.

7        My question is pretty simple, okay?  I'll ask it

8        again.  I want you to assume, okay, that there is a

9        document out there authored by the college to say

10       that we asked Kyle Hall whether he broke into

11       Rachael Swift's apartment.

12       And assuming that document exists and assuming

13       that college representatives would testify to that

14       effect, would you agree that that indicates they

15       investigated whether Kyle Hall was the individual

16       responsible for improperly entering your apartment?

17       MR. MERRILL:  Same objection.

18       BY MR. JANNES:

19    Q.   You're assuming those facts I've given you.

20    A.   Going off the documents that were provided from me

21       per my lawyer, those documents say that they

22       e-mailed Kyle Hall and that he responded and then he

23       responded a second time and that Molly felt that

24       that was -- that it was either suspicious or some

25       type of suspicious behavior to double respond and

1          that was where the e-mails stopped about questioning

2          him.  I have no documentation if she had a phone

3          call with him.  I have no documentation if the

4          campus security talked to him.

5     Q.   So we are in agreement, aren't you, that you've seen

6          documentation where Molly or someone else from the

7          college basically confronted Kyle Hall and asked him

8          whether he was the one that entered your apartment

9          and he denied it and he made a follow-up e-mail that

10         seems suspicious.

11              You've seen those documents; right?  'Cause

12         you've just recited those to me, I believe.

13    A.   I -- I don't know if she necessarily asked if he was

14         the one that entered.  I believe from what I'm

15         remembering from the documents is she asked if he

16         saw anything.  I'm not 100 percent certain if he --

17         if she actually asked if he was the one that entered

18         my apartment or not.

19    Q.   Okay, so wouldn't it be fair to say from those

20         e-mails that you saw that they investigated whether

21         Kyle Hall was the one who entered your apartment?

22    A.   I don't --

23              MR. MERRILL:  Objection.

24              BY MR. JANNES:

25    Q.   Go ahead.  Your attorney's objection is on the

1       record.  You can -- You can answer.

2   A.   I don't think they investigated.

3   Q.   Okay.  What else should they have done, if they

4        reached out to Kyle Hall, made him aware of the

5        incident, made him aware of your concerns, and if he

6        denied being the person, what else were they

7        supposed to do?

8   A.   Having a face-to-face meeting, having a phone call,

9        having someone from security follow up with him.

10  Q.   And what information would that yield that would be

11       any different from making the inquiry by some means

12       of him in saying -- and I'm paraphrasing --

13       "Mr. Hall, were you the one that entered Rachael

14       Swift's apartment?"

15           Why would that be any more effective?

16           MR. MERRILL:  Objection, form, foundation,

17       speculation.

18  A.   I know if I respond to an e-mail, no one's -- you're

19       not seeing the way I'm acting when I respond to an

20       e-mail.  You're just getting the words that I want

21       to put in an e-mail.  A communication face to face

22       or over the phone would give Molly some idea of --

23       if he was lying, if he was moving around a lot,

24       things that could indicate that he was lying, and

25       that could have at least prompted further

```
 1          investigation onto was he -- did he key fob in for

 2          the other break-in that was reported and the

 3          break-in that was caught on camera.

 4     Q.   Well, we know this, though, don't we -- and I'm not

 5          trying to argue with you, but I want to get a set of

 6          facts that we both agree on, if there are, okay?

 7              We know for a fact they checked the fob log-ins,

 8          and you saw later on that he had fob logged in

 9          shortly before someone entered your apartment;

10          right?

11     A.   (Nods head.)

12     Q.   Is that a yes?

13     A.   Yes.  Sorry.

14     Q.   All right, and they did visit with him by some

15          means -- I realize you may take issue with whether

16          it should have been in person or otherwise, but they

17          did visit with him and queried him, asked him about

18          the incident; correct?

19     A.   They asked him about the incident and --

20     Q.   And he denied having any knowledge of it; correct?

21     A.   He denied seeing anything in the hallways.  I'm -- I

22          don't have that e-mail full word by word, but from

23          what I remembered it was "I didn't see anything when

24          I was in the hallway."

25     Q.   And you're saying that they should have done
```

```
1              something more in the sense of followed up with

2              security, had a face to face because he was

3              inclined, what, to lie through e-mail, to tailor his

4              words in some way?  Is that how I'm supposed to

5              understand what you're saying?

6    A.       Yes.

7    Q.       All right.

8    A.       Yes.

9    Q.       I just want to understand.  Thank you.

10             Let's go back again to Loras 148.  We were

11             talking about adding the -- adding Mr. Hall to the

12             Title IX complaint.

13             Ms. Schumacher didn't provide you at that point

14             in time, when you added him with the name, of

15             anybody that had been caught on camera; correct?

16             She never told you it was positively identified to

17             be a certain person.

18   A.       Can you -- Hmm, can you repeat that or clarify?

19   Q.       Yeah.  Did Ms. Schumacher or anybody else tell you

20             "We've definitively determined it's Kyle Hall that

21             entered your apartment"?

22   A.       No one definitively said that it was Kyle Hall,

23             which is why I wanted to add him to my Title IX, so

24             it could be investigated further.

25   Q.       And the Dubuque Police Department never told you
```

```
 1              definitively that they had determined based on their

 2              investigation it was Kyle Hall who entered your

 3              apartment.

 4      A.      They did not.

 5      Q.      And they did investigate and, in fact, discipline

 6              him, as you understood it; correct?

 7      A.      Can you clarify that?

 8      Q.      Yeah.  Later in the year, okay, I believe it was

 9              March --

10      A.      Uh-huh.

11      Q.      -- they had a hearing about where he was

12              definitively shown to be entering an apartment that

13              you participated in --

14      A.      (Nods head.)

15      Q.      -- and he was barred from campus as a result --

16      A.      Uh-huh.

17      Q.      -- correct?

18      A.      Correct, but I -- I apologize.  I wasn't sure if you

19              were saying that the police -- Okay, yeah.

20      Q.      Okay.  Fair enough.  Do you know if he ever admitted

21              to anybody entering your apartment; Mr. Hall?

22      A.      Can you repeat that?  Sorry.

23      Q.      Yeah.  Did he ever admit to anybody he entered your

24              apartment?  That's what I'm asking you, college,

25              police, you, anybody in the world.
```

```
 1    A.   Not that I heard of.  He just admitted to two other
 2         break-ins throughout the semester.
 3    Q.   Let's take a look at Loras 681, and we're going to
 4         look at the top of the page, Ms. Swift.  That's an
 5         e-mail from Molly Schumacher to you on
 6         December 17th, 2020, at 3:23 p.m.
 7              If you'd just read that and let me know when
 8         you're done with that.
 9    A.   (Witness complied.)  Okay.
10    Q.   All right; and we have been over a little of this,
11         and I'm going to try not to ask you the same
12         questions.
13              We've already established Dubuque police was
14         notified and they investigated; right?
15    A.   Uh-huh.
16    Q.   And here Molly is giving you the name of an actual
17         officer, Officer Brianna Marzette, at the Dubuque
18         Police Department.
19              Do you see that?
20    A.   I do.
21    Q.   Do you recall being in touch with her at any time in
22         connection with the investigation?
23    A.   I cannot say if it was her exactly, but I did
24         contact the Dubuque Police Department to figure out
25         the case number and to make changes within the
```

```
 1           report that were incorrect from the initial report.

 2     Q.    Okay, and she's asking you -- I'm looking at the

 3           second line of that e-mail -- if you could provide

 4           the best way to contact you.  So she's asking you to

 5           tell Officer Marzette what's the best way to contact

 6           you.

 7                Did you do that?

 8     A.    I spoke to someone within the police department.  I

 9           don't remember an exact name, but I contacted the

10           department directly.

11     Q.    Would you agree that Ms. Burrows Schumacher telling

12           you that she had connected with Officer Marzette and

13           that you could provide a way to contact you, let

14           Officer Marzette know how to contact you is

15           reflective that the college was investigating your

16           complaint and taking your complaint seriously?

17     A.    I don't know if I can -- I don't think I can

18           necessarily say whether or not -- I'm not sure

19           how -- if she got in contact with the officer or if

20           the officer got in contact with Molly.  I can't

21           necessarily say that Molly was doing her -- Like, I

22           can't attest to if Molly was doing the correct thing

23           or not at this exact moment.

24     Q.    Well, can we agree in this regard when you read this

25           paragraph that I've pointed out to you here with
```

1          regard to Molly saying she visited with

2          Officer Marzette and asking you to provide

3          Officer Marzette with the best way to contact you,

4          we certainly can conclude, can't we, that the

5          college wasn't ignoring your concerns by virtue of

6          what's going on in this e-mail.

7     A.   From this e-mail it seems as though the college

8          wasn't ignoring my claims, but there could have been

9          more throughout the whole time that indicated that

10         the college wasn't as supportive as I would have

11         thought going through this process.

12    Q.   What -- What should they have done then between this

13         time and September 6th that they haven't done and,

14         again, that we haven't already discussed as part of

15         your testimony?

16    A.   Most of the items we've previously discussed.

17    Q.   All right, so --

18    A.   We don't want to rehash --

19    Q.   I apologize, I don't mean to cut you off.  I know

20         we're trying to get through this.

21              So is it fair to say if he look back through the

22         testimony you've already given, you have already

23         explained to me those answers; is that correct?

24    A.   Correct.

25    Q.   All right.  Fair enough.  We'll look back then on

1          the testimony.

2             Again, referring to Officer Marzette or Dubuque

3          police, from September 6th until this e-mail

4          December 17th how many conversations did you have

5          with anybody at Dubuque police?

6     A.   Including the day of the incident?

7     Q.   Yes, ma'am.

8     A.   So between three and five conversations with the

9          Dubuque Police Department.

10    Q.   And, again, no recollection of a particular officer,

11         just someone at the Dubuque Police Department I

12         think is --

13    A.   We contacted them through the phone number we found

14         online and then this secretary or the person that

15         answered the phone call then directed us to who we

16         needed to talk to depending on why we called that

17         time.  So I don't have an exact name, no.

18    Q.   Were you able to take your finals for that

19         particular semester?  I guess we were ending the

20         fall semester, going into winter.

21            Were you able to get your finals completed?

22    A.   The finals that I had, yes.

23    Q.   Okay, and you were able to take those I assume

24         remotely from where you were located at the time?

25    A.   From my recollection of that time period a lot of it

1    was presentations that we -- or multiple of the

2    finals were presentations and then the rest are

3    online anyways.

4  Q. Okay, so you were able to take the finals in the

5    sense of a written examination online and then you

6    had to do some actual presentations in front of

7    people.

8    Is that what you're telling me for your finals?

9  A. I believe that is correct.

10  Q. Okay, and you were able to do those presentations

11    remotely as opposed to in person?

12  A. Yes.

13  Q. And did other students who were on campus have to do

14    them in person?

15  A. I can't answer that.  I'm not sure of an answer.

16  Q. Were any other students doing their presentations

17    remotely?

18  A. I believe one other student did, but there might

19    have been more.

20  Q. Okay, and I assume you had to seek permission from

21    the college to do these presentations remotely as

22    opposed to appearing back on campus?

23  A. No, 'cause everything was done through our

24    professors.  So at that point COVID was still

25    affecting the school, so from my recollection of it

1          they offered online or in person.

2     Q.   Was it your professor that offered it or did the

3          college --

4     A.   I believe it was both.  I believe the college said

5          because of COVID just general for every student they

6          could choose to be in person or online and then our

7          professor within each class also said and dictated

8          about how that worked.

9     Q.   Okay.  Let's look at Loras 693, and we've touched on

10         this a little bit already, so I'll try to be brief

11         in talking about it.

12              This appears to be an e-mail from Rebecca

13         Fabricius of the college dated January 4, 2021, at

14         3:41 p.m. to Arthur Sunleaf.  It's entitled touching

15         base, and you're mentioned in -- in the body of that

16         e-mail.

17              I'll give you a chance to read that and let me

18         know when you're done.

19    A.   (Witness complied.)  Okay.

20    Q.   Okay.  This e-mail is about getting your

21         out-of-the-area student teaching placement squared

22         away; correct?

23    A.   Correct.

24    Q.   And it says in part, "Because Rachael did not

25         undergo the traditional Out-of-Area application

1           process, the general procedures are being pursued

2           somewhat in reverse.  I have requested from Tom

3           Kruse expedited approval/signature for a standard

4           contract with the Arlington Heights district."

5              Do you see that part?

6   A.   I do see it.

7   Q.   Okay.  Would you agree that essentially at that

8           point in time the college was making efforts to

9           accommodate you on an out-of-area student teaching

10          placement and that they were going through efforts

11          that were above and beyond the normal efforts to

12          make that happen?

13  A.   From this e-mail that is what I would assume.

14  Q.   And also, I want to refer you down to it looks like

15          five lines down from the top.  There is another

16          statement there from Ms. Fabricius that said, "I

17          learned that Rachael is not currently registered for

18          Spring classes."

19             Do you see that?

20  A.   I do.

21  Q.   Why was it that you were not registered for spring

22          classes when, at least as I understood your previous

23          testimony, you knew you had to do more to get your

24          degree?

25  A.   I couldn't register for classes.

1    Q.    Why was that?

2    A.    The school had my account blocked.

3    Q.    Why did the school have your account blocked?

4    A.    They had my account blocked because of fall tuition.

5    Q.    Okay.  What was going on with fall tuition that had

6          to do with spring tuition?

7    A.    You can't register for classes until you pay off

8          fall tuition -- or the next -- or you can't sign up

9          for the next semester of classes until you pay off

10         the prior semester of classes, and previously we had

11         communications with President Collins with the

12         possibility of having a tuition waiver, so we were

13         waiting for more information in regards to that.

14   Q.    All right, so not being paid up in the fall was

15         prohibiting you from registering in the spring.

16         That's the essence of it; correct?

17   A.    Correct.

18   Q.    And during that time, both in the fall of 2020 and

19         later in the spring of 2021, you agree that you were

20         still receiving educational services from the

21         college and that those educational services

22         eventually led to you getting a degree from Loras.

23         That's fair, isn't it?

24   A.    Yes, that's accurate.

25   Q.    Did you eventually pay the fall tuition so you could

```
1           register for the spring of 2021 semester?

2     A.    Yes.

3     Q.    And, again, I don't want to go over old ground, but

4           you ended up student teaching in Arlington Heights,

5           Illinois; correct?

6     A.    Correct.

7     Q.    And you completed that successfully?

8     A.    Correct.

9     Q.    And after you had completed that successfully I take

10          it that whoever the powers be in Arlington Heights

11          let Loras College know that Rachael Swift had done

12          what she needed to do to complete her student

13          teaching.

14    A.    Kind of.  I would have -- My teacher would have had

15          to send the paperwork and then I had to send

16          paperwork showing that I did what I needed to do and

17          then approval at Loras was then needed.

18    Q.    Okay; so after the student teaching took place I

19          take it that paperwork did get exchanged, you filled

20          out some paperwork, your student teacher or

21          supervisor in Arlington Heights filled it out, and

22          eventually Loras granted you your degree in

23          elementary education.

24    A.    Correct.

25    Q.    Let me show you what's been marked as Loras 697.
```

```
 1              This is an e-mail from Molly Burrows Schumacher to

 2              you dated January 5th, 2021, at 11:55 a.m.

 3                   Again, take a moment to read through that and

 4              tell me when you're done.

 5    A.   (Witness complied.)  Okay.

 6    Q.   Okay.  It looks like here -- Well, strike that.

 7                   Do you recall Molly reaching out to you about

 8              your housing assignment and meal plan for the fall

 9              of 2020 and for the spring of '21 -- '20-'21

10              semester, as reflected in this e-mail?

11    A.   I do.

12    Q.   And you agree that she canceled the charges for fall

13              of 2021 without you asking because she knew you had

14              not spent much time on campus prior to that

15              September 6, 2021, incident -- or 2020 incident.

16    A.   Correct.

17    Q.   And you agree she cancelled charges for the spring

18              of '21 semester without you asking because she knew

19              you would not be on campus for spring of 2021, but

20              instead were doing student teaching in Arlington

21              Heights; correct?

22    A.   That is what the e-mail says, correct.

23    Q.   Do you believe that that did not occur?

24    A.   More along the notions of I didn't -- I didn't --

25              How -- There was no second application to live in
```

```
 1          the same housing and the food plan -- food meal --
 2          food -- or meal plan for the spring semester.  So
 3          whether or not Molly was the first -- or that Molly
 4          was going to cancel it, I wasn't there, so it
 5          wouldn't be on my account.
 6     Q.   Okay.  Well, irrespective, I mean, you weren't
 7          living on campus in the spring of 2021; correct?
 8     A.   Correct.
 9     Q.   So you didn't need any housing.
10     A.   Correct.
11     Q.   And you didn't need a meal plan.
12     A.   Correct.
13     Q.   So she proactively said, "Rachael, I'm going to
14          cancel these for you."
15          That's what was going on here; correct?
16     A.   According to these e-mails, yes.
17     Q.   Did you ever pay for housing or a meal plan for 2021
18          to Loras College?
19     A.   I would have to look back, but I do not believe so.
20     Q.   Would you agree that -- as reflected in these
21          e-mails, that the college was essentially looking
22          out for your financial best interests at that point
23          and just making sure you're not going to be charged
24          for something that you weren't benefitting from?
25     A.   From my best recollection at this point I didn't see
```

1          the spring bill because we were still working on the

2          fall bill, so I had no knowledge of whether or not

3          the housing was on that or not, but, yes, the

4          college removed it before I knew it was still on my

5          account, even though I wasn't living on campus.

6     Q.   Okay; so assuming these activities that Molly sets

7          forth in her e-mail occurred, you agree that

8          essentially they were making sure to look out for

9          your financial best interests so you wouldn't be

10         charged for things that you weren't receiving any

11         benefit from.

12              That's accurate, isn't it?

13    A.   I mean, I wasn't receiving at all.  I wasn't on

14         campus and I wasn't --

15    Q.   Right.

16    A.   -- having a meal plan, so, yes.

17    Q.   All right.  Let's take a look at Loras 630 to 631.

18         I'll tender that to you and I'll represent to you

19         that's a letter that was sent from your mother to

20         President Collins dated January 8th, 2021, and,

21         again, I'll give you the opportunity to review that,

22         and after -- It goes for it looks like a

23         page-and-a-half.

24              After you have had the chance to review that,

25         let me know, please.

```
 1    A.   (Witness complied.)  Okay.

 2    Q.   Okay.  Did you know that your mother was going to

 3         send this letter to President Collins?

 4    A.   In a previous phone call that we had with President

 5         Collins he asked us for a letter that involved

 6         everything Loras did wrong.

 7    Q.   So you knew.

 8    A.   So I knew that she was writing a letter.

 9    Q.   Did you help your mom draft the letter or did she do

10         that all on her own?

11    A.   I did not.  She did this.

12    Q.   The first line says, "During our most recent

13         conversation, we discussed Rachael's request for a

14         tuition waiver along with reimbursement of her 2020

15         and 2021 deductible due to the complete failure of

16         Loras College to adequately act after the break in

17         (sic) that occurred at her campus apartment in

18         September 2020."

19             Do you see that language?

20    A.   I do.

21    Q.   We've talked at length today about different steps

22         the college took after you reported an intruder

23         entering your apartment; correct?

24    A.   Correct.

25    Q.   Would you agree that it is a mischaracterization of
```

```
1          the record by your mother to say it had been a

2          complete failure of Loras College to act in response

3          to what occurred to you?

4              MR. MERRILL:  I'm going to object just to the

5          point that Rachael just testified that she didn't

6          help draft this letter, and I don't know that her

7          testimony about what words are used in this letter

8          are all that helpful; I mean, we do have Elaine here

9          to answer questions about the letter.

10         BY MR. JANNES:

11    Q.   You can go ahead and answer my question with your

12         attorney's objection on the record.

13    A.   From my point of view and my perspective throughout

14         this entire ordeal, I feel that Loras did not do an

15         adequate job making me feel safe or just me -- or

16         just safe in general when I'm --

17    Q.   You --

18    A.   Oh.

19    Q.   I'm sorry.  Please finish your answer.

20    A.   -- when on campus and the -- the failures that Loras

21         did have allowed other break-ins to occur throughout

22         the semester.

23    Q.   All right.  My question to you originally was

24         looking at your mother's words, wherein she contends

25         that there had been a complete failure by Loras to
```

```
 1              act, do you agree based on what we've discussed
 2              already, that what Loras did or did not can be
 3              categorized as a complete failure.
 4       A.    I think so.
 5       Q.    Even though, as we discussed at length, they put
 6              window bars and door alarms on your apartment, they
 7              moved a camera, they did extra security rounds, they
 8              corresponded with the Dubuque Police Department,
 9              they checked key fob entries, they offered you
10              counseling services, and so forth.  All the things
11              we've already discussed you believe that's a
12              complete failure to address what happened.  That's
13              what I'm asking you.
14       A.    I think whether it was a failure or a complete
15              failure, there was -- I think there was -- it was a
16              failure.
17       Q.    Would you say it's a complete failure?  That's what
18              I'm asking you.
19       A.    I would say it was a failure, not a complete
20              failure.
21       Q.    Your mom goes on to say, Ms. Swift, in that first
22              paragraph we were looking at in the last sentence,
23              "We have not heard back from you or anyone at the
24              College regarding this matter since our call in
25              early October."
```

```
 1              Do you see that?
 2    A.    I do.
 3    Q.    Now, you certainly would agree based on the e-mails
 4          we've looked at that that's not true.
 5    A.    I'd have to relook at the dates of some of the
 6          e-mails and if they are before or after October 8th.
 7    Q.    Well, why don't you look back at a few e-mails.
 8          Wasn't there a December 8th e-mail that
 9          Ms. Schumacher sent you where she updated you
10          concerning what was going on?  I believe that was
11          the date, and if not, we'll specifically find it for
12          you, but I think that's what the date was.
13              MR. JANNES:  Off the record.  Let's take a
14          second to find that, okay?
15              (An off-the-record discussion was held.)
16              MR. JANNES:  Back on the record.
17    Q.    Ms. Swift, there is two of 'em to look at, one is
18          Loras 151, so take a second to find that, and the
19          other is Loras 681 and let me know when you have
20          those two.  Okay, and the other one to look at is
21          Loras 697, which we also just looked at a moment
22          ago.
23    A.    (Witness complied.)
24    Q.    Now, when you look at those three e-mails,
25          Ms. Swift, you would agree that the statement of
```

```
 1            your mother in the last sentence of that first

 2            paragraph, "We have not heard back from you or

 3            anyone at the College regarding this matter since

 4            our call in early October," that's just simply not

 5            true, is it?  Those are all pieces of correspondence

 6            from the college.

 7      A.    At the beginning of this paragraph my mom also talks

 8            about a tuition waiver, so I'm not sure if she's

 9            talking about a tuition waiver or if she's talking

10            about the incident.  That would be something that

11            you'd have to have communication with her on.

12      Q.    All right, that's a fair clarification.  If we

13            assume your mom was talking about the incident

14            versus the tuition waiver, that's not true, is it?

15            You had been hearing back from the college about

16            what was going on with the incident; correct?

17      A.    I did receive e-mails from the college.

18      Q.    All right, and we'll have an opportunity hopefully

19            in a bit here to visit with your mom.

20                  Your mom says in the third paragraph at the

21            beginning, "There were at least five apartments in

22            one campus building to be broken into by the same

23            individual and the College failed to act in any

24            (sic) way to safeguard the students at Loras."

25                  I think we looked at an e-mail earlier
```

1          indicating there were two other incidents and

2          perhaps three if we assume Mr. Hall entered your

3          apartment.

4             Do you know where your mother is coming up with

5          the number of five?

6    A.    Well, she doesn't say necessarily that Kyle is the

7          one that entered each apartment.  She just says that

8          she knows of five.  Loras knew of three within one

9          building and then the other two were hearsay from

10         females in the building that didn't necessarily

11         report what occurred.

12   Q.    Okay, so that's your understanding of where your mom

13         was coming up with the number 5; correct?

14   A.    Correct.

15   Q.    And you'd agree with me -- and I think we

16         established this earlier -- that prior to your

17         incident where someone entered your apartment

18         without authorization, no one had ever reported to

19         Loras any break-ins that had occurred.  They all

20         came after your incident.

21            That's accurate, isn't it?

22   A.    There might have been some prior years, but from my

23         knowledge there wasn't.

24   Q.    Okay.  Let's take a look at Loras 377.  I'll

25         represent to you that these are notes made by

```
1          Matthew Saylor and Molly Burrows Schumacher in

2          connection with an interview of Kyle Hall that

3          apparently occurred on January 14th, 2020 -- I'm

4          sorry, and whoever wrote this should have said

5          January 14th, 2021, because it couldn't have been

6          that earlier time, so that must have been a typo.

7              So assuming they meant 2021, please take a

8          minute to read through and let me know when you're

9          ready.

10   A.     Okay.  (Witness complied.)  Okay.

11   Q.     All right.  You would agree with me that the first

12          two paragraphs of this recitation of the interview

13          with Mr. Hall is discussing the December 5th, 2020,

14          break-in at 301 where they caught Mr. Hall on

15          camera; correct?

16   A.     Correct.

17   Q.     And then if we look at the very next paragraph that

18          begins, "When asked," there specifically they're

19          asking Mr. Hall if he ever entered any other

20          apartments that were not his own, and he indicated

21          no.

22   A.     That's what he said during this interview, but in a

23          prior incident I received an e-mail from Molly

24          saying that he admitted to entering two other

25          apartments.
```

1    Q.    Well, in particular at this point he's saying no,

2           and at the bottom of this e-mail you see him

3           affirming that what they set forth here (indicating)

4           is correct; correct?

5    A.    During this interview, yes, he did say he did not.

6    Q.    Okay, so I think I asked you earlier if they -- the

7           college had ever asked Mr. Hall specifically whether

8           he entered your apartment, and you did not believe

9           that they had.  When you look at that third

10          paragraph there, you would agree that they were

11          asking him whether he entered any other apartments

12          other than the one at 301, which is discussed in the

13          first two paragraphs.

14    A.    I would agree that they asked him and that his

15          answer was different than previously when he was

16          asked.

17    Q.    Okay, but the point -- my point to you -- and you

18          just tell me if you agree or disagree -- was at

19          least at this point in time, if not earlier, they're

20          asking him if he entered any other apartments other

21          than 301, and he's denying that.

22    A.    Correct, that's what these summary notes say.

23    Q.    All right; and would you agree that in looking at

24          these notes and what's set forth herein, the college

25          was still investigating not only this incident

1          concerning apartment 301 but also the incident

2          concerning your apartment or any other apartments

3          that were entered into by someone without

4          permission.

5     A.   I'm unclear on where these notes indicate that they

6          specifically asked about my apartment and if they

7          were still investigating.

8     Q.   Okay.  The sentence that begins the third paragraph,

9          "When asked if he had entered an apartment that was

10         not his own in any other instances, Hall indicated

11         no," based on that isn't it reasonable to interpret

12         that they're saying to Mr. Hall, besides

13         apartment 301 did you enter any other apartments

14         without permission, which would include, but not be

15         limited to, your apartment in 101?

16    A.   Yes, they did ask him.

17    Q.   And as far as you know, he never admitted to

18         entering your apartment to anyone; is that correct?

19    A.   From my knowledge he never admitted it, no -- or

20         yeah.

21         MR. JANNES:  We're getting near the end here, so

22         just bear with me.

23    Q.   Let me show you what's been marked as Loras 597 and

24         598, which, again, are a series of e-mails, and I'll

25         represent to you that these are e-mails that were

1          exchanged between you and Molly Burrows Schumacher

2          between January 26th, 2021, and February 2nd, 2021,

3          and concern the disciplinary hearing for Mr. Hall.

4              Let's start with looking at the 1/26/21 e-mail

5          beginning in the middle at Loras 597.  It looks like

6          Molly's contacting you at that point in time to see

7          if you have any additional information.  I said in

8          the middle; it's near the top of the page.

9              Why don't you read that (indicating) and tell me

10         if you agree that's what she's doing at that point,

11         inviting you to provide any new or additional

12         information to her.

13    A.    Are you talking about the e-mail on 1/26 or 2/2?

14    Q.    I'm talking about the one on 2/2, the one at the top

15         of the page.  I'm sorry if I was unclear.

16    A.    (Witness complied.)  Okay.

17    Q.    Okay.  Would you agree with my statement earlier

18         that that's what she was doing, contacting you to

19         see if you had any additional information for the

20         college -- new or additional information regarding

21         your report that was filed on September 6, 2020.

22    A.    Yes, that's what the e-mail seems like she's doing.

23    Q.    And did you provide her with any additional

24         information at that point that would assist the

25         college in investigating further your incident?

```
 1    A.    I cannot recall if I responded giving new

 2          information or not.

 3    Q.    Okay.  It looks like she's also telling you in the

 4          second line and into the third line of that top

 5          e-mail on Loras 597 that the -- when the

 6          investigation is completed, the case will transition

 7          to the college hearing board, and you have a right

 8          to be involved in that process.

 9             Do you see that?

10    A.    I do.

11    Q.    And she's further telling you if you choose to

12          participate, the college will make the experience

13          for you as comfortable as possible.

14    A.    I see where there -- where she is inviting me to

15          come and be involved in the hearing board.

16    Q.    Did she tell you that they would make it as

17          comfortable as possible for you to experience

18          things?

19    A.    I cannot recall whether that was said or not.

20    Q.    Okay.  Let's take a look at the bottom e-mail,

21          Ms. Swift, that is another e-mail from Molly to you

22          on January 26th and flip the page to go over to

23          Loras 598, and if you look three lines up from the

24          bottom, she's telling you that they will make that

25          hearing experience as comfortable as possible for
```

```
 1          you to participate in, would you agree?
 2    A.    I would agree looking at this e-mail that that is
 3          what they said they would do.
 4    Q.    Let's take a look at Loras 750, which is an e-mail
 5          from you back to Molly dated February 10th, 2021, at
 6          10:42 -- Excuse me, let's go down one e-mail.  It's
 7          the middle e-mail.  This is an e-mail from you to
 8          Molly February 10th, 2020 (sic), at 8:06 a.m.
 9             Do you see there where you're telling Molly "I
10          would like to be part of the hearing process"?
11    A.    I see that, yes.
12    Q.    And you were involved in the hearing process
13          concerning Mr. Hall; correct?
14    A.    Correct.
15    Q.    And I think we have been over it, and I don't want
16          to go over old ground again, but several people came
17          in, they had the right to submit a written statement
18          or give some testimony to the hearing board that the
19          hearing board took into consideration in deciding
20          what punishment or sanction, if any, Mr. Hall would
21          receive; correct?
22    A.    I can't speak to anyone else or what other options
23          people were given.  I went in person and was a part
24          of the hearing in person.
25    Q.    And I think the record from the hearing would
```

1        show -- and we've produced those documents to your

2        attorney -- that you read a statement into the

3        record; correct?

4    A.  I -- I believe I had a list of points I wanted to

5        touch, but I didn't read word for word from it

6        because I was extremely emotional.

7    Q.  Okay.  Irrespective -- and I understand why you

8        would be, because you were recounting something that

9        was, you know, very uncomfortable to you -- you had

10       a right to have your say at the hearing, correct;

11       tell the hearing board what you wanted to say about

12       what occurred?

13   A.  Tell the hearing board, Kyle, and whoever he brought

14       with him, yes.

15   Q.  And if we look at Loras 750 again at the top, that's

16       a February 10th, 2021, e-mail from Molly Burrows

17       Schumacher to you at 10:42 a.m. where Molly is

18       acknowledging your participation request and

19       advising that a lady by the name of Kelsey Callahan,

20       Assistant Director of Student Life, would be in

21       touch with you concerning the hearing process and to

22       help you with participating in that process;

23       correct?

24   A.  Correct, that's what the e-mail says.

25   Q.  Yeah.  And you agree that Ms. Callahan did, in fact,

1         correspond with you and essentially help you and

2         shepherd you through the hearing process so you

3         could participate and have your voice heard;

4         correct?

5   A.   I would have to review our e-mails more in-depth.

6   Q.   Okay.  Let's take a look at e-mails marked

7         Loras 752 -- there is quite a few of them -- through

8         Loras 769, which I'll represent to you are an

9         exchange of e-mails between you and Ms. Callahan

10        concerning the hearing process that span

11        approximately a one-month period.  I'm not asking

12        you to read all those, Ms. Swift.  You can if you

13        want, okay, but I would think for purposes of

14        brevity if you feel just reviewing them quickly is

15        enough --

16   A.   Yeah.

17   Q.   -- to answer my question of whether simply

18        Ms. Callahan was corresponding with you, shepherding

19        you through the hearing process, answering your

20        questions, and so forth.

21         So when you're comfortable answering that

22        question -- I can ask it again -- you let me know

23        after taking what time you need to review that.

24   A.   (Witness complied.)

25   Q.   And also there is one more to add to the bottom,

1          Loras 770 is part of that exchange, but go ahead

2          and, please, keep reviewing it and let me know when

3          you're ready.

4     A.   (Witness complied.)  Okay.

5          MR. JANNES:  All right.  Do you recall my

6          original question to you or do I need to read it

7          back?  Whatever your preference is.

8          THE WITNESS:  If you could read that back,

9          please.

10         MR. JANNES:  All right.  If you can find the

11         question I asked right before.

12         (The requested portion of the record was read by

13         the reporter.)

14    Q.   Okay.

15    A.   Yes, there are e-mails of Kelsey walking me through

16         parts of the process.

17    Q.   All right; and they went for over a month period,

18         right, February through March?

19    A.   I have not checked the exact dates, but

20         approximately between the back and forth lasted a

21         month, I -- according (indicating) --

22    Q.   And when you say walking you through the hearing

23         process, it's fair to state that from your review

24         she was letting you know how the process worked,

25         what to expect, how you could present your position

```
1               to the college board, and so forth; right?

2     A.   I think after the experience there were certain

3          things that I wish she would have told me.

4     Q.   Okay.  Well, at a minimum did she tell you the

5          things that I just asked a moment ago, how the

6          process worked, what to expect, and how you could

7          present your position to the college board?

8     A.   For the "what to expect" part, that's the only part

9          I would say she's missed -- she missed information

10         on.

11    Q.   All right.  What -- What do you believe she should

12         have told you that she did not tell you?

13    A.   Who was going to be in the room with me and the

14         seating arrangement of everyone.

15    Q.   All right.  Would you agree that perhaps, other than

16         that, that the college made the hearing

17         participation process as comfortable as possible for

18         you by telling you these things in advance and how

19         to get ready for participation?

20    A.   I think the -- the college board hearing -- Let me

21         start over.

22              Leading up to the college board hearing Kelsey

23         answered questions that I had and gave me

24         information in regards to the event.

25    Q.   All right.  After hearing that from her did you feel
```

```
 1              more comfortable about you going and participating

 2              at the hearing board and telling what happened to

 3              you in your own words?

 4    A.   No.

 5    Q.   And I'm not talking about the anxiety of

 6              participating in an adversarial proceeding.  What

 7              I'm talking about is did you feel more comfortable

 8              that she told you these things so you would know

 9              what the procedure is.  That's what I'm asking you.

10    A.   I still would have -- I felt and still felt

11              uncomfortable entering the room because of things

12              she left out in the informational process.

13    Q.   I take it you'd certainly agree with me that having

14              her provide some information was better than

15              providing you with no information, correct, even if

16              she left some things out in your opinion?

17    A.   Personally for me I could have had -- I went in with

18              the information I was given, and I was still

19              uncomfortable during the college board hearing.  So

20              whether I had communications or not, I was still

21              uncomfortable.

22    Q.   All right, and you've already explained to me why;

23              right?  We'd be going over things again if not;

24              right?

25    A.   Yes.
```

```
 1    Q.    All right.  You were allowed to read your statement

 2          to the hearing board; correct?

 3    A.    Correct.

 4    Q.    And you were excused after reading your statement?

 5    A.    Correct.

 6    Q.    And Mr. Hall was present; correct?

 7    A.    He was present.  He wasn't necessarily paying

 8          attention --

 9    Q.    All right.

10    A.    -- but he was in the room.

11    Q.    And he never asked you any questions.

12    A.    No.

13    Q.    And he didn't confront or challenge you in any way

14          after you said what you had to say.

15    A.    He laid his head down on the table.

16    Q.    Okay, and that really wasn't my question.  I

17          appreciate the information, but my question was did

18          he say to you or did he say to anyone, "What

19          Ms. Swift is saying is not accurate?  That's not the

20          truth."

21              He didn't do that, did he?

22    A.    He did not.

23    Q.    All right.  Let me show you what's been marked as

24          Loras 557 through 558.  I'll represent to you this

25          is an e-mail from Troy Wright dated February 9th,
```

```
1          2021, to you.  It's rather short.

2              If you'd take a moment to read it and let me

3          know.

4    A.    (Witness complied.)  Okay.

5    Q.    Have you read the e-mail?

6    A.    I read this (indicating) front page.  Should I

7          continue to read this part?

8    Q.    You don't have to read his questions.

9    A.    Okay.

10   Q.    I don't think I have any questions to you about his

11         questions.

12   A.    Okay.

13   Q.    I was referring to the actual e-mail itself.

14   A.    Okay.

15   Q.    All right.  Would you agree that in that second

16         paragraph he's informing you that he's going to be

17         investigating your September 14th, 2020, Title IX

18         complaint and then he sends you some questions to

19         answer, which we have as Loras 558.

20             That's what he's telling you; right?

21   A.    Within that second paragraph, correct.

22   Q.    And then I want to show you what's been marked as

23         Loras 555, and I'll represent to you that that's

24         your response to Troy Wright on February 25th, 2021.

25             And, again, if you want to take a moment to
```

```
 1           review, that's fine.  If you're familiar with it and

 2           ready for questions, that's fine also.

 3   A.      I'd like a second to review it, please.

 4   Q.      That's absolutely fine.  You tell me when you're

 5           ready.

 6   A.      Okay.

 7   Q.      It looks like you responded to Troy approximately

 8           16 days later, his e-mail to you went out on

 9           February 9th and you're responding here on

10           February 25th; correct?

11   A.      Correct.

12   Q.      Looking at your response, the first sentence -- or

13           actually the second sentence of the first paragraph

14           you state, "I appreciate someone at the College

15           finally addressing some of my issues, concerns and

16           complaint."

17             Do you see that?

18   A.      I do.

19   Q.      Would you agree that based upon the extensive

20           numbers of e-mails we already reviewed from

21           September 7th, 2020, until this e-mail on

22           February 25th, 2021, that the college had been

23           addressing your issues, concerns, and complaints?

24   A.      I believe that if my issues, concerns, and

25           complaints were completely addressed throughout the
```

1       semester, there would have not been any break-ins

2       after my break-in.

3    Q. Okay, but that's not what your Title IX complaint is

4       about, is it?  The Title IX complaint is about what

5       happened after the break-in, don't you agree?

6    A. Can you repeat your question?

7    Q. Yeah.  Let me see if I can clarify further, okay?

8    A. Uh-huh.

9    Q. I heard you state earlier in your deposition that

10      you believe that the college handled your complaint

11      inappropriately and not in compliance with Title IX

12      because you were a woman subject to sexual assault,

13      and my point is your complaint focuses on the

14      actions of the college after the break-in; correct?

15   A. Correct.

16   Q. All right, so I'm asking you isn't it true that the

17      college had been from September 7, 2020, until

18      February 25th, 2021, addressing some of your issues

19      and concerns and complaints that originate not from

20      before the break-in but after.

21         Hadn't they been doing that through all the

22      e-mails we have been looking at and the

23      correspondence back and forth?

24   A. I don't think they addressed all of my complaints,

25      concerns, and issues throughout the entire semester.

1     Q.     Okay. Would you agree that they had been addressing

2             some of your issues, concerns, and complaints

3             through that series of e-mail we went through

4             ad nauseam from September 7th of 2020 until up to

5             this point in time, February 25th, 2021?

6     A.     I would agree that they discussed some of the

7             issues, concerns, and complaints.

8     Q.     And then I want to refer you to the second full

9             paragraph that you wrote that begins, "I want to

10            make," and if we move down there is a sentence you

11            wrote that says, "I believe that if" a -- "that if I

12            was a man, the College would have taken me more

13            seriously and would have responded differently."

14            Do you see that?

15     A.     I do.

16     Q.     How do you believe that the college would have

17            responded differently if you were a man and not a

18            woman?

19     A.     I believe that some of their responses would be

20            different. They wouldn't have been so focused on

21            whether or not I locked the door. They would have

22            taken when I talked about a sexual assault, more

23            seriously.

24     Q.     Can you provide me with an example where a male

25            student at the college made a complaint to the

```
 1            college about something that he believed should have

 2            been done and they treated that male student

 3            differently than they treated you with regard to the

 4            complaint you made concerning the February -- or,

 5            excuse me, September 6th, 2020, incident?

 6      A.    I do not have that, no.

 7      Q.    If we look down at the bottom, there are some bullet

 8            points, Ms. Swift, that you also relay to Mr. Wright

 9            in this e-mail, and there is one in the second -- or

10            the second bullet point that begins, "My position

11            is," and if we go down a couple more lines in that

12            paragraph, it says, "The College attempted to claim

13            the sexual assault by this person did not occur and

14            otherwise downplayed my concerns and fears."

15               When did the college attempt to claim that this

16            incident did not occur?

17      A.    It's not that they -- Can you repeat where that is

18            in this?

19      Q.    Yes, I'm sorry.  You see about two-thirds of the way

20            down you begin a new set of thoughts with the words,

21            "With respect to your inquiries" --

22      A.    Uh-huh.

23      Q.    -- and then a colon.

24      A.    Uh-huh.

25      Q.    Do you see that?
```

1    A.    I do.

2    Q.    Okay.  Let's go to the second bullet point, okay,

3          that begins "My position is," and then if we move

4          down it looks like three lines --

5    A.    Okay.

6    Q.    -- you have to start a sentence that says, "The

7          College attempted to claim the sexual assault by

8          this person did not occur and otherwise downplayed

9          my concerns and fears."

10         And I'm asking you when did they ever do that.

11   A.    By not following through with that part of my

12         Title IX, it was downplayed as though it didn't

13         happen.

14   Q.    Well, they did reach out to you pretty consistently

15         about whether you had any other information

16         concerning what had occurred; right?  I mean, we

17         looked at a few e-mails where Molly Schumacher is

18         saying to you "Do you have any other information for

19         the college concerning your complaint?"

20         You remember seeing those right?

21   A.    I do, but within the -- within Loras' handbook it

22         says that voyeurism is considered entering an

23         intimate space, and that's considered sexual assault

24         or sexual harassment, and the college didn't

25         acknowledge that --

```
1    Q.   Well --

2    A.   -- and down- -- it was downplayed.

3    Q.   -- it's fair to say you can't point to an e-mail

4         where the college wrote back to you or your attorney

5         or anybody else affiliated with you and said --

6         saying, "We don't believe you were sexually

7         assaulted."

8              They never told you that, did they?

9    A.   I cannot attest to if someone contacted my lawyer

10        and said that or not.

11   Q.   But you never got anything to that effect from the

12        college; right?

13   A.   Not accepting or denying that the sexual assault

14        occurred.

15   Q.   Okay, so there wasn't anything saying, Ms. Swift,

16        you weren't sexually assaulted; correct?

17   A.   Not in those words, correct.

18   Q.   All right; and they -- and they did continue to

19        investigate the complaint, offer safety measures,

20        were in touch with you periodically concerning what

21        steps they were taking on patrols or additional

22        safety equipment to your apartment.

23             All those things we talked about, right, already

24        in this record, they did do those things; right?

25   A.   For things that we have e-mails for and that can be
```

```
 1          followed, yes --

 2    Q.    All right.

 3    A.    -- they did those things.

 4    Q.    So, in other words, you're telling me if we've

 5          got -- if we've got a written record on it, you

 6          don't deny it happened; right?  That's a --

 7    A.    Correct.

 8    Q.    -- fair statement?  All right, and you finally say

 9          at the bottom of that last bullet point, "The break

10          in was not an attempt to steal; the break in was

11          sexually motivated."

12              And without, again, going over old ground,

13          because we're trying to get through this, you've

14          already explained to me your belief in that regard

15          and I assume that has to do with the voyeurism

16          testimony you gave and your interpretation of it.

17              Is that essentially it?

18    A.    There is also he had the ability -- whoever entered

19          my apartment had the ability to steal laptops that

20          were sitting on our kitchen table and enter the

21          other three bedrooms to steal something, and nothing

22          was stolen.

23    Q.    Okay, so would it -- I just want to make sure I

24          understand your testimony.

25              Would it be by the process of elimination that
```

```
 1            because the individual didn't steal anything, you're

 2            concluding that there must have been a sexual

 3            motivation to this break-in?

 4     A.     I don't -- As discussed earlier, voyeurism doesn't

 5            always have to have a sexual component to it, but

 6            voyeurism occurred.

 7     Q.     Okay, and have you already explained to me how you

 8            believe there was a sexual component involved?

 9     A.     I believe so, yes.

10     Q.     All right.  I just -- The purpose of the question is

11            to make sure I understand everything you might tell

12            someone about this case.

13            All right.  Let's take a look --

14            MR. JANNES:  I can promise you we're very close

15            to ending, and then I'm trying to move along as

16            quick as we can.

17     Q.     Let's take a look at Loras 743.  It looks like --

18            again, we're following this e-mail chain along --

19            Mr. Wright first sent you an e-mail indicating he

20            was investigating on February 9th, we've just

21            discussed your response on February 25th.

22            And it looks like he's responding now back to

23            your e-mail -- is that your understanding -- on

24            March 4, 2021?

25     A.     Yes, that is my understanding.
```

```
 1    Q.    All right.  Do you want to take a moment to review
 2          this e-mail?
 3    A.    Yes, please.
 4    Q.    All right.  Go ahead and you tell me when you're
 5          ready.
 6    A.    (Witness complied.)  Okay.
 7    Q.    All right.  In response to your e-mail of
 8          February 25th Mr. Wright has set forth a list of all
 9          the steps the college has taken to address your
10          issues, concerns, and complaints; correct?
11    A.    That is what is on this e-mail, is what he had
12          gathered from his investigation, correct.
13    Q.    And I think, without belaboring the point, we've
14          pretty much talked about every topic that's listed
15          here already, haven't we?
16    A.    It would seem so, yes.
17    Q.    All right, then I won't -- I won't ask you any
18          further questions other than just simply say you --
19          simply ask you you acknowledge receiving this
20          response from Mr. Wright where he sets forth what he
21          believes and represents to you the college was doing
22          to address your concerns and issues and so forth;
23          correct?
24    A.    Correct.
25    Q.    All right.  I'm going to show you what's been marked
```

1          as Loras 746.  This is an e-mail -- It looks like

2          we've already looked at that.  We're going to go one

3          more.  I apologize.  I'm going to show you what's

4          been marked as -- Well, there is another Loras 746,

5          I believe -- No, Loras 743.  See, this is what

6          happens when you have to review hundreds and

7          hundreds of documents.

8              All right.  We're going to look at an e-mail

9          called Loras 746, which is a shorter e-mail from

10         Mr. Wright.  It looks like it's dated March 16th,

11         2021, at 10:51, and there are two parts to this.

12         There is first apparently a message from you at the

13         bottom to Mr. Wright and Nancy Zachar Fett and then

14         there is a message at the top from Mr. Wright to

15         you.

16             Do you need to take a moment to review this or

17         are you familiar with this e-mail?

18    A.   No, I'm familiar with this e-mail.

19    Q.   All right.  In this e-mail you're requesting --

20         you're telling Mr. Wright and Ms. Zachar Fett that

21         you're going to be on campus later today, which was

22         March 15th, 2021, and you could set up a meeting

23         between the two of you.

24             Do you see that -- or three of you?

25    A.   Yes, that I wanted to set up a meeting between the

1           three of us; correct.

2      Q.   And then he responds -- Then you send your e-mail at

3           12:33 p.m. on March 15th.  He responds on March 15th

4           (sic) saying, "Given the very short notice, Nancy

5           and I were unable to meet with you due to prior

6           commitments."

7               Do you see that?

8      A.   I do.

9      Q.   All right.  My question is given that the three of

10          you were trying to connect, did you ever meet with

11          him or Nancy, either in person or virtually, to

12          discuss what you wanted to talk about per your

13          request in the March 15th, 2021, e-mail?

14     A.   I do not recall if we were -- if we met or not.

15     Q.   All right.  Do you know what the consequences were

16          that Kyle Hall received from the hearing board after

17          the hearing process was over?

18     A.   If I recall correctly, I was told I was not

19          privilege -- privy to that information, so I, if I

20          recall correctly, didn't know about that until a

21          later point.

22     Q.   Okay.  Was the later point at the point that you

23          filed your lawsuit and we gave documents to your

24          attorneys, which was just recently, or was it

25          somewhere between when the hearing process ended and

1          before we gave those documents to your attorneys?

2     A.   I -- I can't say either/or.  I don't want to --

3     Q.   Okay.  Did you understand after the hearing process

4          had concluded, without knowing specifically what

5          happened to Mr. Hall, that some sanction or

6          disciplinary ruling had been handed down against him

7          by the hearing board?

8     A.   Yes.

9     Q.   And did you hear it from someone or did you read it

10         from something that you had received?

11    A.   That he was punished somehow?  Is that the question?

12    Q.   Yes.  I'm just trying to -- I think you affirmed

13         that you knew they handed down some sanction or, as

14         you put it, some punishment, and I was just asking

15         how you learned of that.

16    A.   I believe in the e-mails prior it was mentioned that

17         that is when a punishment of some sort or a --

18         something -- punishment would be given to Kyle.

19    Q.   Let me show you what's been marked as Loras 139, and

20         this is a document we produced to your attorneys.

21              Did you have a chance to read this document

22         before coming today to give your deposition?

23    A.   Yes.

24    Q.   All right.  Again, to try to shorten things up,

25         because I have had you here for quite some time

1         answering questions, would you agree that this is a

2         document to Mr. Hall from Dean Sunleaf setting forth

3         his punishment after the hearing board had convened,

4         heard the testimony from everyone, and evaluated

5         what the appropriate sanction, if any, should be?

6  A.   My understanding from this letter was that the

7         hearing board gave their ruling, but he appealed it

8         and this was his -- his modified sanctions, so not

9         the original.

10  Q.   Correct, and that's fair.  I was trying to be brief

11         and cut to the chase, but I'll represent to you he

12         made an appeal, they reconsidered.

13       So I'll phrase the question this way:  Is it

14         your understanding what's set forth in this letter,

15         Loras 139, is the final decision after any appeals

16         as to what sanction or punishment he would receive?

17  A.   Yes, this -- My understanding is that being banned

18         from campus was his official punishment after the

19         hearing board.

20  Q.   And also there might have been some implication

21         concerning his teaching license or degree.  That was

22         up to the education program of Loras College as set

23         forth in item 2 of that letter; correct?

24  A.   Correct.  I was not informed that they would be

25         separated, though, that the education would have a

1          different --

2     Q.    And I take it you have no reason to believe that

3           these sanctions or these punishments were not

4           actually enforced by the college; correct?

5     A.    Correct.

6     Q.    All right.  Let me show you what's been marked as

7           Loras 749, which is a 3/20- -- I'm looking at the

8           bottom e-mail of the two on that page.  The bottom,

9           or middle-paged e-mail 3/25/21, that's an e-mail

10          from you to Troy Wright, and you're asking -- you're

11          inquiring about the status of the college's

12          investigation of your Title IX claim.

13              Do you see that?

14    A.    I do.

15    Q.    And if you look at the top of the page there,

16          Mr. Wright is saying, "Hello Rachael, The

17          investigation has been completed and a certified

18          letter is being sent to you today."

19              Do you see that?

20    A.    I do.

21    Q.    And do you recall receiving the certified letter,

22          which is Loras 749 -- or, excuse me, 747 and 748,

23          which we've just tendered to you?

24    A.    I do --

25    Q.    All right.

```
 1     A.    -- that I received this letter.

 2     Q.    All right.  Would you like an opportunity to look at

 3           that or are you familiar with that letter and what

 4           it states?

 5     A.    Can we go over your questions and then go from there

 6           on whether I need to look further in detail?

 7     Q.    Absolutely.  If you'd like me to ask my questions

 8           first, and if you -- and I can promise you this is

 9           the last line of questioning that I have, too, but

10           if you want me to start with the questions first,

11           and then if you need additional time to read, that's

12           completely, fine, okay?

13     A.    One question at a time and then moving forward.

14     Q.    Fair enough, fair enough.  Okay, this is -- So you

15           would agree that after investigating this incident

16           thoroughly Mr. Wright is telling you that the

17           college found -- and this is their position.  I'm

18           not asking if this is your position, but the college

19           found that your complaint was unfounded; correct?

20           That was their conclusion.

21     A.    That was my conclusion after the investigation that

22           Mr. Wright did.

23     Q.    Right.  That was your -- That was the information

24           you received that the college concluded that, that's

25           what you're telling me; right?  The way you phrased
```

1          it, you said it was your conclusion that the

2          complaint is unfounded.

3              Are you saying you believe your complaint was

4          unfounded or are you acknowledging the college said

5          to you the complaint was unfounded?

6     A.   That the college said to me --

7     Q.   All right.

8     A.   -- that the complaint was --

9     Q.   I thought that's what you meant, but I did not

10         understand what you were saying, so I asked for

11         clarification.

12             And it looks like Mr. Wright is outlining in the

13         middle of that page a laundry list that the college

14         contends they did to address your safety concerns;

15         correct?  That's their position.

16    A.   That's their position, correct.

17    Q.   And there is a little sticky at the top of the page

18         up there that says, "Sent via certified mail on

19         3/26/21".

20             Do you see that?

21    A.   I do.

22    Q.   And you received the letter, which is Loras 747,

23         748, from the college via Certified Mail on or about

24         that date, 3/26/21; correct?

25    A.   On or approximately around that date --

| | | |
|---|---|---|
| 1 | Q. | Right. |
| 2 | A. | -- correct. |
| 3 | Q. | It would take some time for a Certified Mail to get |
| 4 | | to you; correct? |
| 5 | A. | Correct. |
| 6 | Q. | Have you had -- After receiving this letter on |
| 7 | | 3/26/21 have you had any further correspondence with |
| 8 | | anyone at the college concerning your claim?  And |
| 9 | | what I mean by "claim" is Title IX claim. |
| 10 | A. | To my best recollection after receiving this letter |
| 11 | | I contacted Troy Wright to go over the steps that |
| 12 | | was -- or go over the letter that I received. |
| 13 | Q. | Okay, and did you go over the letter with him? |
| 14 | A. | From my best recollection he was told that that was |
| 15 | | the college's decision, and that was my best -- |
| 16 | | that's my best recollection of -- |
| 17 | Q. | Okay. |
| 18 | A. | -- our conversation. |
| 19 | Q. | So he -- he affirmed to you essentially what was in |
| 20 | | the letter, which is on Loras 747 and 748, telling |
| 21 | | you this is the college's position. |
| 22 | | You have it in the letter, is that what you're |
| 23 | | saying? |
| 24 | A. | Correct. |
| 25 | Q. | All right.  Any other correspondence with anybody at |

| 1 | | the college after that time concerning your Title IX |
|---|---|---|
| 2 | | claim? |
| 3 | A. | I cannot recall any other communication that I would |
| 4 | | have had with the college in terms of my Title IX |
| 5 | | claim. |
| 6 | Q. | Have you ever spoken to anybody in the press, |
| 7 | | newspaper, TV, or otherwise, about the fact that you |
| 8 | | have a Title IX claim pending against Loras College? |
| 9 | A. | Yes. |
| 10 | Q. | Who did you speak to? |
| 11 | A. | I believe the Dubuque Daily Herald. |
| 12 | Q. | Okay.  Can you tell me just generally when that |
| 13 | | conversation would have occurred. |
| 14 | A. | Sometime in the spring semester, if I recall |
| 15 | | correctly.  I don't have an exact time. |
| 16 | Q. | Okay.  Did you reach out to a reporter or did a |
| 17 | | reporter reach out to you? |
| 18 | A. | I'm not sure of how the official conversation began. |
| 19 | Q. | Was anything reported in the media, either online or |
| 20 | | in paper, concerning your complaint by the newspaper |
| 21 | | you just referenced a moment ago? |
| 22 | A. | I believe they did write an article, yes. |
| 23 | Q. | Did you review the article? |
| 24 | A. | I read the article after I saw it online. |
| 25 | Q. | Okay.  Did you keep a copy of it? |

1  A.     I can find a copy of it.  I don't necessarily have

2         it --

3  Q.     All right.

4  A.     -- with me.

5         MR. JANNES:  If you have a copy of it, I'd ask

6         that you give it to your attorney, and we'll --

7         we'll follow up with your attorney.

8         All right.  I have no further questions for you.

9         I know this has been a long process.  I do

10        appreciate your time and attention.  I don't know if

11        Mr. Merrill has any questions for you.  I'll let him

12        state whether he does, and after that there is a

13        read and sign requirement in federal court, but I'll

14        let Mr. Merrill indicate whether he wants to ask you

15        any questions or not first.

16        MR. MERRILL:  I have no questions today.  Thank

17        you.

18        MR. JANNES:  All right; then if I misstate this,

19        please let me know, all right?  I believe the

20        Federal Rules state you have a right to review the

21        transcript that our court reporter is going to

22        prepare after today.  It's not to correct -- It's

23        not to change your testimony, but if you have been

24        misquoted or she made a mistake in some fashion, you

25        have a right to do that.  You can either say, "I

```
1          want to do that," read and sign, in which case you
2          have an obligation to do that quickly so the parties
3          will have a final transcript, or you can say, "I
4          want to waive that.  It's not necessary for me to do
5          it."  So it's really your choice, but you need to
6          decide now so we all know, and if you need a minute
7          to consult, that's fine, but I think that's the
8          final thing we need to do to close your deposition
9          today, okay?
10              THE WITNESS:  Okay.
11              MR. JANNES:  So if you want to take a second
12          before you tell us, if you want to consult with your
13          attorney, that's fine, but --
14              THE WITNESS:  I would like to take a second and
15          consult with my attorney.  Sorry.
16              MR. JANNES:  That's completely fine.  You can
17          let us and the court reporter know and then we will
18          be done with your deposition, okay?
19              THE WITNESS:  Perfect.
20              (An off-the-record discussion was held.)
21              THE WITNESS:  We're waiving that right -- I am
22          waiving that right.
23              (Deposition concluded at 4:01 p.m.)
24
25
```

```
 1                    C E R T I F I C A T E

 2           I, the undersigned, a Certified Shorthand
           Reporter of the State of Iowa, do hereby certify
 3         that there came before me at the time, date, and
           place hereinbefore indicated, the witness named on
 4         the caption sheet hereof, who was by me duly sworn
           to testify to the truth of said witness's knowledge
 5         touching and concerning the matters in controversy
           in this cause; that the witness was thereupon
 6         examined under oath, the examination taken down by
           me in shorthand, and later reduced to Computer-Aided
 7         Transcription under my supervision and direction,
           and that the deposition is a true record of the
 8         testimony given and of all objections interposed to
           the best of my ability.
 9
                   I further certify that I am neither attorney or
10         counsel for, nor related to or employed by any of
           the parties to the action in which this deposition
11         is taken, and further, that I am not a relative or
           employee of any attorney or counsel employed by the
12         parties hereto or financially interested in the
           action.
13
                   Dated at Clarence, Iowa, this 8th day of
14         September, 2023.

15                          _____
                            CERTIFIED SHORTHAND REPORTER
16

17

18

19

20

21

22

23

24

25
```

APP 663

**'**

**'20-'21** [1] - 197:9
**'21** [6] - 95:20, 96:6, 96:8, 96:10, 197:9, 197:18
**'cause** [13] - 32:12, 38:15, 58:15, 95:21, 118:1, 119:18, 119:21, 128:8, 138:25, 149:17, 162:11, 183:11, 192:23
**'em** [3] - 107:15, 167:10, 203:17

**0**

**01019-LTS-KEM** [1] - 1:5
**0594** [2] - 35:2, 35:10
**0633** [1] - 40:15
**0642** [1] - 89:7

**1**

**1** [3] - 2:19, 23:8, 149:7
**1,000** [1] - 5:25
**1/26** [1] - 209:13
**1/26/21** [1] - 209:4
**10** [2] - 23:8, 172:6
**10/16/98** [1] - 6:25
**100** [4] - 97:2, 114:6, 176:15, 183:16
**100-percent** [1] - 87:1
**101** [3] - 12:23, 153:18, 208:15
**101-C** [2] - 16:11, 16:14
**101-D** [2] - 16:2, 16:14
**10:00** [2] - 33:12, 34:18
**10:01** [1] - 70:20
**10:07** [1] - 48:19
**10:42** [2] - 211:6, 212:17
**10:51** [1] - 228:11
**10:56** [1] - 43:4
**10th** [4] - 87:15, 211:5, 211:8, 212:16
**11:01** [1] - 91:6
**11:13** [1] - 173:13
**11:25** [1] - 157:16
**11:55** [1] - 197:2
**11th** [3] - 87:25, 90:21, 91:5
**12** [2] - 37:21, 37:23
**12/9/2020** [1] - 163:21
**12:08** [1] - 119:7

**12:33** [1] - 229:3
**1300** [1] - 1:17
**135** [3] - 20:1, 25:5, 29:21
**136** [2] - 20:2, 25:5
**137** [6] - 98:17, 100:7, 105:19, 108:14, 109:10, 115:7
**138** [2] - 98:17, 100:7
**139** [2] - 230:19, 231:15
**14** [3] - 98:18, 99:22, 122:6
**144** [4] - 70:16, 70:20, 71:7, 75:16
**145** [6] - 47:6, 51:2, 70:16, 70:21, 71:8, 75:16
**146** [2] - 44:23, 45:2
**147** [4] - 150:9, 165:21, 166:7, 168:8
**148** [9] - 156:16, 156:19, 157:13, 157:14, 163:3, 163:7, 164:18, 179:18, 186:10
**149** [3] - 156:23, 157:15, 158:11
**14th** [17] - 100:6, 100:17, 106:24, 108:21, 115:8, 134:24, 135:10, 135:13, 135:17, 136:25, 139:2, 139:8, 141:7, 141:24, 206:3, 206:5, 218:17
**15** [1] - 33:6
**150** [2] - 156:17, 156:19
**151** [2] - 173:11, 203:18
**15th** [12] - 92:5, 116:5, 116:24, 119:5, 119:21, 134:14, 135:11, 139:22, 228:22, 229:3, 229:13
**16** [1] - 219:8
**16th** [2] - 150:10, 228:10
**179** [1] - 2:20
**17th** [8] - 123:25, 151:20, 151:23, 156:21, 157:1, 157:25, 188:6, 191:4
**1:00** [2] - 71:12, 71:15

**2**

**2** [2] - 2:21, 231:23
**2/2** [1] - 209:13, 209:14
**20** [1] - 96:15
**2000** [1] - 1:9
**2017** [2] - 8:18, 8:25
**2020** [92] - 12:20, 15:17, 17:14, 20:16, 29:22, 35:3, 35:24, 38:22, 40:18, 44:25, 45:23, 47:8, 49:8, 50:2, 51:25, 55:14, 59:17, 65:15, 68:12, 68:21, 70:8, 74:24, 76:20, 78:2, 79:8, 79:12, 79:25, 87:21, 87:25, 90:3, 90:14, 90:21, 91:6, 93:9, 95:18, 96:2, 96:8, 96:19, 96:24, 97:8, 97:12, 97:15, 98:3, 98:18, 99:10, 99:22, 100:7, 101:15, 108:22, 113:22, 115:8, 116:5, 116:24, 119:5, 119:21, 122:5, 122:7, 123:25, 129:21, 132:3, 133:2, 134:14, 138:24, 139:22, 150:10, 151:20, 151:23, 156:21, 159:13, 162:14, 167:4, 170:21, 172:3, 173:12, 178:25, 179:14, 188:6, 195:18, 197:9, 197:15, 200:14, 200:18, 206:3, 206:13, 209:21, 211:8, 218:17, 219:21, 220:17, 221:4, 222:5
**2021** [27] - 9:11, 193:13, 195:19, 196:1, 197:2, 197:13, 197:15, 197:19, 198:7, 198:17, 199:20, 200:15, 206:5, 206:7, 209:2, 211:5, 212:16, 218:1, 218:24, 219:22, 220:18, 221:5, 226:24, 228:11, 228:22, 229:13
**2023** [2] - 1:10, 239:14

**21** [2] - 1:10, 161:23
**215** [1] - 1:17
**237** [1] - 2:22
**24** [2] - 6:22, 50:3
**24th** [1] - 157:16
**25** [2] - 6:22, 127:14
**25th** [7] - 218:24, 219:10, 219:22, 220:18, 221:5, 226:21, 227:8
**26** [1] - 45:22
**26th** [2] - 209:2, 210:22
**29** [1] - 156:21
**29th** [3] - 163:7, 163:20, 164:10
**2:22:CV** [1] - 1:4
**2nd** [2] - 209:2

**3**

**3** [1] - 2:3
**3/20** [1] - 232:7
**3/25/21** [1] - 232:9
**3/26/21** [2] - 234:24, 235:7
**3/26/21"** [1] - 234:19
**30** [1] - 33:6
**301** [5] - 206:14, 207:12, 207:21, 208:1, 208:13
**377** [1] - 205:24
**3:00** [2] - 156:24, 157:1
**3:08** [1] - 55:15
**3:16** [1] - 151:23
**3:23** [1] - 188:6
**3:41** [1] - 193:14

**4**

**4** [3] - 37:17, 193:13, 226:24
**400** [2] - 149:6, 149:8
**463-page** [1] - 6:2
**4:00** [4] - 19:25, 64:22, 65:16, 103:9
**4:01** [1] - 238:23
**4:15** [3] - 30:1, 33:8, 102:18
**4:20** [1] - 30:2
**4:25** [3] - 29:23, 33:8, 102:18

**5**

**5** [2] - 2:22, 205:13
**50** [1] - 96:15
**50309** [2] - 1:14, 1:17
**536** [1] - 119:4

**538** [2] - 139:16, 148:1
**555** [1] - 218:23
**557** [1] - 217:24
**558** [2] - 217:24, 218:19
**577** [3] - 91:3, 91:13, 98:12
**578** [1] - 91:3
**597** [2] - 208:23, 209:5, 210:5
**598** [2] - 208:24, 210:23
**5th** [3] - 18:6, 197:2, 206:13

**6**

**6** [27] - 17:14, 29:22, 35:3, 40:18, 68:12, 68:21, 78:2, 79:8, 79:24, 90:3, 90:13, 93:9, 95:17, 96:19, 96:24, 97:8, 97:12, 97:15, 98:3, 99:10, 101:15, 113:22, 122:5, 162:8, 167:4, 197:15, 209:21
**623** [1] - 83:7
**625** [2] - 115:16, 115:21
**630** [1] - 199:17
**631** [1] - 199:17
**632** [1] - 42:17
**633** [4] - 40:25, 42:17, 42:21, 134:5
**634** [2] - 123:22, 124:10
**642** [6] - 64:12, 67:1, 67:10, 68:2, 87:3, 87:6
**643** [5] - 67:1, 67:2, 67:7, 68:7, 87:7
**644** [6] - 64:12, 64:13, 64:16, 68:2, 87:4, 87:7
**645** [2] - 55:8, 61:4
**660** [2] - 151:19, 151:22
**663** [2] - 134:6, 134:7
**666** [2] - 1:9, 1:13
**681** [2] - 188:3, 203:19
**693** [1] - 193:9
**697** [2] - 196:25, 203:21
**6:35** [1] - 45:23
**6:40** [1] - 150:13
**6th** [32] - 12:19, 15:17, 20:16, 33:13, 34:13, 35:23, 38:21, 40:13, 43:3, 43:5, 50:2,

59:17, 70:8, 72:15, 73:9, 79:12, 87:21, 88:21, 91:23, 92:2, 122:8, 129:21, 133:2, 138:24, 140:18, 140:24, 162:14, 167:20, 175:8, 190:13, 191:3, 222:5

## 7

**7** [1] - 220:17
**705** [3] - 14:25, 15:7, 15:11
**737** [3] - 74:15, 74:19, 74:25
**743** [2] - 226:17, 228:5
**746** [3] - 228:1, 228:4, 228:9
**747** [3] - 232:22, 234:22, 235:20
**748** [3] - 232:22, 234:23, 235:20
**749** [2] - 232:7, 232:22
**750** [2] - 211:4, 212:15
**752** [1] - 213:7
**769** [1] - 213:8
**770** [1] - 214:1
**7:08** [1] - 163:8
**7:09** [1] - 134:14
**7th** [14] - 44:25, 45:23, 47:8, 51:25, 55:14, 61:7, 61:20, 62:6, 64:16, 64:22, 65:6, 65:15, 219:21, 221:4

## 8

**8** [2] - 2:20, 171:24
**800-567-8658** [1] - 1:25
**8:00** [1] - 87:15
**8:06** [1] - 211:8
**8:15** [1] - 67:4
**8:38** [1] - 37:23
**8:46** [1] - 43:2
**8:48** [1] - 47:9
**8th** [19] - 49:8, 56:6, 71:12, 74:24, 75:18, 76:20, 83:15, 107:3, 107:10, 171:25, 172:3, 173:12, 177:15, 178:25, 179:14, 199:20, 203:6, 203:8, 239:13

## 9

**9/14/20** [2] - 140:9,

141:9
**9/21/20** [2] - 157:9, 157:24
**9/6** [1] - 83:25
**9/7** [1] - 43:13
**9/7/20** [1] - 137:19
**9/8"** [1] - 118:24
**9/8/20** [1] - 120:19
**9:04** [1] - 1:9
**9:32** [1] - 139:22
**9:45** [1] - 92:5
**9th** [4] - 164:9, 217:25, 219:9, 226:20

## A

**a.m** [18] - 1:9, 29:23, 33:8, 33:12, 34:18, 45:23, 47:9, 67:4, 70:20, 87:15, 91:6, 102:18, 157:16, 163:8, 173:13, 197:2, 211:8, 212:17
**Abbey** [2] - 13:5, 13:8
**ability** [6] - 7:2, 53:2, 181:4, 225:18, 225:19, 239:8
**able** [18] - 22:1, 24:4, 24:6, 25:19, 26:22, 29:10, 29:11, 69:18, 109:18, 121:17, 144:15, 169:4, 172:21, 191:18, 191:21, 191:23, 192:4, 192:10
**absolutely** [9] - 15:2, 37:22, 105:3, 115:18, 153:2, 153:9, 144:15, 219:4, 233:7
**abuse** [1] - 147:22
**academic** [4] - 9:5, 88:24, 89:2, 92:1
**Academic** [2] - 64:17, 65:2
**academically** [1] - 89:4
**academics** [1] - 87:23
**accepting** [1] - 224:13
**access** [13] - 84:2, 84:23, 85:1, 85:3, 85:6, 85:17, 85:24, 125:1, 146:8, 146:14, 146:18, 148:19, 148:21
**acclimated** [1] - 159:6
**accommodate** [3] - 160:2, 160:22, 194:9
**according** [4] - 64:21, 111:4, 198:16,

214:21
**account** [5] - 195:2, 195:3, 195:4, 198:5, 199:5
**accurate** [24] - 15:15, 16:5, 21:4, 21:15, 23:7, 28:15, 29:24, 45:23, 46:5, 46:13, 58:20, 78:16, 108:9, 109:16, 111:18, 115:2, 121:13, 135:12, 140:4, 195:24, 199:12, 205:21, 217:19
**accusation** [1] - 168:15
**acknowledge** [4] - 107:17, 144:20, 223:25, 227:19
**acknowledging** [2] - 212:18, 234:4
**acquit** [1] - 159:5
**act** [6] - 73:2, 111:16, 200:16, 201:2, 202:1, 204:23
**acting** [1] - 184:19
**action** [6] - 54:8, 54:19, 54:22, 81:9, 239:10, 239:12
**actions** [5] - 31:1, 113:13, 114:24, 115:3, 220:14
**active** [1] - 121:15
**activities** [2] - 9:16, 199:6
**actual** [5] - 18:17, 142:25, 188:16, 192:6, 218:13
**ad** [1] - 221:4
**add** [7] - 163:24, 180:2, 180:8, 180:10, 180:15, 186:23, 213:25
**added** [5] - 51:20, 52:20, 144:13, 181:23, 186:14
**adding** [3] - 89:20, 186:11
**additional** [33] - 34:1, 34:10, 44:5, 54:21, 60:5, 60:15, 61:13, 61:15, 61:18, 61:22, 62:3, 73:23, 84:14, 84:16, 105:20, 107:13, 108:20, 116:15, 117:16, 118:4, 118:15, 121:17, 156:5, 156:14, 175:1, 175:7, 209:7,

209:11, 209:19, 209:20, 209:23, 224:21, 233:11
**Additionally"** [1] - 146:3
**address** [12] - 44:5, 52:18, 54:6, 60:20, 68:20, 69:6, 73:1, 164:8, 202:12, 227:9, 227:22, 234:14
**addressed** [5] - 69:7, 78:15, 81:1, 219:25, 220:24
**addresses** [1] - 143:18
**addressing** [8] - 80:16, 81:22, 119:11, 145:19, 219:15, 219:23, 220:18, 221:1
**adequate** [2] - 15:8, 201:15
**adequately** [1] - 200:16
**adjust** [4] - 108:11, 147:19, 158:20, 159:1
**adjusted** [1] - 24:5
**adjustments** [2] - 158:23, 159:3
**administrators** [3] - 103:25, 104:8, 138:4
**admit** [1] - 187:23
**admitted** [10] - 130:19, 131:11, 132:1, 173:20, 180:10, 187:20, 188:1, 206:24, 208:17, 208:19
**advance** [1] - 215:18
**advanced** [1] - 53:1
**advantage** [1] - 147:7
**adversarial** [1] - 216:6
**advice** [1] - 134:3
**advised** [2] - 119:12, 119:13
**advising** [1] - 212:19
**advisor** [3] - 105:13, 105:14, 105:15
**advisors** [3] - 57:7, 100:23, 105:12
**advocate** [1] - 135:21
**advocating** [1] - 136:1
**affect** [2] - 7:2, 7:4
**affecting** [1] - 192:25
**affidavit** [1] - 153:4
**affiliated** [2] - 129:10, 224:5
**affirmed** [2] - 230:12,

235:19
**affirming** [1] - 207:3
**afternoon** [1] - 55:22
**ago** [13] - 53:3, 54:21, 75:16, 87:5, 89:3, 105:11, 119:20, 124:5, 157:24, 164:2, 203:22, 215:5, 236:21
**agree** [82] - 3:20, 11:7, 27:21, 30:6, 30:25, 31:15, 32:6, 35:22, 36:1, 36:5, 36:20, 38:7, 44:10, 44:14, 44:18, 46:5, 46:16, 47:3, 48:2, 48:14, 60:18, 75:21, 75:22, 80:21, 81:15, 82:20, 83:1, 86:12, 99:20, 100:1, 100:2, 108:9, 109:16, 125:25, 127:16, 133:16, 135:24, 138:3, 159:25, 160:20, 166:18, 166:22, 170:7, 176:7, 176:21, 177:13, 180:17, 181:17, 182:14, 185:6, 189:11, 189:24, 194:7, 195:19, 197:12, 197:17, 198:20, 199:7, 200:25, 202:1, 203:3, 203:25, 205:15, 206:11, 207:10, 207:14, 207:18, 207:23, 209:10, 209:17, 211:1, 211:2, 212:25, 215:15, 216:13, 218:15, 219:19, 220:5, 221:1, 221:6, 231:1, 233:15
**agreed** [1] - 153:14
**agreeing** [1] - 86:21
**agreement** [3] - 141:3, 143:1, 183:5
**ahead** [8] - 16:10, 37:24, 172:1, 173:14, 183:25, 201:11, 214:1, 227:4
**ahold** [1] - 56:10
**Aided** [1] - 239:6
**alarm** [5] - 51:10, 74:11, 74:20, 75:7, 76:25
**alarmed** [1] - 111:21
**alarms** [15] - 60:5,

60:15, 73:25, 74:8, 106:2, 107:5, 117:17, 118:7, 119:14, 119:17, 120:8, 124:6, 125:4, 125:11, 202:6
**allegations** [1] - 147:22
**alleging** [1] - 11:17
**allowed** [5] - 95:1, 121:16, 130:10, 201:21, 217:1
**allows** [1] - 100:12
**alone** [7] - 13:2, 17:14, 17:17, 29:15, 38:2, 107:25, 124:25
**Amazon** [2] - 74:24, 107:9
**amend** [4] - 163:23, 175:17, 179:22, 180:1
**amount** [3] - 19:10, 23:7, 66:13
**answer** [33] - 4:10, 5:1, 6:9, 6:13, 7:3, 7:8, 10:13, 11:2, 11:25, 13:14, 18:16, 20:5, 50:7, 76:7, 90:7, 106:12, 117:9, 118:11, 118:13, 151:15, 178:12, 181:16, 181:21, 182:6, 184:1, 192:15, 201:9, 201:11, 201:19, 207:15, 213:17, 218:19
**answered** [5] - 5:2, 54:18, 169:7, 191:15, 215:23
**answering** [4] - 120:17, 213:19, 213:21, 231:1
**answers** [6] - 4:16, 73:7, 80:8, 81:7, 104:17, 190:23
**anxiety** [6] - 97:11, 97:17, 97:20, 167:21, 216:5
**anyways** [1] - 192:3
**apartment** [154] - 12:23, 12:25, 14:15, 15:20, 16:17, 17:1, 17:6, 17:13, 17:15, 18:7, 18:13, 19:4, 21:9, 21:18, 23:12, 23:14, 23:20, 23:23, 26:4, 27:2, 27:22, 28:2, 28:15, 28:19, 29:1, 30:2, 30:5,

31:12, 31:16, 31:24, 32:6, 32:11, 32:15, 32:18, 32:19, 32:24, 33:9, 33:16, 33:20, 34:2, 34:4, 34:16, 38:3, 38:5, 44:6, 46:7, 49:3, 50:19, 50:22, 50:23, 51:4, 51:7, 51:9, 51:17, 51:19, 54:13, 54:15, 55:3, 56:10, 56:13, 56:17, 56:22, 58:17, 58:19, 59:1, 59:4, 59:16, 60:16, 60:21, 61:23, 62:4, 62:21, 63:11, 66:17, 73:9, 73:12, 73:20, 75:5, 76:1, 76:16, 79:3, 79:11, 80:1, 83:25, 85:21, 86:15, 99:11, 99:17, 102:17, 102:20, 103:13, 105:17, 106:22, 108:16, 109:14, 110:1, 110:8, 110:17, 114:8, 119:15, 121:10, 124:18, 125:3, 128:11, 128:13, 128:17, 129:3, 129:20, 130:17, 130:19, 131:5, 131:11, 143:19, 147:18, 147:22, 169:5, 169:19, 170:3, 175:8, 175:21, 178:3, 178:14, 178:16, 180:21, 181:11, 181:19, 182:11, 182:16, 183:8, 183:18, 183:21, 184:14, 185:9, 186:21, 187:3, 187:12, 187:21, 187:24, 200:17, 200:23, 202:6, 205:3, 205:7, 205:17, 207:8, 208:1, 208:2, 208:6, 208:9, 208:13, 208:15, 208:18, 224:22, 225:19
**apartment's** [1] - 59:8
**apartments** [19] - 15:14, 31:23, 32:16, 58:24, 60:24, 63:14, 173:19, 173:21, 175:23, 177:19, 177:21, 204:21, 206:20, 206:25,

207:11, 207:20, 208:2, 208:13
**apologize** [5] - 42:13, 156:6, 187:18, 190:19, 228:3
**apologizes** [1] - 142:5
**appeal** [1] - 231:12
**appealed** [1] - 231:7
**appeals** [1] - 231:15
**appear** [3] - 53:22, 72:14, 163:25
**APPEARANCES** [1] - 1:12
**appeared** [3] - 1:14, 1:17, 11:14
**appearing** [1] - 192:22
**application** [2] - 193:25, 197:25
**applies** [1] - 20:3
**appointed** [1] - 170:9
**appointment** [2] - 91:14, 92:19
**appreciate** [6] - 130:23, 161:11, 182:5, 217:17, 219:14, 237:10
**appropriate** [4] - 13:13, 13:16, 15:2, 231:5
**appropriately** [1] - 73:2
**approval** [1] - 196:17
**approval/signature** [1] - 194:3
**approximate** [3] - 29:24, 37:17, 47:19
**area** [6] - 9:12, 92:22, 94:23, 116:14, 193:21, 194:9
**Area** [1] - 193:25
**areas** [1] - 123:15
**argue** [3] - 108:3, 140:22, 185:5
**Arling** [1] - 161:5
**Arlington** [13] - 7:17, 7:18, 7:25, 8:13, 38:24, 160:15, 161:3, 161:18, 194:4, 196:4, 196:10, 196:21, 197:20
**arrangement** [1] - 215:14
**arrived** [4] - 27:4, 32:19, 33:12, 34:23
**Art** [6] - 52:4, 58:11, 62:19, 68:15, 129:13
**Arthur** [3] - 35:4, 35:19, 193:14
**Article** [1] - 2:21

**article** [3] - 236:22, 236:23, 236:24
**aside** [1] - 160:12
**asleep** [2] - 19:13, 19:18
**aspect** [1] - 160:14
**assault** [17] - 109:6, 109:12, 110:2, 110:6, 112:2, 112:7, 113:12, 140:11, 147:2, 147:14, 147:16, 220:12, 221:22, 222:13, 223:7, 223:23, 224:13
**assaulted** [2] - 224:7, 224:16
**assigned** [1] - 128:20
**assignment** [1] - 197:8
**assist** [2] - 147:3, 209:24
**assistance** [3] - 72:21, 90:1, 120:7
**Assistant** [2] - 100:24, 212:20
**assistant** [1] - 42:10
**assisting** [1] - 161:15
**assume** [37] - 5:1, 5:19, 8:14, 25:4, 32:3, 32:4, 45:5, 53:12, 53:14, 57:6, 60:22, 62:11, 72:9, 83:24, 104:18, 104:20, 117:25, 118:3, 125:18, 133:16, 136:25, 153:15, 159:2, 161:14, 162:8, 172:1, 174:17, 181:5, 181:12, 181:16, 182:8, 191:23, 192:20, 194:13, 204:13, 205:2, 225:15
**assumed** [2] - 53:19, 104:15
**Assuming** [1] - 111:3
**assuming** [24] - 21:23, 32:16, 63:22, 66:10, 68:18, 78:7, 86:10, 117:15, 117:18, 118:8, 119:25, 121:25, 122:9, 132:4, 134:23, 141:15, 148:8, 160:11, 168:1, 182:12, 182:19, 199:6, 206:7
**assumption** [7] -

48:15, 55:24, 127:8, 127:20, 135:14, 175:20, 180:14
**attempt** [4] - 49:23, 56:12, 222:15, 225:10
**attempted** [8] - 30:8, 49:20, 62:25, 69:25, 79:9, 148:22, 222:12, 223:7
**attempting** [4] - 54:3, 60:19, 79:2, 86:14
**attend** [4] - 8:12, 9:1, 68:4, 69:11
**attended** [10] - 8:19, 69:15, 69:21, 70:1, 70:3, 70:4, 70:11, 70:14, 82:9, 130:9
**attending** [1] - 69:22
**attention** [6] - 46:20, 72:9, 98:24, 156:13, 217:8, 237:10
**attest** [8] - 18:12, 58:1, 78:25, 79:21, 104:9, 121:9, 189:22, 224:9
**attorney** [19] - 5:14, 5:18, 5:22, 6:10, 10:24, 11:6, 11:12, 25:12, 25:22, 149:25, 169:25, 212:2, 224:4, 237:6, 237:7, 238:13, 238:15, 239:9, 239:11
**Attorney** [1] - 2:2
**attorney's** [3] - 11:4, 183:25, 201:12
**attorney-client** [3] - 5:18, 5:22, 10:24
**attorneys** [10] - 5:8, 5:11, 148:18, 149:21, 149:22, 180:19, 181:7, 229:24, 230:1, 230:20
**August** [3] - 1:10, 8:25, 96:11
**authored** [2] - 35:22, 182:9
**authorization** [2] - 103:14, 205:18
**availability** [2] - 36:3, 36:7
**available** [26] - 14:11, 43:19, 43:25, 45:16, 46:2, 46:12, 46:17, 47:1, 47:4, 47:23, 48:3, 48:11, 53:3, 73:24, 74:6, 90:13,

106:9, 106:10, 147:9, 156:9, 157:8, 166:20, 168:4, 168:9, 168:10, 168:11
**Avenue** [2] - 1:9, 1:13
**average** [1] - 22:5
**awaiting** [1] - 152:9
**aware** [7] - 33:17, 34:9, 61:17, 144:12, 172:16, 184:4, 184:5
**awoke** [1] - 110:1

# B

**balancing** [1] - 158:21
**balcony** [1] - 17:9
**ball** [1] - 170:15
**banned** [1] - 231:17
**bare** [1] - 108:12
**barred** [1] - 187:15
**Barrington** [1] - 8:11
**bars** [11] - 73:25, 74:8, 74:13, 74:22, 75:8, 107:5, 118:6, 119:14, 125:3, 125:11, 202:6
**base** [1] - 193:15
**based** [20] - 12:15, 18:16, 30:25, 31:1, 40:4, 44:18, 46:13, 46:16, 59:22, 75:15, 114:24, 115:3, 171:16, 177:14, 180:17, 187:1, 202:1, 203:3, 208:11, 219:19
**bathroom** [1] - 16:14
**Beach** [4] - 94:1, 95:9, 95:14, 95:15
**bear** [1] - 208:22
**became** [1] - 145:17
**bed** [8] - 18:25, 19:11, 19:19, 19:20, 19:22, 21:6, 21:7, 23:16
**bedroom** [19] - 14:17, 19:23, 20:24, 21:14, 21:17, 21:22, 23:13, 23:21, 24:25, 26:5, 27:13, 32:4, 56:24, 56:25, 57:2, 110:11, 133:13, 178:18
**bedrooms** [8] - 14:14, 14:16, 16:16, 27:8, 27:12, 31:16, 56:23, 225:21
**began** [2] - 12:19, 236:18
**begin** [1] - 222:20
**beginning** [5] - 94:2,

105:10, 204:7, 204:21, 209:5
**begins** [16] - 40:17, 56:2, 61:12, 87:6, 91:5, 91:13, 99:9, 146:1, 146:23, 154:22, 157:14, 206:18, 208:8, 221:9, 222:10, 223:3
**behalf** [5] - 1:14, 1:17, 53:4, 73:2, 136:17
**behavior** [1] - 182:25
**belaboring** [1] - 227:13
**belief** [4] - 81:8, 112:20, 115:11, 225:14
**believes** [1] - 227:21
**below** [1] - 20:21
**benefit** [2] - 149:5, 199:11
**benefitting** [1] - 198:24
**Benjamin** [1] - 1:13
**best** [41] - 4:7, 4:9, 13:9, 38:17, 50:7, 77:22, 82:17, 82:21, 82:24, 93:16, 95:16, 96:14, 112:13, 127:8, 129:13, 131:24, 132:10, 135:5, 135:16, 135:17, 135:19, 136:24, 144:6, 144:8, 148:2, 151:7, 159:17, 165:10, 171:3, 175:9, 189:4, 189:5, 190:3, 198:22, 198:25, 199:9, 235:10, 235:14, 235:15, 235:16, 239:8
**better** [5] - 51:10, 154:21, 159:14, 169:11, 216:14
**between** [33] - 11:6, 26:16, 27:1, 32:22, 37:17, 44:10, 71:11, 71:16, 80:12, 80:13, 82:9, 96:11, 99:21, 102:18, 103:9, 110:18, 120:1, 120:3, 125:19, 132:5, 132:11, 149:2, 156:20, 170:19, 190:12, 191:8, 209:1, 209:2, 213:9, 214:20, 228:23, 228:25, 229:25

**beyond** [5] - 24:1, 24:21, 78:22, 78:23, 194:11
**big** [3] - 97:23, 154:23, 169:22
**bill** [2] - 199:1, 199:2
**birth** [3] - 6:24, 7:14, 7:16
**bit** [12] - 9:22, 59:23, 65:17, 101:8, 130:23, 131:18, 153:13, 156:11, 176:19, 180:5, 193:10, 204:19
**blame** [1] - 139:12
**blamed** [1] - 114:12
**blaming** [1] - 171:3
**blocked** [3] - 195:2, 195:3, 195:4
**blue** [10] - 52:22, 52:25, 55:5, 122:13, 122:21, 123:11, 145:6, 145:11, 145:17, 152:9
**board** [18] - 210:7, 210:15, 211:18, 211:19, 212:11, 212:13, 215:1, 215:7, 215:20, 215:22, 216:2, 216:19, 217:2, 229:16, 230:7, 231:3, 231:7, 231:19
**body** [5] - 41:21, 47:10, 83:12, 142:11, 193:15
**bogus** [1] - 123:13
**Borelli** [2] - 90:25, 91:17
**born** [1] - 8:10
**boss** [1] - 82:6
**bottom** [39] - 15:21, 20:21, 42:18, 43:15, 43:23, 55:12, 55:21, 61:5, 70:20, 71:7, 91:5, 91:13, 98:24, 99:9, 100:20, 105:19, 108:14, 109:8, 141:18, 143:18, 146:1, 146:22, 146:23, 147:13, 154:17, 154:25, 157:14, 163:3, 163:6, 176:4, 207:2, 210:20, 210:24, 213:25, 222:7, 225:9, 228:13, 232:8
**boy** [1] - 41:7
**boyfriends** [1] - 17:22

**Brad** [1] - 11:11
**brand** [1] - 97:3
**break** [42] - 2:20, 82:2, 115:17, 116:1, 130:20, 132:1, 164:14, 164:17, 175:25, 176:19, 176:24, 177:7, 177:13, 177:17, 177:20, 178:1, 178:4, 178:9, 178:17, 178:20, 178:21, 178:23, 179:1, 180:13, 181:8, 181:8, 185:2, 185:3, 188:2, 200:16, 201:21, 205:19, 206:14, 220:1, 220:2, 220:5, 220:14, 220:20, 225:9, 225:10, 226:3
**break-in** [23] - 2:20, 82:2, 175:25, 176:24, 178:1, 178:4, 178:17, 178:20, 178:21, 178:23, 179:1, 180:13, 181:8, 185:2, 185:3, 206:14, 220:2, 220:5, 220:14, 220:20, 226:3
**break-ins** [10] - 130:20, 132:1, 177:7, 177:17, 177:20, 178:9, 188:2, 201:21, 205:19, 220:1
**brevity** [1] - 213:14
**Brianna** [1] - 188:17
**brief** [3] - 105:16, 193:10, 231:10
**briefly** [1] - 67:21
**bring** [7] - 6:11, 67:22, 76:5, 156:12, 169:2
**bringing** [2] - 37:4, 77:18
**broke** [5] - 99:10, 99:17, 108:16, 178:6, 182:10
**broken** [2] - 178:15, 204:22
**brought** [13] - 67:21, 67:24, 76:9, 76:14, 76:23, 78:15, 90:4, 114:7, 129:15, 132:19, 153:21, 156:5, 212:13
**broughtly** [1] - 67:21
**Brown** [1] - 1:16

**BrownWinick** [1] - 1:13
**building** [32] - 34:5, 34:6, 51:19, 54:13, 54:15, 58:5, 59:3, 59:11, 59:16, 62:21, 63:14, 84:3, 84:8, 85:18, 85:21, 102:11, 116:16, 116:21, 118:18, 126:1, 128:5, 129:23, 131:3, 142:17, 143:1, 143:3, 146:14, 152:7, 178:3, 204:22, 205:9, 205:10
**bullet** [5] - 83:19, 222:7, 222:10, 223:2, 225:9
**Burrows** [27] - 35:4, 35:16, 37:19, 40:19, 41:12, 42:20, 55:13, 61:7, 116:4, 136:11, 137:6, 139:21, 140:3, 150:10, 150:19, 151:6, 151:20, 164:25, 165:2, 166:3, 173:13, 189:11, 197:1, 206:1, 209:1, 212:16
**Burrows-Schumacher** [3] - 150:19, 151:6, 164:25
**business** [1] - 9:25
**button** [1] - 53:8
**buttons** [1] - 52:23, 123:9
**BY** [8] - 3:8, 12:9, 98:9, 118:12, 182:2, 182:18, 183:24, 201:10
**Byrne** [30] - 12:23, 12:24, 14:10, 14:14, 15:14, 34:15, 54:14, 58:18, 59:15, 62:10, 62:11, 62:15, 64:8, 64:10, 67:17, 83:20, 84:7, 86:11, 116:9, 116:15, 121:6, 127:24, 128:11, 130:15, 143:19, 144:13, 145:22, 146:8, 153:18, 173:19

## C

**Cabrera** [1] - 105:15
**Caitlin** [2] - 13:5, 13:9
**calendar** [1] - 117:8
**California** [13] - 7:17, 7:21, 8:5, 8:7, 94:1, 94:4, 94:7, 94:10, 94:25, 95:10, 95:11, 96:5, 96:12
**Callahan** [4] - 212:19, 212:25, 213:9, 213:18
**camera** [18] - 125:17, 126:4, 126:6, 126:17, 127:1, 127:10, 127:12, 127:17, 145:21, 146:7, 146:18, 173:19, 178:20, 178:24, 185:3, 186:15, 202:7, 206:15
**cameras** [13] - 51:18, 52:19, 52:25, 55:4, 55:5, 89:20, 102:10, 103:22, 118:17, 125:5, 125:20, 127:5, 152:6
**Campus** [1] - 57:5
**campus** [99] - 20:15, 24:19, 24:22, 26:13, 26:14, 26:18, 26:24, 27:1, 29:17, 30:17, 31:19, 31:24, 32:7, 32:20, 33:19, 34:4, 35:18, 36:18, 36:20, 37:18, 48:9, 50:15, 52:13, 52:14, 52:20, 54:11, 54:12, 55:4, 55:6, 56:16, 57:10, 57:18, 57:20, 58:4, 64:9, 68:14, 77:10, 78:13, 80:9, 82:8, 82:11, 84:12, 89:20, 99:11, 100:22, 102:22, 103:7, 103:8, 106:10, 106:11, 108:1, 109:13, 116:25, 117:21, 117:23, 119:23, 120:2, 123:14, 123:16, 124:18, 125:2, 128:13, 132:23, 140:19, 142:15, 145:11, 147:3, 147:9, 152:6, 152:24, 160:1, 160:9, 161:7,
161:10, 162:2, 165:25, 172:9, 174:4, 175:2, 175:14, 177:5, 177:6, 177:8, 178:2, 183:4, 187:15, 192:13, 192:22, 197:14, 197:19, 198:7, 199:5, 199:14, 200:17, 201:20, 204:22, 228:21, 231:18
**campus-wide** [1] - 78:13
**cancel** [2] - 198:4, 198:14
**canceled** [1] - 197:12
**cancelled** [2] - 132:8, 197:17
**cannot** [21] - 6:9, 10:13, 23:7, 24:23, 27:3, 27:13, 28:10, 39:16, 40:11, 41:14, 50:20, 56:17, 117:4, 117:5, 143:10, 179:15, 188:23, 210:1, 210:19, 224:9, 236:3
**capacity** [1] - 181:4
**caption** [1] - 239:4
**cared** [1] - 38:16
**career** [2] - 160:4, 160:5
**case** [15] - 33:4, 69:2, 104:12, 137:1, 143:7, 143:11, 143:15, 148:17, 153:15, 172:23, 178:5, 188:25, 210:6, 226:12, 238:1
**cases** [1] - 76:18
**catch** [2] - 126:3, 126:4
**categorized** [1] - 202:3
**caught** [2] - 125:16, 127:9, 127:12, 130:18, 131:11, 173:18, 177:23, 178:20, 178:24, 185:3, 186:15, 206:14
**cc'd** [1] - 120:24
**cell** [1] - 53:2
**Center** [1] - 1:9
**centerpieces** [1] - 9:24
**certain** [20] - 72:25, 73:5, 75:7, 106:14, 109:20, 113:17,

114:2, 114:6, 117:2, 121:25, 122:8, 133:7, 139:14, 176:11, 176:15, 177:4, 183:16, 186:17, 215:2
**certainly** [8] - 44:17, 48:10, 109:24, 144:12, 167:13, 190:4, 203:3, 216:13
**CERTIFIED** [1] - 239:15
**certified** [3] - 232:17, 232:21, 234:18
**Certified** [4] - 1:10, 234:23, 235:3, 239:2
**certify** [2] - 239:2, 239:9
**cetera** [3] - 5:12, 124:7, 133:25
**chain** [3] - 161:24, 163:4, 226:18
**challenge** [2] - 159:8, 217:13
**chance** [7] - 25:8, 55:12, 74:16, 139:23, 193:17, 199:24, 230:21
**change** [2] - 106:21, 237:23
**changed** [3] - 106:18, 118:5, 132:17
**changes** [3] - 52:13, 84:5, 188:25
**changing** [2] - 56:4, 117:17
**charged** [2] - 198:23, 199:10
**charges** [2] - 197:12, 197:17
**chase** [1] - 231:11
**check** [4] - 18:24, 19:3, 46:7, 170:14
**check-in** [1] - 170:14
**checked** [14] - 18:25, 27:8, 27:12, 27:13, 27:16, 31:22, 31:23, 32:5, 32:17, 103:23, 185:7, 202:9, 214:19
**checking** [3] - 27:8, 31:15, 32:16
**children** [1] - 7:12
**choice** [1] - 238:5
**choose** [3] - 161:4, 193:6, 210:11
**Chris** [1] - 3:12
**CHRISTOPHER** [1] - 1:16
**circles** [1] - 131:6
**city** [2] - 93:25, 95:11

**Civil** [1] - 1:4
**civil** [2] - 6:6, 6:8
**claim** [34] - 2:21, 11:17, 137:2, 140:10, 140:20, 141:7, 151:9, 151:14, 155:13, 157:9, 163:23, 163:24, 164:19, 165:4, 166:25, 167:9, 167:17, 176:9, 179:22, 180:1, 180:2, 180:9, 180:10, 180:15, 222:12, 222:15, 223:7, 232:12, 235:8, 235:9, 236:2, 236:5, 236:8
**claims** [6] - 12:2, 97:7, 136:16, 136:17, 176:10, 190:8
**Clarence** [1] - 239:13
**clarification** [5] - 100:6, 122:3, 161:12, 204:12, 234:11
**clarify** [21] - 4:20, 4:23, 11:1, 11:3, 12:8, 66:3, 71:2, 72:23, 76:7, 79:5, 98:22, 112:12, 126:15, 127:1, 129:5, 136:3, 136:18, 180:23, 186:18, 187:7, 220:7
**class** [7] - 69:24, 70:1, 70:11, 70:14, 159:14, 159:22, 193:7
**classes** [21] - 8:22, 17:23, 65:23, 66:8, 66:13, 69:16, 69:21, 70:3, 82:9, 90:25, 96:7, 132:12, 160:7, 160:12, 194:18, 194:22, 194:25, 195:7, 195:9, 195:10
**classifying** [1] - 99:14
**classroom** [6] - 66:18, 67:18, 67:19, 69:4, 69:11, 87:19
**clear** [3] - 4:21, 106:20, 180:6
**cleared** [1] - 130:1
**Clemente** [2] - 7:17, 95:13
**client** [3] - 5:18, 5:22, 10:24
**close** [6] - 40:10, 62:24, 129:19,

131:3, 226:14, 238:8
**closed** [6] - 21:17, 21:19, 21:21, 21:24, 103:17, 103:18
**closer** [2] - 30:1, 95:14
**closest** [1] - 13:23
**cloud** [2] - 50:4, 148:24
**coach** [2] - 9:2, 37:11
**codes** [3] - 121:10, 121:12, 153:19
**coincide** [1] - 121:18
**colleague** [1] - 3:13
**collect** [1] - 13:12
**collected** [1] - 148:14
**college** [152] - 12:6, 12:13, 14:11, 42:6, 42:9, 44:12, 46:1, 46:19, 48:3, 52:24, 53:25, 54:7, 54:24, 56:11, 58:9, 59:14, 59:23, 61:19, 63:18, 64:1, 64:9, 72:6, 72:25, 73:3, 74:9, 75:5, 75:11, 76:14, 77:24, 77:25, 78:5, 78:25, 79:7, 79:18, 79:19, 79:21, 80:12, 80:14, 80:23, 81:3, 81:9, 81:15, 82:12, 86:10, 90:2, 90:12, 90:25, 107:23, 108:7, 113:13, 113:16, 113:23, 114:15, 114:20, 114:25, 115:4, 115:11, 117:15, 119:13, 128:23, 129:11, 133:1, 133:8, 138:3, 138:23, 146:17, 148:16, 152:7, 152:14, 153:3, 153:12, 153:16, 154:1, 154:2, 155:1, 155:10, 155:22, 159:25, 160:20, 169:20, 170:1, 170:7, 171:11, 171:19, 172:17, 174:11, 175:17, 176:7, 176:21, 178:6, 178:22, 180:19, 181:9, 182:9, 182:13, 183:7, 187:24, 189:15, 190:5, 190:7, 190:10, 192:21, 193:3,

193:4, 193:13, 194:8, 195:21, 198:21, 199:4, 200:22, 204:6, 204:15, 204:17, 207:7, 207:24, 209:20, 209:25, 210:7, 210:12, 215:1, 215:7, 215:16, 215:20, 215:22, 216:19, 219:22, 220:10, 220:14, 220:17, 221:16, 221:25, 222:1, 222:15, 223:19, 223:24, 224:4, 224:12, 227:9, 227:21, 232:4, 233:17, 233:18, 233:24, 234:4, 234:6, 234:13, 234:23, 235:8, 236:1, 236:4
**COLLEGE** [1] - 1:6
**College** [37] - 2:19, 3:14, 8:4, 8:15, 8:19, 8:23, 9:1, 11:18, 11:22, 33:7, 49:25, 52:8, 70:11, 74:24, 88:4, 94:8, 98:19, 104:1, 104:9, 104:21, 106:14, 107:17, 133:23, 171:7, 196:11, 198:18, 200:16, 201:2, 202:24, 204:3, 204:23, 219:14, 221:12, 222:12, 223:7, 231:22, 236:8
**college's** [6] - 36:7, 48:6, 121:4, 232:11, 235:15, 235:21
**colleges** [5] - 8:20, 8:21, 123:3, 123:5
**Collins** [16] - 83:6, 87:25, 88:16, 89:13, 89:14, 90:1, 170:20, 170:23, 171:9, 171:14, 171:18, 195:11, 199:20, 200:3, 200:5
**colon** [1] - 222:23
**combat** [1] - 51:8
**comfortable** [16] - 91:21, 94:24, 116:21, 117:22, 124:18, 162:2, 165:2, 167:25, 168:16, 210:13,

210:17, 210:25, 213:21, 215:17, 216:1, 216:7
**comforted** [1] - 31:4
**coming** [11] - 23:25, 29:17, 74:1, 74:3, 117:23, 126:1, 176:17, 205:4, 205:13, 230:22
**commencing** [1] - 1:9
**comments** [3] - 76:19, 169:17, 169:21
**commitments** [1] - 229:6
**communicate** [2] - 121:4, 176:8
**communicated** [1] - 115:11
**communicating** [4] - 104:2, 104:23, 112:14, 176:20
**communication** [11] - 5:18, 5:23, 81:13, 81:16, 82:22, 104:10, 175:11, 175:12, 184:21, 204:11, 236:3
**communications** [7] - 2:19, 5:16, 24:23, 167:7, 179:3, 195:11, 216:20
**community** [1] - 62:11
**compassion** [1] - 54:3
**complaint** [20] - 175:17, 186:12, 189:16, 218:18, 219:16, 220:3, 220:4, 220:10, 220:13, 221:25, 222:4, 223:19, 224:19, 233:19, 234:2, 234:3, 234:5, 234:8, 236:20
**complaints** [7] - 219:23, 219:25, 220:19, 220:24, 221:2, 221:7, 227:10
**complete** [11] - 159:15, 160:4, 196:12, 200:15, 201:2, 201:25, 202:3, 202:12, 202:14, 202:17, 202:19
**completed** [9] - 20:14, 95:22, 140:10, 141:9, 191:21, 196:7, 196:9, 210:6, 232:17
**completely** [6] -

13:13, 13:16, 23:22, 219:25, 233:12, 238:16
**compliance** [2] - 121:11, 220:11
**complied** [35] - 15:10, 20:7, 35:8, 42:24, 47:15, 55:18, 61:10, 64:15, 71:2, 74:18, 83:18, 91:11, 92:10, 99:7, 116:7, 119:9, 124:15, 134:19, 139:25, 150:16, 152:1, 157:6, 157:22, 173:16, 188:9, 193:19, 197:5, 200:1, 203:23, 206:10, 209:16, 213:24, 214:4, 218:4, 227:6
**comply** [1] - 12:14
**component** [3] - 112:25, 226:5, 226:8
**Computer** [1] - 239:6
**computer** [4] - 49:21, 148:11, 148:12, 148:24
**Computer-Aided** [1] - 239:6
**concede** [1] - 109:24
**concentration** [1] - 9:12
**concern** [13] - 30:6, 31:16, 36:1, 36:6, 36:9, 66:7, 100:14, 122:23, 152:5, 155:3, 155:21, 155:23, 209:3
**concerned** [7] - 30:18, 38:8, 39:24, 53:22, 56:9, 72:14, 72:16
**concerning** [30] - 46:3, 63:10, 69:3, 82:22, 96:18, 101:21, 102:8, 104:3, 104:11, 120:12, 133:2, 136:2, 167:3, 175:7, 176:22, 203:10, 208:1, 208:2, 211:13, 212:21, 213:10, 222:4, 223:16, 223:19, 224:20, 231:21, 235:8, 236:1, 236:20, 239:5
**concerns** [48] - 47:1, 48:4, 48:5, 52:18, 54:6, 60:20, 65:22, 65:24, 66:2, 66:9,

66:11, 66:12, 66:15, 66:18, 66:23, 67:18, 68:20, 69:4, 72:21, 72:24, 73:2, 78:14, 81:22, 86:13, 86:23, 87:19, 92:1, 92:2, 135:8, 154:9, 160:3, 160:22, 161:16, 184:5, 190:5, 219:15, 219:23, 219:24, 220:19, 220:25, 221:2, 221:7, 222:14, 223:9, 227:10, 227:22, 234:14
**concessions** [1] - 171:19
**conclude** [4] - 44:11, 111:9, 130:21, 190:4
**concluded** [4] - 96:17, 230:4, 233:24, 238:23
**concludes** [1] - 157:14
**concluding** [1] - 226:2
**conclusion** [4] - 11:24, 233:20, 233:21, 234:1
**concrete** [1] - 17:12
**conduct** [2] - 3:21, 136:12
**conducting** [1] - 12:2
**conferred** [1] - 69:23
**configurations** [1] - 16:16
**confined** [2] - 67:18, 99:5
**confining** [1] - 113:22
**confirmed** [1] - 59:14
**confront** [1] - 217:13
**confronted** [1] - 183:7
**confuse** [1] - 153:2
**confused** [1] - 166:8
**congratulations** [1] - 6:23
**connect** [1] - 229:10
**connected** [1] - 189:12
**connection** [3] - 147:10, 188:22, 206:2
**connections** [1] - 161:9
**consent** [1] - 51:13
**consequences** [1] - 229:15
**consider** [1] - 13:22
**consideration** [1] - 211:19
**considered** [4] -

112:6, 159:22, 223:22, 223:23
**consistently** [1] - 223:14
**constant** [2] - 13:21, 13:25
**consult** [4] - 117:8, 238:7, 238:12, 238:15
**consultation** [1] - 46:12
**contact** [28] - 13:18, 13:21, 13:24, 13:25, 14:2, 90:10, 90:25, 92:13, 110:8, 136:11, 137:21, 137:22, 138:6, 138:18, 138:21, 140:3, 165:9, 170:17, 174:25, 175:6, 188:24, 189:4, 189:5, 189:13, 189:14, 189:19, 189:20, 190:3
**contacted** [18] - 13:20, 46:6, 46:7, 49:15, 136:25, 137:5, 137:10, 137:13, 141:21, 142:19, 142:22, 142:24, 143:2, 179:2, 189:9, 191:13, 224:9, 235:11
**contacting** [6] - 82:13, 136:19, 147:8, 152:7, 209:6, 209:18
**contained** [1] - 128:18
**contemporaneously** [1] - 102:4
**contend** [1] - 28:8
**contends** [2] - 201:24, 234:14
**context** [3] - 32:13, 140:15, 165:19
**continue** [5] - 50:18, 174:12, 176:3, 218:7, 224:18
**continued** [2] - 50:21, 176:8, 176:21
**contract** [1] - 194:4
**contrary** [1] - 28:8
**controversy** [1] - 239:5
**convened** [1] - 231:3
**conver** [1] - 88:10
**conversation** [21] - 31:1, 36:23, 53:5, 59:18, 63:5, 64:3, 73:4, 73:5, 73:15,

73:21, 73:22, 88:5, 88:9, 88:14, 105:16, 114:20, 171:25, 200:13, 235:18, 236:13, 236:18
**conversations** [10] - 4:13, 5:8, 29:5, 39:13, 40:4, 49:16, 167:22, 170:6, 191:4, 191:8
**conversing** [2] - 30:22, 53:17
**conveyed** [4] - 62:1, 63:17, 64:1, 64:7
**copied** [1] - 170:18
**copy** [5] - 102:6, 124:6, 236:25, 237:1, 237:5
**cordial** [1] - 14:2
**correct** [286] - 7:23, 8:15, 8:16, 9:6, 9:7, 9:9, 10:17, 10:18, 11:13, 11:15, 11:16, 12:20, 12:21, 14:12, 14:13, 15:17, 15:18, 15:22, 16:13, 16:15, 16:20, 17:4, 17:5, 17:8, 18:1, 23:1, 23:2, 24:15, 25:5, 28:22, 31:6, 32:11, 33:13, 33:14, 34:16, 34:17, 34:18, 35:15, 35:25, 39:24, 40:1, 41:2, 41:5, 42:7, 43:9, 43:10, 45:7, 46:15, 47:19, 47:25, 48:1, 48:15, 53:15, 53:16, 53:18, 53:20, 53:21, 54:15, 54:16, 56:20, 57:1, 58:19, 59:6, 59:11, 60:1, 60:2, 60:16, 60:17, 60:22, 62:8, 63:21, 65:19, 65:20, 66:20, 68:10, 71:13, 71:14, 72:5, 72:12, 72:13, 75:3, 75:10, 75:12, 77:11, 77:12, 83:21, 83:22, 84:21, 85:3, 85:4, 86:1, 86:2, 86:8, 86:9, 86:24, 87:21, 87:22, 89:5, 89:8, 89:11, 91:25, 92:23, 94:5, 94:6, 100:9, 100:10, 100:14, 100:15, 100:18, 106:22, 106:23, 106:24, 107:6, 107:7, 107:11, 107:12,

107:15, 107:16, 107:20, 107:21, 109:16, 109:17, 109:21, 109:22, 110:9, 110:11, 110:15, 110:21, 110:25, 111:2, 111:6, 111:10, 112:17, 112:18, 113:24, 113:25, 115:8, 115:9, 119:2, 119:3, 119:15, 119:17, 119:24, 121:15, 122:17, 122:18, 124:7, 124:8, 124:11, 124:12, 126:1, 127:24, 128:16, 128:21, 129:1, 130:7, 130:8, 130:11, 130:12, 132:14, 132:15, 133:18, 133:19, 133:20, 133:21, 137:12, 137:20, 140:11, 141:1, 141:9, 141:10, 141:24, 142:12, 142:18, 143:16, 144:18, 144:19, 144:21, 144:22, 145:3, 145:18, 147:23, 147:24, 149:11, 150:20, 150:21, 155:8, 155:9, 155:15, 155:16, 158:21, 158:22, 160:19, 162:20, 164:13, 165:4, 165:5, 165:8, 165:9, 166:10, 168:13, 169:23, 172:5, 174:23, 174:24, 175:19, 176:8, 177:17, 185:18, 185:20, 186:15, 187:6, 187:17, 187:18, 189:22, 190:23, 190:24, 192:9, 193:22, 193:23, 195:16, 195:17, 196:5, 196:6, 196:8, 196:24, 197:16, 197:21, 197:22, 198:7, 198:8, 198:10, 198:12, 198:15, 200:23, 200:24, 204:16, 205:13, 205:14, 206:15, 206:16,

207:4, 207:22, 208:18, 211:13, 211:14, 211:21, 212:3, 212:10, 212:23, 212:24, 213:4, 216:15, 217:2, 217:3, 217:5, 217:6, 218:21, 219:10, 219:11, 220:14, 220:15, 224:16, 224:17, 225:7, 227:10, 227:12, 227:23, 227:24, 229:1, 231:10, 231:23, 231:24, 232:4, 232:5, 233:19, 234:15, 234:16, 234:24, 235:2, 235:4, 235:5, 235:24, 237:22
**correctly** [8] - 95:21, 110:7, 126:24, 139:1, 160:18, 229:18, 229:20, 236:15
**correspond** [2] - 164:24, 213:1
**corresponded** [1] - 202:8
**correspondence** [8] - 148:15, 148:25, 149:1, 169:24, 204:5, 220:23, 235:7, 235:25
**corresponding** [2] - 150:19, 213:18
**counsel** [2] - 239:10, 239:11
**counseling** [3] - 90:5, 90:8, 202:10
**counselor** [1] - 93:8
**couple** [3] - 80:10, 163:21, 222:11
**courage** [2] - 135:21, 136:6
**course** [4] - 5:2, 5:20, 77:17, 78:11
**courses** [1] - 159:18
**COURT** [1] - 1:1
**court** [6] - 4:3, 4:15, 93:15, 237:13, 237:21, 238:17
**Court** [1] - 79:22
**Courtney** [6] - 93:13, 93:20, 93:24, 95:8, 95:17, 96:13
**courtroom** [1] - 4:1
**covered** [1] - 87:10
**COVID** [3] - 162:11,

192:24, 193:5
**create** [2] - 9:21, 9:24
**critical** [1] - 168:19
**criticism** [1] - 77:24
**CRR** [1] - 1:24
**crying** [1] - 26:6
**Crystal** [1] - 7:16
**CSR** [1] - 1:24
**cut** [2] - 190:19, 231:11

## D

**dad** [9] - 29:16, 32:19, 33:12, 34:18, 34:22, 34:23, 38:3, 39:17, 103:7
**dad's** [1] - 34:20
**Daily** [2] - 2:21, 236:11
**dark** [2] - 23:22, 123:15
**darkness** [1] - 24:5
**date** [25] - 6:23, 8:24, 16:6, 16:8, 29:20, 29:22, 70:12, 70:13, 81:6, 92:20, 100:16, 102:1, 106:25, 107:1, 117:2, 117:14, 120:2, 134:23, 139:14, 158:12, 203:11, 203:12, 234:24, 234:25, 239:3
**dated** [9] - 55:14, 123:24, 163:20, 193:13, 197:2, 199:20, 211:5, 217:25, 228:10
**Dated** [1] - 239:13
**dates** [2] - 203:5, 214:19
**daughter** [1] - 78:3
**Davis** [1] - 1:16
**day-and-a-half** [1] - 65:17
**days** [11] - 79:1, 80:15, 82:7, 90:22, 92:4, 124:11, 132:9, 158:1, 172:6, 181:24, 219:8
**days'** [1] - 80:11
**deadbolt** [15] - 73:25, 105:22, 107:7, 107:8, 118:16, 120:20, 121:5, 121:11, 143:18, 144:13, 145:5, 152:8, 153:22, 155:11, 156:6
**deadbolt's** [1] -

154:11
**deadbolts** [1] - 153:17
**deadlock** [1] - 156:6
**deal** [3] - 90:2, 98:3, 136:22
**dealing** [1] - 83:20
**Dean** [24] - 35:21, 36:2, 37:20, 41:14, 41:20, 43:24, 44:25, 45:15, 46:16, 51:24, 52:7, 52:16, 52:24, 53:9, 54:20, 55:23, 56:1, 64:17, 65:2, 65:21, 66:7, 100:23, 100:24, 231:2
**December** [11] - 95:20, 130:19, 131:10, 164:9, 173:12, 178:25, 179:14, 188:6, 191:4, 203:8, 206:13
**decide** [2] - 9:1, 238:6
**decided** [1] - 56:11
**deciding** [1] - 211:19
**decision** [3] - 160:11, 231:15, 235:15
**deck** [4] - 17:4, 17:9, 17:11, 18:19
**decor** [2] - 9:21, 9:23
**deductible** [1] - 200:15
**deem** [1] - 136:4
**deemed** [1] - 112:2
**Defendant** [3] - 1:7, 1:18, 3:4
**defender** [1] - 162:24
**definitive** [1] - 151:15
**definitively** [4] - 186:20, 186:22, 187:1, 187:12
**degree** [15] - 9:6, 9:8, 9:13, 10:3, 10:12, 11:4, 69:13, 69:23, 159:15, 160:4, 160:6, 194:24, 195:22, 196:22, 231:21
**delays** [1] - 138:9
**denied** [5] - 155:16, 183:9, 184:6, 185:20, 185:21
**Dentons** [1] - 1:16
**deny** [1] - 225:6
**denying** [2] - 207:21, 224:13
**department** [3] - 161:15, 189:8, 189:10
**Department** [15] - 101:4, 101:9,

101:12, 102:7, 104:2, 104:11, 104:24, 143:7, 147:17, 186:25, 188:18, 188:24, 191:9, 191:11, 202:8
**depicted** [3] - 15:24, 17:1, 30:21
**depicting** [1] - 15:13
**deposition** [16] - 3:17, 5:17, 6:12, 6:17, 13:12, 49:18, 79:23, 94:3, 101:10, 109:19, 220:9, 230:22, 238:8, 238:18, 239:7, 239:10
**Deposition** [1] - 238:23
**DEPOSITION** [1] - 1:8
**depression** [4] - 97:11, 97:18, 97:20, 167:21
**depth** [3] - 149:10, 149:12, 213:5
**derived** [1] - 34:11
**Des** [3] - 1:9, 1:13, 1:17
**describe** [1] - 22:1
**described** [3] - 29:4, 29:5
**description** [4] - 20:21, 29:10, 29:11, 29:12
**Description** [5] - 27:7, 27:25, 99:1, 99:9, 100:13
**Descriptive** [4] - 20:22, 25:16, 25:17, 98:25
**designated** [1] - 16:2
**desired** [1] - 45:17
**detail** [2] - 63:12, 233:6
**detailed** [1] - 29:11
**details** [3] - 63:9, 80:4, 104:13
**detective** [1] - 101:18
**determine** [1] - 111:9
**determined** [3] - 84:6, 186:20, 187:1
**devices** [7] - 60:5, 60:15, 61:13, 61:15, 61:18, 61:22, 62:3
**devote** [1] - 46:20
**DeVries** [1] - 13:8
**diagnosed** [1] - 97:9
**diagram** [3] - 15:21, 15:24, 17:2
**dialogue** [7] - 37:7,

44:10, 44:18, 72:10, 78:14, 110:18, 139:7
**diary** [1] - 117:8
**dictated** [1] - 193:7
**difference** [5] - 43:8, 99:20, 125:19, 125:23, 128:6
**different** [21] - 25:17, 52:14, 52:16, 59:7, 89:4, 100:2, 100:5, 126:2, 130:23, 149:13, 149:20, 149:23, 155:25, 156:11, 168:6, 168:7, 184:11, 200:21, 207:15, 221:20, 232:1
**differential** [2] - 26:16, 26:25
**differently** [5] - 79:20, 115:1, 221:13, 221:17, 222:3
**difficult** [4] - 102:12, 159:8, 167:24, 170:7
**difficulty** [1] - 127:17
**dining** [1] - 16:22
**direct** [2] - 64:13, 98:23
**directed** [2] - 71:6, 191:15
**directing** [2] - 147:3, 154:21
**direction** [1] - 239:7
**directly** [4] - 14:9, 46:10, 181:10, 189:10
**Director** [1] - 212:20
**disagree** [7] - 28:5, 29:3, 29:7, 31:6, 122:25, 123:2, 207:18
**disciplinary** [7] - 130:6, 130:10, 131:1, 131:19, 131:21, 209:3, 230:6
**discipline** [1] - 187:5
**Discriminating** [2] - 109:4, 115:12
**discrimination** [2] - 12:15, 140:11
**discuss** [23] - 36:13, 41:11, 42:1, 44:15, 47:1, 49:17, 82:17, 92:21, 93:4, 93:9, 107:3, 132:18, 147:4, 155:18, 157:9, 165:13, 165:25, 166:19, 166:24, 167:9, 170:10, 171:12,

229:12
**discussed** [26] - 14:7, 41:13, 52:10, 54:20, 68:11, 68:13, 78:18, 78:19, 80:13, 84:24, 88:20, 89:25, 101:4, 107:13, 117:17, 170:24, 190:14, 190:16, 200:13, 202:1, 202:5, 202:11, 207:12, 221:6, 226:4, 226:21
**discussing** [4] - 49:17, 84:15, 91:20, 206:13
**discussion** [13] - 20:9, 41:9, 61:1, 67:15, 67:17, 69:8, 98:7, 122:16, 123:20, 128:10, 165:20, 203:15, 238:20
**discussions** [2] - 57:19, 145:10
**disgust** [1] - 111:13
**display** [1] - 160:3
**displayed** [1] - 160:21
**disposal** [2] - 46:3
**dispute** [3] - 143:23, 152:14, 152:18
**disputing** [1] - 172:23
**district** [1] - 194:4
**DISTRICT** [2] - 1:1, 1:1
**doctor** [1] - 96:20
**document** [14] - 6:2, 20:17, 25:8, 29:2, 35:9, 74:25, 79:22, 104:22, 153:8, 182:9, 182:12, 230:20, 230:21, 231:2
**documentation** [4] - 181:7, 183:2, 183:3, 183:6
**documents** [30] - 5:11, 5:13, 5:25, 6:1, 25:7, 25:12, 25:21, 35:13, 41:1, 100:2, 100:4, 105:2, 105:5, 144:25, 148:6, 149:6, 149:7, 149:18, 149:19, 180:18, 180:22, 182:20, 182:21, 183:11, 183:15, 212:1, 228:7, 229:23, 230:1
**done** [51] - 18:6, 33:22, 34:1, 34:10, 36:24, 42:23, 47:14, 49:3, 51:3, 51:16,

54:4, 55:3, 55:17, 57:16, 57:21, 57:23, 58:1, 58:9, 60:9, 83:17, 91:10, 96:3, 98:21, 105:22, 106:3, 106:24, 107:11, 114:17, 119:8, 133:10, 134:18, 139:13, 139:19, 150:15, 151:25, 155:24, 157:5, 157:21, 160:15, 173:15, 184:3, 185:25, 188:8, 190:12, 190:13, 192:23, 193:18, 196:11, 197:4, 222:2, 238:18
**Donna** [16] - 64:17, 65:1, 65:5, 65:7, 65:8, 65:9, 65:14, 66:21, 67:2, 67:16, 67:22, 68:7, 68:11, 87:14, 89:3, 89:6
**door** [77] - 17:12, 18:13, 18:17, 19:23, 20:25, 21:1, 21:13, 21:17, 21:22, 21:24, 22:4, 22:5, 23:13, 23:18, 24:25, 25:1, 26:4, 26:5, 26:6, 28:2, 51:7, 51:10, 51:12, 56:5, 56:24, 56:25, 57:2, 58:19, 58:21, 58:22, 59:1, 59:2, 59:5, 59:8, 73:14, 73:19, 73:25, 74:1, 74:7, 74:11, 74:20, 75:7, 84:3, 85:17, 106:21, 107:5, 114:10, 114:11, 117:17, 118:15, 118:17, 119:14, 119:16, 120:8, 121:6, 124:6, 125:4, 125:6, 125:9, 127:11, 128:12, 133:12, 133:13, 133:17, 133:20, 133:22, 144:13, 152:8, 156:14, 168:21, 169:1, 169:2, 169:13, 202:6, 221:21
**DoorDashing** [1] - 95:7
**doorknob** [2] - 23:1, 23:2
**doors** [10] - 19:3, 19:6, 31:22, 56:19, 56:21,

56:22, 106:22, 118:5, 125:9, 134:1
**doorway** [14] - 21:8, 21:10, 22:23, 22:25, 23:5, 23:11, 23:15, 23:17, 24:3, 26:1, 99:19, 110:10, 111:1, 178:19
**dormitory** [1] - 14:11
**double** [1] - 182:25
**down** [23] - 4:4, 83:14, 84:4, 111:14, 123:23, 124:3, 134:12, 146:22, 176:19, 177:13, 194:14, 194:15, 211:6, 217:15, 221:10, 222:7, 222:11, 222:20, 223:4, 224:2, 230:6, 230:13, 239:6
**download** [1] - 148:22
**downplayed** [4] - 222:14, 223:8, 223:12, 224:2
**Dr** [5] - 93:20, 93:24, 95:8, 95:17, 96:13
**draft** [2] - 200:9, 201:6
**drafted** [2] - 10:19, 11:9
**drunken** [2] - 169:20, 170:2
**Dubuque** [41] - 2:21, 7:20, 39:18, 61:20, 100:23, 101:3, 101:9, 101:11, 102:7, 102:19, 103:1, 103:11, 104:2, 104:10, 104:24, 124:23, 132:17, 132:21, 141:21, 143:6, 143:15, 147:16, 147:18, 147:20, 160:24, 161:5, 161:18, 172:19, 172:21, 173:7, 173:9, 186:25, 188:13, 188:17, 188:24, 191:2, 191:5, 191:9, 191:11, 202:8, 236:11
**due** [5] - 43:11, 52:25, 200:15, 229:5
**duly** [2] - 3:4, 239:4
**during** [30] - 5:17, 62:19, 62:20, 63:5, 72:7, 73:15, 73:23, 76:20, 77:6, 77:14,

77:19, 78:8, 88:20, 90:15, 95:3, 95:5, 95:12, 101:10, 109:19, 113:24, 123:4, 129:13, 129:14, 130:20, 131:13, 156:3, 195:18, 206:22, 207:5, 216:19
**During** [1] - 200:12
**duty** [1] - 32:17

# E

**E-mail** [1] - 2:19
**e-mail** [224] - 35:3, 35:22, 36:10, 37:1, 37:8, 37:19, 38:7, 40:16, 40:18, 40:20, 41:12, 41:15, 41:17, 41:21, 42:19, 43:2, 43:3, 43:9, 44:8, 44:25, 45:5, 45:6, 45:7, 45:10, 45:15, 45:22, 47:3, 47:8, 47:10, 47:16, 47:22, 48:13, 48:16, 49:16, 49:21, 49:22, 51:1, 55:13, 55:19, 56:2, 57:5, 58:3, 58:6, 60:3, 60:10, 60:19, 61:5, 61:11, 62:9, 62:14, 64:16, 64:18, 65:6, 66:6, 70:19, 71:3, 71:6, 71:10, 75:15, 76:23, 77:9, 78:13, 82:16, 83:11, 83:12, 83:20, 84:5, 84:9, 84:12, 84:22, 87:11, 87:14, 87:16, 87:20, 87:22, 89:10, 91:4, 91:9, 92:3, 116:3, 116:8, 116:13, 118:23, 118:25, 119:6, 119:10, 119:22, 119:25, 120:7, 120:17, 120:24, 121:19, 123:23, 124:3, 124:4, 131:10, 134:8, 134:13, 137:4, 137:12, 137:14, 139:17, 139:21, 140:4, 142:3, 142:8, 142:11, 144:19, 145:7, 148:1, 149:1, 149:2, 149:24, 150:10, 150:18, 151:1, 151:4, 151:20, 151:22,
153:23, 154:15, 155:8, 156:2, 156:19, 156:25, 157:5, 157:12, 157:13, 157:23, 157:25, 158:4, 158:9, 158:13, 163:4, 163:16, 163:20, 164:3, 164:5, 164:6, 164:7, 164:8, 164:9, 164:12, 165:11, 165:22, 166:21, 166:22, 170:6, 170:13, 170:15, 170:18, 173:12, 173:17, 175:3, 175:13, 175:16, 176:2, 177:14, 178:8, 178:25, 179:14, 179:16, 183:9, 184:18, 184:20, 184:21, 185:22, 186:3, 188:5, 189:3, 190:6, 190:7, 191:3, 193:12, 193:16, 193:20, 194:13, 197:1, 197:10, 197:22, 199:7, 203:8, 204:25, 206:23, 207:2, 209:4, 209:13, 209:22, 210:5, 210:20, 210:21, 211:2, 211:4, 211:6, 211:7, 212:16, 212:24, 217:25, 218:5, 218:13, 219:8, 219:21, 221:3, 222:9, 224:3, 226:18, 226:19, 226:23, 227:2, 227:7, 227:11, 228:1, 228:8, 228:9, 228:17, 228:18, 228:19, 229:2, 229:13, 232:8, 232:9
**e-mailed** [1] - 182:22
**e-mailing** [5] - 135:11, 156:23, 157:1, 163:5, 163:7
**e-mails** [53] - 44:18, 46:14, 49:19, 49:22, 55:10, 61:21, 64:12, 66:25, 68:2, 70:17, 80:11, 82:18, 82:19, 82:24, 83:1, 101:4, 106:1, 137:18, 139:3, 139:7, 148:15, 148:23,
149:2, 149:14, 149:19, 149:23, 156:17, 161:24, 163:25, 164:5, 164:18, 179:2, 179:5, 183:1, 183:20, 198:16, 198:21, 203:3, 203:6, 203:7, 203:24, 204:17, 208:24, 208:25, 213:5, 213:6, 213:9, 214:15, 219:20, 220:22, 223:17, 224:25, 230:16
**early** [13] - 17:15, 18:2, 70:9, 73:10, 103:5, 129:21, 130:15, 131:8, 131:9, 137:19, 202:25, 204:4
**earn** [1] - 9:6
**easier** [1] - 4:10
**Eats** [1] - 95:7
**education** [7] - 9:14, 10:3, 50:16, 161:15, 196:23, 231:22, 231:25
**educational** [3] - 12:13, 195:20, 195:21
**effect** [3] - 117:19, 182:14, 224:11
**effective** [2] - 122:22, 184:15
**efforts** [3] - 194:8, 194:10, 194:11
**egress** [1] - 16:25
**either** [21] - 17:20, 17:21, 27:22, 38:4, 47:24, 67:25, 77:25, 90:4, 97:11, 97:17, 104:22, 130:11, 140:2, 153:3, 171:5, 175:6, 177:24, 182:24, 229:11, 236:19, 237:25
**either/or** [1] - 230:2
**Elaine** [4] - 40:18, 41:4, 41:6, 201:8
**elementary** [2] - 9:14, 196:23
**elevator** [2] - 127:13, 127:15
**elevators** [4] - 126:9, 126:19, 126:22, 127:3
**elimination** [1] - 225:25
**emergency** [1] - 52:22
**emotional** [2] - 78:8, 212:6
**employed** [4] - 9:18, 9:19, 239:10, 239:11
**employee** [1] - 239:11
**employees** [1] - 115:3
**employment** [2] - 8:7, 10:10
**encounters** [2] - 24:16, 24:19
**end** [4] - 66:21, 81:14, 148:22, 208:21
**ended** [4] - 21:7, 177:9, 196:4, 229:25
**ending** [2] - 191:19, 226:15
**endorsement** [1] - 9:14
**enforced** [1] - 232:4
**enforcement** [2] - 174:12, 174:19
**enrollment** [1] - 172:19
**enter** [8] - 59:3, 62:25, 125:14, 126:5, 169:4, 181:11, 208:13, 225:20
**entered** [48] - 22:24, 31:12, 51:12, 56:9, 56:14, 59:5, 59:7, 63:1, 73:11, 76:1, 76:16, 79:3, 79:10, 79:11, 80:1, 84:3, 85:21, 86:7, 86:14, 127:7, 127:18, 129:3, 129:12, 129:20, 131:4, 147:21, 175:21, 180:21, 181:18, 183:8, 183:14, 183:17, 183:21, 184:13, 185:9, 186:21, 187:2, 187:23, 205:2, 205:7, 205:17, 206:19, 207:8, 207:11, 207:20, 208:3, 208:9, 225:18
**entering** [30] - 17:12, 51:9, 56:16, 59:15, 85:18, 103:13, 110:11, 111:23, 126:3, 126:4, 126:14, 127:9, 127:21, 128:24, 130:16, 130:19, 131:11, 133:18, 173:19, 173:20, 175:23, 178:18, 182:16, 187:12,
187:21, 200:23, 206:24, 208:18, 216:11, 223:22
**enters** [2] - 110:3, 127:11
**entire** [6] - 25:20, 128:5, 132:2, 167:2, 201:14, 220:25
**entitled** [1] - 193:14
**entrance** [5] - 18:19, 27:22, 56:21, 118:17, 125:15
**entrances** [2] - 58:22, 58:24
**entranceway** [1] - 127:24
**entries** [2] - 125:20, 202:9
**entry** [10] - 16:17, 16:18, 17:2, 27:22, 27:23, 51:20, 74:23, 125:2, 125:8, 147:17
**entryway** [2] - 126:17, 127:2
**equates** [1] - 110:1
**equipment** [2] - 106:2, 224:22
**equipped** [1] - 125:3
**equivalent** [1] - 97:22
**Erikson** [1] - 13:8
**errands** [1] - 18:8
**essence** [2] - 47:21, 195:16
**essentially** [7] - 31:7, 194:7, 198:21, 199:8, 213:1, 225:17, 235:19
**established** [4] - 65:16, 164:22, 188:13, 205:16
**estimates** [1] - 152:9
**et** [3] - 5:12, 124:7, 133:25
**evaluated** [1] - 231:4
**evaluation** [1] - 170:9
**evening** [7] - 17:15, 18:9, 18:13, 21:20, 25:2, 59:5, 59:11
**evening"** [1] - 40:17
**event** [2] - 130:4, 215:24
**events** [2] - 102:21, 133:6
**eventually** [4] - 132:13, 195:22, 195:25, 196:22
**evidence** [6] - 103:21, 150:7, 152:14, 152:16, 153:8, 178:22

**exact** [24] - 19:14, 27:4, 40:11, 54:10, 63:12, 69:20, 70:6, 73:22, 76:3, 92:20, 101:23, 106:25, 107:1, 117:2, 117:5, 120:2, 123:4, 152:25, 158:12, 189:9, 189:23, 191:17, 214:19, 236:15
**exact..** [1] - 96:16
**exactly** [11] - 6:9, 63:8, 68:17, 77:2, 77:4, 90:16, 107:19, 133:4, 158:9, 177:1, 188:23
**examination** [2] - 192:5, 239:6
**EXAMINATION** [1] - 3:7
**examined** [2] - 3:5, 239:6
**example** [5] - 106:18, 111:12, 127:7, 127:14, 221:24
**except** [1] - 151:15
**exchange** [4] - 150:18, 164:18, 213:9, 214:1
**exchanged** [5] - 49:24, 80:11, 148:16, 196:19, 209:1
**exchanges** [1] - 156:20
**excuse** [8] - 37:20, 44:4, 132:16, 141:19, 146:18, 149:22, 222:5, 232:22
**Excuse** [1] - 211:6
**excused** [1] - 217:4
**exhibit** [7] - 25:5, 43:1, 74:19, 87:6, 98:11, 98:13, 115:23
**exhibits** [3] - 15:1, 87:5, 102:16
**exists** [1] - 182:12
**exited** [1] - 25:25
**expect** [3] - 214:25, 215:6, 215:8
**expedited** [1] - 194:3
**experience** [6] - 113:16, 173:9, 210:12, 210:17, 210:25, 215:2
**explain** [2] - 6:15, 82:24
**explained** [6] - 59:13,

113:3, 190:23, 216:22, 225:14, 226:7
**explaining** [1] - 171:11
**explanation** [3] - 122:21, 122:24, 122:25
**express** [1] - 72:24
**expressed** [5] - 86:23, 152:5, 172:17
**expressing** [2] - 36:1, 36:6
**extended** [1] - 94:18
**extensive** [1] - 219:19
**extent** [5] - 10:23, 11:23, 11:24, 126:11, 178:13
**exterior** [5] - 18:19, 57:11, 106:21, 118:6, 142:16
**extra** [7] - 34:5, 34:14, 57:17, 57:18, 57:20, 84:7, 202:7
**extremely** [3] - 78:3, 78:4, 212:6
**eyes** [2] - 21:7, 24:5

## F

**Fabricius** [4] - 161:1, 161:14, 193:13, 194:16
**face** [12] - 66:14, 66:18, 66:20, 184:8, 184:21, 186:2
**face-to-face** [2] - 66:18, 184:8
**faced** [1] - 159:9
**facilitate** [2] - 160:23, 161:20
**facility** [1] - 57:12
**facing** [1] - 19:22
**fact** [8] - 48:2, 55:25, 59:24, 68:7, 90:5, 111:25, 112:15, 113:1, 138:1, 138:3, 141:19, 144:21, 154:15, 163:25, 185:7, 187:5, 212:25, 236:7
**factors** [1] - 153:18
**facts** [3] - 32:12, 182:19, 185:6
**failed** [2] - 171:11, 204:23
**failure** [11] - 200:15, 201:2, 201:25, 202:3, 202:12, 202:14, 202:15,

202:16, 202:17, 202:19, 202:20
**failures** [1] - 201:20
**fair** [33] - 5:5, 6:19, 6:20, 10:15, 44:20, 44:21, 46:24, 47:2, 48:12, 55:23, 65:14, 66:15, 107:22, 115:10, 135:18, 138:6, 142:2, 152:21, 154:13, 156:16, 167:2, 183:19, 187:20, 190:21, 190:25, 195:23, 204:12, 214:23, 224:3, 225:8, 231:10, 233:14
**fairness** [2] - 155:10, 168:8
**fall** [16] - 95:22, 95:25, 96:7, 132:2, 155:18, 159:13, 191:20, 195:4, 195:5, 195:8, 195:14, 195:18, 195:25, 197:8, 197:12, 199:2
**false** [5] - 80:6, 123:6, 123:8, 123:11, 123:13
**familiar** [4] - 219:1, 228:17, 228:18, 233:3
**family** [6] - 94:25, 116:20, 138:5, 145:21, 155:21, 156:12
**far** [3] - 27:18, 27:20, 208:17
**fashion** [1] - 237:24
**father** [1] - 39:8
**fault** [7] - 113:19, 114:10, 114:18, 115:5, 132:25, 133:3, 169:4
**fearful** [2] - 31:14, 132:22
**fears** [2] - 222:14, 223:9
**February** [16] - 209:2, 211:5, 211:8, 212:16, 214:18, 217:25, 218:24, 219:9, 219:10, 219:22, 220:18, 221:5, 222:4, 226:20, 226:21, 227:8
**federal** [1] - 237:13
**Federal** [1] - 237:20

**feedback** [1] - 138:6
**fell** [2] - 19:13, 19:17
**felt** [29] - 30:22, 39:23, 62:21, 79:17, 80:7, 81:5, 106:10, 107:25, 113:16, 117:22, 123:7, 123:12, 133:6, 139:7, 139:11, 139:12, 142:6, 162:2, 167:4, 167:6, 167:11, 168:20, 169:11, 171:1, 182:23, 216:10
**female** [14] - 2:19, 83:24, 99:25, 109:5, 113:11, 113:15, 113:17, 114:12, 114:16, 114:17, 114:24, 115:1, 115:13, 133:25
**females** [3] - 28:25, 179:1, 205:10
**Fett** [18] - 12:1, 134:13, 136:15, 136:19, 136:21, 140:2, 150:18, 156:20, 163:6, 163:20, 163:22, 164:19, 165:23, 167:16, 168:10, 179:22, 228:13, 228:20
**Fett's** [2] - 165:11, 170:13
**few** [15] - 3:19, 15:2, 69:15, 69:18, 80:13, 80:14, 84:3, 85:18, 105:11, 113:10, 138:12, 174:9, 203:7, 213:7, 223:17
**fifth** [2] - 145:19, 145:25
**figure** [4] - 22:3, 24:4, 99:19, 188:24
**figured** [1] - 53:6
**file** [4] - 135:6, 147:14, 147:15, 147:21
**filed** [18] - 3:16, 10:16, 79:22, 122:2, 138:25, 139:1, 139:2, 140:18, 140:24, 140:25, 141:1, 144:1, 144:22, 148:19, 155:9, 209:21, 229:23
**filing** [1] - 147:17
**fill** [1] - 100:13
**filled** [5] - 100:8,

100:16, 141:8, 196:19, 196:21
**final** [6] - 122:10, 122:11, 231:15, 238:3, 238:8
**finally** [6] - 4:19, 4:25, 146:22, 147:12, 219:15, 225:8
**finals** [6] - 191:18, 191:21, 191:22, 192:2, 192:4, 192:8
**financial** [3] - 171:19, 198:22, 199:9
**financially** [1] - 239:12
**findings** [1] - 103:18
**fine** [13] - 15:2, 81:21, 98:1, 98:2, 104:7, 169:22, 219:1, 219:2, 219:4, 233:12, 238:7, 238:13, 238:16
**finish** [3] - 50:15, 81:19, 201:19
**finished** [3] - 96:7, 181:14
**finishing** [1] - 104:7
**fire** [10] - 121:10, 121:11, 121:16, 121:18, 153:19, 154:16, 155:2, 155:17, 155:19, 155:23
**Firm** [1] - 1:13
**firm** [1] - 1:16
**First** [2] - 112:15, 128:7
**first** [66] - 3:4, 3:22, 6:3, 15:14, 17:6, 20:23, 26:8, 26:9, 26:11, 27:6, 29:21, 32:10, 33:25, 35:12, 37:12, 37:18, 47:22, 48:1, 55:25, 56:5, 59:1, 61:11, 79:17, 82:3, 83:19, 84:7, 86:11, 91:12, 95:16, 99:8, 115:10, 115:14, 119:12, 120:6, 120:19, 137:22, 137:23, 142:7, 142:14, 142:20, 149:6, 150:25, 152:3, 153:21, 154:10, 163:4, 165:22, 166:13, 170:21, 171:14, 173:18, 174:14, 178:15, 198:3, 200:12, 202:21, 204:1,

206:11, 207:13, 219:12, 219:13, 226:19, 228:12, 233:8, 233:10, 237:15

**five** [19] - 13:3, 13:18, 13:22, 26:22, 28:13, 28:15, 50:12, 50:14, 50:18, 50:21, 52:19, 75:6, 89:21, 90:22, 191:8, 194:15, 204:21, 205:5, 205:8

**five-year** [2] - 52:19, 89:21

**fixing** [1] - 102:5

**fled** [3] - 110:21, 110:25, 111:22

**flexibility** [2] - 160:3, 160:21

**flip** [1] - 210:22

**floor** [7] - 15:14, 17:6, 59:1, 84:7, 126:7, 127:5, 127:13

**fob** [31] - 58:4, 58:19, 58:21, 58:23, 58:25, 59:15, 59:24, 84:2, 84:23, 85:1, 85:3, 85:6, 85:17, 85:24, 107:18, 125:8, 125:21, 127:11, 127:19, 128:12, 128:14, 128:18, 128:20, 129:2, 129:7, 129:11, 181:9, 185:1, 185:7, 185:8, 202:9

**fob-in** [2] - 125:21, 181:9

**fobbed** [17] - 59:6, 59:8, 59:19, 59:25, 125:2, 125:20, 129:17, 129:19, 129:22, 130:14, 131:3, 131:7, 131:13, 131:22, 142:20, 142:25, 143:3

**fobbed-entry** [1] - 125:2

**fobbing** [3] - 126:3, 127:23, 128:23

**fobs** [5] - 125:21, 127:21, 128:3, 128:4, 128:8

**focus** [6] - 23:12, 23:13, 69:5, 79:18, 113:9, 130:4

**focused** [1] - 221:20

**focuses** [1] - 220:13

**focusing** [1] - 100:20

**folks** [3] - 46:1, 49:25, 153:2

**follow** [11] - 10:13, 36:24, 56:1, 87:7, 103:16, 113:21, 170:14, 170:19, 183:9, 184:9, 237:7

**follow-up** [4] - 113:21, 170:14, 170:19, 183:9

**followed** [5] - 82:7, 159:15, 165:6, 186:1, 225:1

**following** [9] - 46:23, 55:21, 81:3, 86:13, 87:18, 178:1, 181:24, 223:11, 226:18

**follows** [1] - 3:6

**food** [3] - 198:1, 198:2

**footage** [1] - 102:11

**FOR** [1] - 1:1

**forced** [3] - 27:21, 27:23, 74:23

**form** [3] - 118:10, 181:20, 184:16

**forth** [30] - 44:19, 63:11, 67:12, 67:19, 74:1, 78:1, 82:20, 85:1, 91:8, 106:3, 118:7, 120:1, 120:5, 120:9, 148:13, 153:19, 199:7, 202:10, 207:3, 207:24, 213:20, 214:20, 215:1, 220:23, 227:8, 227:20, 227:22, 231:2, 231:14, 231:23

**forward** [7] - 54:19, 131:18, 162:7, 162:8, 162:14, 177:12, 233:13

**foundation** [3] - 118:10, 181:20, 184:16

**four** [11] - 8:20, 9:8, 14:16, 16:16, 46:1, 46:10, 47:17, 92:4, 113:24, 165:22, 166:13

**four-year** [2] - 8:20, 9:8

**fourth** [1] - 143:17

**franchises** [1] - 124:22

**friend** [1] - 30:15

**friends** [2] - 14:3, 17:22

**frightened** [1] - 30:13

**frightening** [2] - 109:23, 109:24

**front** [15] - 18:12, 18:17, 21:1, 21:12, 26:6, 28:2, 58:19, 58:21, 59:5, 87:8, 115:22, 128:12, 179:23, 192:6, 218:6

**fuck** [1] - 110:24

**full** [21] - 3:9, 8:20, 35:6, 50:24, 90:16, 91:12, 141:17, 141:18, 142:21, 143:8, 146:1, 146:23, 159:11, 159:12, 170:8, 172:22, 181:3, 185:22, 221:8

**full-rounded** [1] - 172:22

**full-time** [1] - 159:12

**fully** [3] - 25:8, 50:6, 168:1

**future** [2] - 10:9, 10:12

## G

**game** [1] - 132:8

**Garfoot** [12] - 42:5, 43:13, 47:9, 60:4, 70:19, 107:3, 119:6, 151:5, 164:25, 165:3, 166:2, 166:12

**Garfoot's** [1] - 42:8

**garlands** [1] - 9:24

**gather** [1] - 55:24

**gathered** [1] - 227:12

**gathering** [2] - 145:6, 145:13, 145:16

**gender** [1] - 12:16

**general** [8] - 16:15, 62:15, 96:21, 96:22, 123:17, 193:5, 194:1, 201:16

**generally** [5] - 16:20, 16:21, 58:17, 77:16, 236:12

**generic** [1] - 97:22

**genitals** [1] - 111:15

**gestures** [1] - 111:8

**given** [21] - 54:11, 61:22, 66:25, 80:10, 106:20, 108:5, 108:6, 128:24, 129:12, 129:24, 139:7, 148:10, 160:22, 161:4, 182:19, 190:22, 211:23, 216:18,

229:9, 230:18, 239:8

**Given** [1] - 229:4

**Gmail** [1] - 149:24

**goal** [2] - 5:22, 46:21

**gosh** [1] - 159:5

**governed** [1] - 153:18

**graduate** [2] - 8:17, 9:10

**graduated** [3] - 8:14, 13:20, 96:10

**graduation** [1] - 94:11

**GRAL** [2] - 1:16, 134:6

**Gral** [1] - 3:13

**Grand** [2] - 1:9, 1:13

**granted** [1] - 196:22

**gratification** [1] - 111:17

**great** [2] - 36:24, 50:4

**greatest** [1] - 104:19

**ground** [8] - 3:19, 6:16, 17:7, 17:10, 148:9, 196:3, 211:16, 225:12

**grounds** [1] - 57:12

**group** [1] - 167:13

**grouping** [1] - 101:6

**Grove** [1] - 7:17

**guard** [1] - 74:22

**guess** [4] - 6:23, 78:9, 108:2, 191:19

**guest** [1] - 125:2

## H

**H-a-r-k-i-n-s** [1] - 93:17

**hair** [2] - 22:6, 22:13, 109:21

**half** [5] - 6:3, 65:17, 102:23, 199:23

**halfway** [1] - 41:21

**hall** [7] - 14:10, 131:2, 184:13, 186:11, 187:21, 205:2, 206:13, 206:14, 206:19, 207:7, 208:12, 209:3, 211:13, 211:20, 217:6, 230:5, 231:2

**Hall** [26] - 94:22, 129:19, 129:22, 130:6, 130:14, 131:13, 163:24, 175:18, 175:21, 177:9, 180:2, 180:8, 180:20, 181:10, 182:10, 182:15, 182:22, 183:7, 183:21, 184:4,

186:20, 186:22, 187:2, 206:2, 208:10, 229:16

**halls** [1] - 55:5

**hallway** [2] - 71:21, 185:24

**hallways** [9] - 27:9, 27:14, 27:16, 32:5, 51:20, 118:18, 126:13, 127:18, 185:21

**hand** [8] - 15:20, 15:24, 22:4, 22:25, 23:2, 74:5, 123:21, 155:1

**handbook** [5] - 110:3, 112:4, 112:8, 133:24, 223:21

**handed** [2] - 230:6, 230:13

**handle** [1] - 22:4

**handled** [2] - 138:24, 220:10

**handling** [1] - 136:16

**harassment** [3] - 110:5, 112:7, 223:24

**hard** [1] - 151:16

**Harkins** [1] - 93:18

**HARKINS** [1] - 93:19

**Harper** [1] - 8:22

**Harrick** [3] - 93:13, 93:14

**head** [8] - 35:18, 37:11, 113:8, 126:18, 179:10, 185:11, 187:14, 217:15

**header** [1] - 64:21

**Heald** [10] - 64:17, 65:1, 65:5, 66:21, 67:3, 67:16, 67:22, 68:11, 87:14, 89:3

**health** [1] - 97:7

**hear** [2] - 134:24, 230:9

**heard** [18] - 20:23, 21:11, 48:8, 51:11, 69:8, 111:7, 138:18, 138:22, 139:9, 139:11, 163:2, 168:18, 188:1, 202:23, 204:2, 213:3, 220:9, 231:4

**hearing** [43] - 7:6, 21:5, 53:19, 130:6, 130:10, 131:1, 131:19, 131:21, 187:11, 204:15, 209:3, 210:7, 210:15, 210:25,

APP 668

211:10, 211:12, 211:18, 211:19, 211:24, 211:25, 212:10, 212:11, 212:13, 212:21, 213:2, 213:10, 213:19, 214:22, 215:16, 215:20, 215:22, 215:25, 216:2, 216:19, 217:2, 229:16, 229:17, 229:25, 230:3, 230:7, 231:3, 231:7, 231:19

**hearsay** [1] - 205:9

**heavily** [1] - 114:9

**height** [1] - 22:5

**Heights** [13] - 7:17, 7:18, 7:25, 8:13, 38:24, 160:16, 161:3, 161:18, 194:4, 196:4, 196:10, 196:21, 197:21

**held** [9] - 20:9, 41:9, 61:1, 66:13, 98:7, 123:20, 165:20, 203:15, 238:20

**Hello** [3] - 157:19, 163:22, 232:16

**help** [16] - 36:3, 36:7, 36:13, 36:15, 36:24, 54:5, 54:11, 68:19, 90:18, 92:13, 116:20, 158:9, 200:9, 201:6, 212:22, 213:1

**helped** [2] - 161:2, 177:12

**helpful** [1] - 201:8

**helping** [1] - 36:21

**Herald** [2] - 2:21, 236:11

**hereby** [1] - 239:2

**herein** [2] - 3:3, 207:24

**hereinbefore** [1] - 239:3

**hereof** [1] - 239:4

**hereto** [1] - 239:12

**herself** [4] - 47:23, 48:3, 48:11, 166:2

**Hershey** [1] - 8:13

**hesitations** [1] - 151:8

**high** [1] - 8:12

**High** [1] - 8:13

**himself** [3] - 46:17, 47:4, 170:16

**hinted** [1] - 68:3

**hinting** [1] - 85:16

**history** [1] - 127:21

**hitting** [1] - 53:8

**Hmm** [1] - 186:18

**hold** [1] - 26:20

**holiday** [1] - 70:10

**home** [41] - 8:5, 9:21, 9:23, 10:7, 10:8, 17:21, 37:4, 38:18, 38:21, 38:24, 49:14, 74:20, 82:8, 82:10, 94:24, 95:24, 96:9, 120:1, 120:3, 120:4, 132:3, 132:4, 132:6, 158:4, 158:6, 158:8, 158:10, 158:12, 158:14, 158:15, 158:17, 158:19, 158:21, 159:1, 159:7, 160:2, 160:11, 160:25, 161:17, 172:4, 172:8

**hometown** [1] - 92:22

**honest** [2] - 73:8, 73:13

**honestly** [2] - 73:10, 168:2

**honor** [1] - 144:15

**hope** [2] - 39:25, 53:13

**hoped** [2] - 121:16, 156:7

**hopefully** [3] - 15:5, 87:7, 204:18

**hospitalization** [1] - 43:12

**hotel** [13] - 124:17, 124:21, 125:1, 125:5, 125:8, 125:14, 126:7, 127:5, 127:6, 127:8, 127:20, 127:22

**hour** [5] - 43:8, 73:11, 102:23, 129:21

**hours** [10] - 17:15, 33:3, 33:5, 37:17, 37:21, 37:23, 45:22, 47:17, 130:15, 140:1

**housing** [5] - 197:8, 198:1, 198:9, 198:17, 199:3

**hundreds** [2] - 228:6, 228:7

**hung** [1] - 18:7

**hysterically** [1] - 26:6

---

**I**

**idea** [7] - 59:10, 133:17, 153:21, 158:7, 171:20,

178:18, 184:22

**identification** [1] - 128:19

**identified** [6] - 59:25, 103:12, 151:4, 175:22, 178:25, 186:16

**identify** [5] - 79:2, 79:10, 99:24, 104:25, 109:18

**identifying** [1] - 102:12

**identity** [2] - 11:8, 128:24

**ignore** [1] - 138:1

**ignored** [3] - 138:4, 138:8, 138:11

**ignoring** [5] - 44:17, 48:10, 134:9, 190:5, 190:8

**Illinois** [9] - 7:22, 7:25, 8:11, 8:23, 11:12, 92:24, 94:4, 94:9, 196:5

**immediate** [1] - 10:9

**immediately** [2] - 96:4, 130:16

**impairments** [1] - 7:5

**implement** [1] - 54:25

**implication** [2] - 112:11, 231:20

**implied** [4] - 114:23, 133:8, 133:10, 171:17

**implies** [1] - 38:7

**imply** [1] - 133:5

**important** [6] - 4:4, 6:11, 6:16, 36:25, 62:18, 128:10

**importantly** [1] - 4:19

**improper** [1] - 147:17

**improperly** [5] - 51:9, 79:11, 80:1, 147:21, 182:16

**improved** [1] - 123:18

**IN** [1] - 1:1

**in's** [1] - 125:21

**in-depth** [3] - 149:10, 149:12, 213:5

**in-person** [4] - 69:16, 69:21, 70:14, 72:3

**inappropriately** [4] - 76:1, 76:16, 133:18, 220:11

**Incident** [6] - 27:6, 27:25, 98:18, 99:1, 99:9, 100:13

**incident** [122] - 12:18, 13:1, 15:17, 18:2, 20:14, 20:20, 24:23,

26:10, 26:18, 28:16, 29:4, 29:20, 29:22, 31:2, 31:3, 31:8, 31:11, 34:11, 35:23, 37:16, 38:1, 38:9, 40:9, 40:10, 40:12, 43:14, 44:12, 45:22, 46:4, 47:18, 48:5, 48:8, 49:10, 50:1, 52:11, 59:17, 60:1, 63:23, 63:24, 65:18, 66:16, 67:16, 67:20, 68:12, 68:21, 69:12, 69:15, 69:24, 70:2, 70:8, 75:25, 77:11, 79:1, 79:8, 79:24, 80:15, 87:21, 87:23, 88:21, 90:14, 90:22, 92:2, 93:5, 93:7, 93:9, 94:7, 95:18, 96:19, 97:8, 97:12, 98:3, 98:4, 100:22, 101:15, 101:21, 102:9, 104:3, 104:11, 105:14, 112:5, 113:2, 113:22, 120:4, 122:23, 129:23, 131:8, 131:14, 131:22, 133:3, 138:24, 140:6, 140:9, 140:17, 142:22, 143:4, 167:4, 167:20, 169:22, 169:23, 171:1, 174:13, 176:22, 176:23, 176:25, 184:5, 185:18, 185:19, 191:6, 197:15, 204:10, 204:13, 204:16, 205:17, 205:20, 206:23, 207:25, 208:1, 209:25, 222:5, 222:16, 233:15

**incidents** [5] - 76:15, 97:14, 133:7, 180:11, 205:1

**inclined** [1] - 186:3

**include** [2] - 175:18, 208:14

**including** [3] - 105:21, 128:15, 191:6

**income** [1] - 10:11

**incorrect** [1] - 189:1

**incorrectly** [1] - 28:11

**increase** [1] - 58:2

**increased** [5] - 57:11, 116:8, 116:14,

117:18, 142:16

**indeed** [4] - 59:14, 71:15, 75:4, 180:20

**indefinitely** [2] - 158:6, 158:20

**independently** [3] - 80:23, 81:23, 82:12

**INDEX** [1] - 2:1

**indicate** [11] - 21:24, 63:16, 105:2, 111:16, 144:3, 144:25, 146:11, 174:22, 184:24, 208:5, 237:14

**indicated** [12] - 22:12, 22:25, 113:18, 114:9, 114:13, 144:15, 154:10, 158:4, 190:9, 206:20, 208:10, 239:3

**indicated"** [1] - 154:22

**indicates** [2] - 169:25, 182:14

**indicating** [21] - 22:4, 22:6, 23:3, 25:6, 25:16, 37:8, 83:24, 89:8, 99:21, 149:14, 154:4, 154:24, 175:25, 176:1, 181:8, 205:1, 207:3, 209:9, 214:21, 218:6, 226:19

**indicating)** [1] - 166:7

**indication** [1] - 83:2

**individual** [17] - 31:23, 56:22, 79:3, 79:10, 90:24, 99:15, 99:16, 126:12, 127:4, 142:23, 175:20, 178:24, 180:21, 181:18, 182:15, 204:23, 226:1

**individuals** [4] - 83:15, 104:1, 116:13, 142:23

**inform** [2] - 86:4, 178:8

**Information** [4] - 20:22, 25:17, 98:18, 98:25

**information** [65] - 5:20, 10:25, 20:14, 22:8, 22:21, 25:18, 34:11, 59:23, 62:1, 63:4, 63:16, 63:17, 63:23, 63:25, 76:4, 76:10, 78:7, 81:11, 85:10, 100:14, 105:2, 105:7, 105:8,

107:18, 108:15, 108:20, 108:23, 109:1, 129:17, 129:18, 129:24, 141:20, 143:15, 144:24, 145:14, 145:16, 146:11, 155:7, 168:3, 170:25, 175:1, 175:2, 175:7, 176:11, 176:22, 177:11, 180:18, 184:10, 195:13, 209:7, 209:12, 209:19, 209:20, 209:24, 210:2, 215:9, 215:24, 216:14, 216:15, 216:18, 217:17, 223:15, 223:18, 229:19, 233:23

**informational** [2] - 68:22, 216:12

**informed** [13] - 26:13, 33:21, 33:24, 33:25, 39:21, 76:17, 85:14, 86:3, 87:1, 143:25, 177:8, 178:2, 231:24

**informing** [7] - 26:23, 62:10, 68:24, 174:3, 179:16, 179:21, 218:16

**ingress** [1] - 16:25

**initial** [4] - 80:21, 147:19, 171:8, 189:1

**initiate** [3] - 81:15, 106:13, 137:22

**initiated** [2] - 81:23, 171:15

**inquiries** [3] - 136:23, 138:4, 222:21

**inquiring** [2] - 65:23, 232:11

**inquiry** [1] - 184:11

**Instacarting** [1] - 95:7

**installation** [2] - 74:9, 145:21

**installed** [2] - 75:5, 146:8

**installing** [3] - 146:18, 153:17, 155:23

**instances** [2] - 82:11, 208:10

**instead** [2] - 156:8, 197:20

**institution** [1] - 12:14

**intend** [2] - 10:9, 172:10

**intended** [1] - 172:9

**intent** [2] - 110:13,

172:18

**intention** [2] - 13:15, 117:20

**intentions** [1] - 173:7

**interaction** [5] - 31:5, 32:14, 65:5, 67:19, 69:13

**interactions** [2] - 113:23, 114:2

**interested** [4] - 53:25, 61:13, 61:14, 239:12

**interests** [2] - 198:22, 199:9

**interior** [4] - 57:11, 106:22, 118:5, 142:16

**interposed** [1] - 239:8

**interpret** [10] - 30:18, 36:11, 47:2, 74:25, 75:2, 78:10, 112:10, 119:2, 119:3, 208:11

**interpretation** [4] - 48:12, 112:1, 113:7, 225:16

**interpreting** [1] - 78:11

**interrupt** [1] - 22:17

**interview** [5] - 181:13, 206:2, 206:12, 206:22, 207:5

**interviewed** [1] - 181:10

**intimate** [2] - 110:4, 223:23

**introducing** [1] - 170:16

**intruder** [13] - 59:4, 62:25, 63:17, 63:19, 63:20, 66:16, 73:11, 83:25, 104:25, 110:7, 110:19, 119:1, 200:22

**invest** [1] - 181:18

**investigate** [9] - 79:14, 79:15, 102:9, 151:11, 174:13, 174:19, 180:20, 187:5, 224:19

**investigated** [9] - 180:16, 181:3, 181:17, 182:1, 182:15, 183:20, 184:2, 186:24, 188:14

**investigating** [14] - 12:2, 79:1, 79:25, 80:6, 84:2, 118:23, 137:15, 189:15, 207:25, 208:7, 209:25, 218:17,

226:20, 233:15

**investigation** [21] - 79:9, 81:5, 81:21, 103:17, 103:18, 104:25, 108:16, 136:12, 168:17, 170:8, 175:2, 176:9, 176:23, 185:1, 187:2, 188:22, 210:6, 227:12, 232:12, 232:17, 233:21

**investigator** [4] - 165:8, 165:25, 166:20, 170:10

**investigators** [6] - 150:23, 151:3, 164:23, 166:1, 166:11

**inviting** [2] - 209:11, 210:14

**involved** [13] - 9:15, 77:3, 77:20, 78:17, 123:7, 168:14, 177:18, 177:20, 200:5, 210:8, 210:15, 211:12, 226:8

**involving** [5] - 76:18, 108:23, 156:3, 176:23, 178:9

**IOWA** [1] - 1:1

**Iowa** [8] - 1:9, 1:11, 1:13, 1:17, 7:20, 160:24, 239:2, 239:13

**irrespective** [2] - 198:6, 212:7

**issue** [11] - 24:21, 73:14, 76:22, 118:23, 118:25, 119:18, 154:8, 154:12, 155:11, 172:7, 185:15

**issues** [12] - 69:4, 138:13, 138:23, 219:15, 219:23, 219:24, 220:18, 220:25, 221:2, 221:7, 227:10, 227:22

**issuing** [1] - 56:5

**item** [3] - 74:21, 78:22, 231:23

**items** [4] - 75:2, 75:4, 75:20, 190:16

**itself** [1] - 218:13

**IX** [66] - 2:21, 11:17, 11:22, 12:3, 12:5, 12:8, 12:14, 12:17,

135:6, 136:16, 136:17, 136:22, 136:23, 137:2, 137:15, 138:25, 139:1, 139:2, 139:4, 140:20, 141:7, 141:16, 144:1, 144:22, 148:19, 150:22, 150:23, 151:9, 151:10, 151:14, 152:23, 155:9, 155:13, 157:9, 163:23, 164:19, 164:23, 165:4, 165:8, 165:10, 165:25, 166:1, 166:20, 166:25, 167:9, 167:17, 168:15, 170:10, 175:17, 179:22, 180:1, 180:15, 181:23, 186:12, 186:23, 218:17, 220:3, 220:4, 220:11, 223:12, 232:12, 235:9, 236:1, 236:4, 236:8

**J**

**Jaelynn** [1] - 13:5

**JANNES** [33] - 1:16, 3:8, 10:21, 11:1, 11:3, 12:9, 20:8, 20:10, 41:7, 41:10, 60:25, 98:9, 115:18, 118:12, 123:19, 134:7, 164:15, 165:17, 180:24, 182:2, 182:18, 183:24, 201:10, 203:13, 203:16, 208:21, 214:5, 214:10, 226:14, 237:5, 237:18, 238:11, 238:16

**Jannes** [2] - 2:3, 3:12

**January** [7] - 193:13, 197:2, 199:20, 206:3, 206:5, 209:2, 210:22

**job** [12] - 4:21, 31:18, 31:25, 32:7, 36:17, 46:22, 48:8, 60:22, 136:1, 154:21, 161:19, 201:15

**John** [2] - 8:13, 120:25

**joining** [1] - 71:25

**journey** [1] - 160:1

**July** [4] - 43:12, 96:10, 96:11

**junior** [1] - 8:20

**K**

**Kaitlyn** [1] - 13:5

**KATHERINE** [1] - 1:16

**Katie** [52] - 3:13, 36:12, 36:16, 36:19, 42:4, 42:5, 42:8, 43:13, 44:5, 47:9, 47:16, 47:21, 48:18, 49:8, 55:2, 60:4, 60:9, 60:10, 60:14, 61:21, 62:2, 68:16, 70:19, 71:11, 71:16, 71:19, 71:20, 72:6, 75:19, 75:23, 76:13, 76:20, 78:15, 78:18, 82:5, 107:2, 114:6, 115:23, 119:6, 121:23, 123:24, 129:14, 151:5, 151:10, 164:25, 166:2, 166:12, 167:25, 168:11, 168:12, 168:14, 175:11

**keep** [7] - 13:18, 101:20, 102:15, 133:21, 134:1, 214:2, 236:25

**keeping** [4] - 36:17, 36:19, 86:3, 173:7

**Keleher** [9] - 42:5, 42:8, 43:13, 47:9, 60:4, 70:19, 107:3, 119:6, 151:5

**Keleher-Garfoot** [8] - 42:5, 43:13, 47:9, 60:4, 70:19, 107:3, 119:6, 151:5

**Keleher-Garfoot's** [1] - 42:8

**Kelsey** [3] - 212:19, 214:15, 215:22

**Kenneth** [1] - 34:21

**kept** [3] - 81:6, 139:13, 172:19

**key** [7] - 56:10, 56:14, 56:16, 58:4, 107:18, 185:1, 202:9

**keyed** [1] - 57:2

**keys** [1] - 56:5

**Kiki** [1] - 105:15

**kind** [5] - 88:21, 94:19, 118:16, 123:13, 196:14

**kitchen** [5] - 14:20,

15:23, 16:17, 16:18, 225:20

**knowing** [4] - 22:2, 56:13, 180:12, 230:4
**knowledge** [33] - 14:6, 18:10, 18:23, 21:9, 34:13, 51:12, 57:23, 59:12, 59:21, 61:16, 63:15, 63:19, 65:8, 74:10, 75:13, 76:15, 81:4, 85:20, 104:4, 107:15, 126:8, 126:11, 129:9, 129:22, 131:7, 162:17, 180:12, 181:25, 185:20, 199:2, 205:23, 208:19, 239:4
**knows** [1] - 205:8
**Kostopoulos** [3] - 40:18, 41:4, 41:6
**Kruse** [1] - 194:3
**Kyle** [30] - 94:22, 129:19, 129:22, 130:6, 130:14, 130:18, 131:13, 163:24, 175:18, 175:21, 177:9, 180:2, 180:8, 180:20, 181:10, 181:23, 182:10, 182:15, 182:22, 183:7, 183:21, 184:4, 186:20, 186:22, 187:2, 205:6, 206:2, 212:13, 229:16, 230:18

**L**

**Labor** [3] - 17:20, 50:13, 70:9
**lack** [2] - 159:14, 169:11
**lady** [2] - 6:21, 212:19
**laid** [1] - 217:15
**Lake** [1] - 7:16
**language** [1] - 200:19
**laptops** [1] - 225:19
**large** [2] - 81:13, 97:5
**largest** [1] - 122:11
**last** [23] - 13:7, 13:10, 44:7, 45:14, 47:2, 62:23, 70:7, 70:10, 70:13, 109:3, 109:10, 113:9, 113:10, 138:17, 146:23, 154:25, 159:13, 161:2,

162:24, 202:22, 204:1, 225:9, 233:9
**lasted** [1] - 214:20
**late** [3] - 17:15, 103:5, 132:5
**laundry** [1] - 234:13
**law** [2] - 174:12, 174:19
**Law** [1] - 1:13
**lawsuit** [11] - 3:15, 10:16, 10:19, 11:9, 11:14, 12:19, 14:7, 14:8, 14:9, 25:22, 229:23
**lawyer** [7] - 5:16, 35:13, 41:1, 129:24, 179:8, 182:21, 224:9
**lawyers** [1] - 150:4
**layout** [4] - 15:14, 15:15, 15:19, 16:15
**layperson's** [2] - 12:5, 12:12
**lead** [2] - 136:22, 168:17
**leading** [1] - 215:22
**learn** [2] - 63:4, 85:12
**learned** [4] - 94:22, 131:20, 194:17, 230:15
**learning** [2] - 51:18, 69:13
**least** [20] - 10:9, 17:1, 23:4, 40:13, 45:6, 46:24, 55:5, 68:3, 82:21, 107:14, 119:1, 146:17, 149:5, 167:13, 173:20, 177:18, 184:25, 194:22, 204:21, 207:19
**leave** [6] - 23:12, 32:4, 32:19, 38:5, 98:10, 126:5
**leaving** [2] - 8:4, 160:1
**led** [3] - 112:5, 130:21, 195:22
**left** [25] - 16:18, 16:22, 21:8, 21:9, 21:10, 23:9, 23:14, 23:17, 33:16, 33:19, 34:2, 34:4, 59:3, 82:7, 82:11, 102:25, 103:7, 103:9, 111:24, 135:1, 135:9, 158:10, 216:12, 216:16
**legal** [1] - 11:24
**Legal** [1] - 1:24
**length** [4] - 16:23, 172:4, 200:21, 202:5

**letter** [24] - 144:7, 171:10, 199:19, 200:3, 200:5, 200:8, 200:9, 201:6, 201:7, 201:9, 231:6, 231:14, 231:23, 232:18, 232:21, 233:1, 233:3, 234:22, 235:6, 235:10, 235:12, 235:13, 235:20, 235:22
**letters** [2] - 148:15, 149:19
**letting** [5] - 71:5, 85:23, 177:19, 177:22, 214:24
**level** [3] - 17:7, 17:10, 125:23
**Levison** [2] - 11:11, 11:12
**license** [1] - 231:21
**lie** [1] - 186:3
**Life** [1] - 212:20
**life** [7] - 35:18, 42:11, 94:16, 97:15, 100:24, 137:7, 159:4
**light** [6] - 23:24, 23:25, 24:3, 52:22, 52:25, 145:6
**lighting** [1] - 23:20
**lights** [11] - 23:21, 23:22, 24:2, 55:6, 122:13, 122:21, 123:11, 123:15, 145:11, 145:17, 152:9
**likely** [1] - 137:5
**limited** [6] - 105:21, 108:17, 128:15, 162:11, 177:11, 208:15
**line** [12] - 2:20, 2:22, 45:4, 47:2, 47:22, 85:17, 116:8, 189:3, 200:12, 210:4, 233:9
**lines** [11] - 48:1, 90:17, 146:13, 165:22, 166:13, 169:18, 173:6, 194:15, 210:23, 222:11, 223:4
**list** [6] - 54:10, 105:10, 166:4, 212:4, 227:8, 234:13
**listed** [1] - 227:14
**listen** [3] - 7:2, 53:10, 72:6
**listening** [2] - 53:23, 54:2

**live** [6] - 7:24, 8:1, 8:2, 69:11, 153:4, 197:25
**lived** [10] - 7:16, 8:3, 12:25, 28:16, 54:15, 87:1, 94:22, 128:11, 128:13, 129:4
**lives** [1] - 94:25
**living** [12] - 12:22, 12:24, 13:2, 14:22, 16:16, 16:21, 28:21, 28:25, 94:16, 95:12, 198:7, 199:5
**lobby** [2] - 126:8, 127:10
**locate** [1] - 165:18
**located** [4] - 93:24, 95:8, 160:25, 191:24
**locating** [1] - 67:4
**location** [4] - 7:21, 67:11, 84:6, 96:18
**lock** [14] - 24:25, 25:3, 51:10, 105:22, 114:10, 114:11, 118:15, 118:16, 121:17, 133:17, 154:8, 155:24, 156:1, 156:14
**locked** [13] - 18:12, 18:20, 18:23, 19:3, 26:5, 28:2, 73:14, 73:19, 134:1, 168:21, 169:1, 169:3, 221:21
**locking** [6] - 18:17, 19:6, 51:7, 133:12, 169:12
**locks** [8] - 56:4, 74:12, 106:21, 117:18, 118:5, 125:6, 133:20, 155:18
**locksmith** [1] - 152:8
**log** [2] - 58:12, 185:7
**log-ins** [1] - 185:7
**logged** [1] - 185:8
**logical** [1] - 44:11
**logs** [6] - 50:6, 58:4, 59:15, 59:24, 86:6, 181:9
**London** [1] - 35:1
**look** [73] - 15:3, 15:4, 15:7, 20:5, 22:11, 27:6, 27:23, 42:25, 43:3, 44:22, 47:6, 54:25, 55:19, 58:12, 59:14, 59:24, 68:1, 70:17, 74:16, 74:19, 83:7, 83:9, 91:12, 92:3, 102:11, 115:16, 116:3, 117:13, 119:4,

121:19, 123:5, 124:3, 127:21, 134:5, 136:5, 139:16, 141:17, 142:2, 150:9, 151:19, 154:10, 156:16, 163:18, 164:9, 165:21, 173:11, 188:3, 188:4, 190:21, 190:25, 193:9, 198:19, 199:8, 199:17, 203:7, 203:17, 203:20, 203:24, 205:24, 206:17, 207:9, 210:20, 210:23, 211:4, 212:15, 213:6, 222:7, 226:13, 226:17, 228:8, 232:15, 233:2, 233:6
**Look** [3] - 138:21, 153:16, 155:22
**looked** [23] - 22:6, 23:3, 52:15, 61:5, 72:8, 85:24, 86:6, 89:2, 106:1, 116:2, 119:21, 129:16, 137:18, 157:23, 165:11, 175:15, 179:19, 181:9, 203:4, 203:21, 204:25, 223:17, 228:2
**looking** [26] - 52:17, 53:14, 61:3, 75:15, 84:23, 85:14, 93:12, 112:4, 115:6, 119:25, 140:5, 143:11, 146:17, 148:17, 150:4, 164:4, 189:2, 198:21, 201:24, 202:22, 207:23, 209:4, 211:2, 219:12, 220:22, 232:7
**looks** [64] - 15:19, 15:23, 17:3, 20:13, 20:22, 42:19, 42:25, 43:1, 43:4, 43:11, 43:17, 44:3, 45:14, 45:21, 47:21, 48:17, 55:21, 57:5, 64:18, 64:25, 65:14, 65:21, 66:22, 66:25, 67:2, 67:3, 68:2, 71:10, 83:14, 83:19, 83:23, 91:12, 92:3, 92:11, 93:18, 100:19,

118:22, 119:10, 120:16, 123:24, 134:8, 134:13, 134:25, 140:1, 143:17, 147:13, 150:17, 151:4, 151:22, 157:16, 163:5, 174:3, 194:14, 197:6, 199:22, 209:5, 210:3, 219:7, 223:4, 226:17, 226:22, 228:1, 228:10, 234:12

**LORAS** [1] - 1:6

**Loras** [168] - 2:19, 3:14, 5:13, 7:20, 7:21, 8:4, 8:15, 8:19, 8:24, 9:1, 9:3, 9:6, 9:16, 10:16, 11:17, 11:22, 14:25, 15:11, 17:23, 20:1, 25:5, 29:21, 33:7, 35:2, 35:10, 40:15, 40:25, 42:17, 44:23, 45:2, 46:8, 47:6, 49:20, 49:25, 51:2, 52:8, 55:8, 61:4, 64:12, 64:16, 66:19, 68:23, 69:21, 70:11, 70:16, 70:20, 70:21, 74:14, 74:19, 74:24, 74:25, 75:16, 79:14, 83:6, 83:7, 87:3, 87:6, 88:4, 89:7, 91:3, 91:13, 91:21, 91:22, 94:7, 95:23, 98:17, 98:19, 100:7, 104:1, 104:8, 104:21, 105:19, 105:20, 105:22, 106:3, 106:14, 107:14, 107:17, 108:14, 109:4, 109:8, 115:7, 115:16, 115:21, 119:4, 123:22, 124:10, 133:23, 134:5, 136:17, 139:16, 148:1, 148:11, 148:12, 148:23, 149:1, 149:7, 149:20, 150:9, 150:22, 151:19, 151:22, 156:16, 156:19, 156:23, 157:14, 157:15, 158:10, 161:15, 163:3, 164:18, 165:21, 166:7, 168:8, 171:6, 173:11, 173:24,

177:4, 179:18, 186:10, 188:3, 193:9, 195:22, 196:11, 196:17, 196:22, 196:25, 198:18, 199:17, 200:6, 200:16, 201:2, 201:14, 201:20, 201:25, 202:2, 203:18, 203:19, 203:21, 204:24, 205:8, 205:19, 205:24, 208:23, 209:5, 210:5, 210:23, 211:4, 212:15, 213:7, 213:8, 214:1, 217:24, 218:19, 218:23, 226:17, 228:1, 228:4, 228:5, 228:9, 230:19, 231:15, 231:22, 232:7, 232:22, 234:22, 235:20, 236:8

**Loras'** [8] - 6:4, 100:8, 100:25, 110:3, 112:1, 112:4, 112:8, 223:21

**lost** [4] - 49:20, 56:15, 115:25, 117:10

**love** [1] - 162:3

**lying** [3] - 19:19, 184:23, 184:24

---

# M

**ma'am** [2] - 30:4, 191:7

**Mail** [2] - 234:23, 235:3

**mail** [227] - 2:19, 35:3, 35:22, 36:10, 37:1, 37:8, 37:19, 38:7, 40:16, 40:18, 40:20, 41:12, 41:15, 41:17, 41:21, 42:19, 43:2, 43:3, 43:9, 44:8, 44:25, 45:5, 45:6, 45:7, 45:10, 45:15, 45:22, 47:3, 47:8, 47:10, 47:16, 47:22, 48:13, 48:16, 49:16, 49:21, 49:22, 51:1, 55:13, 55:19, 56:2, 57:5, 58:3, 58:6, 60:3, 60:10, 60:19, 61:5, 61:11, 62:9, 62:14, 64:16, 64:18, 65:6, 66:6, 70:19, 71:3, 71:6, 71:10,

75:15, 76:23, 77:9, 78:13, 82:16, 83:11, 83:12, 83:20, 84:5, 84:9, 84:12, 84:22, 87:11, 87:14, 87:16, 87:20, 87:22, 89:10, 91:4, 91:9, 92:3, 116:3, 116:8, 116:13, 118:23, 118:25, 119:6, 119:10, 119:22, 119:25, 120:7, 120:17, 120:24, 121:19, 123:23, 124:3, 124:4, 131:10, 134:8, 134:13, 137:4, 137:12, 137:14, 139:17, 139:21, 140:4, 142:3, 142:8, 142:11, 144:19, 145:7, 148:1, 149:1, 149:2, 149:24, 150:10, 150:18, 151:1, 151:4, 151:20, 151:22, 153:23, 154:15, 155:8, 156:2, 156:19, 156:25, 157:5, 157:12, 157:13, 157:23, 157:25, 158:4, 158:9, 158:13, 163:4, 163:16, 163:20, 164:3, 164:5, 164:6, 164:7, 164:8, 164:9, 164:12, 165:11, 165:22, 166:21, 166:22, 170:6, 170:13, 170:15, 170:18, 173:12, 173:17, 175:3, 175:13, 175:16, 176:2, 177:14, 178:8, 178:25, 179:14, 179:16, 183:9, 184:18, 184:20, 184:21, 185:22, 186:3, 188:5, 189:3, 190:6, 190:7, 191:3, 193:12, 193:16, 193:20, 194:13, 197:1, 197:10, 197:22, 199:7, 203:8, 204:25, 206:23, 207:2, 209:4, 209:13, 209:22, 210:5, 210:20, 210:21,

211:2, 211:4, 211:6, 211:7, 212:16, 212:24, 217:25, 218:5, 218:13, 219:8, 219:21, 221:3, 222:9, 224:3, 226:18, 226:19, 226:23, 227:2, 227:7, 227:11, 228:1, 228:8, 228:9, 228:17, 228:18, 228:19, 229:2, 229:13, 232:8, 232:9, 234:18

**mailed** [1] - 182:22

**mailing** [5] - 135:11, 156:23, 157:1, 163:5, 163:7

**mails** [53] - 44:18, 46:14, 49:19, 49:22, 55:10, 61:21, 64:12, 66:25, 68:2, 70:17, 80:11, 82:18, 82:19, 82:24, 83:1, 101:4, 106:1, 137:18, 139:3, 139:7, 148:15, 148:23, 149:2, 149:14, 149:19, 149:23, 156:17, 161:24, 163:25, 164:5, 164:18, 179:2, 179:5, 183:1, 183:20, 198:16, 198:21, 203:3, 203:6, 203:7, 203:24, 204:17, 208:24, 208:25, 213:5, 213:6, 213:9, 214:15, 219:20, 220:22, 223:17, 224:25, 230:16

**main** [6] - 56:24, 69:5, 79:18, 125:9, 125:15, 127:10

**maintain** [1] - 116:14

**maintenance** [2] - 56:4, 152:7

**major** [1] - 9:12

**majority** [2] - 28:20, 81:13

**male** [17] - 22:3, 22:5, 22:12, 24:8, 24:14, 99:10, 99:15, 99:16, 99:19, 99:24, 109:20, 111:3, 113:14, 115:1, 133:25, 221:24, 222:2

**man** [2] - 221:12,

221:17

**March** [8] - 187:9, 214:18, 226:24, 228:10, 228:22, 229:3, 229:13

**marked** [26] - 14:24, 20:1, 35:2, 40:14, 42:17, 44:22, 55:7, 64:12, 70:15, 74:14, 91:2, 98:16, 100:7, 115:20, 123:22, 148:1, 149:7, 196:25, 208:23, 213:6, 217:23, 218:22, 227:25, 228:4, 230:19, 232:6

**married** [1] - 7:10

**Marriott** [4] - 124:22, 126:6, 126:13, 132:9

**Marzette** [7] - 188:17, 189:5, 189:12, 189:14, 190:2, 190:3, 191:2

**master** [1] - 56:16

**math** [1] - 9:14

**Matt** [24] - 37:13, 37:14, 37:15, 37:24, 38:4, 38:15, 38:16, 40:9, 136:11, 137:6, 140:2, 151:4, 151:13, 164:24, 166:2, 166:12, 167:16, 168:4, 168:5, 168:10, 170:15, 174:25, 175:6, 175:10

**matter** [6] - 44:13, 46:19, 147:4, 153:15, 202:24, 204:3

**matters** [2] - 152:5, 239:5

**Matthew** [1] - 206:1

**McDermott** [1] - 120:25

**meal** [6] - 197:8, 198:1, 198:2, 198:11, 198:17, 199:16

**mean** [14] - 22:17, 30:11, 84:18, 94:17, 140:21, 141:2, 149:7, 177:16, 190:19, 198:6, 199:13, 201:8, 223:16, 235:9

**meaning** [1] - 4:14

**means** [4] - 10:10, 16:25, 184:11, 185:15

**meant** [6] - 42:2, 141:15, 157:19, 169:8, 206:7, 234:9

**measures** [20] - 33:18, 34:2, 34:10, 51:8, 52:14, 52:17, 55:6, 73:6, 78:24, 89:15, 89:19, 89:22, 105:21, 106:6, 106:14, 107:4, 117:16, 133:13, 156:5, 224:19

**media** [2] - 14:3, 236:19

**medical** [1] - 97:16

**medication** [6] - 96:23, 97:1, 97:4, 97:11, 97:17, 97:19

**medications** [2] - 7:1, 97:21

**meet** [25] - 43:13, 43:24, 46:25, 47:23, 47:24, 48:3, 51:24, 91:17, 93:4, 93:6, 96:13, 151:3, 151:7, 151:13, 157:24, 163:12, 163:17, 165:6, 165:24, 166:19, 168:13, 170:9, 170:11, 229:5, 229:10

**meeting** [59] - 36:17, 41:13, 41:18, 41:19, 45:17, 46:8, 46:12, 46:17, 47:5, 52:2, 52:3, 53:9, 53:13, 54:20, 55:22, 58:11, 62:20, 66:21, 66:24, 67:1, 67:16, 67:20, 68:16, 68:22, 68:25, 69:10, 71:11, 71:15, 72:4, 72:7, 72:18, 73:23, 75:17, 75:22, 75:23, 76:21, 77:3, 77:7, 77:14, 77:19, 77:20, 78:8, 78:17, 81:11, 90:15, 90:20, 91:1, 96:17, 129:13, 129:14, 150:24, 151:8, 156:3, 158:3, 159:23, 163:15, 184:8, 228:22, 228:25

**meetings** [12] - 44:15, 44:16, 68:15, 79:17, 80:13, 80:18, 80:20, 80:22, 88:22, 88:23, 114:5, 156:3

**member** [1] - 91:22

**members** [1] - 145:20

**memorialize** [1] - 172:24

**memory** [1] - 18:17

**mental** [2] - 7:5, 97:6

**mentally** [1] - 167:24

**mention** [1] - 62:18

**mentioned** [15] - 42:4, 62:24, 64:4, 76:3, 97:22, 105:11, 115:15, 118:23, 118:25, 154:18, 166:4, 170:5, 176:1, 193:15, 230:16

**mentioning** [1] - 155:2

**mentions** [2] - 147:12, 147:13

**Merrill** [5] - 1:13, 5:20, 11:15, 237:11, 237:14

**MERRILL** [15] - 10:20, 10:23, 11:2, 11:23, 12:7, 38:10, 98:6, 118:10, 178:11, 181:20, 182:17, 183:23, 184:16, 201:4, 237:16

**message** [1] - 135:1, 135:3, 135:10, 228:12, 228:14

**messy** [2] - 22:6, 22:13

**met** [8] - 49:7, 68:15, 93:8, 93:11, 96:17, 107:2, 120:19, 229:14

**methods** [1] - 125:25

**Michele** [2] - 1:10, 1:24

**mid** [1] - 131:9

**middle** [24] - 20:23, 29:21, 37:8, 40:16, 43:20, 47:7, 47:11, 55:20, 64:19, 67:4, 67:10, 134:10, 134:11, 141:19, 143:7, 150:12, 165:23, 179:21, 179:25, 209:5, 209:8, 211:7, 232:9, 234:13

**middle-paged** [1] - 232:9

**midnight** [1] - 18:11

**might** [31] - 6:14, 17:2, 24:21, 25:6, 25:14, 25:15, 28:10, 31:3, 50:23, 53:3, 54:17, 56:15, 65:8, 76:3, 76:9, 88:4, 89:16, 95:14, 122:21,

127:6, 135:14, 137:13, 138:12, 144:10, 145:16, 156:7, 176:16, 192:18, 205:22, 226:11, 231:20

**milligrams** [1] - 97:2

**mind** [8] - 38:12, 51:14, 51:22, 51:23, 63:15, 78:22, 110:12, 118:19

**mine** [3] - 63:1, 178:1, 178:17

**minimum** [2] - 108:12, 215:4

**minute** [11] - 13:12, 13:16, 33:23, 48:22, 58:15, 64:25, 123:19, 127:15, 128:8, 206:8, 238:6

**minutes** [7] - 26:22, 33:3, 33:6, 91:1, 105:11, 129:23, 131:7

**mischaracterization** [1] - 200:25

**misheard** [1] - 28:10

**misquoted** [1] - 237:24

**misread** [1] - 37:22

**missed** [3] - 170:13, 215:9

**missing** [1] - 110:17

**misstate** [1] - 237:18

**misstates** [1] - 178:12

**mistake** [3] - 169:20, 170:3, 237:24

**mistaken** [1] - 173:2

**misunderstood** [1] - 61:25

**mix** [2] - 49:13, 73:7

**modified** [1] - 231:8

**Moines** [3] - 1:9, 1:13, 1:17

**Molly** [84] - 35:4, 35:16, 36:1, 36:6, 40:19, 41:12, 41:14, 41:20, 42:20, 43:9, 43:12, 44:3, 44:4, 44:11, 55:13, 55:21, 56:11, 60:3, 60:4, 60:10, 60:15, 61:6, 62:18, 83:14, 83:23, 84:11, 116:4, 116:12, 118:22, 136:11, 137:6, 137:19, 137:21, 137:24, 139:21, 140:2, 140:3, 140:6, 150:10, 150:19,

150:22, 151:5, 151:9, 151:20, 155:2, 160:10, 164:24, 166:3, 166:9, 166:10, 166:11, 167:25, 168:14, 173:12, 173:17, 175:6, 175:9, 176:16, 177:1, 182:23, 183:6, 184:22, 188:5, 188:16, 189:20, 189:21, 189:22, 190:1, 197:1, 197:7, 198:3, 199:6, 206:1, 206:23, 209:1, 210:21, 211:5, 211:8, 211:9, 212:16, 212:17, 223:17

**Molly's** [3] - 43:17, 60:18, 209:6

**mom** [47] - 8:2, 8:3, 8:6, 26:7, 26:8, 26:11, 26:13, 26:15, 26:20, 26:21, 37:4, 38:2, 39:17, 39:19, 49:1, 49:7, 51:2, 51:24, 52:4, 53:10, 53:15, 68:2, 68:3, 68:8, 68:14, 71:20, 76:22, 77:1, 77:2, 77:3, 78:3, 80:14, 86:17, 88:16, 90:4, 93:2, 149:2, 170:20, 171:1, 171:10, 200:9, 202:21, 204:7, 204:13, 204:19, 204:20, 205:12

**mom's** [3] - 43:2, 43:9, 149:24

**moment** [30] - 32:23, 49:10, 51:23, 54:21, 55:16, 61:8, 74:15, 75:16, 89:3, 98:20, 101:23, 117:5, 119:20, 124:5, 124:13, 151:24, 157:24, 164:2, 165:19, 170:4, 173:14, 189:23, 197:3, 203:21, 215:5, 218:2, 218:25, 227:1, 228:16, 236:21

**moments** [2] - 84:4, 85:18

**Monday** [2] - 70:9,

150:22, 151:5, 151:9, 151:20, 155:2, 160:20, 164:24, 166:3, 166:9, 166:10, 166:11, 167:25, 168:14, 173:12, 173:17, 175:6, 175:9, 176:16, 177:1, 182:23, 183:6, 184:22, 188:5, 188:16, 189:20, 189:21, 189:22, 190:1, 197:1, 197:7, 198:3, 199:6, 206:1, 206:23, 209:1, 210:21, 211:5, 211:8, 211:9, 212:16, 212:17, 223:17

**money** [1] - 171:22

**month** [3] - 213:11, 214:17, 214:21

**months** [5] - 94:14, 95:6, 95:12, 163:21, 163:22

**morning** [18] - 17:15, 18:2, 18:5, 19:25, 33:8, 34:3, 59:20, 70:9, 73:11, 79:11, 88:1, 101:16, 103:3, 103:6, 129:7, 129:21, 130:15, 177:10

**most** [6] - 4:19, 13:24, 111:20, 122:22, 190:16, 200:12

**mostly** [1] - 133:12

**mother** [41] - 26:17, 39:7, 39:9, 41:4, 41:6, 41:11, 41:13, 42:1, 42:20, 44:4, 44:11, 44:14, 44:17, 45:1, 45:17, 46:11, 46:25, 54:23, 75:18, 76:19, 77:6, 77:8, 77:13, 77:23, 78:4, 78:14, 78:18, 81:10, 81:16, 86:23, 87:24, 89:13, 154:9, 170:22, 171:5, 171:17, 199:19, 200:2, 201:1, 204:1, 205:4

**mother's** [3] - 45:5, 46:3, 201:24

**motions** [1] - 111:19

**motivated** [3] - 112:21, 113:4, 225:11

**motivation** [3] - 112:11, 112:23, 226:3

**move** [10] - 120:16, 131:17, 131:18, 154:24, 154:25, 158:25, 160:14, 221:10, 223:3, 226:15

**moved** [10] - 8:5, 117:2, 120:3, 158:6, 158:7, 158:10, 158:12, 158:14, 158:19, 202:7

**moving** [5] - 120:4, 158:4, 177:12, 184:23, 233:13

**MR** [47] - 3:8, 10:20, 10:21, 10:23, 11:1,

157:8

11:2, 11:3, 11:23, 12:7, 12:9, 20:8, 20:10, 38:10, 41:7, 41:10, 60:25, 98:6, 98:9, 115:18, 118:10, 118:12, 123:19, 134:7, 164:15, 165:17, 178:11, 180:24, 181:20, 182:2, 182:17, 182:18, 183:23, 183:24, 184:16, 201:4, 201:10, 203:13, 203:16, 208:21, 214:5, 214:10, 226:14, 237:5, 237:16, 237:18, 238:11, 238:16
**MS** [1] - 134:6
**multiple** [2] - 125:17, 192:1
**must** [7] - 21:23, 28:1, 135:1, 170:1, 170:2, 206:6, 226:2

**N**

**Nadine** [1] - 3:11
**name** [25] - 3:9, 3:12, 11:8, 15:25, 34:20, 34:25, 37:12, 41:8, 91:7, 93:1, 93:3, 93:12, 93:13, 97:4, 97:5, 97:23, 101:17, 125:21, 161:2, 186:14, 188:16, 189:9, 191:17, 212:19
**named** [2] - 90:24, 239:3
**names** [5] - 13:4, 13:7, 13:10, 101:19, 166:21
**Nancy** [29] - 12:1, 134:13, 136:15, 136:19, 136:21, 137:4, 138:16, 140:2, 150:18, 156:20, 156:23, 157:1, 157:7, 157:19, 163:5, 163:19, 163:22, 164:5, 164:19, 166:9, 166:12, 167:16, 168:10, 170:13, 179:22, 228:13, 229:4, 229:11
**Nancy's** [2] - 157:23,

164:3
**naturally** [1] - 111:21
**nauseam** [1] - 221:4
**near** [4] - 134:11, 156:23, 208:21, 209:8
**necessarily** [18] - 30:8, 30:23, 31:4, 36:9, 65:7, 69:7, 74:4, 108:24, 138:8, 139:13, 170:11, 183:13, 189:18, 189:21, 205:6, 205:10, 217:7, 237:1
**necessary** [1] - 238:4
**need** [16] - 4:15, 13:12, 13:15, 76:6, 90:18, 92:13, 198:9, 198:11, 213:23, 214:6, 228:16, 233:6, 233:11, 238:5, 238:6, 238:8
**needed** [8] - 26:13, 52:23, 52:25, 95:2, 191:16, 196:12, 196:16, 196:17
**needs** [1] - 80:25
**neighbor** [4] - 84:3, 85:18, 86:4, 86:8
**never** [23] - 3:18, 41:2, 57:17, 57:22, 84:19, 110:8, 138:11, 145:17, 163:2, 164:2, 165:6, 166:23, 170:12, 170:13, 172:8, 179:6, 186:16, 186:25, 208:17, 208:19, 217:11, 224:8, 224:11
**new** [5] - 56:5, 209:11, 209:20, 210:1, 222:20
**newspaper** [2] - 236:7, 236:20
**next** [15] - 16:1, 19:17, 43:20, 49:8, 54:17, 54:18, 84:3, 85:17, 86:11, 87:1, 102:2, 144:17, 195:8, 195:9, 206:17
**next-door** [1] - 84:3
**night** [5] - 19:19, 22:9, 23:21, 140:7
**nights** [3] - 132:10, 132:11, 159:8
**nine** [5] - 18:10, 32:22, 94:14, 95:5, 95:12
**nobody** [2] - 72:3, 114:25

**noise** [3] - 20:24, 21:5, 21:11
**none** [5] - 7:4, 51:19, 74:5, 87:20, 138:3
**normal** [3] - 4:13, 23:10, 194:11
**normally** [1] - 18:16
**NORTHERN** [1] - 1:1
**note** [1] - 22:18
**noted** [2] - 29:20, 174:14
**notes** [7] - 27:9, 27:25, 149:19, 205:25, 207:22, 207:24, 208:5
**nothing** [15] - 78:20, 105:22, 106:4, 107:23, 108:8, 110:17, 144:2, 144:5, 145:3, 152:18, 173:1, 174:10, 174:22, 225:21
**Nothing** [1] - 97:19
**notice** [1] - 229:4
**noticed** [2] - 28:1, 141:21
**notified** [6] - 51:11, 65:22, 66:7, 175:16, 177:23, 188:14
**notify** [1] - 122:22
**notifying** [2] - 144:20, 144:21
**noting** [2] - 36:2, 36:7
**notions** [1] - 197:24
**November** [1] - 177:25
**number** [13] - 19:14, 40:11, 69:19, 69:20, 70:6, 123:4, 143:7, 143:11, 166:6, 188:25, 191:13, 205:5, 205:13
**numbers** [1] - 219:20

**O**

**o'clock** [4] - 18:10, 32:22, 75:17, 103:8
**Oak** [2] - 130:15, 153:18
**Oaks** [26] - 12:23, 12:24, 14:10, 14:14, 15:14, 34:15, 54:14, 58:18, 59:16, 62:10, 62:11, 62:15, 64:8, 64:10, 67:17, 83:20, 84:8, 86:12, 116:15, 121:6, 128:11, 143:19, 144:14, 145:22, 146:8,

173:19
**Oaks"** [1] - 116:9
**oath** [3] - 3:23, 18:12, 239:6
**object** [6] - 5:21, 10:23, 11:23, 38:10, 118:10, 201:4
**objecting** [1] - 11:6
**objection** [10] - 10:20, 12:7, 118:13, 178:11, 181:20, 182:17, 183:23, 183:25, 184:16, 201:12
**objections** [1] - 239:8
**obligation** [1] - 238:2
**obligations** [3] - 11:22, 12:5, 12:13
**observe** [2] - 110:13, 112:22
**observes** [1] - 112:17
**obtain** [1] - 97:17
**obtaining** [1] - 10:11
**obviously** [2] - 59:10, 134:9
**occupied** [1] - 75:6
**occur** [9] - 19:8, 39:14, 52:7, 172:3, 197:23, 201:21, 222:13, 222:16, 223:8
**occurred** [70] - 15:17, 18:2, 19:24, 21:4, 21:15, 26:19, 26:23, 29:25, 31:11, 36:2, 36:6, 36:21, 37:17, 37:25, 38:1, 38:9, 39:5, 39:13, 39:16, 40:10, 49:11, 49:12, 50:1, 50:10, 52:12, 63:10, 65:18, 67:17, 68:18, 70:8, 72:22, 73:8, 73:10, 77:11, 78:2, 78:5, 78:23, 80:6, 81:22, 82:21, 88:21, 96:19, 98:4, 99:21, 102:25, 113:3, 114:13, 124:10, 134:8, 139:8, 142:22, 147:10, 170:20, 171:1, 175:7, 175:14, 178:2, 178:17, 181:8, 199:7, 200:17, 201:3, 205:11, 205:19, 206:3, 212:12, 223:16, 224:14, 226:6, 236:13

**occurred"** [1] - 141:22
**occurrences** [1] - 97:14
**occurring** [3] - 85:9, 105:3, 117:20
**October** [10] - 6:22, 132:6, 170:21, 171:24, 171:25, 172:3, 177:25, 202:25, 203:6, 204:4
**OF** [2] - 1:1, 1:8
**off-brand** [1] - 97:3
**off-campus** [1] - 147:3
**off-the-record** [8] - 20:9, 41:9, 61:1, 98:7, 123:20, 165:20, 203:15, 238:20
**offer** [5] - 54:5, 90:1, 90:8, 167:19, 224:19
**offered** [11] - 56:18, 61:19, 69:24, 72:20, 74:4, 90:11, 164:23, 165:7, 193:1, 193:2, 202:9
**offering** [4] - 74:2, 91:14, 163:17, 167:8
**offers** [1] - 147:2
**office** [7] - 6:6, 6:8, 10:6, 45:16, 52:8, 67:11, 95:13
**officer** [10] - 30:5, 46:6, 101:17, 102:22, 122:1, 122:3, 188:17, 189:19, 189:20, 191:10
**Officer** [27] - 20:15, 22:8, 24:14, 24:16, 27:2, 27:7, 27:25, 28:7, 29:3, 30:6, 32:14, 32:23, 33:10, 33:18, 34:2, 34:12, 99:22, 102:17, 122:5, 141:1, 188:17, 189:5, 189:12, 189:14, 190:2, 190:3, 191:2
**officers** [3] - 24:24, 27:4, 101:19
**official** [3] - 27:3, 231:18, 236:18
**officially** [10] - 21:9, 50:6, 97:9, 117:1, 120:3, 120:4, 132:4, 162:1, 173:5, 177:24
**officials** [3] - 46:8, 68:23, 104:8
**often** [2] - 13:24, 120:5

**old** [5] - 6:21, 50:3, 196:3, 211:16, 225:12
**Olivia** [2] - 13:5, 13:8
**on-campus** [2] - 128:13, 175:2
**once** [8] - 21:8, 38:1, 40:13, 48:6, 76:9, 132:8, 164:6, 174:20
**one** [101] - 4:5, 16:12, 19:21, 22:4, 23:4, 25:6, 28:23, 28:25, 40:8, 40:10, 42:15, 47:7, 47:17, 49:14, 50:12, 50:14, 50:18, 51:19, 55:12, 61:21, 63:5, 64:4, 67:24, 70:2, 70:22, 71:3, 71:6, 73:18, 75:24, 78:16, 78:22, 79:7, 79:16, 80:18, 80:19, 82:2, 82:5, 82:9, 90:5, 92:3, 97:2, 97:3, 102:16, 104:21, 108:9, 120:15, 123:9, 123:10, 124:3, 124:22, 125:7, 126:8, 126:21, 130:21, 131:13, 131:22, 131:25, 132:19, 137:5, 137:20, 140:24, 143:13, 145:25, 146:1, 146:13, 148:1, 150:12, 159:19, 161:12, 165:12, 167:14, 171:14, 176:1, 179:1, 179:19, 179:20, 180:13, 181:24, 183:8, 183:14, 183:17, 183:21, 184:13, 186:22, 192:18, 203:17, 203:20, 204:22, 205:7, 205:8, 205:18, 207:12, 209:14, 211:6, 213:11, 213:25, 222:9, 228:2, 233:13
**one's** [2] - 138:22, 184:18
**one-month** [1] - 213:11
**ones** [3] - 75:9, 119:18, 126:12
**online** [9] - 100:8, 140:10, 191:14,

192:3, 192:5, 193:1, 193:6, 236:19, 236:24
**open** [3] - 14:22, 21:17, 21:20
**opened** [2] - 21:23, 51:12
**opening** [4] - 19:23, 21:7, 22:5, 141:12
**openly** [1] - 106:8
**operating** [1] - 77:25
**opinion** [3] - 97:16, 98:1, 216:16
**opinions** [1] - 53:25
**opportunities** [1] - 147:8
**opportunity** [8] - 15:4, 15:8, 35:6, 83:9, 139:18, 199:21, 204:18, 233:2
**opposed** [4] - 28:19, 147:17, 192:11, 192:22
**option** [6] - 61:18, 145:12, 145:17, 156:8, 160:8, 161:3
**options** [3] - 73:24, 74:2, 211:22
**ordeal** [1] - 201:14
**order** [4] - 74:20, 74:23, 75:19, 107:8
**ordered** [10] - 74:8, 74:10, 74:12, 74:13, 75:2, 75:4, 75:8, 107:9, 107:12
**original** [3] - 124:4, 214:6, 231:9
**originally** [1] - 201:23
**originate** [1] - 220:19
**otherwise** [7] - 49:25, 68:20, 104:23, 185:16, 222:14, 223:8, 236:7
**Out-of-Area** [1] - 193:25
**out-of-area** [1] - 194:9
**out-of-the-area** [1] - 193:21
**outcome** [1] - 168:7
**outline** [3] - 22:7, 24:6, 24:12
**outlining** [1] - 234:12
**outside** [7] - 23:24, 23:25, 32:5, 32:17, 145:21, 152:6, 153:18
**overview** [2] - 88:22
**own** [7] - 30:14, 56:12, 94:20, 200:10, 206:20, 208:10,

216:3

## P

**p.m** [20] - 37:23, 43:2, 43:4, 48:19, 55:15, 64:22, 65:16, 71:12, 71:15, 92:5, 119:7, 139:22, 150:13, 151:23, 156:24, 157:1, 188:6, 193:14, 229:3, 238:23
**package** [1] - 25:11
**packing** [1] - 158:15
**Page** [1] - 2:2
**page** [41] - 2:20, 2:22, 29:21, 40:16, 42:19, 42:21, 43:15, 43:20, 45:2, 47:7, 47:11, 48:18, 55:20, 64:14, 64:19, 67:5, 67:7, 67:11, 71:8, 87:12, 91:6, 122:12, 134:11, 150:2, 158:11, 163:6, 163:19, 164:1, 179:21, 179:25, 188:4, 199:23, 209:8, 209:15, 210:22, 218:6, 232:8, 232:15, 234:13, 234:17
**page-and-a-half** [1] - 199:23
**paged** [1] - 232:9
**pages** [2] - 156:18, 156:19
**paid** [2] - 171:6, 195:14
**panicky** [1] - 116:2
**pants** [1] - 111:14
**paper** [1] - 236:20
**paperwork** [7] - 101:20, 101:23, 102:3, 196:15, 196:16, 196:19, 196:20
**paragraph** [59] - 20:23, 27:6, 27:24, 43:21, 43:24, 44:7, 45:15, 86:11, 91:13, 98:24, 99:1, 99:8, 100:20, 105:19, 109:8, 120:6, 120:17, 120:21, 121:19, 122:11, 122:12, 122:19, 138:17, 141:13, 141:17, 141:18,

142:7, 142:15, 142:21, 143:8, 143:17, 144:12, 145:5, 145:19, 145:24, 146:23, 147:5, 152:2, 154:16, 154:20, 154:22, 154:23, 173:18, 174:14, 175:3, 176:4, 189:25, 202:22, 204:2, 204:7, 204:20, 206:17, 207:10, 208:8, 218:16, 218:21, 219:13, 221:9, 222:12
**paragraphs** [3] - 152:3, 206:12, 207:13
**parameters** [2] - 178:1, 178:4
**paraphrasing** [2] - 116:12, 184:12
**parking** [2] - 24:22
**part** [38] - 21:11, 21:13, 25:11, 25:17, 25:18, 25:21, 29:10, 31:19, 32:7, 55:1, 61:11, 78:18, 109:10, 134:10, 142:20, 150:25, 151:10, 151:14, 151:22, 162:10, 163:24, 165:4, 167:17, 170:21, 180:2, 180:8, 190:14, 193:24, 194:5, 211:10, 211:23, 214:1, 215:8, 218:7, 223:11
**participate** [3] - 210:12, 211:1, 213:3
**participated** [1] - 187:13
**participating** [4] - 131:1, 212:22, 216:1, 216:6
**participation** [3] - 212:18, 215:17, 215:19
**particular** [18] - 17:18, 38:21, 55:19, 68:12, 71:12, 73:25, 78:22, 89:19, 92:18, 92:19, 114:1, 126:14, 127:18, 127:24, 130:4, 191:10, 191:19, 207:1
**parties** [3] - 238:2,

239:10, 239:12
**parts** [4] - 122:25, 123:2, 214:16, 228:11
**party** [1] - 49:18
**pass** [1] - 24:22
**past** [4] - 69:10, 158:11, 169:9, 174:9
**path** [1] - 10:13
**patrols** [2] - 34:14, 224:21
**pause** [1] - 13:12
**pay** [4] - 195:7, 195:9, 195:25, 198:17
**paying** [2] - 72:9, 217:7
**pending** [1] - 236:8
**people** [25] - 5:11, 12:3, 28:20, 28:21, 53:7, 79:7, 82:1, 101:5, 104:21, 116:5, 125:17, 127:14, 127:23, 133:21, 137:6, 137:11, 137:13, 164:22, 165:13, 167:8, 167:11, 168:9, 192:7, 211:16, 211:23
**per** [7] - 60:14, 67:4, 121:16, 137:1, 145:10, 182:21, 229:12
**perceived** [3] - 31:7, 45:6, 167:23
**percent** [3] - 114:6, 176:15, 183:19
**perception** [2] - 40:1, 40:2
**perceptions** [1] - 40:4
**perfect** [2] - 99:4, 238:19
**perform** [2] - 170:8
**performing** [2] - 32:17, 84:12
**perhaps** [6] - 4:19, 39:5, 69:19, 75:18, 205:2, 215:15
**perimeter** [1] - 84:8
**period** [4] - 127:15, 191:25, 213:11, 214:17
**periodically** [1] - 224:20
**permission** [4] - 127:7, 192:20, 208:4, 208:14
**perpetrator** [1] - 103:12
**person** [91] - 20:24,

20:25, 21:13, 21:14, 21:22, 21:23, 22:1, 22:2, 22:12, 22:15, 22:22, 23:17, 24:4, 24:7, 24:9, 24:14, 25:25, 26:8, 26:11, 37:5, 47:24, 54:8, 56:9, 59:6, 59:11, 62:5, 63:11, 69:16, 69:21, 69:25, 70:3, 70:11, 70:14, 72:3, 80:1, 82:2, 87:1, 93:1, 93:4, 99:18, 99:24, 102:12, 103:12, 108:23, 109:18, 110:15, 110:21, 110:25, 111:1, 111:8, 111:13, 111:20, 111:22, 111:23, 112:1, 112:17, 125:21, 126:1, 126:3, 126:4, 127:6, 127:9, 127:10, 127:18, 128:19, 129:16, 130:14, 131:4, 136:22, 160:8, 167:14, 173:20, 174:4, 175:22, 177:9, 180:14, 184:6, 185:16, 186:17, 191:14, 192:11, 192:14, 193:1, 193:6, 211:23, 211:24, 222:13, 223:8, 229:11

**personally** [3] - 57:17, 118:2, 216:17
**perspective** [5] - 12:5, 12:12, 133:6, 167:23, 201:13
**phone** [21] - 26:7, 26:17, 26:21, 38:1, 39:17, 39:19, 50:5, 82:23, 91:1, 134:21, 135:4, 170:14, 170:22, 171:4, 171:13, 183:2, 184:8, 184:22, 191:13, 191:15, 200:4
**phones** [1] - 53:2
**phonetic** [2] - 93:13, 159:5
**phrase** [2] - 79:20, 231:13
**phrased** [1] - 233:25
**physical** [7] - 7:5, 110:8, 120:24,

121:1, 121:4, 121:8, 121:9
**Physical** [1] - 144:14
**physically** [1] - 127:22
**pieces** [1] - 204:5
**place** [17] - 33:19, 54:24, 67:1, 71:15, 73:6, 73:21, 75:20, 80:22, 93:25, 100:22, 115:7, 121:10, 160:25, 172:1, 174:18, 196:18, 239:3
**placed** [1] - 74:23
**placement** [3] - 173:7, 193:21, 194:10
**places** [3] - 7:22, 12:6, 123:17
**Plaintiff** [2] - 1:4, 1:14
**plan** [12] - 10:11, 52:20, 54:19, 54:22, 89:21, 132:15, 197:8, 198:1, 198:2, 198:11, 198:17, 199:16
**planned** [3] - 117:23, 132:7, 132:15
**plans** [1] - 132:17
**Plant** [1] - 144:14
**plant** [5] - 120:24, 121:1, 121:5, 121:8, 121:9
**play** [4] - 9:2, 9:4, 9:5, 162:21
**played** [2] - 9:2, 162:16
**pleasure** [1] - 94:18
**point** [91] - 6:12, 10:4, 10:5, 39:11, 41:16, 45:25, 49:11, 50:15, 51:21, 55:11, 57:25, 69:8, 69:14, 72:18, 76:6, 79:14, 83:20, 91:20, 94:3, 99:14, 106:4, 107:19, 107:23, 107:24, 108:8, 108:21, 109:2, 116:24, 117:4, 117:21, 119:19, 119:23, 119:25, 123:12, 130:13, 130:18, 130:25, 131:20, 137:11, 140:13, 146:8, 146:14, 146:18, 148:3, 148:8, 148:12, 149:11, 149:17, 150:1, 152:25, 154:1, 154:6, 159:2,

159:11, 160:13, 161:21, 162:1, 168:2, 169:24, 170:16, 171:8, 171:24, 172:4, 172:8, 180:7, 181:22, 182:4, 186:13, 192:24, 194:8, 198:22, 198:25, 201:5, 201:13, 207:1, 207:17, 207:19, 209:6, 209:10, 209:24, 220:13, 221:5, 222:10, 223:2, 224:3, 225:9, 227:13, 229:21, 229:22
**pointed** [1] - 189:25
**points** [3] - 51:20, 212:4, 222:8
**poles** [1] - 145:6
**police** [18] - 20:15, 100:23, 102:19, 103:1, 103:10, 103:11, 105:6, 123:9, 141:22, 143:15, 147:18, 147:20, 187:19, 187:25, 188:13, 189:8, 191:3, 191:5
**Police** [15] - 101:3, 101:9, 101:11, 102:7, 104:2, 104:10, 104:24, 143:7, 147:16, 186:25, 188:18, 188:24, 191:9, 191:11, 202:8
**policies** [1] - 112:2
**poor** [1] - 144:10
**portion** [12] - 37:7, 38:19, 61:5, 61:6, 88:24, 89:2, 143:8, 156:24, 158:18, 163:6, 181:1, 214:12
**position** [19] - 6:4, 6:5, 6:7, 10:1, 136:2, 148:5, 149:13, 161:17, 162:21, 214:25, 215:7, 222:10, 223:3, 233:17, 233:18, 234:15, 234:16, 235:21
**positive** [1] - 135:13
**positively** [2] - 175:22, 186:16
**possess** [1] - 149:18
**possibilities** [1] -

156:13
**possibility** [7] - 120:20, 121:5, 153:16, 153:25, 155:8, 155:25, 195:12
**possible** [11] - 117:3, 120:23, 153:22, 154:11, 155:18, 173:2, 210:13, 210:17, 210:25, 215:17
**post** [3] - 23:24, 91:1, 94:11
**post-graduation** [1] - 94:11
**powers** [1] - 196:10
**practice** [2] - 93:25, 162:9
**practices** [1] - 94:1
**practitioner** [2] - 96:21, 96:22
**preceded** [1] - 139:4
**prefer** [2] - 43:24, 47:24
**preference** [1] - 214:7
**prepare** [1] - 237:22
**prescribed** [1] - 96:23
**prescription** [1] - 97:10
**presence** [1] - 116:14
**present** [8] - 28:19, 52:3, 68:3, 71:18, 214:25, 215:7, 217:6, 217:7
**presentations** [6] - 192:1, 192:2, 192:6, 192:10, 192:16, 192:21
**preserve** [1] - 49:23
**preserved** [1] - 49:19
**President** [16] - 83:6, 87:25, 88:16, 89:13, 89:14, 90:1, 170:20, 170:23, 171:9, 171:14, 171:18, 195:11, 199:20, 200:3, 200:4
**president** [1] - 100:25
**press** [1] - 236:6
**pretty** [7] - 103:22, 120:5, 135:24, 152:3, 182:7, 223:14, 227:14
**prevent** [1] - 74:23
**previous** [4] - 130:20, 145:10, 194:22, 200:4
**previously** [6] - 25:19, 109:13, 152:5,

190:16, 195:10, 207:15
**prices** [1] - 145:6
**privilege** [1] - 229:19
**privileged** [1] - 10:24
**privy** [1] - 229:19
**pro** [2] - 10:22, 11:10
**proactively** [1] - 198:13
**problem** [1] - 75:9
**problems** [1] - 143:12
**procedure** [1] - 216:9
**procedures** [1] - 194:1
**proceed** [2] - 4:11, 5:5
**proceeding** [2] - 6:6, 216:6
**PROCEEDINGS** [1] - 3:1
**process** [28] - 12:2, 137:23, 138:10, 167:3, 167:10, 168:3, 181:22, 190:11, 194:1, 210:8, 211:10, 211:12, 212:21, 212:22, 213:2, 213:10, 213:19, 214:16, 214:23, 214:24, 215:6, 215:17, 216:12, 225:25, 229:17, 229:25, 230:3, 237:9
**produce** [2] - 150:1, 179:9
**produced** [6] - 25:22, 149:21, 169:25, 181:7, 212:1, 230:20
**Proesch** [2] - 1:10, 1:24
**professor** [2] - 193:2, 193:7
**professors** [2] - 172:21, 192:24
**program** [1] - 231:22
**prohibiting** [1] - 195:15
**project** [1] - 18:8
**promise** [2] - 226:14, 233:8
**prompt** [3] - 81:10, 81:24, 82:13
**prompted** [4] - 82:5, 82:6, 97:16, 184:25
**prompting** [1] - 18:3
**pronounce** [1] - 161:2
**proof** [4] - 153:9, 154:1, 154:4, 174:20
**proposing** [1] - 163:11
**protect** [2] - 105:22,

106:4
**protected** [1] - 117:22
**proud** [1] - 136:5
**prove** [2] - 145:3, 174:10
**provide** [14] - 63:9, 72:20, 105:20, 142:10, 143:9, 176:3, 186:13, 189:3, 189:13, 190:2, 209:11, 209:23, 216:14, 221:24
**provided** [3] - 143:14, 180:19, 182:20
**provider** [2] - 97:7, 97:17
**provides** [1] - 152:4
**providing** [1] - 216:15
**public** [1] - 125:14
**Pucci** [17] - 37:1, 37:4, 37:10, 37:16, 37:24, 37:25, 38:4, 38:6, 38:8, 38:16, 38:18, 39:1, 39:4, 39:7, 39:13, 40:9, 162:1
**Pucci's** [1] - 38:12
**punished** [1] - 230:11
**punishment** [7] - 211:20, 230:14, 230:17, 230:18, 231:3, 231:16, 231:18
**punishments** [1] - 232:3
**purchase** [1] - 106:2
**purports** [9] - 35:3, 40:17, 44:24, 47:8, 55:13, 74:19, 98:17, 116:4, 150:9
**purpose** [4] - 41:17, 113:6, 171:21, 226:10
**purposes** [8] - 60:6, 60:16, 68:22, 104:20, 117:25, 172:2, 181:6, 213:13
**pursued** [1] - 194:1
**pursuing** [1] - 137:2
**put** [13] - 26:20, 33:19, 82:25, 118:15, 118:16, 141:23, 153:1, 160:12, 165:18, 173:3, 184:21, 202:5, 230:14
**putting** [2] - 120:7, 158:13

## Q

**qualification** [1] - 62:17
**quantify** [1] - 69:18
**queried** [1] - 185:17
**question's** [1] - 4:9
**questioning** [2] - 183:1, 233:9
**questions** [33] - 3:15, 4:21, 20:6, 20:12, 35:5, 45:3, 101:5, 105:10, 122:13, 128:9, 132:20, 152:13, 164:20, 174:9, 188:12, 201:9, 213:20, 215:23, 217:11, 218:8, 218:10, 218:11, 218:18, 219:2, 227:18, 231:1, 233:5, 233:7, 233:10, 237:8, 237:11, 237:15, 237:16
**quick** [1] - 226:16
**quickly** [2] - 213:14, 238:2
**quit** [2] - 161:21, 161:25
**quite** [3] - 15:1, 213:7, 230:25
**quote** [1] - 77:17

## R

**race** [1] - 12:16
**Rachael** [16] - 2:3, 2:21, 3:11, 16:1, 38:12, 41:22, 163:23, 180:1, 182:11, 184:13, 193:24, 194:17, 196:11, 198:13, 201:5, 232:16
**RACHAEL** [3] - 1:3, 1:8, 3:2
**Rachael's** [1] - 200:13
**Rachael.Swift@ loras.edu** [1] - 164:11
**raised** [1] - 155:12
**ran** [1] - 18:7
**range** [1] - 69:20
**ranged** [1] - 33:5
**RAs** [2] - 57:6, 57:10
**rather** [3] - 53:8, 139:17, 218:1
**rating** [4] - 154:16, 155:3, 155:19,

155:23
**ratings** [1] - 155:17
**re** [1] - 164:7
**re-e-mail** [1] - 164:7
**reacclimated** [1] - 159:7
**reach** [9] - 24:3, 54:8, 60:4, 60:11, 82:6, 165:12, 223:14, 236:16, 236:17
**Reach** [1] - 90:18
**reached** [8] - 14:1, 60:14, 82:3, 90:6, 102:5, 166:23, 168:5, 184:4
**reaching** [8] - 45:21, 46:1, 65:15, 79:16, 80:19, 80:23, 82:12, 197:7
**reaction** [1] - 50:9
**read** [50] - 6:3, 20:11, 25:8, 25:18, 25:19, 35:6, 36:9, 42:22, 44:23, 48:22, 55:12, 55:16, 83:16, 92:8, 98:20, 98:22, 116:6, 124:13, 139:18, 139:24, 157:4, 157:20, 160:16, 166:13, 173:14, 181:1, 188:7, 189:24, 193:17, 197:3, 206:8, 209:9, 212:2, 212:5, 213:12, 214:6, 214:8, 214:12, 217:1, 218:2, 218:5, 218:6, 218:7, 218:8, 230:9, 230:21, 233:11, 236:24, 237:13, 238:1
**reader** [1] - 99:23
**readily** [2] - 74:6, 106:9
**reading** [1] - 217:4
**ready** [24] - 5:9, 6:1, 15:5, 15:9, 20:5, 20:11, 35:7, 40:22, 40:24, 45:4, 45:11, 45:13, 48:24, 61:9, 70:25, 71:9, 92:9, 124:14, 206:9, 214:3, 215:19, 219:2, 219:5, 227:5
**realize** [1] - 185:15
**realized** [1] - 31:11
**really** [13] - 24:6, 65:10, 81:3, 107:22, 136:20, 158:7, 168:9, 169:6,

172:24, 177:14, 182:3, 217:16, 238:5
**Really** [1] - 173:6
**reason** [30] - 8:8, 8:9, 17:19, 22:18, 28:7, 57:15, 58:8, 74:7, 79:4, 80:2, 84:11, 104:12, 121:12, 121:14, 130:3, 139:2, 143:23, 144:23, 145:8, 145:15, 146:16, 146:19, 149:15, 150:7, 153:19, 158:1, 174:7, 174:17, 232:2
**reasonable** [1] - 208:11
**reasoning** [1] - 122:19
**reasons** [4] - 123:10, 155:17, 161:16
**rebalance** [1] - 158:17
**Rebecca** [2] - 161:1, 193:12
**recalling** [1] - 169:10
**receive** [6] - 40:23, 129:18, 142:6, 204:17, 211:21, 231:16
**received** [19] - 5:1, 108:17, 119:14, 119:16, 129:17, 131:10, 144:5, 144:7, 152:22, 153:23, 156:2, 177:15, 206:23, 229:16, 230:10, 233:1, 233:24, 234:22, 235:12
**receiving** [9] - 116:13, 175:13, 195:20, 199:10, 199:13, 227:19, 232:21, 235:6, 235:10
**recent** [3] - 140:14, 141:13, 200:12
**recently** [3] - 35:14, 148:18, 229:24
**recess** [4] - 61:2, 98:8, 115:19, 164:16
**recitation** [1] - 206:12
**recited** [2] - 174:8, 183:12
**recognize** [1] - 15:11
**recollect** [1] - 168:1
**recollection** [58] - 19:12, 49:7, 49:13, 52:4, 52:11, 53:5, 58:13, 59:18, 61:16, 62:5, 67:20, 67:23,

68:14, 68:24, 71:17, 71:22, 73:4, 73:13, 73:22, 81:2, 90:9, 90:16, 95:16, 96:14, 102:21, 102:24, 108:23, 114:21, 115:14, 126:17, 127:2, 129:13, 131:16, 131:24, 132:10, 135:5, 135:17, 135:19, 136:24, 143:13, 144:7, 144:9, 148:3, 151:7, 156:15, 159:18, 163:16, 165:10, 171:4, 171:16, 175:9, 191:10, 191:25, 192:25, 198:25, 235:10, 235:14, 235:16
**recommendation** [1] - 133:24
**reconsider** [1] - 164:1
**reconsidered** [1] - 231:12
**record** [44] - 3:10, 11:10, 14:25, 20:8, 20:9, 41:8, 41:9, 41:10, 60:25, 61:1, 82:17, 82:21, 87:4, 98:6, 98:7, 102:14, 120:18, 122:16, 123:19, 123:20, 126:1, 128:2, 128:4, 150:5, 165:17, 165:20, 171:25, 178:5, 178:12, 181:1, 184:1, 201:1, 201:12, 203:13, 203:15, 203:16, 211:25, 212:3, 214:12, 224:24, 225:5, 238:20, 239:7
**recorded** [1] - 125:22
**recording** [5] - 82:23, 83:2, 83:4, 83:5, 88:3
**records** [2] - 160:16, 173:1
**recounting** [1] - 212:8
**reduced** [1] - 239:6
**refer** [18] - 20:20, 27:24, 40:15, 42:18, 48:17, 55:11, 61:4, 64:11, 66:6, 70:16, 70:18, 87:11, 91:4, 123:22, 157:12, 163:3, 194:14, 221:8
**reference** [1] - 86:12

**referenced** [1] - 236:21
**references** [1] - 121:20
**referencing** [1] - 141:20
**referring** [18] - 6:7, 47:7, 83:12, 88:5, 88:6, 105:18, 121:23, 122:6, 141:12, 142:1, 150:11, 151:21, 156:22, 158:19, 169:16, 173:17, 191:2, 218:13
**reflect** [1] - 67:1
**reflected** [2] - 197:10, 198:20
**reflective** [4] - 38:8, 60:19, 75:16, 189:15
**regard** [12] - 38:9, 60:20, 85:6, 86:3, 89:3, 89:5, 129:9, 161:13, 189:24, 190:1, 222:3, 225:14
**regarding** [17] - 2:21, 60:5, 60:15, 60:20, 68:20, 69:2, 69:4, 76:10, 81:17, 81:21, 82:1, 87:19, 138:23, 147:2, 202:24, 204:3, 209:20
**regardless** [3] - 76:13, 106:12, 106:13
**regards** [5] - 137:15, 165:9, 177:7, 195:13, 215:24
**register** [3] - 194:25, 195:7, 196:1
**registered** [2] - 194:17, 194:21
**registering** [1] - 195:15
**regular** [2] - 149:2, 162:13
**rehash** [1] - 190:18
**reimbursed** [1] - 171:7
**reimbursement** [1] - 200:14
**rejected** [1] - 153:24
**rekeyed** [3] - 56:19, 56:23, 57:2
**relate** [1] - 11:5
**related** [2] - 98:2, 239:10
**relation** [5] - 26:18, 78:1, 95:17, 95:19, 101:14
**relative** [1] - 239:11
**relay** [2] - 22:8, 222:8

**relook** [1] - 203:5
**relying** [1] - 148:17
**remain** [1] - 23:5
**remainder** [1] - 132:2
**remained** [1] - 27:12
**remark** [1] - 78:12
**remember** [13] - 15:5, 19:17, 76:13, 76:17, 81:2, 101:19, 139:1, 143:13, 151:9, 165:14, 176:17, 189:9, 223:20
**remembered** [1] - 185:23
**remembering** [1] - 183:15
**remote** [1] - 69:13
**remotely** [7] - 69:22, 95:23, 132:13, 191:24, 192:11, 192:17, 192:21
**removed** [2] - 174:4, 199:4
**reordered** [2] - 75:11, 75:13
**repeat** [7] - 36:4, 166:6, 180:24, 186:18, 187:22, 220:6, 222:17
**repeatedly** [2] - 169:1, 169:2
**reply** [2] - 92:4, 124:10
**Report** [1] - 98:18
**report** [56] - 20:14, 22:11, 22:16, 27:15, 99:21, 99:22, 100:5, 100:7, 100:11, 100:12, 101:11, 101:14, 101:24, 110:19, 115:6, 119:1, 121:20, 121:23, 122:1, 122:2, 122:5, 122:7, 122:8, 123:13, 124:7, 140:6, 140:9, 140:14, 140:18, 140:24, 141:2, 141:5, 141:6, 141:8, 141:9, 141:13, 141:21, 141:24, 142:1, 143:1, 146:6, 147:2, 147:14, 147:16, 147:18, 147:19, 147:20, 175:1, 175:6, 179:4, 189:1, 205:11, 209:21
**report"** [1] - 146:24
**reported** [16] - 35:23, 37:18, 47:18, 79:2,

79:8, 83:25, 100:22, 109:13, 177:8, 177:24, 178:21, 180:13, 185:2, 200:22, 205:18, 236:19
**REPORTER** [3] - 30:4, 164:14, 239:15
**Reporter** [2] - 1:10, 239:2
**reporter** [9] - 4:3, 4:15, 9:15, 181:2, 214:13, 236:16, 236:17, 237:21, 238:17
**reporting** [4] - 102:7, 123:7, 123:8, 123:11
**reports** [8] - 84:2, 84:23, 85:3, 85:17, 85:25, 129:2, 129:7, 129:11
**represent** [14] - 3:13, 119:5, 139:20, 156:18, 173:11, 179:6, 181:5, 199:18, 205:25, 208:25, 213:8, 217:24, 218:23, 231:11
**representation** [2] - 20:2, 60:14
**representations** [1] - 73:18
**representatives** [4] - 80:12, 80:14, 80:22, 182:13
**represented** [2] - 57:16, 153:6
**representing** [1] - 85:6
**represents** [1] - 227:21
**request** [12] - 106:13, 129:11, 143:20, 144:16, 144:17, 145:1, 145:20, 146:7, 171:5, 200:13, 212:18, 229:13
**requested** [13] - 44:14, 46:15, 47:5, 105:20, 116:9, 116:20, 129:15, 144:13, 170:23, 171:17, 181:1, 194:2, 214:12
**requesting** [6] - 81:10, 81:11, 121:20, 124:6, 158:3, 228:19
**Requests** [1] - 2:18

**requests** [1] - 106:15
**require** [1] - 127:19
**requirement** [1] - 237:13
**res** [2] - 42:10, 42:12
**reside** [2] - 50:18, 50:22
**resided** [1] - 7:14
**residence** [9] - 14:10, 42:12, 100:23, 100:24, 105:13, 105:14, 152:7, 152:8, 153:17
**resident** [3] - 35:18, 55:5, 105:15
**residential** [1] - 62:11
**residents** [1] - 57:6
**residents'** [1] - 105:11
**residing** [1] - 21:18
**resources** [3] - 44:5, 147:4, 147:9
**respect** [1] - 222:21
**respond** [9] - 53:24, 106:14, 120:12, 158:2, 163:15, 179:13, 182:25, 184:18, 184:19
**responded** [14] - 46:10, 137:24, 148:2, 148:3, 148:8, 155:12, 170:13, 179:15, 182:22, 182:23, 210:1, 219:7, 221:13, 221:17
**responding** [10] - 43:9, 48:4, 72:11, 72:21, 122:12, 135:2, 138:22, 147:25, 219:9, 226:22
**responds** [2] - 229:2, 229:3
**response** [25] - 33:9, 46:17, 48:18, 48:23, 49:1, 61:6, 81:9, 86:22, 106:15, 111:5, 111:7, 120:14, 123:24, 124:16, 142:6, 148:4, 154:8, 163:19, 201:2, 218:24, 219:12, 226:21, 227:7, 227:20
**responses** [2] - 167:21, 221:19
**responsible** [1] - 182:16
**rest** [4] - 62:22,

149:10, 176:17, 192:2
**restrict** [2] - 7:6, 71:4
**resubmission** [1] - 145:1
**resubmit** [1] - 144:17
**resubmitted** [1] - 143:20
**resubmitting** [1] - 144:8
**result** [4] - 90:13, 96:24, 175:15, 187:15
**resume** [1] - 160:4
**return** [6] - 50:14, 132:20, 162:3, 172:18, 172:20, 173:8
**returned** [7] - 17:21, 19:9, 82:8, 82:10, 94:4, 94:9, 172:8
**returning** [3] - 29:16, 49:14, 162:2
**reverse** [1] - 194:2
**review** [25] - 47:13, 61:8, 70:22, 71:3, 74:15, 85:11, 91:9, 119:7, 134:17, 140:15, 141:14, 150:14, 151:25, 199:21, 199:24, 213:5, 213:23, 214:23, 219:1, 219:3, 227:1, 228:6, 228:16, 236:23, 237:20
**reviewed** [18] - 5:13, 5:24, 5:25, 6:2, 6:10, 85:2, 85:7, 85:8, 85:10, 85:12, 106:1, 107:20, 108:5, 129:24, 149:9, 149:17, 173:1, 219:20
**reviewing** [9] - 5:10, 35:13, 58:4, 71:4, 107:18, 112:4, 149:5, 213:14, 214:2
**revisit** [3] - 154:8, 154:12
**revisiting** [1] - 155:6
**right-hand** [3] - 15:20, 15:24, 155:1
**rights** [2] - 6:6, 6:8
**Robert** [1] - 20:15
**role** [1] - 42:8
**rolled** [2] - 19:22, 21:6
**rolling** [2] - 21:6, 170:15
**room** [28] - 16:1, 16:8,

16:17, 16:21, 16:22, 19:9, 19:20, 22:22, 22:24, 23:4, 24:1, 52:5, 61:19, 71:21, 72:8, 74:9, 111:23, 114:9, 125:15, 126:7, 126:14, 127:7, 127:18, 128:5, 158:15, 215:13, 216:11, 217:10

**roommate** [7] - 56:15, 63:7, 63:8, 63:9, 63:23, 64:2, 64:7

**roommates** [32] - 13:2, 13:3, 13:19, 17:16, 17:18, 17:21, 28:12, 28:13, 29:16, 49:3, 49:12, 49:25, 50:8, 50:12, 50:14, 51:4, 51:16, 57:19, 61:12, 61:14, 61:17, 62:1, 62:2, 62:7, 63:6, 63:13, 75:6, 75:24, 76:11, 84:15, 84:17, 120:15

**rooms** [4] - 125:2, 125:12, 127:19, 127:22

**Rosenow** [18] - 20:15, 22:8, 24:14, 24:16, 27:2, 27:7, 27:25, 28:7, 29:3, 30:6, 32:14, 32:23, 33:10, 33:18, 34:2, 34:12, 102:17, 141:1

**Rosenow's** [2] - 99:22, 122:5

**roughly** [2] - 5:24, 45:21

**round** [2] - 9:25, 10:2

**rounded** [1] - 172:22

**rounds** [18] - 34:5, 54:12, 54:22, 57:11, 57:20, 58:2, 84:7, 84:13, 84:14, 84:16, 107:13, 116:9, 116:15, 116:19, 117:18, 118:4, 142:16, 202:7

**route** [1] - 168:6

**routed** [2] - 140:14, 141:14

**RPR** [1] - 1:24

**Ruan** [1] - 1:9

**rule** [1] - 6:16

**rules** [1] - 3:19

**Rules** [1] - 237:20

**ruling** [2] - 230:6, 231:7

**run** [1] - 53:6

**running** [3] - 23:9, 23:10, 110:1

**runs** [7] - 42:20, 55:20, 70:20, 71:7, 83:11, 91:6, 156:25

**rushing** [1] - 13:14

## S

**safe** [23] - 31:25, 32:8, 36:18, 36:20, 48:9, 54:1, 56:12, 60:23, 80:9, 106:11, 108:1, 117:22, 118:8, 118:20, 132:24, 160:9, 161:7, 161:10, 171:22, 172:7, 177:5, 201:15, 201:16

**safeguard** [1] - 204:24

**safer** [6] - 49:4, 51:4, 51:16, 52:14, 125:2, 177:6

**safety** [43] - 20:15, 30:7, 30:14, 30:19, 31:17, 31:19, 32:7, 33:19, 36:13, 44:5, 51:8, 52:22, 55:6, 58:2, 60:6, 60:16, 60:20, 61:13, 61:15, 61:18, 62:3, 73:24, 78:1, 78:24, 89:15, 89:19, 89:22, 105:21, 105:23, 106:2, 106:5, 106:6, 106:14, 107:4, 118:6, 121:16, 121:18, 123:16, 125:24, 156:5, 224:19, 224:22, 234:14

**safety-wise** [1] - 78:1

**San** [2] - 7:17, 95:13

**sanction** [5] - 211:20, 230:5, 230:13, 231:5, 231:16

**sanctions** [2] - 231:8, 232:3

**saved** [1] - 50:6

**saw** [26] - 20:24, 21:13, 21:22, 22:7, 23:6, 35:12, 41:15, 46:13, 57:17, 57:22, 62:6, 78:3, 99:18, 99:19, 102:16, 107:12, 110:9, 111:20, 112:1, 144:14, 164:2, 164:7, 183:16,

183:20, 185:8, 236:24

**Saylor** [12] - 136:11, 137:6, 140:2, 151:5, 151:13, 164:24, 165:6, 166:2, 166:12, 167:16, 174:25, 206:1

**scared** [2] - 30:13, 31:14

**scary** [4] - 31:2, 31:3, 31:8, 31:9

**schedule** [1] - 159:2

**scheduled** [1] - 92:20

**scholarship** [1] - 9:4

**scholarships** [1] - 9:5

**school** [24] - 2:20, 7:20, 8:12, 8:22, 13:1, 50:22, 52:15, 52:17, 89:16, 132:6, 132:7, 133:14, 143:20, 148:21, 148:22, 149:3, 158:16, 167:4, 167:8, 171:2, 179:3, 192:25, 195:2, 195:3

**School** [1] - 8:13

**school's** [1] - 167:21

**schoolwork** [2] - 158:21, 159:14

**Schumacher** [35] - 35:4, 35:16, 37:19, 38:6, 39:2, 40:19, 41:12, 42:20, 55:14, 61:7, 61:12, 83:15, 116:4, 136:11, 137:7, 139:21, 150:11, 150:19, 151:6, 151:21, 164:25, 165:2, 166:3, 173:13, 174:8, 186:13, 186:19, 188:5, 189:11, 197:1, 203:9, 206:1, 209:1, 212:17, 223:17

**Scopa** [1] - 13:9

**scream** [2] - 110:20, 110:23

**screamed** [8] - 20:25, 21:8, 21:14, 23:6, 110:22, 111:23

**se** [2] - 10:22, 11:10

**season** [4] - 162:3, 162:13, 162:16, 162:18

**seasonal** [1] - 10:1

**seating** [1] - 215:14

**secluded** [1] - 123:16

**second** [39] - 2:19,

6:3, 27:24, 42:21, 47:22, 66:22, 71:8, 74:21, 85:16, 89:1, 91:6, 120:16, 120:21, 122:11, 142:14, 146:1, 154:16, 154:25, 165:18, 175:3, 176:4, 177:13, 179:1, 182:23, 189:3, 197:25, 203:14, 203:18, 210:4, 218:15, 218:21, 219:3, 219:13, 221:8, 222:9, 222:10, 223:2, 238:11, 238:14

**second-to-final** [1] - 122:11

**second-to-last** [1] - 154:25

**seconds** [1] - 23:8

**secretary** [1] - 191:14

**section** [3] - 25:16, 42:22, 91:9

**secure** [1] - 161:2

**security** [33] - 24:19, 24:24, 26:14, 26:18, 26:24, 27:1, 33:18, 34:1, 34:5, 34:10, 37:18, 54:12, 57:6, 57:10, 57:17, 57:20, 58:4, 74:21, 74:22, 75:8, 77:25, 84:12, 103:8, 109:13, 117:16, 137:6, 140:19, 142:15, 183:4, 184:9, 186:2, 202:7

**security-wise** [1] - 77:25

**see** [154] - 3:20, 10:14, 11:14, 16:3, 16:4, 21:2, 22:11, 22:14, 24:4, 24:6, 27:9, 27:14, 27:18, 28:3, 29:19, 33:22, 37:7, 38:4, 38:19, 40:20, 41:24, 43:6, 43:15, 43:16, 43:22, 44:1, 44:7, 45:19, 45:20, 47:10, 48:20, 49:5, 51:5, 53:9, 56:2, 56:7, 57:13, 57:19, 57:25, 58:2, 58:5, 58:6, 59:15, 60:7, 62:13, 62:14, 63:2, 64:18, 64:23, 65:25, 67:6, 67:13, 68:5,

68:9, 68:10, 84:9, 84:14, 84:16, 84:18, 87:16, 91:15, 92:6, 92:15, 95:17, 98:25, 99:12, 101:1, 103:16, 105:24, 108:18, 109:7, 111:19, 116:10, 116:17, 116:22, 117:13, 120:10, 120:21, 121:2, 121:21, 122:14, 124:1, 124:3, 124:19, 125:17, 129:2, 129:11, 133:23, 134:15, 135:22, 136:13, 137:8, 138:19, 140:15, 142:7, 143:21, 145:23, 146:4, 146:9, 146:25, 147:5, 148:4, 150:25, 152:10, 154:18, 154:23, 155:1, 155:4, 156:25, 157:2, 157:10, 157:17, 163:9, 163:13, 164:5, 165:18, 165:23, 165:24, 166:5, 166:14, 168:2, 173:1, 173:22, 174:1, 174:5, 175:4, 176:5, 180:3, 185:23, 188:19, 194:5, 194:6, 194:19, 198:25, 200:19, 203:1, 207:2, 209:6, 209:19, 210:9, 210:14, 211:9, 211:11, 219:17, 220:7, 221:14, 222:19, 222:25, 228:5, 228:24, 229:7, 232:13, 232:19, 234:20

**seeing** [7] - 25:21, 124:9, 127:8, 163:16, 184:19, 185:21, 223:20

**seek** [4] - 5:22, 97:16, 97:19, 192:20

**seeking** [2] - 108:20, 171:18

**seem** [1] - 227:16

**self** [1] - 9:19

**self-employed** [1] - 9:19

semester [28] - 95:23, 95:25, 96:1, 96:2, 96:7, 96:8, 117:24, 130:20, 132:3, 159:13, 159:14, 173:21, 178:16, 178:21, 180:11, 188:2, 191:19, 191:20, 195:9, 195:10, 196:1, 197:10, 197:18, 198:2, 201:22, 220:1, 220:25, 236:14

send [6] - 36:12, 163:18, 196:15, 200:3, 229:2

sending [2] - 41:11, 78:12

sends [1] - 218:18

sense [22] - 5:10, 13:23, 29:3, 33:3, 34:1, 34:9, 39:14, 52:2, 53:22, 54:7, 54:23, 59:10, 70:12, 90:12, 93:25, 103:13, 122:20, 122:24, 122:25, 144:24, 186:1, 192:5

Sent [1] - 234:18

sent [19] - 6:10, 35:13, 37:19, 41:1, 64:21, 76:23, 77:9, 84:11, 119:6, 140:3, 151:22, 157:15, 157:25, 173:13, 179:2, 199:19, 203:9, 226:19, 232:18

sentence [18] - 36:11, 41:22, 45:14, 55:25, 62:23, 66:22, 109:3, 109:11, 113:9, 144:17, 154:25, 202:22, 204:1, 208:8, 219:12, 219:13, 221:10, 223:6

separated [1] - 231:25

separately [1] - 168:6

September [130] - 12:19, 15:17, 17:14, 20:16, 29:22, 33:13, 34:13, 35:3, 35:23, 38:21, 40:13, 40:18, 43:3, 43:5, 44:25, 45:23, 47:8, 49:8, 50:2, 51:25, 55:14, 56:6, 59:17, 61:7, 61:20, 62:6, 64:16,

64:22, 65:6, 65:15, 68:12, 68:21, 70:8, 71:12, 72:15, 73:9, 74:24, 75:18, 76:20, 78:2, 79:8, 79:12, 79:24, 83:15, 87:15, 87:21, 87:25, 90:3, 90:13, 90:21, 91:5, 91:23, 92:2, 92:5, 93:9, 95:17, 96:19, 96:24, 97:8, 97:12, 97:15, 98:3, 98:18, 99:10, 99:22, 100:6, 100:17, 101:15, 106:24, 107:3, 107:10, 108:21, 113:22, 115:8, 116:5, 116:24, 119:5, 119:21, 122:5, 122:6, 122:8, 123:25, 129:21, 131:9, 131:20, 132:5, 133:2, 134:14, 135:10, 135:11, 135:13, 135:17, 136:25, 138:24, 139:8, 139:22, 140:24, 141:24, 150:10, 151:20, 151:23, 156:21, 157:1, 157:16, 157:25, 161:22, 161:23, 162:8, 162:14, 163:7, 163:20, 164:10, 167:4, 167:20, 175:8, 177:15, 190:13, 191:3, 197:15, 200:18, 209:21, 218:17, 219:21, 220:17, 221:4, 222:5, 239:14

series [4] - 64:11, 156:17, 208:24, 221:3

serious [2] - 44:13, 46:19

seriously [5] - 48:4, 86:14, 189:16, 221:13, 221:23

sertraline [1] - 97:2

service [1] - 90:5

services [4] - 90:8, 195:20, 195:21, 202:10

sessions [1] - 69:12

set [18] - 41:13, 41:18, 41:19, 91:14, 93:2, 150:24, 159:1,

159:23, 163:15, 185:5, 207:3, 207:24, 222:20, 227:8, 228:22, 228:25, 231:14, 231:22

sets [2] - 199:6, 227:20

setting [4] - 66:19, 71:10, 80:19, 231:2

several [6] - 119:11, 130:9, 161:23, 163:12, 163:21, 211:16

sexual [29] - 109:6, 109:12, 110:2, 110:5, 110:6, 111:9, 111:16, 112:2, 112:7, 112:10, 112:23, 112:25, 113:12, 140:11, 147:2, 147:14, 147:16, 147:22, 220:12, 221:22, 222:13, 223:7, 223:23, 223:24, 224:13, 226:2, 226:5, 226:8

sexually [5] - 112:21, 113:4, 224:6, 224:16, 225:11

shaming [6] - 167:6, 167:23, 168:18, 168:23, 169:9, 169:15

share [4] - 14:17, 49:11, 65:23, 66:23

sheet [1] - 239:4

shepherd [1] - 213:2

shepherding [1] - 213:18

shifting [1] - 169:12

short [1] - 152:3, 157:4, 218:1, 229:4

shorten [2] - 98:25, 230:24

shorter [1] - 228:9

Shorthand [2] - 1:10, 239:2

SHORTHAND [1] - 239:15

shorthand [1] - 239:6

shortly [3] - 142:21, 143:3, 185:9

shoved [1] - 26:5

show [33] - 11:10, 14:24, 14:25, 15:1, 20:1, 35:2, 40:14, 42:16, 53:24, 54:3, 55:7, 70:15, 74:14,

83:8, 84:2, 85:17, 91:2, 98:10, 98:16, 115:20, 115:23, 120:18, 171:25, 178:5, 196:25, 208:23, 212:1, 217:23, 218:22, 227:25, 228:3, 230:19, 232:6

showed [3] - 30:6, 43:1, 103:1

showing [2] - 31:16, 196:16

shown [1] - 187:12

shut [3] - 23:13, 23:17, 26:3

sic [7] - 92:11, 100:24, 130:15, 200:17, 204:24, 211:8, 229:4

side [11] - 15:20, 15:24, 16:18, 16:22, 16:24, 17:3, 26:5, 52:6, 58:21, 127:11, 155:1

sign [4] - 27:21, 195:8, 237:13, 238:1

signs [1] - 91:7

similar [3] - 127:23, 152:12

simple [1] - 182:7

simply [4] - 204:4, 213:17, 227:18, 227:19

single [2] - 14:19, 16:1

sister [6] - 8:2, 8:4, 34:24, 52:5, 71:21, 75:19

sit [2] - 13:15, 38:4

sitting [2] - 53:12, 225:20

situation [6] - 36:3, 36:8, 36:21, 46:18, 86:19, 109:25

six [3] - 28:14, 28:21, 28:25

size [2] - 75:10, 75:12

skim [1] - 149:13

skimmed [7] - 6:2, 25:7, 25:14, 25:15, 25:20, 149:11, 149:13

slab [1] - 17:12

sleep [8] - 18:9, 18:14, 18:22, 18:24, 19:2, 19:7, 21:17, 159:7

sleeping [5] - 18:3, 19:21, 109:15, 111:25, 113:2

small [2] - 161:12, 164:14

soccer [11] - 9:2, 9:3, 9:15, 37:11, 132:7, 161:21, 161:25, 162:3, 162:8, 162:15, 162:18

social [1] - 14:3

solely [2] - 67:17, 171:20

Solutions [1] - 1:24

someone [60] - 19:23, 30:21, 31:12, 37:5, 51:9, 51:11, 58:14, 59:2, 59:19, 63:24, 76:16, 79:6, 79:21, 85:15, 85:21, 85:24, 85:25, 86:5, 86:7, 86:18, 87:2, 90:9, 90:10, 92:12, 104:21, 109:14, 109:25, 110:3, 112:16, 112:22, 114:7, 121:8, 122:22, 126:15, 128:3, 128:4, 129:20, 129:25, 130:16, 131:3, 131:7, 147:21, 161:14, 173:4, 176:17, 177:2, 177:22, 183:6, 184:9, 185:9, 189:8, 191:11, 205:17, 208:3, 219:14, 224:9, 226:12, 230:9

someplace [1] - 23:11

sometime [2] - 132:5, 236:14

somewhat [1] - 194:2

somewhere [6] - 64:9, 95:14, 102:17, 103:9, 172:16, 229:25

Sorry [5] - 38:15, 66:5, 88:12, 104:6, 166:8

sorry [23] - 22:17, 36:4, 39:6, 60:13, 72:1, 81:19, 81:20, 93:17, 102:1, 116:3, 138:2, 154:20, 159:5, 162:25, 166:10, 181:13, 185:13, 187:22, 201:19, 206:4, 209:15, 222:19, 238:15

sort [1] - 230:17

sound [1] - 4:11

sounded [1] - 149:9

sounds [6] - 4:18, 4:24, 5:4, 32:11,

149:5, 149:10

**space** [5] - 14:22, 16:21, 16:23, 110:4, 223:23

**span** [2] - 156:17, 213:10

**speaking** [1] - 88:17

**specific** [8] - 9:22, 39:16, 70:13, 78:12, 78:14, 89:18, 128:5, 134:23

**specifically** [20] - 42:18, 64:13, 67:2, 70:18, 70:23, 73:16, 91:3, 98:23, 107:5, 113:10, 120:25, 131:25, 137:2, 152:6, 166:24, 203:11, 206:18, 207:7, 208:6, 230:4

**Specifically** [1] - 83:11

**specifics** [1] - 22:2

**specify** [1] - 86:8

**speculate** [1] - 6:14

**speculates** [1] - 38:11

**speculation** [2] - 178:11, 184:17

**spell** [1] - 93:15

**spend** [2] - 95:1, 132:2

**spent** [2] - 94:10, 197:14

**spoken** [3] - 85:24, 85:25, 236:6

**spot** [3] - 161:3, 167:24, 168:5

**spring** [20] - 96:1, 96:2, 96:6, 96:8, 117:24, 159:24, 172:14, 172:18, 194:21, 195:6, 195:15, 195:19, 196:1, 197:9, 197:17, 197:19, 198:2, 198:7, 199:1, 236:14

**Spring** [1] - 194:18

**squared** [1] - 193:21

**squarely** [1] - 22:4

**staff** [1] - 91:22

**stairs** [1] - 27:9

**stand** [1] - 108:9

**standard** [1] - 194:3

**standing** [4] - 99:18, 111:1, 111:20, 178:18

**standstill** [1] - 103:23

**start** [15] - 3:16, 8:24, 13:1, 52:3, 71:1,

99:3, 99:8, 109:10, 137:23, 156:22, 160:4, 209:4, 215:21, 223:6, 233:10

**started** [5] - 17:23, 81:13, 95:20, 152:23, 162:18

**starter** [4] - 162:5, 162:15, 162:17, 162:19

**starting** [4] - 55:11, 70:7, 94:13, 134:10

**starts** [7] - 55:20, 70:19, 71:7, 83:13, 134:20, 157:19, 157:20

**State** [2] - 1:10, 239:2

**state** [12] - 3:9, 28:8, 49:1, 51:1, 84:1, 124:16, 179:25, 214:23, 219:14, 220:9, 237:12, 237:20

**statement** [26] - 44:20, 44:21, 58:3, 66:10, 106:20, 108:5, 108:7, 108:13, 109:7, 113:11, 135:24, 136:4, 136:7, 136:9, 138:6, 146:20, 149:13, 154:13, 194:16, 203:25, 209:17, 211:17, 212:2, 217:1, 217:4, 225:8

**statements** [1] - 130:11

**states** [7] - 20:23, 37:1, 57:5, 57:10, 65:21, 143:19, 233:4

**STATES** [1] - 1:1

**stating** [1] - 11:4

**stationary** [1] - 98:19

**status** [2] - 176:9, 232:11

**stay** [3] - 30:15, 30:17, 132:9

**stayed** [5] - 32:25, 50:23, 96:9, 117:23, 132:6

**staying** [10] - 17:21, 29:15, 94:23, 94:24, 95:10, 117:21, 124:17, 124:21, 124:24, 124:25

**steal** [5] - 110:14, 225:10, 225:19, 225:21, 226:1

**step** [5] - 23:4, 49:10,

58:15, 64:25, 135:7

**steps** [7] - 36:24, 79:13, 79:17, 200:21, 224:21, 227:9, 235:11

**sticky** [1] - 234:17

**still** [32] - 13:18, 13:23, 14:1, 32:15, 32:18, 61:3, 80:9, 104:7, 106:3, 106:10, 108:5, 108:7, 116:25, 118:22, 119:22, 148:19, 148:21, 158:16, 159:10, 159:17, 159:22, 179:5, 192:24, 195:20, 199:1, 199:4, 207:25, 208:7, 216:10, 216:18, 216:20

**stolen** [1] - 225:22

**stop** [1] - 89:1

**stopped** [2] - 105:17, 183:1

**storming** [1] - 19:19

**strategies** [1] - 36:13

**Street** [1] - 1:17

**strictly** [1] - 69:17

**Strike** [2] - 39:6, 172:15

**strike** [1] - 197:6

**struggle** [1] - 81:2

**struggling** [2] - 151:16, 170:12

**stuck** [1] - 64:5

**student** [59] - 15:16, 53:4, 83:24, 95:24, 96:1, 96:3, 96:4, 96:9, 100:12, 109:5, 113:11, 113:14, 113:15, 113:17, 115:1, 116:20, 116:21, 122:23, 123:14, 132:13, 132:16, 132:21, 133:23, 137:7, 159:11, 159:12, 159:16, 159:17, 159:19, 159:21, 160:14, 160:15, 160:23, 161:6, 161:8, 161:17, 161:20, 169:18, 169:20, 170:2, 170:3, 172:19, 172:20, 172:22, 173:9, 173:25, 176:24, 192:18, 193:5, 193:21,

194:9, 196:4, 196:12, 196:18, 196:20, 197:20, 221:25, 222:2

**Student** [2] - 100:24, 212:20

**students** [18] - 14:12, 17:20, 36:17, 36:20, 48:9, 53:1, 60:23, 62:15, 62:16, 62:22, 76:25, 77:10, 133:25, 161:9, 192:13, 192:16, 204:24

**Students** [1] - 35:21

**stuff** [3] - 148:23, 149:11, 158:25

**subject** [6] - 12:18, 50:1, 109:5, 116:8, 118:13, 220:12

**subjected** [3] - 109:6, 109:11, 113:12

**submit** [2] - 159:21, 211:17

**submitted** [7] - 5:13, 6:8, 107:24, 141:6, 144:6, 146:7, 152:24

**submitting** [1] - 146:17

**successfully** [2] - 196:7, 196:9

**suffered** [1] - 167:20

**suggesting** [1] - 43:12

**suggestion** [1] - 171:8

**Suite** [2] - 1:9, 1:17

**summary** [1] - 207:22

**summer** [1] - 8:22

**Sunday** [2] - 18:1, 18:5

**Sunleaf** [19] - 35:4, 35:19, 36:2, 37:20, 43:24, 44:25, 45:15, 51:24, 52:16, 52:24, 53:10, 54:20, 55:23, 56:1, 65:21, 66:7, 193:14, 231:2

**Sunleaf's** [2] - 46:16, 52:7

**supervision** [1] - 239:7

**supervisor** [1] - 196:21

**support** [3] - 38:17, 90:12, 173:10

**supported** [2] - 31:4, 132:23

**supporting** [1] - 171:2

**supportive** [5] - 135:24, 136:4, 136:7, 136:9, 190:10

**supposed** [4] - 46:23, 127:6, 184:7, 186:4

**surprised** [1] - 90:6

**surrounding** [2] - 57:12, 94:22

**surveillance** [1] - 146:7

**suspect** [3] - 108:25, 173:18, 178:9

**suspicious** [3] - 182:24, 182:25, 183:10

**swags** [1] - 9:24

**sweeper** [1] - 162:22

**SWIFT** [3] - 1:3, 1:8, 3:2

**Swift** [46] - 2:3, 3:11, 3:12, 16:1, 29:6, 34:21, 35:1, 35:9, 44:24, 48:18, 55:10, 60:3, 61:3, 74:16, 77:5, 79:8, 79:24, 87:7, 89:18, 91:4, 108:21, 114:15, 118:1, 123:21, 134:9, 139:23, 146:22, 151:24, 153:6, 154:20, 163:23, 164:17, 165:21, 179:20, 180:1, 181:11, 188:4, 196:11, 202:21, 203:17, 203:25, 210:21, 213:12, 217:19, 222:8, 224:15

**swift** [1] - 3:9

**Swift's** [3] - 2:21, 182:11, 184:14

**switches** [1] - 143:5

**sworn** [2] - 3:5, 239:4

**system** [1] - 74:21

## T

**table** [3] - 26:5, 217:15, 225:20

**tailor** [1] - 186:3

**talks** [2] - 28:11, 204:7

**teacher** [3] - 160:5, 196:14, 196:20

**teachers** [2] - 66:14, 159:21

**teaches** [1] - 161:6

**teaching** [31] - 95:24, 96:1, 96:3, 96:4, 96:6, 96:9, 132:14, 132:16, 132:21, 159:16, 159:17, 159:19, 159:20,

159:21, 160:14, 160:15, 160:23, 161:8, 161:17, 161:20, 172:19, 172:20, 172:22, 173:9, 193:21, 194:9, 196:4, 196:13, 196:18, 197:20, 231:21

**team** [5] - 161:21, 161:25, 162:5, 162:10, 162:15

**technically** [1] - 159:18

**technology** [2] - 50:4, 53:1

**Technology** [1] - 154:22

**telephone** [2] - 87:24, 170:19

**telescoping** [1] - 74:22

**template** [1] - 100:12

**ten** [10] - 32:22, 70:3, 75:17, 82:9, 91:1, 94:14, 95:6, 95:12, 103:8, 127:15

**ten-minute** [1] - 127:15

**tender** [1] - 199:18

**tendered** [1] - 232:23

**tense** [1] - 158:11

**Tenth** [1] - 1:17

**term** [2] - 112:20, 135:16

**terms** [9] - 30:12, 47:19, 54:2, 114:16, 114:19, 114:21, 118:20, 123:3, 236:4

**test** [1] - 53:6

**test-run** [1] - 53:6

**tested** [2] - 52:23, 53:7

**testified** [3] - 3:5, 25:10, 201:5

**testify** [7] - 38:13, 117:19, 153:3, 153:20, 182:13, 239:4

**testimony** [38] - 19:6, 23:16, 24:8, 24:13, 84:25, 85:2, 85:7, 97:21, 104:22, 111:4, 119:20, 126:24, 130:22, 131:2, 135:10, 137:1, 139:10, 144:25, 148:10, 149:9, 153:4, 156:10, 160:13,

161:12, 164:2, 165:1, 169:10, 190:15, 190:22, 191:1, 194:23, 201:7, 211:18, 225:16, 225:24, 231:4, 237:23, 239:8

**text** [2] - 50:5, 53:2

**texts** [3] - 49:13, 49:23, 49:24

**THE** [11] - 1:1, 1:1, 30:4, 115:17, 118:14, 164:14, 214:8, 238:10, 238:14, 238:19, 238:21

**themselves** [3] - 111:14, 151:12, 168:17

**theory** [1] - 133:16

**therapist** [4] - 92:21, 92:22, 93:6, 93:8

**thereupon** [1] - 239:5

**thinking** [2] - 51:15, 76:5

**thinks** [1] - 135:25

**third** [12] - 121:19, 123:23, 141:17, 141:18, 142:20, 143:8, 152:2, 178:19, 204:20, 207:9, 208:8, 210:4

**thirds** [2] - 83:13, 222:19

**thorough** [1] - 87:11

**thoroughly** [1] - 233:16

**thoughts** [4] - 13:13, 110:15, 110:16, 222:20

**three** [26] - 27:8, 28:12, 51:22, 87:4, 132:11, 140:1, 150:22, 153:5, 156:18, 156:19, 158:1, 164:22, 165:13, 165:22, 166:24, 167:8, 191:8, 203:24, 205:2, 205:8, 210:23, 223:4, 225:21, 228:24, 229:1, 229:9

**throughout** [18] - 31:5, 39:11, 39:18, 50:22, 91:20, 113:16, 118:18, 138:9, 159:25, 161:6, 167:2, 180:11, 188:2,

190:9, 201:13, 201:21, 219:25, 220:25

**Thursday** [2] - 123:25, 151:23

**timeframe** [1] - 103:10

**timeline** [2] - 102:19, 175:24

**timeliness** [1] - 138:12

**timestamps** [1] - 140:5

**timing** [1] - 27:4

**tiny** [1] - 65:17

**Title** [66] - 2:21, 11:17, 11:22, 12:3, 12:5, 12:8, 12:14, 12:17, 135:6, 136:16, 136:17, 136:22, 136:23, 137:2, 137:15, 138:25, 139:1, 139:2, 139:4, 140:20, 141:7, 141:16, 144:1, 144:22, 148:19, 150:22, 150:23, 151:9, 151:10, 151:14, 152:23, 155:9, 155:13, 157:9, 163:23, 164:19, 164:23, 165:4, 165:8, 165:10, 165:25, 166:1, 166:20, 166:25, 167:9, 167:17, 168:15, 170:10, 175:17, 179:22, 180:1, 180:15, 181:23, 186:12, 186:23, 218:17, 220:3, 220:4, 220:11, 223:12, 232:12, 235:9, 236:1, 236:4, 236:8

**today** [24] - 3:21, 3:23, 5:10, 5:22, 6:1, 7:1, 10:16, 15:1, 24:8, 24:13, 25:5, 25:10, 79:23, 111:4, 140:14, 141:14, 144:14, 200:21, 228:21, 230:22, 232:18, 237:16, 237:22, 238:9

**Tom** [1] - 194:2

**tomorrow** [1] - 37:5

**took** [18] - 8:22, 20:25, 21:12, 21:14, 49:20, 67:1, 73:21, 75:19,

81:9, 115:4, 115:7, 132:12, 158:1, 164:17, 172:1, 196:18, 200:22, 211:19

**top** [32] - 45:1, 45:5, 48:17, 51:1, 61:4, 68:7, 83:13, 87:12, 89:7, 134:9, 134:12, 141:19, 142:15, 142:21, 145:20, 145:25, 151:22, 152:2, 154:24, 156:23, 156:25, 157:15, 158:11, 188:4, 194:15, 209:8, 209:14, 210:4, 212:15, 228:14, 232:15, 234:17

**topic** [8] - 77:9, 77:21, 78:17, 78:19, 89:7, 89:9, 132:19, 227:14

**topics** [2] - 77:18, 84:5

**total** [2] - 28:14, 32:25

**touch** [7] - 39:20, 137:19, 188:21, 212:5, 212:21, 224:20

**touched** [2] - 101:10, 193:9

**touching** [3] - 111:14, 193:14, 239:5

**tough** [1] - 168:5

**town** [1] - 39:18

**towns** [1] - 7:15

**track** [2] - 115:25, 128:24

**traditional** [1] - 193:25

**traffic** [1] - 82:16

**trained** [1] - 150:23

**transcript** [2] - 237:21, 238:3

**Transcription** [1] - 239:7

**transition** [1] - 210:6

**treated** [3] - 97:6, 222:2, 222:3

**treating** [4] - 44:12, 46:18, 48:4, 114:25

**Tricia** [3] - 90:24, 91:7, 91:17

**tried** [1] - 38:16

**Troy** [5] - 217:25, 218:24, 219:7, 232:10, 235:11

**true** [16] - 66:10, 79:4, 80:3, 108:5, 146:20, 153:20, 160:18,

177:14, 181:6, 181:12, 181:16, 203:4, 204:5, 204:14, 220:16, 239:7

**truth** [3] - 3:25, 217:20, 239:4

**truthful** [2] - 7:3, 7:7

**truthfully** [1] - 5:3

**try** [4] - 93:15, 188:11, 193:10, 230:24

**trying** [21] - 23:13, 39:19, 41:13, 53:23, 67:3, 79:15, 108:3, 108:4, 111:13, 150:2, 153:2, 158:16, 158:20, 160:2, 185:5, 190:20, 225:13, 226:15, 229:10, 230:12, 231:10

**tuition** [12] - 171:6, 171:12, 195:4, 195:5, 195:6, 195:8, 195:12, 195:25, 200:14, 204:8, 204:9, 204:14

**turn** [2] - 64:14, 157:13

**turning** [1] - 6:22

**TV** [2] - 19:10, 236:7

**two** [39] - 13:10, 16:25, 43:8, 45:15, 48:1, 55:10, 70:17, 83:13, 87:4, 97:21, 101:19, 118:21, 124:11, 125:6, 130:20, 131:12, 132:10, 132:11, 137:5, 152:3, 159:18, 167:16, 168:9, 173:20, 177:18, 177:20, 180:11, 188:1, 203:17, 203:20, 205:1, 205:9, 206:12, 206:24, 207:13, 222:19, 228:11, 228:23, 232:8

**two-hour** [1] - 43:8

**two-paragraph** [1] - 45:15

**two-thirds** [2] - 83:13, 222:19

**type** [7] - 109:20, 111:8, 111:16, 111:17, 138:5, 171:18, 182:25

**types** [1] - 125:6

**typical** [2] - 19:1, 25:3
**typically** [2] - 21:18, 21:24
**typo** [1] - 206:6

---

## U

**Uber** [1] - 95:7
**ukchelsea** [1] - 45:8
**ultimately** [1] - 53:6
**umbrella** [1] - 110:5
**unable** [2] - 39:20, 229:5
**unacceptable** [2] - 41:23, 42:2
**unauthorized** [2] - 130:16, 131:4
**unavailability** [1] - 43:11
**unavailable** [1] - 43:18
**uncertainty** [1] - 151:17
**unclear** [3] - 4:20, 208:5, 209:15
**uncomfortable** [7] - 50:11, 167:11, 168:12, 212:9, 216:11, 216:19, 216:21
**under** [11] - 3:22, 11:22, 18:12, 27:6, 27:24, 98:25, 99:9, 110:5, 239:6, 239:7
**undergo** [1] - 193:25
**undersigned** [1] - 239:2
**understood** [6] - 5:2, 41:18, 110:19, 141:15, 187:6, 194:22
**unfair** [1] - 60:12
**unfounded** [4] - 233:19, 234:2, 234:4, 234:5
**uninvited** [1] - 76:1
**unit** [3] - 62:25, 64:6, 64:8
**UNITED** [1] - 1:1
**unknown** [3] - 19:10, 99:10, 99:24
**unlocked** [3] - 59:3, 73:15, 73:19
**unnecessarily** [1] - 169:12
**unsure** [3] - 27:17, 71:20, 74:11
**untrue** [2] - 174:9, 174:10
**up** [85] - 6:11, 10:3, 10:5, 17:10, 20:24, 21:7, 23:16, 26:3, 41:13, 41:18, 41:19, 45:1, 48:17, 55:21, 61:4, 66:21, 67:21, 67:22, 67:23, 67:24, 71:11, 73:15, 74:1, 74:3, 74:4, 76:2, 76:5, 76:9, 76:14, 76:23, 77:18, 78:15, 80:19, 81:6, 86:13, 87:18, 90:4, 91:14, 93:2, 94:13, 98:25, 103:1, 103:16, 111:11, 113:21, 114:7, 120:7, 123:5, 125:15, 127:12, 127:14, 129:15, 132:19, 139:14, 150:24, 153:21, 156:5, 156:12, 158:15, 159:15, 163:15, 165:6, 167:10, 167:19, 169:2, 170:14, 170:19, 177:9, 183:9, 184:9, 186:1, 195:8, 195:14, 196:4, 205:4, 205:13, 210:23, 215:22, 221:4, 228:22, 228:25, 230:24, 231:22, 234:18, 237:7
**up"** [1] - 56:1
**update** [2] - 152:22, 176:22
**updated** [5] - 176:13, 176:14, 177:4, 177:6, 203:9
**updates** [8] - 108:17, 142:11, 152:4, 160:10, 176:3, 176:15, 176:17, 177:11
**upset** [4] - 50:11, 78:3, 78:4, 78:23
**upsetting** [1] - 77:1
**uses** [1] - 142:25

---

## V

**vacation** [1] - 94:19
**variety** [1] - 116:5
**verbally** [1] - 130:11
**verbatim** [1] - 77:17
**Veritext** [1] - 1:24
**versus** [8] - 53:8, 69:21, 100:5, 115:1, 123:5, 128:5, 161:18, 204:14
**via** [4] - 70:1, 170:6, 234:18, 234:23
**victim** [7] - 140:11, 167:6, 167:22, 168:18, 168:23, 169:8, 171:3
**view** [5] - 57:25, 69:8, 72:18, 171:8, 201:13
**viewpoint** [2] - 48:7, 78:5
**vigilant** [1] - 102:15
**virtually** [2] - 47:25, 229:11
**virtue** [3] - 111:25, 113:1, 190:5
**visit** [5] - 94:7, 155:21, 185:14, 185:17, 204:19
**visited** [2] - 167:18, 190:1
**visiting** [2] - 92:17, 102:4
**vivid** [1] - 110:22
**voice** [1] - 213:3
**voyeur** [2] - 112:17, 112:22
**voyeurism** [10] - 110:4, 112:6, 112:9, 112:16, 112:21, 112:25, 223:22, 225:15, 226:4, 226:6
**vs** [1] - 1:5

---

## W

**wait** [1] - 4:9
**waiting** [2] - 38:3, 195:13
**waive** [1] - 238:4
**waiver** [5] - 195:12, 200:14, 204:8, 204:9, 204:14
**waiving** [2] - 238:21, 238:22
**walk** [4] - 17:10, 23:10, 57:18, 58:18
**walk-around** [1] - 57:18
**walking** [2] - 214:15, 214:22
**wants** [2] - 37:5, 237:14
**waste** [1] - 139:5
**watched** [1] - 19:10
**watching** [4] - 23:12, 112:16, 126:21, 127:2
**ways** [2] - 123:14, 126:2
**website** [2] - 100:8, 100:11
**week** [2] - 159:24, 178:7
**weekend** [2] - 17:20, 70:9
**welcomed** [1] - 133:21
**whereas** [1] - 126:4
**whereby** [2] - 107:9, 125:20
**wherein** [2] - 99:23, 201:24
**whole** [9] - 16:21, 16:23, 77:10, 98:22, 123:17, 151:17, 171:21, 177:6, 190:9
**wide** [1] - 78:13
**willing** [4] - 44:16, 46:19, 66:23, 160:21
**window** [18] - 19:20, 19:22, 23:24, 74:8, 74:12, 74:13, 74:20, 74:22, 107:5, 119:14, 119:16, 119:18, 120:8, 124:6, 125:3, 125:11, 202:6
**windows** [3] - 19:21, 24:1, 73:25
**winter** [1] - 191:20
**wireless** [1] - 74:21
**wise** [2] - 77:25, 78:1
**wish** [2] - 139:14, 215:3
**WITNESS** [7] - 115:17, 118:14, 214:8, 238:10, 238:14, 238:19, 238:21
**Witness** [36] - 2:2, 15:10, 20:7, 35:8, 42:24, 47:15, 55:18, 61:10, 64:15, 71:2, 74:18, 83:18, 91:11, 92:10, 99:7, 116:7, 119:9, 124:15, 134:19, 139:25, 150:16, 152:1, 157:6, 157:22, 173:16, 188:9, 193:19, 197:5, 200:1, 203:23, 206:10, 209:16, 213:24, 214:4, 218:4, 227:6
**witness** [5] - 3:3, 153:8, 239:3, 239:5
**witness's** [1] - 239:4
**witnessed** [1] - 84:19
**woke** [2] - 20:24, 111:11
**woman** [2] - 220:12, 221:18
**women's** [1] - 37:11
**word** [13] - 42:2, 77:15, 116:14, 142:25, 143:3, 148:5, 159:14, 169:11, 185:22, 212:5
**wording** [1] - 76:4
**words** [28] - 19:2, 22:23, 23:10, 66:11, 73:9, 82:18, 94:20, 98:3, 110:22, 113:10, 122:20, 128:20, 133:3, 133:4, 136:5, 154:10, 158:23, 158:25, 165:3, 168:20, 184:20, 186:4, 201:7, 201:24, 216:3, 222:20, 224:17, 225:4
**works** [1] - 68:8
**world** [2] - 162:23, 187:25
**worried** [2] - 30:14, 50:11
**worth** [1] - 80:11
**wreaths** [1] - 9:24
**Wright** [16] - 217:25, 218:24, 222:8, 226:19, 227:8, 227:20, 228:10, 228:13, 228:14, 228:20, 232:10, 232:16, 233:16, 233:22, 234:12, 235:11
**write** [3] - 41:15, 171:10, 236:22
**writing** [8] - 82:21, 130:11, 172:16, 172:25, 173:2, 173:3, 173:6, 200:8
**written** [4] - 28:11, 192:5, 211:17, 225:5
**wrote** [4] - 206:4, 221:9, 221:11, 224:4

---

## Y

**year** [14] - 8:17, 8:20, 9:8, 9:10, 9:25, 10:2, 13:1, 50:22, 52:19, 89:21, 148:21, 148:22, 162:6, 187:8
**year-round** [2] - 9:25, 10:2

**years** [4] - 50:3, 53:3, 113:24, 205:22

**yelled** [1] - 111:6

**yield** [1] - 184:10

**younger** [3] - 8:3, 34:24, 71:21

**yourself** [6] - 13:23, 14:18, 45:18, 92:8, 141:9, 155:11

**yourself"** [1] - 135:21

## Z

**Zachar** [7] - 150:18, 163:5, 163:20, 165:11, 165:23, 228:13, 228:20

**Zoloft** [2] - 97:3, 97:22

**Zoom** [7] - 66:20, 69:17, 70:1, 70:4, 160:7, 160:8

## Event Report

Event ID: **20-071618**    Call Ref #: 826              Date/Time Received: 09/06/20 06:40:58

| Rpt #: | | Call Source: PHONE | Prime 107E Unit: SCHROEDER, SAGE | Services Involved |
|---|---|---|---|---|

Services Involved: **LAW**

Location: **850-101 KIRKWOOD ST**

| X-ST: | *COX ST* | Jur: CAD    Service: LAW    Agency: DUPD |
|---|---|---|
| | *BLAKE ST* | St/Beat: 106    District:    RA: |

Business: BYRNE OAKS HALL LORAS      Phone: ( )  -                               GP: 106C

Nature: **LAW SUSPICIOUS/WANTED**    Alarm Lvl:    1   Priority:   3          Medical Priority: 129B03

Caller: SWISS, RACHEL                                        Alarm:

Addr: 1280 RUSH ST          Phone: (224) 548-2807          Alarm Type:

Vehicle #:          St:          Report Only: No          Race:          Sex:          Age:

Call Taker: MBENEVENTI                          Console: CAD5

Geo-Verified Addr.: Yes Nature Summary Code: SUSP Disposition: FI          Close Comments:

Notes: *See Event Notes Addendum at end of this report*

### Times

| | | | | |
|---|---|---|---|---|
| Call Received: | 09/06/20 06:40:58 | Time From Call Received | | |
| Call Routed: | 09/06/20 06:48:30 | 000:07:32 | Unit Reaction: 000:03:36 | *(1st Dispatch to 1st Arrive)* |
| Call Take Finished: | 09/06/20 06:48:30 | 000:07:32 | En-Route: 000:00:03 | *(1st Dispatch to 1st En-Route)* |
| 1st Dispatch: | 09/06/20 06:51:16 | 000:10:18 *(Time Held)* | On-Scene: 000:24:08 | *(1st Arrive to Last Clear)* |
| 1st En-Route: | 09/06/20 06:51:19 | 000:10:21 | | |
| 1st Arrive: | 09/06/20 06:54:52 | 000:13:54 *(Reaction Time)* | | |
| Last Clear: | 09/06/20 07:19:00 | 000:38:02 | | |

### Radio Log

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| 107E | *476* | D | Dispatched | 09/06/20 06:51:16 | Stat/Beat: 107 | | JROONE |
| 107E | *476* | E | En-Route | 09/06/20 06:51:19 | | | JROONE |
| 180A | *389* | D | Dispatched | 09/06/20 06:51:21 | Out Srv: [OOS] at FUEL | | JROONE |
| 180A | *389* | E | En-Route | 09/06/20 06:51:23 | | | JROONE |
| 107E | *476* | A | Arrived | 09/06/20 06:54:52 | | | Unit:107E |
| 180A | *389* | C | Cleared | 09/06/20 07:09:25 | | ASU | Unit:180A |
| 107E | *476* | C | Cleared | 09/06/20 07:19:00 | | FI | Unit:107E |

### Event Log

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|---|---|---|---|---|---|---|---|
| | | TR | Time Received | 09/06/20 06:40:58 | By: PHONE | | MBENEV |
| | | ENT | Entered Street | 09/06/20 06:41:13 | BURN OAK | | MBENEV |
| | | CHG | Changed Street | 09/06/20 06:41:25 | BURN OAK --> 1990 | | MBENEV |
| | | CHG | Changed Street | 09/06/20 06:42:08 | 1990 --> 1990 KIRKWOOD | | MBENEV |
| | | CHG | Changed Street | 09/06/20 06:42:43 | 1990 KIRKWOOD --> BRYNE OAK | | MBENEV |
| | | CHG | Changed Street | 09/06/20 06:42:47 | BRYNE OAK --> 1280 RUSH ST | | MBENEV |
| | | CHG | Changed Street | 09/06/20 06:43:08 | 1280 RUSH ST --> BRYNE | | MBENEV |
| | | CHG | Changed Street | 09/06/20 06:43:13 | BRYNE --> 850 KIRKWOOD ST | | MBENEV |

Case 2:22-cv-01019-LTS-KEM   Document 63-6   Filed 09/15/23   Page 322 of 331
APP 663

| Unit | Empl ID | Type | Description | Time Stamp | Comments | Close Code | User |
|------|---------|------|-------------|------------|----------|-----------|------|
| | | ENT | Entered | 09/06/20 06:43:35 | SWISS, RACHEL | | MBENEV |
| | | ENT | Entered CallerPhone | 09/06/20 06:46:05 | 2245482807 | | MBENEV |
| | | ENT | Entered Nature | 09/06/20 06:46:07 | POLICE DISPATCH - PRO QA | | MBENEV |
| | | LPS | Law Pri. Started | 09/06/20 06:46:07 | Case Started | | MBENEV |
| | | ENT | Entered | 09/06/20 06:46:19 | SWISS, RACHEL | | MBENEV |
| | | CHG | Changed Street | 09/06/20 06:46:40 | 850 KIRKWOOD ST --> 850-101 | | MBENEV |
| | | ENT | Entered Remarks | 09/06/20 06:48:14 | | | MBENEV |
| | | CHG | Changed Nature Code | 09/06/20 06:48:30 | PD-->LSUSB | | MBENEV |
| | | FIN | Finished Call Taking | 09/06/20 06:48:30 | | | MBENEV |
| | | ARM | Added Remarks | 09/06/20 06:48:30 | | | MBENEV |
| | | VEV | Viewed Event | 09/06/20 06:48:37 | User First Viewed Event CAD | | JROONE |
| | | VEV | Viewed Event | 09/06/20 06:50:43 | User First Viewed Event CAD | | LLUGRA |
| 107E | | NCIC QRY:Drivers | | 09/06/20 07:12:59 | UNIT:107E NAME=SWIFT, RACHAEL | | Unit:107E |
| 107E | | NCIC QRY:Drivers | | 09/06/20 07:13:27 | UNIT:107E NAME=SWIFT, RACHAEL | | Unit:107E |
| | | ARM | Added Remarks | 09/06/20 07:13:45 | | | Unit:107E |
| | | ARM | Added Remarks | 09/06/20 07:16:20 | | | Unit:107E |

## Event Notes Addendum

Notes:  42-Swift advised around 0415 hours she woke up and saw a silhouette she believed to be male opening the door to her bedroom. She advised she was not sure how long the subject was in the apartment before opening her door. She advised campus security checked the apartment prior to our arrival and did not locate the subject inside.

Swift advised she must have left the front door unlocked. She also advised nothing was taken, and wanted the incident documented.  [09/06/20 07:16:20 Unit:107E]



END  [09/06/20 07:13:45 Unit:107E]
[PROQA] Dispatch Code: 129B03 (PAST SUSPICIOUS circumstances)
Response: BRAVO.
Questions:
   -- Vict caller on scene.
   -- Susp unk.
   -- Suspicious because: see notes  [09/06/20 06:48:30 MBENEVENTI]
Woke up to a male subject standing in the doorway of bedroom holding door handle. Rolled back over and male subject was gone. Unknown discription of male subj. Loras campus security was notified.  [09/06/20 06:48:14 MBENEVENTI]

Case 2:22-cv-01019-LTS-KEM   Document 18-6   Filed 09/15/23   Page 323 of 331
APP 684

| | |
|---|---|
| **From:** | Arthur W. Sunleaf <Arthur.Sunleaf@loras.edu> |
| **Sent:** | Monday, September 7, 2020 6:35 AM |
| **To:** | ukchelsea@aol.com; Molly A. Burrows Schumacher (staff) |
| **Subject:** | RE: Rachael Swift incident and other matters |

Thank you for contacting us regarding the recent incident in Byrne Oaks. I was made aware of it over the weekend and appreciate your concerns. Due to the adjusted academic calendar for this year, the college is not observing Labor Day. Classes are being held and offices are open.

It is my understanding, Molly Burrows Schumacher, assistant dean of students, has made herself available. Additionally, I too will be in my office.

Best regards,

Dr. A.W. Sunleaf
Vice President for Student Development/Dean of Students
Loras College
Dubuque, IA 52001
#LorasTogether

**From:** ukchelsea@aol.com <ukchelsea@aol.com>
**Sent:** Sunday, September 6, 2020 8:46 PM
**To:** Arthur W. Sunleaf <Arthur.Sunleaf@loras.edu>; Molly A. Burrows Schumacher (staff)
<Molly.BurrowsSchumacher@loras.edu>
**Subject:** Rachael Swift incident and other matters

Good evening,
I believe Matt Pucci may have reached out to you today regarding my request for a meeting tomorrow, Monday the 7th.
We were informed to speak with Katie as you would not be on campus.
I understand tomorrow is Labor Day, yet we will be driving to campus from Chicago to help get some things resolved and ensure Rachael is safe.
What happened to Rachael is unacceptable and it is critical that we speak tomorrow either in person or on the phone. This needs to be a priority. Unfortunately as a result of the situation Rachael, nor myself can look at tomorrow as a holiday and we would appreciate a few minutes of your time.
Early afternoon would be ideal, yet we can make ourselves available any time during the day.
I look forward to your response.
Thank you,
Elaine Kostopoulos

LORAS 0146

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| RACHAEL SWIFT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 2:22-CV-01019-LTS-KEM |
| | ) | |
| vs. | ) | **ANSWER AND AFFIRMATIVE** |
| | ) | **DEFENSES TO PLAINTIFF'S** |
| LORAS COLLEGE, | ) | **COMPLAINT** |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW Defendant, Loras College ("Loras"), and, for its Answer and Affirmative Defenses to Plaintiff's Complaint, states as follows:

### Nature of the Case

1.      Loras admits that Plaintiff, Rachael Swift ("Swift") was enrolled at Loras College. Loras admits Swift reported to campus security the presence of an individual in her apartment and that campus security informed other persons and/or entities of the incident.  Loras denies the remaining allegations of Paragraph 1 of the Complaint.

### The Parties

2.      Loras admits the allegations of Paragraph 2 of the Complaint.

3.      Loras admits the allegations of Paragraph 3 of the Complaint.

4.      Loras admits the allegations of Paragraph 4 of the Complaint.

### Jurisdiction and Venue

5.      Paragraph 5 of Swift's Complaint states a legal conclusion to which no response is required but, if a response is required, Loras admits that jurisdiction for this cause of action is controlled by federal statute.

#3393559

6.      Paragraph 6 of Swift's Complaint states a legal conclusion to which no response is required but, if a response is required, Loras admits that venue for this cause of action is controlled by federal statute.

### Facts Giving Rise to Relief

7.      Loras admits the allegations of Paragraph 7 of the Complaint.

8.      Loras admits the allegations of Paragraph 8 of the Complaint.

9.      Loras admits that on September 6, 2020 Swift was alone and reported to campus security the presence of an individual in her apartment.  Loras admits Swift reported to campus security that she screamed, and that the individual exited the apartment. Loras denies the remaining allegations of Paragraph 9 of the Complaint.

10.     Loras denies for lack of information the allegations of Paragraph 10 of the Complaint.

11.     Loras admits Swift called Campus Security and made a report. Loras denies, for lack of information, the remaining allegations of Paragraph 11 of the Complaint.

12.     Loras admits that after being contacted, Officer Robert Rosenow of Campus Safety came to Swift's apartment to investigate the incident that is the subject of the Complaint.  Loras denies the remaining allegations of Paragraph 12 of the Complaint.

13.     Loras admits that Swift communicated with campus security on September 6, 2020.  Loras denies the remaining allegations of Paragraph 13 of the Complaint.

14.     Loras admits that on September 6, 2020 Molly Burrows-Schumacher was informed of the incident that is the subject of the Complaint. Loras denies the remaining allegations of Paragraph 14 of the Complaint.

15.     Loras admits that Molly Burrows-Schumacher and Art Sunleaf were informed of

the incident that is the subject of the Complaint and that a meeting was arranged to discuss the incident. Loras denies the remaining allegations of Paragraph 15 of the Complaint.

16.     Loras admits that Art Sunleaf met with Rachael Swift to discuss her concerns deriving from the incident. Loras denies the remaining allegations of Paragraph 16 of the Complaint.

17.     Loras admits that Katie Keleher-Garfoot met with Rachael Swift to discuss her concerns deriving from the incident. Loras denies the remaining allegations of Paragraph 17 of the Complaint.

18.     Loras admits that Swift left Loras' campus and returned home. Loras denies the remaining allegations of Paragraph 18 of the Complaint.

19.     For its answer to Paragraph 19 of the Complaint, Loras states that the language of its Title IX Administrative Policy and Procedures speaks for itself; any attempt to characterize it is denied.

20.     Loras admits that Swift submitted an online incident report. Loras admits that, in the report, Swift requested Loras provide additional safety measures. Loras admits that, in the report, Swift alleged Loras ignored her requests to protect her safety. Loras admits that, in the report, Swift alleged she was discriminated against as a female student. Loras admits that, in the report, Swift claimed she was subjected to a sexual assault. Loras denies the remaining allegations of Paragraph 20 of the Complaint.

21.     Loras admits that it agreed to investigate the incident. Loras denies the remaining allegations of Paragraph 21 of the Complaint.

22.     Loras admits that on or about September 11, 2020, Swift and her mother had a conversation with Loras' President, Jim Collins, about the incident, the investigation of the

incident, and Swift's concerns pertaining to safety.  Loras denies the remaining allegations of Paragraph 22 of the Complaint.

23.     Loras denies the allegations of Paragraph 23 of the Complaint.

24.     Loras admits that, after the incident involving Swift, other female students reported that an individual or individuals entered their apartments without permission. Loras denies the remaining allegations of Paragraph 24 of the Complaint.

25.     Loras admits that, after the incident involving Swift, other female students reported that an individual or individuals entered their apartments without permission. Loras denies the remaining allegations of Paragraph 24 of the Complaint.

26.     Loras denies the allegations of Paragraph 26 of the Complaint.

27.     Loras admits that a group of students living in another apartment installed a camera in the apartment's kitchen and the camera captured the presence of an uninvited individual.  Loras denies the remaining allegations of Paragraph 27 of the Complaint.

28.     Loras denies the allegations of Paragraph 28 of the Complaint.

29.     Loras admits that Swift expressed a desire to amend her Title IX complaint to add the individual alleged to have entered her apartment without permission. Loras denies the remaining allegations of Paragraph 29 of the Complaint.

30.     For its answer to the first sentence of Paragraph 30 of the Complaint, Loras states that the language of its Title IX Administrative Policy and Procedures speaks for itself; any attempt to characterize it is denied.  Loras denies the allegations contained in the second sentence of Paragraph 30 of the Complaint.

31.     Loras denies the allegations of Paragraph 31 of the Complaint.

32.     Loras denies the allegations of Paragraph 32 of the Complaint.

33.     Loras denies the allegations of Paragraph 33 of the Complaint.

34.     Loras denies the allegations of Paragraph 34 of the Complaint.

35.     Loras denies the allegations of Paragraph 35 of the Complaint.

36.     Loras admits that Swift elected not to live on campus for certain periods of time while still enrolled as a Loras student. Loras denies the remaining allegations of Paragraph 36 of the Complaint.

37.     Loras denies the allegations of Paragraph 37 of the Complaint.

38.     Loras admits that Swift filed a complaint with the United States Department of Education's Office of Civil Rights. Loras denies the remaining allegations of Paragraph 38 of the Complaint.

## Count I
### (Discrimination in violation of Title IX of the Education Amendments of 1972)

39.     Loras re-alleges its answers to allegations of Paragraphs 1-38 of Plaintiff's Complaint as if fully set forth herein.

40.     Loras denies the allegations of Paragraph 40 of the Complaint.

41.     For its answer to of Paragraph 41 of the Complaint, Loras denies Swift made allegations of sexual misconduct when first reporting the incident and affirmatively states such allegations only appeared later in connection with Swift's recitation of the incident.

42.     Loras denies the allegations of Paragraph 42 of the Complaint.

43.     Loras denies the allegations of Paragraph 43 of the Complaint.

44.     Loras denies the allegations of Paragraph 44 of the Complaint.

45.     Loras denies the allegations of Paragraph 45 of the Complaint.

WHEREFORE, Defendant, Loras College, prays that Plaintiff's Complaint be dismissed at Plaintiff's costs.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

The Complaint, in whole or in part, fails to state a cause of action upon which relief can be granted.

### Second Affirmative Defense

Swift failed to mitigate her alleged damages adequately and properly.

### Third Affirmative Defense

Pursuant to the United States Supreme Court decision in <u>Cummings v. Premier Rehab Keller, PLLC</u>, (142 S. Ct. 1562) "emotional distress" damages are precluded under Title IX.

### Fourth Affirmative Defense

If Swift sustained injuries and incurred any expenses as claimed, they were caused, in whole or in part, by the acts or omissions of others for whose intervening conduct or negligence Loras is not responsible.

### Fifth Affirmative Defense

Injury to Swift was not foreseeable as a matter of law.

### Sixth Affirmative Defense

Any claims for attorney fees are inappropriate and unjustified as a matter of law.

*/s/ **Christopher P. Jannes***
Christopher P. Jannes
Katie E. Gral
DENTONS DAVIS BROWN PC
The Davis Brown Tower
215 10th Street, Suite 1300
Des Moines, IA  50309-3993
Telephone:  515/288-2500
Email:  Chris.Jannes@dentons.com
Email:  Katie.Gral@dentons.com

ATTORNEYS FOR DEFENDANT, LORAS
COLLEGE

ORIGINAL FILED

COPY TO:

Rachael Swift
1338 N. Chicago Ave.
Arlington Hts, IL  60004
Phone: 224-548-2807
Email: rachael.swifty04@gmail.com

PLAINTIFF PRO SE

| PROOF OF SERVICE | |
| --- | --- |

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses disclosed on the pleadings on November 14, 2022 by:

___ U.S. Mail          ___ FAX
___ Hand Delivered     ___ Overnight Courier
___ Federal Express    _X_ ECF Filing

Signature: /s/ *Christopher P. Jannes*